**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Board of Regents, The University of Texas System, and 3D Systems, Inc. | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No.  A03 CA 113SS |
| EOS GmbH Electro Optical Systems, | § § | |
| Defendant. | § § § | |

**PLAINTIFFS' MOTION TO DISMISS THE ANTITRUST COUNTERCLAIMS
(COUNTS V AND VI) FOR FAILURE TO STATE A CLAIM UPON
WHICH RELIEF CAN BE GRANTED PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Plaintiffs Board of Regents, the University of Texas System ("U.T."), and 3D Systems,

Inc. ("3D Systems"), hereby respectfully request that the Court dismiss the antitrust claims

asserted by defendant EOS GmbH Electro Optical Systems ("EOS"), pursuant to Federal Rule of

Civil Procedure 12(b)(6).  Plaintiffs also respectfully request a hearing on this motion.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................................... 2

III.  ARGUMENT ............................................................................................................. 6

    A.    COUNTERCLAIM V SHOULD BE DISMISSED AS A MATTER OF
        LAW ............................................................................................................... 7

        1.    Count V Must Be Dismissed Because EOS Has Failed to Plead a
               Relevant Antitrust Market.......................................................................... 7

        2.    Count V Must Be Dismissed Because EOS Has Failed to Plead
               Antitrust Injury to EOS and the Requisite Anticompetitive Effects........ 10

        3.    Count V Also Fails to State a Claim Against 3D Systems Under
               Section 2 of the Sherman Act. ................................................................. 14

        4.    Count V Fails to State a Claim Against U.T. Under Any Provision
               of the Federal Antitrust Laws ................................................................... 16

        5.    Count V Should Fail Because Of Laches ................................................. 18

    B.    COUNTERCLAIM VI SHOULD BE DISMISSED AS A MATTER OF
        LAW ............................................................................................................. 19

        1.    The Noerr-Pennington Doctrine, Which Provides Absolute
               Immunity to Antitrust Actions, Bars Count VI........................................ 20

        2.    The Exception to the Noerr-Pennington Doctrine Does Not Apply
               Because EOS Does Not and Cannot Allege Sufficient Facts to
               Meet The Exception.................................................................................. 20

IV.   CONCLUSION......................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

### Cases

*Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n,*
  64 F. Supp. 2d 1097 (D. Kan. 1999) ................................................................. 8

*Alberta Gas Chemicals Ltd. v. E.I. DuPont de Nemours and Co.,*
  826 F.2d 1235 (3rd Cir. 1987) ...................................................................... 10

*Anago, Inc. v. Tecnol Medical Products, Inc.,*
  976 F.2d 248 (5th Cir. 1992) ........................................................................ 10

*Ansell Inc. v. Schmid Laboratories, Inc.,*
  757 F. Supp. 467 (D. N.J. 1991) ................................................................... 11

*Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.,*
  116 F. Supp. 2d 1159 (C.D. Cal. 2000) ......................................................... 18

*Apani Southwest Inc. v. Coca-Cola Enterprises,*
  300 F.3d 620 (5th Cir. 2002) .......................................................... 7, 8, 9, 13

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*
  459 U.S. 519 n.17 (1983) .............................................................................. 1

*Bayou Bottling, Inc. v. Dr. Pepper Co.,*
  725 F.2d 300 (5th Cir. 1984) .................................................................. 14, 20

*Brass v. American Film Technologies, Inc.,*
  987 F.2d 142 (2d Cir. 1993) .......................................................................... 6

*Broyles v. Wilson,*
  812 F. Supp. 651 (M.D. La. 1993), *aff'd without op.*, 3 F.3d 439 (5th Cir. 1993) .................. 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ............................................................................... 10, 11

*C.R. Bard, Inc. v. M3 Systems, Inc.,*
  157 F.3d 1340 (Fed. Cir. 1998) ................................................................... 23

*California v. American Stores Co.,*
  495 U.S. 271 (1990) ..................................................................................... 18

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
  479 U.S. 104 (1986) ......................................................................... 10, 11, 13

*Chandler v. O'Bryan,*
  311 F. Supp. 1121 (D.C. Okla. 1969) ............................................................. 3

*City of Columbia v. Omni Outdoor Advertising, Inc.,*
  499 U.S. 365 (1991) ..................................................................................... 14

*Commercial Data Servers, Inc. v. Int'l Business Machines Corp.,*
  166 F. Supp. 2d 891 (S.D.N.Y. 2001) ............................................................ 8

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Cortec Indus., Inc. v. Sum Holding L.P.,*
  949 F.2d 42 (2d Cir. 1991) ........................................................................... 6

*Duhart v. Carlson,*
  469 F.2d 471 (10th Cir. 1972) .................................................................... 3

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
  365 U.S. 127 (1961) ................................................................................... 20

*Electronics Comm. Corp. v. Toshiba Am. Consumer Prods., Inc.,*
  129 F.3d 240 (2d Cir. 1997) ...................................................................... 12

*Elliott v. Foufas,*
  867 F.2d 877 (5th Cir. 1989) ....................................................................... 6

*Estate Constr. Co. v. Miller & Smith Holding Co.,*
  14 F.3d 213 (4th Cir. 1994) ....................................................................... 17

*Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.,*
  789 F. Supp. 760 (S.D. Miss. 1992), aff'd, 986 F.2d 1418 (5th Cir. 1993) .............. 6, 15, 16, 17

*Gianna Enters. v. Miss World (Jersey) Ltd.,*
  551 F. Supp. 1348 (S.D.N.Y. 1982) .......................................................... 8, 9

*Glass Equip. Dev., Inc. v. Besten, Inc.,*
  174 F.3d 1337 (Fed. Cir. 1999) ................................................................. 24

*Hack v. President and Fellows of Yale College,*
  6 F. Supp. 2d 183 (D. Conn. 1998) .............................................................. 8

*Handgards, Inc. v. Ethicon, Inc.,*
  601 F.2d 986 (9th Cir. 1979) ..................................................................... 24

*Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co., Inc.,*
  964 F. Supp. 624 (D.Conn. 1997) ....................................................... 21, 22, 23

*Heart Disease Research Foundation v. General Motors Corp.,*
  463 F.2d 98 (2d Cir. 1972) ........................................................................ 16

*Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.,*
  21 F.3d 1068 (Fed. Cir. 1994) ................................................................... 24

*Hittman Nuclear & Dev. Corp. v. ChemNuclear Sys.,*
  1980-1 Trade Cas. (CCH) ¶ 63,140 at 77,682 (D. Md. 1979) ....................... 9

*In re Netsolve, Inc. Securities Litigation,*
  185 F. Supp. 2d 684 (W.D. Tex. 2001) ........................................................ 6

## TABLE OF AUTHORITIES
### (continued)

Page

*JM Computer Servs., Inc. v. Schlumberger Technologies, Inc.,*
    1996 WL 241607 at *5 (N.D. Cal. 1996) .................................................................. 9

*Kalmanovitz v. G. Heileman Brewing Co.,*
    595 F. Supp. 1385 (D. Del. 1984), *aff'd,* 769 F.2d 152 (3d Cir. 1985)..................... 14

*Larry R. George Sales Co. v. Cool Attic Corp.,*
    587 F.2d 266 (5th Cir. 1979) .................................................................................... 17

*Leonard F. v. Israel Discount* Bank,
    199 F.3d 99 (2d Cir. 1999 .......................................................................................... 6

*Lombard's Inc. v. Prince Mfg. Inc.,*
    753 F.2d 974 (11th Cir. 1985) .................................................................................... 6

*Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.,*
    605 F.2d 1169 (10th Cir. 1979) .................................................................................. 3

*Mathias v. Daily News, L.P.*
    152 F. Supp. 2d 465 (S.D.N.Y. 2001) ...................................................................... 17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986).............................................................................................. 11, 12

*Medtronic, Inc. v. Daig Corp.,*
    789 F.2d 903 (Fed. Cir. 1986) .................................................................................. 24

*Miree v. DeKalb County, Ga.,*
    433 U.S. 25 n.2 (1977).............................................................................................. 6

*Muenster Butane, Inc. v. Stewart Co.,*
    651 F.2d 292 (5th Cir. 1981) .................................................................................... 12

*North Jersey Secretarial School v. McKiernan,*
    713 F. Supp. 577 (S.D.N.Y. 1989) ............................................................................ 9

*Pearl Brewing Co. v. Miller Brewing Co.,*
    1993 U.S. Dist. LEXIS 16844, *4 1993-2 Trade Cases ¶ 70,370 (W.D. Tex. 1993) ......... 10, 13

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,*
    836 F.2d 173 (3rd Cir. 1988) .................................................................................... 17

*Phototron Corp. v. Eastman Kodak Co.,*
    842 F.2d 95 (5th Cir. 1988) ........................................................................ 10, 11, 12, 13

*Pittsburgh v. West Penn Power Co.,*
    147 F.3d 256 (3d Cir. 1998) ...................................................................................... 6

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. ("PRE")*,
    508 U.S. 49 (1993)................................................................................................................ 20, 21, 24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3rd Cir. 1997) ........................................................................................................ 7, 8

*Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*,
    533 F.2d 510 (10th Cir. 1976) ........................................................................................................... 3

*Remington Prods. Inc. v. North American Philips Corp.*,
    755 F. Supp. 52 (D. Conn. 1991) ................................................................................................... 13

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
    802 F. Supp. 1544 (S.D. Tex. 1991) ............................................................................................. 23

*Spectrum Sports Inc. v. McQuillan*,
    506 U.S. 447 (1993).......................................................................................................................... 15

*Stearns Airport Equipment Co., Inc. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) .......................................................................................................... 14

*Sugar Busters, L.L.C. v. Brennan*,
    1999 WL 109564, (E.D. La. 1999) ................................................................................................ 22

*Taylor Publishing Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) .......................................................................................................... 15

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................................................................. 9

*Tuchman v. DSC Communications Corp.*,
    14 F.3d 1061 (5th Cir. 1994) ............................................................................................................ 6

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965)......................................................................................................................... 20

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)......................................................................................................... 14

*United States v. Sungard Data Systems, Inc.*,
    172 F. Supp. 2d 172 (D.D.C. 2001)................................................................................................ 8

*Virtue v. Creamery Package Mfg. Co.*,
    227 U.S. 8 (1913).............................................................................................................................. 24

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
    796 F.2d 1216 (10th Cir. 1986) ....................................................................................................... 9

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Statutes**

15 U.S.C. § 18 ............................................................................................................................ 16

35 U.S.C. § 282 .......................................................................................................................... 23

Clayton Act, Section 7 ......................................................................................................... 7, 8, 16

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 6, 17, 24

Sherman Act, Section 1 ........................................................................................................ 7, 16, 17

Sherman Act, Section 2 ................................................................................. 1, 5, 7, 9, 14, 16, 19, 22

Tunney Act, 15 U.S.C. § 16(b)-(h) ................................................................................................ 3

# I.
# INTRODUCTION

Neither Count V nor Count VI of EOS's Counterclaims states a claim as a matter of law. Each contains critical gaps—numerous elements that must be satisfied to plead, much less to establish, antitrust liability. Instead, the Counterclaims impermissibly rely on conclusory allegations regarding loss of competition and exclusion rather than the well-pleaded factual allegations that courts require in order to allow antitrust claims to proceed to the very costly discovery phase.[1]

Count V is little more than a collateral attack on a merger agreement between DTM Corporation and 3D Systems that was approved by the United States Department of Justice Antitrust Division and the United States District Court for the District of Columbia. The allegations of Count V are defective because of the inadequacy of the alleged conspiracy claim against U.T., including the lack of a legally-sufficient pleading of a relevant market and the failure to show that EOS incurred "antitrust injury," and also because of the lack of factual allegations regarding the effects of the various practices challenged by EOS. Count VI, which asserts that institution of this lawsuit violates Section 2 of the Sherman Act, is deficient because of the immunity that protects litigants from antitrust suits arising out of their First Amendment activities.

In short, plaintiffs respectfully contend that the Court should dismiss Counts V and VI. In the event the Court is inclined to allow either of the claims to remain, U.T. and 3D Systems urge the Court to bifurcate the antitrust claims and to stay all discovery concerning those claims

---

[1] *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983) ("Certainly in a case of this magnitude, a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

because resolution of the patent claims undoubtedly will affect, if not render moot, the two antitrust claims. The practice of sequencing the patent claims in advance of the antitrust claims has become standard procedure in most courts, as reflected in the cases that plaintiffs cite in their concurrently-filed motion to bifurcate and stay the antitrust claims, which is incorporated by reference.

## II.
## STATEMENT OF FACTS

Plaintiffs' complaint alleges two patent infringement claims against defendant EOS for willful infringement of United States Patent Nos. 5,597,589 and 5,569,070. (*See* Complaint, ¶ 7-18.) In response, EOS alleges eight counterclaims, six of which relate to the two patents in the underlying complaint. Count I is a claim for breach by 3D Systems of a "Settlement Agreement" and "License Agreement" that were entered into in 1997 and allegedly concern the patents. (Counterclaims, ¶¶ 6-13.) Count II is a claim for "legal and equitable estoppel" against 3D Systems based on alleged representations by 3D Systems relating to the "Settlement Agreement" and "License Agreement." (*Id.*, ¶¶ 14-22.) Count III is a claim for "Specific Performance" against 3D Systems, again based on the "Settlement Agreement" and "License Agreement." (*Id.*, ¶¶ 23-25.) Count IV alleges a breach of fiduciary duty claim against 3D Systems, again based on the alleged license relationship between EOS and 3D Systems. (*Id.*, ¶¶ 26-28.) Count VII is a claim for "Declaratory Judgment of Invalidity" of the patents." (*Id.*, ¶¶ 56-58.) And Count VIII is a claim for "Declaratory Judgment of Non-Infringement" of the patents. (*Id.*, ¶¶ 59-61.)

The antitrust claims in Counts V and VI, by contrast, raise a host of legal and factual issues far beyond those raised in the other counterclaims, in the complaint or in the answer. Count V avers that the merger of 3D Systems with DTM is illegal under the antitrust laws because of its effect on competition in "Laser RP Systems" and "Industrial RP Systems."

(Counterclaims, ¶¶ 31-40.) EOS alleges that the 3D Systems-DTM merger closed on August 31, 2001, over eighteen months before the counterclaims were brought. (*Id.*, ¶ 4.) Count V also alleges that the 3D Systems-DTM merger was challenged by the United States Department of Justice on June 6, 2001, and that the challenge was settled by the Department on terms that required 3D Systems to license the right to market Laser RP Systems in the United States to another company. (*Id.*, ¶¶ 41-42-e.) In addition, EOS alleges that 3D Systems purposely did not select a licensee that would be an effective competitor, and the company 3D Systems did select has not sold any Laser RP System equipment in the United States. (*Id.*, ¶ 42-e(1)-(2).)

The Department of Justice lawsuit involving the 3D Systems-DTM merger was filed in the United States District Court for the District of Columbia. As pleadings from another court and documents from the Federal Register, this Court may, in connection with this motion, consider these facts based on public records.[2] The settlement ("Consent Decree") in that case was filed with the court on August 16, 2001. (Exhibit A.[3]) Along with the Consent Decree, the parties filed a Stipulation and Order that, when signed, allowed 3D Systems and DTM to close their transaction. (Exhibit B.) The court signed that order on August 16, 2001, and the 3D Systems-DTM merger was consummated on August 31, 2001.

The Consent Decree was, under the Tunney Act, 15 U.S.C. § 16(b)-(h), subject to public comment before it could be approved by the District Court. EOS filed a public comment dated

---

[2] As explained more fully in the concurrently-filed Request For Judicial Notice, judicial notice can be taken of pleadings filed in another United States District Court and documents printed in the Federal Register. FED. EVID. R. 201 ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"). *See Chandler v. O'Bryan*, 311 F. Supp. 1121 (D.C. Okla. 1969); *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510 (10th Cir. 1976); *Duhart v. Carlson*, 469 F.2d 471 (10th Cir. 1972).

November 21, 2001, that was published in the Federal Register on March 12, 2002, along with the Department of Justice's reply. (Exhibit C.)

On March 13, 2002, EOS also filed a petition to intervene as a party in the Tunney Act proceedings. The District Court denied EOS's petition on April 16, 2002. (Exhibit D.) EOS did not appeal that order.

The Consent Decree was approved by the District Court and was formally entered on May 1, 2002. The District Court did not require any changes in the original language of the decree that had been filed on August 16, 2001, before the public comment period.

Under the Consent Decree, 3D Systems was required to grant a license under certain patents to a company that was a current manufacturer of what the decree referred to as "RP Industrial Equipment," which licensee "shall by approved by [the United States] in its sole discretion." (Exhibit A, Section IV(C).) The decree also required 3D Systems to provide specified additional licenses (Section IV(B)) and sublicenses (Section IV(E)), and agree not to assert certain specified claims against the licensee approved by the Department of Justice (Section IV(G)). Section IV(N) of the Consent Decree set forth the standards for the exercise of the Department's exercise of its "sole discretion" in approving the licensee for the patents and other rights described above, such that the "Acquirer that, in the United States' sole judgment, has the intent and capability ... of competing effectively in the business of servicing and selling RP Industrial Equipment in the United States." (Section IV(N)(1).) After the Consent Decree was approved by the District Court on May 1, 2002, the Department of Justice approved Sony Corporation as the licensee by letter dated July 9, 2002.

---

[3] All exhibits are attached to the concurrently-filed Declaration of Elizabeth Brown Fore.

In addition to attacking the 3D Systems-DTM merger in Count V, EOS alleges that U.T. and 3D Systems have committed a variety of "acts ... with the intent of excluding competition" that include the conduct alleged in paragraphs 42 and 43 of the counterclaim, including the fact that U.T. and 3D Systems have brought this suit and caused EOS to retain counsel. (Counterclaims, ¶¶ 42-43.)

Although the thrust of Count V is that EOS has been unable to compete, EOS admits that it "has planned to enter the United States" since approximately 1997 and is now "participating in the U.S. Industrial RP Systems market through sales of powder used in RP machines . . . and has now begun selling Laser RP Systems in the U.S." (*Id.*, ¶ 44.) EOS goes on to claim that, as the result of plaintiffs' conduct, "customers have paid higher prices for Laser RP Systems, Industrial RP Systems, related materials and supplies, and services" (*Id.*, ¶ 46), and that EOS has lost "substantial profits." (*Id.*, ¶ 47.)

Count VI alleges a violation of Section 2 of the Sherman Act (the anti-monopolization statute). EOS makes the bare assertion that 3D Systems has "knowingly [made] wrongful assertions of [patent] infringement that are objectively baseless" with the intent of restricting competition in the U.S. These claims of patent infringement, EOS alleges, constitute actual and attempted monopolization. (*Id.*, ¶ 52.) With virtually no explanation, other than a reference to the status of certain patents *outside* of the United States, EOS alleges that this lawsuit was brought in "bad faith," is based on "knowingly invalid patent claims," and is intended to illegally exclude competition. (*Id.*, ¶ 54.) EOS claims that it has been irreparably injured and damaged, "including by being forced to defend against the claims of infringement." (*Id.*, ¶ 55.)

### III.
### ARGUMENT

The standard for a Rule 12(b)(6) motion is that the Court "'will accept as true the well-pleaded factual allegations of the ... complaint and any reasonable inferences to be drawn from them,'" but "will 'not accept as true conclusory allegations or unwarranted deductions of fact.'" *In re Netsolve, Inc. Securities Litigation*, 185 F. Supp. 2d 684, 692 (W.D. Tex. 2001) (Sparks, J.) (citation omitted) (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)); *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n.2 (1977) (a court will accept well-pleaded allegations as true for the purposes of the motion, but it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation). *See also Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989) ("In order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not conclusory allegations ..."). As stated in *Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 771-72 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993), "enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified." *Id.* (quoting *Lombard's Inc. v. Prince Mfg. Inc.*, 753 F.2d 974, 975 (11th Cir. 1985)).

In deciding the motion, the Court may consider documents referenced in the complaint and documents that are in the antitrust plaintiff's possession or that it knew of and relied on in bringing suit. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991). The Court may also consider "matters of which judicial notice may be taken." *Leonard F. v. Israel Discount* Bank, 199 F.3d 99, 107 (2d Cir. 1999); *Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998).

## A.    COUNTERCLAIM V SHOULD BE DISMISSED AS A MATTER OF LAW.

Count V of the Counterclaims alleges antitrust violations against plaintiffs mostly arising

from 3D Systems' acquisition of DTM in 2001.  This merger, as the Counterclaims note, was not

halted by the Justice Department, but in fact was cleared subject to the Consent Decree that

required 3D Systems to grant a license to a company for the rights to market "Laser RP Systems

in the United States."  (Counterclaims, ¶ 42; Exhibit A.)  While Sections 1 and 2 of the Sherman

Act and Section 7 of the Clayton Act have different elements and therefore require different

factual allegations, each requires (i) a properly plead relevant market; and (ii) allegations of

antitrust injury and anticompetitive effects.  EOS has failed to include these basic elements in

Count V, and the claim should be dismissed.

### 1.    Count V Must Be Dismissed Because EOS Has Failed to Plead a Relevant Antitrust Market.

Count V (as well as Count VI) must be dismissed because EOS does not adequately plead

the existence of a relevant market.  Sufficient pleading of a relevant product and geographic

market is indispensable under Section 2 of the Sherman Act, which proscribes monopolization

and attempted monopolization, under Section 7 of the Clayton Act, which bars mergers or

acquisitions that tend to substantially lessen competition in a line of commerce, as well as in a

Section 1 rule of reason case.  *See Apani Southwest Inc. v. Coca-Cola Enterprises*, 300 F.3d 620,

628 (5th Cir. 2002) (plaintiff has burden to plead relevant market in a Section 1 rule of reason

case);[4] *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir. 1997)

("Plaintiffs have the burden of defining the relevant market" in a Section 2 case); *United States v.*

---

[4] To the extent EOS seeks to assert a claim under Section 1, it is clearly a "rule of reason" rather than a "per se" claim.

*Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172, 180-81 (D.D.C. 2001) (in Section 7 case, plaintiff must establish a relevant product and geographic market).

To sufficiently plead a relevant market, a party must allege *facts* that indicate that the products or services constituting the relevant market must satisfy the "interchangeability" or "substitutability" principle. *Apani Southwest, Inc.,* 300 F.3d at 625 ("the relevant product market must be identified by considering interchangeability and cross-elasticity of demand").[5]

Numerous cases in the Fifth Circuit and elsewhere have dismissed antitrust cases for failure to allege a relevant market. *Apani Southwest, Inc,* 300 F.3d at 633 (affirming order granting motion to dismiss because market definition was "insufficient as a matter of law"); *Queen City Pizza, Inc.*, 124 F.3d at 441 ("we agree with district court that plaintiffs have not pleaded a valid relevant market"); *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982).

In Count V (as well as Count VI), EOS alleges two relevant markets. The first is "Laser RP Systems" allegedly consisting of "rapid prototyping...systems and related equipment based upon laser technology." (Counterclaims, ¶ 30.) This pleading is legally insufficient as no facts

---

[5] *See also Queen City Pizza*, 124 F.3d at 436; *Commercial Data Servers, Inc. v. Int'l Business Machines Corp.*, 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001) ("Because a relevant market includes all products which are reasonably interchangeable, a plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal") (citation omitted); *Hack v. President and Fellows of Yale College*, 16 F. Supp. 2d 183, 197 (D. Conn. 1998) (dismissing complaint for failing to "allege all reasonably interchangeable substitutes in the relevant market"); *Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 64 F. Supp. 2d 1097, 1103-04 (D. Kan. 1999) (granting judgment on the pleadings for failure to define relevant market in terms of interchangeability and cross-elasticity of demand).

are alleged that these products do not have competitive substitutes.[6]  Instead, EOS offers only an

abstract description of a product and no facts indicating why, for example, non-laser technology

equipment that may be used for prototyping are not substitutes.  Therefore, this first market

definition proffered by EOS must fail.  *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)

(where the complaint exhibits a "failure even to attempt a plausible explanation as to why a

market should be limited in a particular way ... dismissal on the pleadings is appropriate"); *Apani*

*Southwest, Inc.*, 300 F.3d at 633.

The second alleged market is for "Industrial RP Systems," which "include[s] but is not

limited to Laser RP Systems, proprietary materials used in Laser RP Systems, and associated

services for Laser RP Systems, in the United States."  (Counterclaims, ¶ 31.)  On its face, this

market is not "plausible" in antitrust terms, *see Todd*, 275 F.3d at 200, because there is no

allegation that the equipment, materials and services are substitutes or interchangeable for each

other and no explanation "for lumping equipment, materials, and services together in a single

market."  *North Jersey Secretarial School v. McKiernan*, 713 F. Supp. 577, 583 (S.D.N.Y. 1989)

(dismissing pleading for failure to allege plausible relevant market); *Westman Comm'n Co. v.*

*Hobart Int'l, Inc.*, 796 F.2d 1216, 1221-22 (10th Cir. 1986) (rejecting the "cluster or package"

approach to "one-stop" distributor offering a package of restaurant equipment because

competition in that industry did not occur at the "full-line-of-services" level); *Hittman Nuclear &*

*Dev. Corp. v. ChemNuclear Sys.*, 1980-1 Trade Cas. (CCH) ¶ 63,140 at 77,682 (D. Md. 1979)

---

[6] As held in *Gianna*, to survive a dismissal motion on the relevant market issue, an
alleged product market must bear a "rational relation to the methodology courts prescribe to
define a market for antitrust purposes--analysis of the interchangeability of use or the cross-
elasticity of demand ..." *Id.* at 1354.  *See also Apani Southwest, Inc.*, 300 F.3d at 626; *Queen
City Pizza, Inc.*, 124 F.3d at 436-37; *JM Computer Servs., Inc. v. Schlumberger Technologies,
Inc.*, 1996 WL 241607 at *5 (N.D. Cal. 1996) (dismissing Section 2 claim on the pleadings
because "Plaintiff's market allegations are largely conclusory, parroting the legal rules in the area
of antitrust law without setting forth any facts from Plaintiff's circumstances to support the
market definition").

(rejecting argument that relevant market is cluster of services provided to nuclear industry for "radioactive waste"). In short, the relevant market allegations are insufficient, and this defect mandates dismissal of the antitrust counterclaims.

### 2. Count V Must Be Dismissed Because EOS Has Failed to Plead Antitrust Injury to EOS and the Requisite Anticompetitive Effects.

A critical element of any private action attacking a merger and its consequences is that the plaintiff must properly allege that it has suffered "antitrust injury" – namely, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 99 (5th Cir. 1988) (denying claim for injunctive relief asserted by a competitor of two other competitors who were merging) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). For a private plaintiff such as EOS to challenge a merger, it is not sufficient to allege that the merger itself be illegal. Rather, the plaintiff must make a threshold showing that the merger has actually caused *antitrust injury* to the plaintiff. Numerous private challenges to mergers have foundered on this requirement. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 115-16 (1986); *Phototron*, 842 F.2d at 100 ("the notion that merely facing the specter of a monopoly is enough to create standing in a competitor is not the law"); *Anago, Inc. v. Tecnol Medical Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) (denying relief to target of merger and noting that this "Circuit has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition"); *Pearl Brewing Co. v. Miller Brewing Co.*, 1993 U.S. Dist. LEXIS 16844, *4 1993-2 Trade Cases ¶ 70,370 (W.D. Tex. 1993) (denying relief to competitor challenging merger of two other competitors for failure to show antitrust injury).[7]

---

[7] *See also Alberta Gas Chemicals Ltd. v. E.I. DuPont de Nemours and Co.*, 826 F.2d 1235 (3rd Cir. 1987) (denying relief to competitor challenging competitor's acquisition of another corporation because "plaintiff has not presented evidence of antitrust injury"); *Ansell Inc.*

Thus, it is critical to focus on the claimed effects of the merger, whether the effects impact the competitor, and whether the effects have resulted in antitrust injury.  The fact that the competitor may lose profits as a result of the merger that it might have gained absent the merger is *not* antitrust injury, as cases such as *Brunswick*, *Cargill* and *Phototron* make clear because "the loss of profits to competitors" due to a merger is "not of concern under the antitrust laws, since it result[s] only from continued competition."  *Cargill*, 479 U.S. at 115 (citing *Brunswick*, 429 U.S. at 488).  Instead, the focus must be on anticompetitive acts caused by the merger and whether they inflict antitrust injury on the plaintiff.  This requires a careful review of what acts and outcomes the plaintiff alleges are directly caused by the merger.  *Phototron*, 842 F.2d at 100-02.

The Counterclaims allege basically six "effects," none of which satisfies even the minimum pleading requirements for antitrust injury to EOS.  *First*, EOS alleges that as a result of the merger and the post-merger conduct, "customers have paid higher prices for Laser RP Systems, Industrial RP systems, related material and supplies, and services."  (Counterclaims, ¶ 42.)  This cannot constitute an antitrust injury to EOS, which is not alleged to be a "customer" for any of these items that has been forced to pay higher prices.  As an alleged competitor (*see id.*, ¶ 44), EOS cannot be harmed by "higher prices" because, as the Supreme Court has stated, such prices "could not injure ... competitors" because they "stand to gain" from any "raise[d] ... market price" in the products in question.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986).

*Second*, EOS alleges that 3D Systems' unlawful conduct includes its "agreements with manufacturers" of "materials," needed for Laser RP or Industrial RP Systems, that give 3D

---

(continued...)

*v. Schmid Laboratories, Inc.*, 757 F. Supp. 467, 485 (D. N.J. 1991) (holding that manufacturer failed to make required showing of threatened antitrust injury and, therefore, lacked standing to seek divestiture of competitor's acquisition of another company).

Systems "exclusive distribution rights" in the United States. (*Id.*, ¶ 42-a.) There is no allegation

that the "agreements" resulted from the DTM merger, but, even more importantly, no allegation

that these unspecified "agreements" prevented EOS's access to materials needed to compete. In

fact, the Counterclaims contend that EOS has its own independent materials business in the U.S.

(*Id.*, ¶ 44.) Nor does EOS allege that the "agreements" at issue gave or even could give 3D

Systems market or monopoly power with respect to "materials" or caused any anti-competitive

result. Without a showing of anticompetitive effects, the claim must be dismissed. As stated in

*Phototron*, "without evidence of how [the practice] can act as a barrier to [a party's]

participation" in its industry, there is no claim. 842 F.2d at 101.[8] Here, there are no factual

allegations that show how these "agreements" acted as a barrier to competition by EOS, as an

independent materials seller.[9]

    *Third*, EOS alleges that 3D Systems has terminated "distribution and development

agreements" with an unnamed materials manufacturer in "order to exclude competition for the

sale of such materials in the United States." (*Id.*, ¶ 42-b.) This allegation not only contradicts

the claim in the previous sub-paragraph, but it is again impossible, in the context of the pleading,

to see how this harms competition generally in the "materials industry," much less EOS, which

does not allege that it was harmed by the termination of these agreements. *See Phototron*, 842

F.2d at 100.

---

    [8] *See also Matsushita Electrical Indus. Co., Ltd.*, 475 U.S. at 583 (although "non-price restraints that have the effect of either raising market price or limiting output...[may be harmful to competition, they] actually benefit competitors by making supracompetitive pricing more attractive").

    [9] Since exclusive distribution agreements are "presumptively legal," *Electronics Comm. Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997), there is no basis for proceeding in the absence of anticompetitive effects in a relevant market that are reflected in the harm to the plaintiff. *See Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 296-98 (5th Cir. 1981).

*Fourth*, EOS alleges that 3D Systems, above and beyond the DTM acquisition, has also acquired an unnamed "manufacturer of materials" in order to "exclude competition from that competitor for sale of such materials in the United States." (Counterclaims, ¶ 42-c.) This allegation does not indicate that EOS, which presumably is not the manufacturer involved, has been harmed in any way. Even, if EOS is a competitor, as the Counterclaims suggest (*Id.*, ¶ 44), it has no cognizable claim because it has alleged no facts indicating that the effects of these transactions caused it to suffer antitrust injury. *See Cargill*, 479 U.S. at 115, *Phototron*, 842 F.2d at 100; *Pearl Brewing Co.*, 1993 U.S. Dist. LEXIS, at *4; *Remington Prods. Inc. v. North American Philips Corp.*, 755 F. Supp. 52, 58 (D. Conn. 1991).

*Fifth*, EOS alleges that 3D Systems has threatened not to honor warranty or service claims unless the customers "agreed to purchase materials or services solely from 3D [Systems]." (Counterclaims, ¶ 42-d.) No facts are alleged indicating any connection between this alleged practice and the DTM transaction. Nor has EOS made a well-pleaded allegation of a relevant market for either "materials or services." This allegation, in short, is so vaguely stated as to be meaningless. *See Apani Southwest, Inc.*, 300 F.3d at 627 ("it must be determined whether the arrangement foreclosed competition in a substantial share of the established market"). And since there is no allegation as to how EOS was injured, there is nothing that suggests that this practice satisfies the *Phototron* requirement that EOS indicate *how* it is threatened with anti-competitive harm. 842 F.2d at 101.

*Sixth*, EOS alleges that in "[a]greeing to settle the Justice Department Antitrust Litigation," 3D Systems chose a "New Licensee" that would be an "effective competitor" and chose one that has not sold any Laser RP System equipment to date. (Counterclaims, ¶ 42-e.) Again, this does not plead antitrust injury to EOS. EOS has no entitlement to have been chosen

as the licensee, which, of course, was subject to approval by the Department of Justice under the terms of the Consent Decree—a point that EOS does not deny. Losing bidders do not have standing to attack acquisitions—in this case, the acquisition of a license from 3D Systems. *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984); *Kalmanovitz v. G. Heileman Brewing Co.*, 595 F. Supp. 1385, 1397 (D. Del. 1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985). Moreover, if any anticompetitive effect occurred as a result of the choice of the "New Licensee," that was the result of conduct by the United States Government, which cannot be attacked on antitrust grounds. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379-380, 382 (1991).

3. **Count V Also Fails to State a Claim Against 3D Systems Under Section 2 of the Sherman Act.**

Count V does not state a claim for actual or attempted monopolization under Section 2 of the Sherman Act. With respect to actual monopolization, a plaintiff must plead facts that show monopoly power in a properly defined market in addition to exclusionary conduct lacking a valid business justification that has the effect of maintaining the defendant's monopoly power. *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ("to be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice") (citation omitted). There are no allegations in Count V that satisfy this standard. Although EOS alleges that *it* was harmed, it never articulates except in the most conclusory

terms how any of the practices it mentions had a negative effect on the *competitive process* in a relevant market. (Counterclaims, ¶ 47.)[10]

For an attempted monopolization claim (*see id.*, ¶ 43), the factual allegations must show that plaintiffs "had a specific intent to monopolize" a relevant market. *Taylor Publishing Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000) (*citing Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). As stated in *Futurevision*, "enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified." 789 F. Supp. at 771-72. Count V lacks *all* of the necessary factual allegations. For example, the practices EOS alleges in paragraph 42 of EOS's Counterclaims contain no allegation of specific intent, and even as to the DTM merger discussed in paragraphs 34-39, there is no allegation that 3D Systems intended to monopolize. In addition, an attempted monopolization claim requires a showing that the "defendant engaged in predatory or exclusionary conduct"—namely conduct that "not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way" because it "has no rational business purpose other than its adverse effects on competitors." *Taylor Publishing Co.*, 216 F.3d at 474-75 (citations omitted). The Counterclaims do not contain any factual allegations, as opposed to conclusory legal language, that indicate that 3D Systems' alleged practices are predatory or exclusionary. *See Futurevision*, 789 F. Supp. at 772; *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989) ("In order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations ...").

---

[10] This lapse applies to every practice mentioned in Count V, ranging from the DTM merger itself, to the vaguely described distribution agreements for "materials" mentioned in ¶¶ 42-(a) and 42-(b), to the acquisition of the unnamed "manufacturer" of "materials" mentioned in ¶ 42-(c), to the threats to force purchase of "materials and services" in ¶ 42-(d), to the licensing under the Consent Decree approved by the Department of Justice attacked in ¶ 42-(e).

4.      **Count V Fails to State a Claim Against U.T. Under Any Provision of the Federal Antitrust Laws.**

The allegations against the University of Texas arise solely in Counts V and VI. Count V combines a Section 7 Clayton Act claim (relating to the merger), a Section 2 Sherman Act claim (involving alleged monopolization or attempted monopolization involving rapid prototyping equipment), and a reference to Section 1 of the Sherman Act, which bars combinations and conspiracies that unreasonably restrain trade. (Counterclaims, ¶¶ 29-50.) The Section 7 and Section 2 claims plainly do not, and cannot as a matter of law, implicate U.T. The University of Texas was not a party to the merger and cannot be liable under Section 7.[11] Nor was U.T. a producer of the equipment or related items, so it cannot be liable for a monopolization or attempted monopolization claim. All that is left is the Section 1 conspiracy allegation, which is simply too threadbare to be permitted to proceed.

It is well established that a "bare bones statement of conspiracy ... under the antitrust laws without any supporting facts permits dismissal." *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972). As the District Court for the Southern District of Mississippi recently held, a "complaint [containing] nothing more than a conclusory allegation" will "not suffice." *Futurevision*, 789 F. Supp. at 772. The "pleader must allege the facts constituting the conspiracy, its object and its accomplishment," including "facts from which it can be determined as a matter of law that by reason of intent, tendency or inherent nature of the contemplated acts, the conspiracy alleged... unduly restrict[ed] the free flow of interstate

---

[11] Section 7 only applies to parties to a merger: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

commerce." *Id.* (quoting *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273-74 (5th Cir. 1979)).

Here, U.T. is alleged merely to have consented to certain intellectual property transfers as part of the DTM merger. (*See* Counterclaims, ¶ 35.) This is a facially lawful business transaction, as in *Futurevision*, rather than an indication of an agreement by U.T. and 3D Systems to restrain trade. EOS has made no allegation that U.T. intended to do anything more than allow an intellectual property transfer. Because there is no "proper allegation of 'a conscious commitment to a common scheme designed to achieve an unlawful objective,'" dismissal is required. *Futurevision*, 789 F. Supp. at 773 (citation omitted).

Moreover, EOS fails to state any specific actions involving U.T., allegations that are essential for a Section 1 claim to survive. *See Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994) ("mere allegation that 'the defendants violated the antitrust laws as to a particular plaintiff and commodity' is insufficient to survive a Rule 12(b)(6) motion") (quoting *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 179 (3rd Cir. 1988)); *Mathias v. Daily News, L.P.* 152 F. Supp. 2d 465, 484 (S.D.N.Y. 2001) (granting motion to dismiss antitrust conspiracy claim because plaintiff failed to allege facts describing conspiracy but instead merely identified unilateral acts by one defendant); *Broyles v. Wilson*, 812 F. Supp. 651, 655 (M.D. La. 1993), *aff'd without op.*, 3 F.3d 439 (5th Cir. 1993) (granting motion to dismiss where complaint contained "purely conclusory" allegations of conspiracy). Although EOS mentioned U.T. in paragraph 42 of Count V, *none* of the acts alleged are acts of U.T. Nor are any facts alleged that suggest that U.T. acted in concert with 3D Systems with respect to any of this alleged conduct.

5.    **Count V Should Fail Because Of Laches.**

Finally, Count V seeks equitable relief that would, in effect, undo the benefits of the 3D

Systems-DTM merger. (*See* Prayer for Relief ¶ 3 (seeking an injunction against any

understanding or plan, "the effect of which would be to combine DTM with the operations of 3D

[Systems]" and against "enforcement of any patent rights acquired by 3D [Systems] through

merger with DTM").) EOS's decision to wait 18 months after the merger must bar any such

relief.

The publicly-announced 3D Systems-DTM merger closed in late August 2001. EOS's

first request for relief was asserted on March 25, 2003, over eighteen months later. Thus, the

Counterclaims fall into that category of attacks characterized by the Supreme Court as

appropriate application for the defense of laches "[to] protect consummated transactions from

belated attacks by private parties..." *California v. American Stores Co.*, 495 U.S. 271, 296-98

(1990) (Kennedy, J., concurring) (noting that plaintiff had notice of the transaction when it was

under investigation by the Government, that it "elected not to act at that time, but now seeks a

divestiture which, the facts suggest, would upset ... agreements and other matters influenced by

the [Government] proceeding" and noting that "the bar of laches" could be a "consequence[]" of

this "delay").

The standard for laches applied in antitrust challenges to mergers is whether the delay of

the plaintiff shows a lack of diligence, and whether there is prejudice to the party seeking the

defense. *Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.*, 116 F. Supp. 2d

1159, 1172 (C.D. Cal. 2000). In appraising whether the lack of diligence standard is met, the

focus is on whether the "plaintiffs knew about the merger months before it occurred, yet

'deliberately chose to wait until the merger had been effectuated, before commencing court

proceedings...'." *Id.* at 1173 (citation omitted).

EOS was aware not only of the proposed DTM merger but also of the fact that it was investigated by the Department of Justice. EOS was aware, as was the public, of the fact that the Department filed suit on June 6, 2001 and of the fact that the parties filed a Consent Decree and accompanying stipulation and order (all publicly announced) with the District Court for the District of Columbia on August 16, 2001, which allowed the transaction to close as soon as the court signed the stipulation and order, which it did that day. (Exhibits A and B.)

Had EOS wished to seek to halt the transaction in the summer of 2001, nothing prevented it from bringing suit - *then*. It chose not to. Even after the Consent Decree was announced in mid-August 2001, EOS delayed in taking affirmative action (other than filing a comment with the Department of Justice in October 2001), waiting until March 13, 2002 to file a petition to intervene in the District Court proceedings that reviewed the Consent Decree. When its petition to intervene was denied on April 17, 2002, EOS did not seek to appeal. (Exhibit D.) EOS did nothing further before asserting the Counterclaims in this action.

The prejudice to 3D Systems of equitable relief against the merger and the transfer of DTM's patent rights to 3D Systems requires no elaboration. The patents are valuable and the costs involved in unwinding this merger approved by the Department of Justice would be high. For these reasons, the claim for equitable relief should be dismissed.

**B.    COUNTERCLAIM VI SHOULD BE DISMISSED AS A MATTER OF LAW.**

EOS asserts that plaintiffs' patent infringement claims are "based upon knowingly wrongful assertions of infringement that are objectively baseless with the intent by 3D Systems and UT of restricting competition for the sale in the United States of Laser RP Systems and Industrial RP Systems." (Counterclaims, ¶ 52.) EOS further alleges that plaintiffs' lawsuit is, therefore, in violation of section 2 of the Sherman Act. (*Id.*, ¶¶ 51-55.) Neither statement is true

and, more importantly, neither allegation is sufficient to prevent the application of the *Noerr-Pennington* doctrine, which provides immunity to EOS's antitrust claim.

       **1.**      **The Noerr-Pennington Doctrine, Which Provides Absolute Immunity to Antitrust Actions, Bars Count VI.**

Established in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), the *Noerr-Pennington* doctrine absolutely prohibits retaliation in the form of an antitrust suit for the exercise of the First Amendment right to petition the Government. *Noerr*, 365 U.S. at 136-38. Of course, petitioning activity includes the prosecution of a lawsuit. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 60 (1993). EOS attempts to slide within a very narrow exception to the *Noerr-Pennington* doctrine, but the conclusory attempt at meeting the exception must fail.

       **2.**      **The Exception to the *Noerr-Pennington* Doctrine Does Not Apply Because EOS Does Not and Cannot Allege Sufficient Facts to Meet The Exception.**

In *PRE*, 508 U.S. at 60, the Supreme Court held that "an antitrust civil litigant cannot be constitutionally punished for bad faith or sham civil litigation unless the litigant's suit is *objectively baseless* in the sense that no reasonable litigant could realistically expect success on the merits." "The 'sham' exception applies to defendants who use the process as an anticompetitive weapon, rather than those who genuinely seek to achieve an intended result." Thus, lobbying activity is objectively baseless if a reasonable private citizen could not expect to secure favorable government action. *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 862 (5th Cir. 2000) (citing *PRE*, 508 U.S. at 60) (granting motion for summary judgment, finding that Bayou Fleet did not assert that the Clulees' endeavors were objectively unreasonable. "To the contrary,

the evidence shows that a reasonable private citizen could expect to secure favorable government action.").

Here, plaintiffs filed a lawsuit against EOS for patent infringement to protect their intellectual property from actions taken by EOS. This is not the type of suit that falls into the "sham" exception, and EOS does not and cannot establish otherwise.

The "sham" exception has two elements, both of which must be present. First, "the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." The test is by definition an objective one. It is not what the parties think of the merits of their positions that matters; it is whether there are, in fact, sufficient objective bases for the positions taken. *PRE*, 508 U.S. at 63. The *PRE* standard also contains a second, subjective component: in order to be stripped of immunity, a baseless lawsuit must also conceal an attempt to interfere directly with a competitor's business relationships through the use of governmental process itself, as opposed to the outcome of the process. *PRE*, 508 U.S. at 60-61.

The second element involving subjective intent is not considered unless a claim is first held to be objectively baseless. A finding that a lawsuit was instituted with probable cause is an absolute defense to a claim that the case is a sham regardless of litigant's subjective motivation. *Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co., Inc.*, 964 F. Supp. 624 (D.Conn. 1997) (citing *PRE*, 508 U.S. at 62-63). Probable cause to institute civil proceedings requires no more than a " 'reasonabl[e] belie[f] there is a chance that [a] claim may be held valid upon adjudication.'" *Hartford Life Ins.*, 964 F. Supp. at 627. "Where there is no dispute over the predicate acts of the underlying proceedings, the court may determine probable cause as a matter of law." *Id.* (citing *PRE*, 508 U.S. at 63).

The only allegations made by EOS in an attempt to invoke the "sham" exception to the

*Noerr-Pennington* doctrine is that plaintiffs' patent infringement claims are "objectively baseless" and therefore in violation of Section 2 of the Sherman Act. (Counterclaims, ¶ 52.) Obviously, a mere conclusory allegation, without any supporting facts, that the plaintiffs' claims are "objectively baseless" cannot possibly suffice to defeat *Noerr-Pennington* immunity; otherwise, such immunity would have to be litigated in virtually every context.

In *Sugar Busters, L.L.C. v. Brennan*, 1999 WL 109564, (E.D. La. 1999), the court granted the motions to dismiss because defendants failed to state a claim for a violation of federal and state antitrust laws. The Brennans alleged that Sugar Busters and Ballantine attempted to restrain trade and to monopolize the market for the Sugar Busters name, as well as goods and services based on the diet principles, and to restrain trade "through all available means." *Id.* at *3. However, the Brennans did not allege facts to identify any activity in unreasonable restraint of trade or competition other than Sugar Busters' effort and Ballantine's support and encouragement in the enforcement of the trademark at issue. The court held that the sham exception does not deprive Sugar Busters and Ballantine of *Noerr-Pennington* immunity. In *Hartford Life*, an insurer brought a trademark infringement action against a competitor. The competitor filed a counterclaim, alleging that the filing of the suit caused it economic harm. On the insurer's motion to dismiss the counterclaim based on *Noerr-Pennington*, the district court granted the motion and held that insurer's action was not objectively baseless, for purposes of the sham exception to *Noerr-Pennington* doctrine, which entitled the insurer to immunity on the competitor's counterclaim. Like EOS here, all the defendant in *Hartford* had done was to restate as counterclaims its equitable defenses to the underlying litigation. As the court explained, "[s]tripped of everything but its essentials, [defendant's] argument is that because its defenses

ultimately will prevail, Hartford's lawsuit must be "objectively baseless" within the meaning of the sham exception. [Defendant's] argument is unpersuasive." *Id.*, 964 F. Supp. at 628.

In *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544 (S.D. Tex. 1991), Rockbit alleged that Baker Hughes instituted a state court action to enforce a patent license agreement, even thought it knew that the underlying patent was baseless, for the sole purpose of driving Rockbit out of business. *Id.* at 1552. The court dismissed Rockbit's second amended complaint ruling that "Rockbit's bare pleading of sham cannot overcome the inference that Baker Hughes' state court action qualifies for *Noerr-Pennington* immunity. " *Id.* In light of the fundamental First Amendment values that the *Noerr-Pennington* doctrine is designed to protect, a complaint should contain certain allegations demonstrating that the *Noerr-Pennington* protections do not apply. Conclusory allegations are insufficient. *Id.*

EOS has done precisely what multiple courts have ruled is insufficient to deny the application of *Noerr-Pennington* immunity. EOS has simply included one line in its Counterclaims that concludes that plaintiffs' complaint is "objectively baseless." Using the "magic words" does not overcome *Noerr-Pennington* immunity. EOS has done nothing more to support the notion that plaintiffs' patent infringement claims are fraudulent, and the motion to dismiss should be granted.

Nor can EOS include allegations to suggest that plaintiffs' infringement claims are fraudulent. EOS has failed to acknowledge the well-known premise that an issued United States patent is entitled to a presumption of validity. *See* 35 U.S.C. § 282. Accordingly, 3D Systems does not "know" that the patents-in-suit are invalid as alleged by EOS; instead, the law presumes that the assertion of a duly granted patent is made in good faith. *See C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) (citing *Virtue v. Creamery Package Mfg.*

*Co.*, 227 U.S. 8, 37-38 (1913)); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir.

1979) ("a patentee's infringement suit is presumptively in good faith and that this presumption

can only be rebutted by clear and convincing evidence.").[12]

Finally, the Counterclaims lack factual allegations indicating that the second standard in

*PRE*—that the suit itself has been used to directly interfere with EOS's business relationships—is

satisfied. There is no factual allegation that the existence of this case has deprived EOS of any

business, much less sufficient business to constitute a harm to competition, as opposed to just a

particular competitor. *See Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343 (Fed. Cir.

1999) (dismissing antitrust counterclaim for failure to satisfy the second prong of *PRE*).

## IV.
## CONCLUSION

For the foregoing reasons, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, this Court should grant plaintiffs' motion to dismiss the antitrust Counterclaims.

---

[12] EOS claims that 3D Systems "knows" the patents are invalid because allegedly corresponding foreign patents have been "deleted" or declared invalid by foreign patent offices and courts. This argument is misplaced. A declaration of invalidity of a foreign patent counterpart does not render the related United States patent invalid. Foreign courts and patent offices have different legal standards for determining whether patents are invalid. *See Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907 (Fed. Cir. 1986); *Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994) (cautioning against considering the action of a foreign patent examiner, since "'international uniformity' in theory and practice of patent law has not been achieved").

Dated:  April 24, 2003

Respectfully submitted,

*Philip E. Cook, by permission* EQBF

PHILIP E. COOK
California State Bar No. 149067
Admitted *pro hac vice*
ROBERT W. DICKERSON
California State Bar No. 89367
Admitted *pro hac vice*
JONES DAY
555 West Fifth Street
Suite 4600
Los Angeles, California 90013-1025
Telephone: (213) 489-3939

ROBERT W. TURNER
Texas State Bar No. 20329000
JONES DAY
2727 North Harwood Street
P.O. Box 660623
Dallas, Texas 75266-0623
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100

GRAY, CARY, WARE & FREIDENRICH LLP
ALAN D ALBRIGHT
Federal Bar No. 13048
Texas State Bar No. 00973650
ELIZABETH J. BROWN FORE
Texas State Bar No. 24001795
1221 South MoPac Expressway, Suite 400
Austin, TX 78746-6875
Telephone:  (512) 457-7000
Facsimile:   (512) 457-7001

Attorneys for Plaintiffs
BOARD OF REGENTS, THE
UNIVERSITY OF TEXAS SYSTEM,
and 3D SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent via United States certified mail, return receipt requested to the following counsel of record on this 24th day of April, 2003.

Thomas H. Watkins
State Bar No. 20928000
Albert A. Carrion, Jr.
State Bar No. 03883100
HILGERS & WATKINS P.C.
98 San Jacinto Boulevard
San Jacinto Center, Suite 1300
Austin, Texas 78701
(512)476-4716
(512) 476-5139 Facsimile

Michael H. Baniak
Michael D. Gannon
BANIAK PIKE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois 60606
(312) 673-0360
(312) 673-0361 Facsimile

Attorneys for Defendant
EOS GMBH ELECTRO OPTICAL SYSTEMS

ELIZABETH J. BROWN FORE