**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Board of Regents, The University of Texas System, and 3D Systems, Inc. | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No.  A03 CA 113SS |
| EOS GmbH Electro Optical Systems, | § § | |
| Defendant. | § § § | |

**DECLARATION OF ELIZABETH J. BROWN FORE IN SUPPORT OF:
(1) PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE;
(2) MOTION TO DISMISS THE ANTITRUST COUNTERCLAIMS (COUNTS V AND
VI) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6); AND,
(3) MOTION TO BIFURCATE AND STAY ANTITRUST COUNTERCLAIMS (COUNTS
V AND VI) PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 42(b)**

I, Elizabeth J. Brown Fore, declare that:

1.      I am an attorney with the law firm of Gray Cary Ware & Freidenrich, L.L.P.,

counsel for Plaintiff Samsung Electronics Co., Ltd. ("Samsung").  I have personal knowledge of

the facts stated herein and if called as a witness, could and would competently testify hereto.

2.      Attached hereto as Exhibit A is a true and correct copy of the August 16, 2001,

settlement or final judgment ("Consent Decree") from the Department of Justice lawsuit

involving the 3D Systems-DTM merger (*United States of America v. 3D Systems Corporation

and DTM Corporation*, Civil No.: 1:01CV01237).

3.      Attached hereto as Exhibit B is a true and correct copy of the August 16, 2001

Stipulation and Order from *United States of America v. 3D Systems Corporation and DTM

Corporation*.

4.      Attached hereto as Exhibit C is a true and correct copy of EOS' public comment

from *United States of America v. 3D Systems Corporation and DTM Corporation*, dated

November 21, 2001, and the Department of Justice's reply, both published in the Federal
Register on March 12, 2002.

    5.    Attached hereto as Exhibit D is a true and correct copy of the District Court's
April 16, 2002, denial of EOS's petition to intervene in *United States of America v. 3D Systems Corporation and DTM Corporation.*

    I declare under penalty of perjury under the laws of United States of America that the
foregoing is true and correct.

    Executed this 24th day of April, 2003, at Austin, Texas.

ELIZABETH J. BROWN FORE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent via United States certified mail, return receipt requested to the following counsel of record on this 24th day of April, 2003.

Thomas H. Watkins
State Bar No. 20928000
Albert A. Carrion, Jr.
State Bar No. 03883100
HILGERS & WATKINS P.C.
98 San Jacinto Boulevard
San Jacinto Center, Suite 1300
Austin, Texas 78701
(512)476-4716
(512) 476-5139 Facsimile

Michael H. Baniak
Michael D. Gannon
BANIAK PIKE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois 60606
(312) 673-0360
(312) 673-0361 Facsimile

Attorneys for Defendant
EOS GMBH ELECTRO OPTICAL SYSTEMS

Elizabeth J. Brown Fore

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Civil No: 1:01CV01237 (GK) |
| v. | |
| 3D SYSTEMS CORPORATION and DTM CORPORATION, | Filed: August 16, 2001 |
| *Defendants.* | Judge: Gladys Kessler |

### FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on June 6, 2001,

plaintiff and defendants, 3D Systems Corporation ("3D") and DTM Corporation ("DTM"), by

their respective attorneys, have consented to the entry of this Final Judgment without trial or

adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence

against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment

pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture

of certain rights or assets by the defendants to assure that competition is not substantially

lessened;

AND WHEREAS, plaintiff requires defendants to make certain divestitures for the

purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures

required below can and will be made and that defendants will later raise no claim of hardship or

difficulty as grounds for asking the Court to modify any of the divestiture provisions contained

below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any

issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND

DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and, for purposes of this case only,

each of the parties to this action. The Complaint states a claim upon which relief may be granted

against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. Definitions

As used in this Final Judgment:

A.    "Acquirer" means the entity to whom defendants divest the Divestiture Assets.

B.    "3D" means defendant 3D Systems Corporation, a Delaware corporation with its

headquarters in Valencia, California, its successors and assigns, and its subsidiaries, divisions,

groups, affiliates, partnerships and joint ventures, including 3D Systems, Inc., and their directors,

officers, managers, agents, and employees.

C.    "DTM" means defendant DTM Corporation, a Texas corporation with its

headquarters in Austin, Texas, its successors and assigns, and its subsidiaries, divisions, groups,

affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and

employees.

D.    "Defendants" means, collectively or individually as the context requires, DTM

and/or 3D.

E.    "Divestiture Assets" means (1) a perpetual, assignable, transferable, fully paid-up (except as permitted by Section IV(E) below), non-exclusive license (without the right to sublicense, except for establishing distribution and contracting out manufacturing) under the RP Patents to develop, test, produce, market, sell, or distribute, or to supply any support or maintenance services for, products for use only in the field of either (but not both) the SL Technology or the LS Technology, which technology shall be the technology currently used by the Acquirer to manufacture RP Industrial Equipment (the "Selected Technology"); and (2) the RP Assets.

F.    "North America" means Canada, Mexico and the United States.

G.    "RP Assets" means (1) a list of all North American purchasers of RP Industrial Equipment from 3D, if the Selected Technology is SL Technology, or from DTM, if the Selected Technology is LS Technology; (2) all software copyright licenses needed by Acquirer to purchase and resell both defendants' used RP Industrial Equipment in North America; and (3) at the option of the Acquirer, DTM's plant located at 1611 Headway Circle, Bldg. 1, Austin, Texas ("Plant").

H.    "RP Patents" means all North American patents owned by or licensed to defendants (including patents relating to materials and software), as of the date of filing of this Final Judgment, including all subsequent continuations, continuations-in-part, divisions, reexaminations or reissues thereof, if any, as well as any patents that have been applied for as of the date of filing of this Final Judgment but have not been issued covering technology marketed by defendants as of the date of filing of this Final Judgment, specifically including but not limited to the patents listed in Appendix I and applied for patents listed in Appendix IIA. annexed hereto, but specifically excluding those Inkjet Technology patents listed in Appendix III and applied for Inkjet Technology patents listed in Appendix IV annexed hereto and those licenses granted to 3D

and DTM listed in Appendix V annexed hereto.

I.    "LS Technology" means technology (other than Inkjet Technology) that uses data to form, by heat, a three-dimensional object, layer-by-layer, from a sinterable powder material.

J.    "SL Technology" means technology (other than Inkjet Technology) that uses data to form, by radiation, a three-dimensional object, layer-by-layer, from a liquid, photocurable material.

K.    "Inkjet Technology" shall mean and include equipment, systems, supplies, software, processes or other technology utilized in the fabrication of three-dimensional objects from jettable materials.

L.    "RP Industrial Equipment" means products or processes incorporating LS Technology or SL Technology, but not the other, and not Inkjet Technology.

M.    "Selected Technology" means whichever one of the LS Technology or the SL Technology is currently used by the Acquirer to manufacture RP Industrial Equipment.

### III. Applicability

A.    This Final Judgment applies to 3D and DTM, as defined above, and all other persons in active concert or participation with either of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.    Defendants shall require, as a condition of the sale or other disposition of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, that the purchaser of the Divestiture Assets agrees to be bound by the provisions of this Final Judgment, provided, however, that defendants need not obtain such an agreement from the Acquirer.

## IV. Divestitures

A.        Defendants are ordered and directed, within one hundred twenty (120) calendar days after the filing of this Final Judgment, or five (5) days after notice of entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion. The United States, in its sole discretion, may agree to extensions of this time period of up to sixty (60) days, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B.        Defendants shall provide Acquirer with all software copyright licenses needed by Acquirer to purchase and resell defendants' used RP Industrial Equipment in North America, which licenses shall be on terms no less favorable than defendants offer to other purchasers and resellers of their used RP Industrial Equipment.

C.        The Acquirer shall be a firm that currently manufactures RP Industrial Equipment in the Selected Technology, and shall be approved by plaintiff in its sole discretion. If plaintiff does not approve a purchaser of the Divestiture Assets under this Final Judgment, any grant by defendants of a license to that purchaser shall not satisfy the requirements of this Judgment.

D.        Defendants warrant that they have the authority to convey all intellectual property included in the Divestiture Assets free and clear of any encumbrances, contractual commitments or obligations, except for the licenses granted to 3D and DTM which are identified in Appendix V annexed hereto.

E.        To the extent that any rights to the RP Patents require defendants to sublicense rights from a third party to the Acquirer, such sublicense(s) must either be fully paid-up or granted on terms no less favorable than the terms applicable to defendants. Any sublicense

granted pursuant to this Final Judgment must include provisions acceptable to plaintiff that will guard against the monitoring of the Acquirer's sales or production by defendants.

F.      Nothing in this Final Judgment shall be construed to require the Acquirer, as a condition of any license granted by defendants pursuant to Sections IV(A) or (B), to extend to the defendants the right to use the Acquirer's improvements to any of the Divestiture Assets.

G.      Defendants shall not assert against Acquirer any claims (1) for patent or copyright infringement in North America for products made, sold or used pursuant to the licenses granted in accordance with Section IV(A) and (B) of this Final Judgment; (2) for patent infringement in North America of the patents listed in Appendix V; or (3) that any equipment, systems, supplies, software, processes, or other technology sold by the Acquirer outside of North America prior to filing of this Final Judgment infringes in North America any patent or copyright issued or licensed to defendants in North America prior to the date of filing of this Final Judgment.

H.      In accomplishing the divestiture ordered by this Final Judgment, defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Assets.  Defendants shall inform any eligible person making inquiry regarding a possible license or purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment except those parts filed under seal. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client or work-product privileges and except customer lists and information regarding patent applications. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

I.      Defendants shall waive any non-compete clause(s) in any employment agreement(s), whether written or oral, with any of defendants' present or former employees that are currently in effect, and shall not include non-compete clauses in any future employment agreements with respect to such present or former employees for a period of two (2) years from the date of filing of this Final Judgment.  Defendants shall provide the Acquirer and the United States information relating to the personnel involved in the sales, marketing and manufacturing of RP Industrial Equipment in the Selected Technology to enable the Acquirer to make offers of employment, which does not preclude defendants from seeking to retain such personnel as employees.  Defendants will not interfere with any negotiations by the Acquirer to employ any of defendants' present or former employees for a period of two (2) years from the date of filing of this Final Judgment.

J.      Defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the Divestiture Assets, other than customer lists or patent applications; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

K.      Defendants shall warrant to the Acquirer of the Divestiture Assets that each tangible asset will be operational on the date of sale.

L.      Defendants shall not take any action that will impede, jeopardize, or delay in any way the permitting, operation, or divestiture of any of the Divestiture Assets.

M.      Defendants shall warrant to the Acquirer of the Divestiture Assets that there are no material defects in the environmental, zoning or other permits pertaining to the operation of any tangible asset, and that following the sale of the Divestiture Assets, defendants will not undertake,

directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of any of the tangible Divestiture Assets.

N.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer as part of a viable, ongoing commercial enterprise engaged in the sale of RP Industrial Equipment in North America, and that the divestiture will remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

(1)    shall be made to an Acquirer that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of servicing and selling RP Industrial Equipment in the United States; and

(2)    shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and defendants give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V. Appointment of Sales Trustee

A.    If defendants have not divested the Divestiture Assets within the time period specified in Section IV(A), defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.    After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets. The trustee shall have the power and authority to

accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V (D) of this Final Judgment, the trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

      C.     Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

      D.     The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the plaintiff approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

      E.     Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and

facilities of the business to be divested, and defendants shall develop financial and other

information relevant to such business as the trustee may reasonably request, subject to reasonable

protection for trade secret or other confidential research, development, or commercial

information, customer lists and information relating to patent applications. Defendants shall take

no action to interfere with or to impede the trustee's accomplishment of the divestiture.

      F.      After its appointment, the trustee shall file monthly reports with the United States

and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this

Final Judgment. To the extent such reports contain information that the trustee deems

confidential or that would be deemed confidential under Section V(E), such reports shall not be

filed in the public docket of the Court. Such reports shall include the name, address, and

telephone number of each person who, during the preceding month, made an offer to acquire,

expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made

an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each

contact with any such person. The trustee shall maintain full records of all efforts made to divest

the Divestiture Assets.

      G.      If the trustee has not accomplished such divestiture within six months after its

appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's

efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the

required divestiture has not been accomplished, and (3) the trustee's recommendations. To the

extent such reports contain information that the trustee deems confidential or that would be

deemed confidential under Section V(E), such reports shall not be filed in the public docket of the

Court. The trustee shall at the same time furnish such reports to the plaintiff who shall have the

right to make additional recommendations consistent with the purpose of the trust. The Court

thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final

Judgment, which may, if necessary, include extending the trust and the term of the trustee's

appointment by a period requested by the United States.

## VI. Notice of Proposed Divestiture

A.      Within two (2) business days following execution of a definitive divestiture

agreement, defendants or the trustee, whichever is then responsible for effecting the divestiture

required herein, shall notify the United States of any proposed divestiture required by Section IV

or V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendants. The

notice shall set forth the details of the proposed divestiture and list the name, address, and

telephone number of each person not previously identified who offered or expressed an interest in

or desire to acquire any ownership interest in the Divestiture Assets, together with full details of

the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the

United States may request from defendants, the proposed Acquirer, any other third party, or the

trustee if applicable, additional information concerning the proposed divestiture, the proposed

Acquirer, and any other potential Acquirer. Defendants and the trustee shall furnish any

additional information requested within fifteen (15) calendar days of the receipt of the request,

unless the parties shall otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20)

calendar days after the United States has been provided the additional information requested from

defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United

States shall provide written notice to defendants and the trustee, if there is one, stating whether or

not it objects to the proposed divestiture. If the United States provides written notice that it does

not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. Preservation of Assets

Until the divestiture required by this Final Judgment has been accomplished:

A.      Defendants shall provide sufficient working capital and lines and sources of credit to continue to maintain the Plant as an economically viable facility.

B.      Defendants shall not, except as part of a divestiture approved by the United States, remove, sell, lease, assign, transfer, pledge or otherwise dispose of any of the Divestiture Assets.

C.      Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestiture to an Acquirer acceptable to the United States.

## IX. Affidavits

A.      Within twenty (20) calendar days of the filing of the proposed Final Judgment in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall

include the name, address, and telephone number of each person who, during the preceding thirty days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective purchasers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) days of receipt of such affidavit.

B.     Within twenty (20) calendar days of the filing of the proposed Final Judgment in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.     Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## X. Compliance Inspection

A.     For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United

States Department of Justice, including consultants and other persons retained by the United

States, shall, upon written request of a duly authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

    (1)    access during defendants' office hours to inspect and copy, or at plaintiff's option, to require defendants to provide copies of, all books, ledgers, accounts, records and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

    (2)    to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

    B.    Upon the written request of a duly authorized representative of the Assistant

Attorney General in charge of the Antitrust Division, defendants shall submit written reports,

under oath if requested, relating to any of the matters contained in this Final Judgment as may be

requested.

    C.    No information or documents obtained by the means provided in this section or

Section IX shall be divulged by the United States to any person other than an authorized

representative of the executive branch of the United States, except as required by this Court, or in

the course of legal proceedings to which the United States is a party (including grand jury

proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise

required by law.

    D.    If at the time information or documents are furnished by defendants to the United

States, defendants represent and identify in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal

Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to

claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United

States shall give defendants ten (10) calendar days notice prior to divulging such material in any

legal proceeding (other than a grand jury proceeding).

## XI. No Reacquisition

Defendants may not reacquire any part of the Divestiture Assets during the term of this

Final Judgment.

## XII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this

Court at any time for further orders and directions as may be necessary or appropriate to carry

out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to

punish violations of its provisions.

## XIII. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the

date of its entry.

## XIV. Public Interest Determination

Entry of this Final Judgment is in the public interest.


**Date:** _____

                                Court approval subject to procedures
                                  of Antitrust Procedures and Penalties
                                  Act, 15 U.S.C. § 16


                                  _____

                                  **United States District Judge**

# APPENDIX I

## UNITED STATES PATENTS ISSUED, ASSIGNED OR LICENSED TO 3D SYSTEMS

| Patent No. | Patent Title |
|---|---|
| 4,469,654 | EDM Electrodes |
| 4,491,558 | Austenitic Manganese Steel-Containing Composite Article |
| 4,575,330 | Apparatus for production of three-dimensional objects by stereolithography |
| 4,929,402 | Method for production of three dimensional objects by stereolithography |
| 4,961,154 | Three dimensional modelling apparatus |
| 4,996,010 | Methods and apparatus for production of three-dimensional objects by stereolithography |
| 4,999,143 | Methods and apparatus for production of three-dimensional objects by stereolithography |
| 5,015,424 | Methods and apparatus for production of three-dimensional objects by stereolithography |
| 5,058,988 | Apparatus and method for profiling a beam |
| 5,059,021 | Apparatus and method for correcting for drift in production of objects by stereolithography |
| 5,059,359 | Methods and apparatus for production of three-dimensional objects by stereolithography |
| 5,071,337 | Apparatus for forming a solid three-dimensional object from a liquid medium |
| 5,076,974 | Methods of curing partially polymerized parts |
| 5,096,530 | Resin film recoating method and apparatus |
| 5,104,592 | Method of and apparatus for production of three-dimensional objects by stereolithography with reduced curl |

| | |
|---|---|
| 5,123,734 | Apparatus and method for calibrating and normalizing a stereolithographic apparatus |
| 5,130,064 | Method of making a three dimensional object by stereolithography |
| 5,137,662 | Method and apparatus for production of three-dimensional objects by stereolithography |
| 5,143,663 | Stereolithography method and apparatus |
| 5,164,128 | Methods for curing partially polymerized parts |
| 5,174,931 | Method of and apparatus for making a three-dimensional product by stereolithography |
| 5,182,055 | Method of making a three-dimensional object by stereolithography |
| 5,182,056 | Stereolithography method and apparatus employing various penetration depths |
| 5,182,715 | Rapid and Accurate production of stereolithographic parts |
| 5,184,307 | Method and apparatus for production of high resolution three-dimensional objects by stereolithography |
| 5,192,469 | Simultaneous multiple layer curing in stereolithography |
| 5,192,559 | Apparatus for building three-dimensional objects with sheets |
| 5,209,878 | Surface resolution in three-dimensional objects by inclusion of thin fill layers |
| 5,234,636 | Method of coating stereolithographic parts |
| 5,236,637 | Method of and apparatus for production of three-dimensional objects by stereolithography |
| 5,238,639 | Method and apparatus for stereolithographic curl balancing |
| 5,248,456 | Method and apparatus for cleaning stereolithographically produced objects |
| 5,256,340 | Method of making a three-dimensional object by stereolithography |

| | |
|---|---|
| 5,258,146 | Method of and apparatus for measuring and controlling fluid level in stereolithography |
| 5,267,013 | Apparatus and Method of profiling a beam |
| 5,273,691 | Stereolithographic curl reduction |
| 5,321,622 | Boolean layer comparison slice |
| 5,345,391 | Method and apparatus for production of high resolution three-dimensional objects by stereolithography |
| 5,358,673 | Applicator device and method for dispensing a liquid medium in a laser modeling machine |
| 5,447,822 | Apparatus and related method for forming a substantially flat stereolithographic working surface |
| 5,460,758 | Method and apparatus for production of a three-dimensional object |
| 5,481,470 | Boolean layer comparison slice |
| 5,495,328 | Apparatus and method for calibrating and normalizing a stereolithographic apparatus |
| 5,534,104 | Method and apparatus for production of three-dimensional objects |
| 5,536,467 | Method and apparatus for producing a three-dimensional object |
| 5,554,336 | Method and apparatus for production of three-dimensional objects by stereolithography |
| 5,569,431 | Method and apparatus for production of three-dimensional objects by stereolithography |
| 5,571,471 | Method of production of three-dimensional objects by stereolithography |
| 5,573,722 | Method and apparatus for production of three-dimensional objects by stereolithography |
| 5,582,876 | Stereographic apparatus and method |
| 5,597,520 | Simultaneous multiple layer curing in stereolithography |

| | |
|---|---|
| 5,609,812 | Method of making a three-dimensional object by stereolithography |
| 5,609,813 | Method of making a three-dimensional object by stereolithography |
| 5,610,824 | Rapid and accurate production of stereolithographic parts |
| 5,630,981 | Method for production of three-dimensional objects by stereolithography |
| 5,637,169 | Method of building three-dimensional objects with sheets |
| 5,651,934 | Recoating of stereolithographic layers |
| 5,665,401 | Apparatus for producing an object using stereolithography |
| 5,667,820 | Apparatus for making solid three-dimensional article from a liquid medium |
| 5,688,464 | Vibrationally enhanced stereolithographic recoating |
| 5,693,144 | Vibrationally enhanced stereolithographic recoating |
| 5,711,911 | Methods and apparatus for making a three-dimensional object by stereolithography |
| 5,745,834 | Free Form Fabrication of Metallic Components |
| 5,753,171 | Method and apparatus for producing a three-dimensional object |
| 5,762,856 | Method for production of three-dimensional objects by stereolithography |
| 5,772,947 | Stereolithographic curl reduction |
| 5,779,967 | Method and apparatus for production of three-dimensional objects by stereolithography |
| 5,785,918 | Method and apparatus for production of three-dimensional objects by stereolithography |
| 5,814,265 | Method and apparatus for production of three-dimensional objects by stereolithography |

| 5,832,415 | Method and apparatus for calibrating a control apparatus for deflecting a laser beam |
|---|---|
| 5,840,239 | Apparatus and method for forming three-dimensional objects in stereolithography utilizing a laser exposure system having a diode pumped frequency quadrupled solid state laser |
| 5,854,748 | Boolean layer comparison slice |
| 5,855,718 | Method and apparatus for making partially solidified three-dimensional objects on a layer-by-layer basis from a solidifiable medium |
| 5,870,307 | Method and apparatus for production of high resolution three-dimensional objects by stereolithography |
| 5,885,511 | Method of making a solid three-dimensional article from a liquid medium |
| 5,891,382 | Recoating of stereolithographic layers |
| 5,897,825 | Method for producing a three-dimensional object |
| 5,902,537 | Rapid recoating of three-dimensional objects formed on a cross-sectional basis |
| 5,902,538 | Simplified stereolithographic object formation methods of overcoming minimum recoating depth limitations |
| 5,904,889 | Apparatus and method for producing an object using stereolithography |
| 5,932,055 | Direct Metal fabrication Using a Carbon Precursor to Bind the "Green Form" Part and Catalyze a Eutectic Reducing Element in a Supersolidus Liquid Phase Sintering Process |
| 5,932,059 | Method for producing a three-dimensional object |
| 5,940,890 | Apparatus and method for producing three-dimensional objects |

| 5,945,058 | Method and apparatus for identifying surface features associated with selected lamina of a three-dimensional object being stereographically formed |
| --- | --- |
| 5,965,079 | Method and apparatus for making a three-dimensional object by stereolithography |
| 5,989,476 | Process of making a molded refractory article |
| 5,999,184 | Simultaneous multiple layer curing in stereolithography |
| 6,001,297 | Method for controlling exposure of a solidifiable medium using a pulsed radiation source in building a three-dimensional object using stereolithography |
| 6,027,324 | Apparatus for production of three dimensional objects by stereolithography |
| 6,029,096 | Method and apparatus for identifying surface features associated with selected lamina of a three dimensional object being stereolithographically formed |
| 6,036,911 | Method of making a three-dimensional object by stereolithography |
| 6,048,188 | Stereolithographic curl reduction |
| 6,048,487 | Recoating stereolithographic layers |
| 6,084,980 | Method of and apparatus for deriving data intermediate to cross-sectional data descriptive of a three-dimensional object |
| 6,103,176 | Stereolithographic method and apparatus for production of three dimensional objects using recoating parameters for groups of layers |
| 6,110,409 | Rapid prototyping process and apparatus |
| 6,110,602 | Method of making a three-dimensional object |
| 6,126,884 | Stereolithographic method and apparatus with enhanced control of prescribed stimulation production and application |

| 6,129,884 | Stereolithographic method and apparatus with enhanced control of prescribed stimulation production and application |
|---|---|
| 6,132,667 | Stereolithographic method and apparatus with enhanced control of prescribed stimulation production and application |
| 6,153,142 | Stereolithographic method and apparatus for production of three dimensional objects with enhanced control of the build environment |
| 6,153,312 | Apparatus and methods for economically fabricating molded refractory articles using refractory mix displacing elements |
| 6,157,663 | Laser with optimized coupling of pump light to a gain medium in a side-pumped geometry |
| 6,159,411 | Rapid prototyping method and apparatus with simplified build preparation for production of three dimensional objects |
| 6,172,996 | Apparatus and method for forming three-dimensional objects in stereolithography utilizing a laser exposure system with a diode pumped frequency-multiplied solid state laser |
| 6,179,601 | Simplified stereolithographic object formation methods of overcoming minimum recoating depth limitations |
| 6,215,095 | Apparatus and method for controlling exposure of a solidifiable medium using a pulsed radiation source in building a three-dimensional object using stereolithography |
| 6,224,816 | Molding method, apparatus and device including use of powder metal technology for forming a molding tool with thermal control elements |
| 6,241,934 | Stereolithographic method and apparatus with enhanced control of prescribe stimulation production and application |
| 6,261,077 | Rapid prototyping apparatus with enhanced thermal and/or vibrational stability for production of three dimensional objects |

| 6,261,506 | Method of making a three dimensional object |
|-----------|---------------------------------------------|
| 6,261,507 | Method of and apparatus for making a three dimensional object by stereolithography |
| 6,264,873 | Method of making a three-dimensional object by stereolithography |

## CANADIAN PATENTS ISSUED TO 3D SYSTEMS

| Serial No. | Topic | Patent No. |
|------------|-------|------------|
| 596827 | Curl Reduction | 1339750 |
| 596825 | Slice | 1338521 |
| 596826 | Beam Profiling | 1334052 |
| 596838 | Off-Peak Post Cure | 1338954 |
| 596850 | Stress Reliefs | 1338628 |
| 596847 | Supports | 1339751 |
| 612990 | Doctor Blade/ Liquid Leveling | 1337955 |
| 616962 | Beam Profiling Div. | 1340501 |
| 617113 | SL Beam Profiling | 1341214 |
| 617087 | SL Curl Reduction | 1340890 |

## MEXICAN PATENTS ISSUED TO 3D SYSTEMS

| Serial No. | Topic | Patent No. |
|------------|-------|------------|
| 975844 | Rapid Recoating | 195669 |

## UNITED STATES PATENTS ISSUED, ASSIGNED OR LICENSED TO DTM CORPORATION

| Patent No. | Patent Title |
|---|---|
| 4,863,538 | Method and apparatus for producing parts by selective sintering |
| 4,938,816 | Selective laser sintering with assisted powder handling |
| 4,944,817 | Multiple material systems for selective beam sintering |
| 5,017,753 | Method and apparatus for producing parts by selective sintering (Deckard) |
| 5,076,869 | Multiple material systems for selective beam sintering |
| 5,132,143 | Method for producing parts (Deckard) |
| 5,147,587 | Method of producing parts and molds using composite ceramic powders |
| 5,155,321 | Radiant heating apparatus for providing uniform surface temperature useful in selective laser sintering |
| 5,156,697 | Selective laser sintering of parts by compound formation of precursor powders |
| 5,252,264 | Apparatus and method for producing parts with multi-directional powder delivery |
| 5,296,062 | Multiple material systems for selective beam sintering |
| 5,304,329 | Method of recovering recyclable unsintered powder from the part bed of a selective laser sintering machine |
| 5,316,580 | Method and apparatus for producing parts by selective sintering |
| 5,342,919 | Sinterable Semi-Crystalline Powder and Near-Fully Dense Article Formed Therewith |

| 5,352,405 | Thermal control of selective laser sintering via control of the laser scan |
| 5,382,308 | Multiple material systems for selective beam sintering |
| 5,527,877 | Sinterable semi-crystalline powder and near-fully dense article formed therewith |
| 5,597,589 | Apparatus for producing parts by selective sintering |
| 5,616,294 | Method for producing parts by infiltration of porous intermediate parts |
| 5,639,070 | Method for producing parts by selective sintering |
| 5,640,667 | Laser-directed fabrication of full-density metal articles using hot isostatic processing |
| 5,648,450 | Sinterable semi-crystalline powder and near-fully dense article formed therein |
| 5,733,497 | Selective laser sintering with composite plastic material |
| 5,749,041 | Method of forming three-dimensional articles using thermosetting materials |
| 5,817,206 | Selective laser sintering of polymer powder of controlled particle size distribution |
| 5,990,268 | Sinterable semi-crystalline powder and near fully dense article formed therewith |
| 6,085,122 | End-of-vector laser power control in a selective laser sintering system |
| 6,136,948 | Sinterable semi-crystalline powder and near-fully dense article formed therewith |
| 6,151,345 | Laser power control with stretched initial pulses |

# APPENDIX II

## A.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

# APPENDIX II

# B.

## CANADIAN PATENTS APPLIED FOR BY 3D SYSTEMS

| Serial No. | Topic |
|---|---|
| 2072136 | Skintinuous/ Weave |
| 2095225 | Layer Comparison |
| 2186613 | SMLC/ Quickcast |

# APPENDIX III

## 3D SYSTEMS' UNITED STATES INKJET PATENTS

| Patent No. | Title |
|---|---|
| 4,992,806 | Method of jetting phase change ink |
| 5,141,680 | Thermal Stereolithography |
| 5,174,943 | Method for production of three-dimensional objects by stereolithography |
| 5,313,232 | Method of jetting phase change ink |
| 5,344,298 | Apparatus for making three-dimensional objects by stereolithography |
| 5,501,824 | Thermal stereolithography |
| 5,569,349 | Thermal stereolithography |
| 5,672,312 | Thermal stereolithography |
| 5,676,904 | Thermal stereolithography |
| 5,695,707 | Thermal stereolithography |
| 5,776,409 | Thermal stereolithograph using slice techniques |
| 5,855,836 | Method for selective deposition modeling |
| 5,943,235 | Rapid prototyping system and method with support region data processing |
| 5,997,291 | Hot-melt material for heating plate |
| 6,027,682 | Thermal stereolithograph using slice techniques |
| 6,132,665 | Compositions and methods for selective deposition modeling |
| 6,133,353 | Phase change solid imaging material |
| 6,133,355 | Selective deposition modeling materials and method |
| 6,136,252 | Apparatus for electro-chemical deposition with thermal anneal chamber |
| 6,162,378 | Method and apparatus for variably controlling the temperature in a selective deposition modeling environment |

| 6,193,923 | Selective deposition modeling method and apparatus for forming three-dimensional objects and supports |
|---|---|
| 6,270,335 | Selective Deposition Modeling Method and Apparatus for Forming Three-Dimensional Objects and Supports |
| Des. 420,371 | Rapid prototype machine |
| Des. 422,609 | Container for material loading |
| Des. 423,023 | Rapid prototype machine |

# APPENDIX IV

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

# APPENDIX V

## PATENTS LICENSED TO 3D SYSTEMS WITH NO RIGHT TO SUBLICENSE

| Patent No. | Assignee |
|---|---|
| 4,704,503 | Patlex Corporation |
| 4,746,201 | Patlex Corporation |
| 5,253,177 | NTT Data/ CMET Inc. |
| 5,415,820 | NTT Data/ CMET Inc. |

## PATENTS LICENSED TO DTM CORPORATION WITH NO RIGHT TO SUBLICENSE

| Patent No. | Assignee |
|---|---|
| 5,745,834 | Rockwell Science |
| 5,932,055 | Rockwell Science |

Tab B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Civil No: 1:01CV01237 (GK) |
| v. | |
| 3D SYSTEMS CORPORATION and DTM CORPORATION, | Filed: August 16, 2001 |
| *Defendants.* | Judge: Gladys Kessler |

## STIPULATION AND ORDER

It is stipulated by and between the undersigned parties, by their respective attorneys, as follows:

(1)    The Court has jurisdiction over the subject matter of this action and, for purposes of this case only, over each of the parties hereto, and venue of this action is proper in the United States District Court for the District of Columbia.

(2)    The parties stipulate that a Final Judgment in the form hereto attached may be filed and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States of America (hereinafter "United States") has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on the parties and by filing that notice with the Court.

(3)    Defendants shall abide by and comply with the provisions of the proposed Final

Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

(4)     Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Stipulation and Order.

(5)     This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

(6)     In the event (a) the United States has withdrawn its consent, as provided in paragraph (2) above, or (b) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

(7)     The defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made, and that the defendants will later raise no claims of mistake, hardship or difficulty of noncompliance as grounds for asking the Court to modify any of the divestiture or termination provisions contained therein.

(8)     The parties stipulate that Appendices IIA. and IV of the proposed Final Judgment, relating to defendants' patent applications, shall be filed under seal.

FOR PLAINTIFF UNITED STATES
OF AMERICA

FOR DEFENDANT 3D SYSTEMS
CORPORATION


_____/s/_____
Dando B. Cellini, Esq.
Paul A. Moore III, Esq.
U.S. Department of Justice
Antitrust Division
Litigation II
1401 H Street, NW
Suite 4000
Washington, DC 20005
(202) 307-0829

_____/s/_____
John A. Herfort, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-3832


FOR DEFENDANT DTM CORPORATION

FOR DEFENDANT 3D SYSTEMS
CORPORATION


_____/s/_____
Charles F. Rule, Esq.  (#370818)
Fried Frank Harris Shriver and Jacobson
1001 Pennsylvania Ave, N.W.
Suite 800
Washington, D.C. 20004
(202) 639-7300

_____/s/_____
Charles E. Biggio, Esq.
Akin, Gump, Strauss, Hauer & Feld LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1010


FOR DEFENDANT 3D SYSTEMS
CORPORATION


_____/s/_____
David Donohoe, Esq. (#3426)
Akin, Gump, Strauss, Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000

## ORDER

IT IS SO ORDERED by the Court, this 16th day of August, 2001.

_____/s/_____
**United States District Judge**

**Federal Register** / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices   **11123**

information users and professionals to advise the Federal Government of activities and plans that may improve the effectiveness of meeting the Nation's water information needs. More than 30 organizations have been invited by the Secretary of the Interior to name representatives to the ACWI. These include Federal departments, State, local, and tribal government organizations, industry, academia, agriculture, environmental organizations, professional societies, and volunteer groups.

**DATES:** The formal meeting will convene at 8:30 a.m. on April 2, 2002, and will adjourn on April 3, 2002, by 5 p.m.

**ADDRESSES:** Days Hotel and Conference Center, 2200 Centreville Road, Herndon, Virginia.

**FOR FURTHER INFORMATION CONTACT:** Ms. Toni M. Johnson (Executive Secretary, ACWI), Chief, Water Information Coordination Program, U.S. Geological Survey, 12201 Sunrise Valley Drive, 417 National Center, Reston, VA 20192. Telephone: 703–648–6810; Fax: 703–648–5644; e-mail: tjohnson@usgs.gov.

**SUPPLEMENTARY INFORMATION:** This meeting is open to the public. Up to a half hour will be set aside for public comment. Persons wishing to make a brief presentation (up to 5 minutes) are asked to provide a written request with a description of the general subject to Ms. Johnson at the above address no later than noon, March 25, 2002. It is requested that 40 copies of a written statement be submitted at the time of the meeting for distribution to members of the ACWI and placement in the official file. Any member of the public may submit written information and (or) comments to Ms. Johnson for distribution at the ACWI Meeting.

Dated: February 26, 2002.

**Katherine Lins,**
*Senior Staff Scientist.*
[FR Doc. 02–5843 Filed 3–11–02; 8:45 am]
**BILLING CODE 4310-Y7-M**

---

# DEPARTMENT OF JUSTICE

## Antitrust Division

[Civil No. 01–01237 GK]

## Public Comments and Response on Proposed Final Judgment in United States v. 3D Systems Corp., *et al.*

Pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b)–(h), the United States of America hereby publishes below the five comments received on the proposed Final Judgment in United States v. 3D

Systems Corporation, et al., Civil Action No. 01–01237 GK, filed in the United States District Court for the District of Columbia, together with the United States' response to the comments.

Copies of the comments and response are available for inspection in Room 215 of the U.S. Department of Justice, Antitrust Division, 325 7th Street, NW., Washington, DC 20530, Telephone: (202) 514–2481, and at the office of the Clerk of the United States District Court for the District of Columbia, E. Barrett Prettyman United States Courthouse, Room 1225, 333 Constitution Avenue, NW., Washington, DC 20001. Copies of any of these materials may be obtained upon request and payment of a copying fee.

**Constance K. Robinson,**
*Director of Operations.*

### United States District Court for the District of Columbia

[Civil No.: 1:01CV01237 (GK)]

*United States of America, Plaintiff, v. 3D Systems Corporation and DTM Corporation, Defendants; Plaintiff's Response to Public Comments*

The United States, pursuant to the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. 16(b)–(h), hereby responds to the five public comments received regarding the proposed Final Judgment in this case.

### I. Background

On June 6, 2001, the United States filed a Complaint alleging that the proposed acquisition of DTM Corporation ("DTM") by 3D Systems Corporation ("3D") would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. 18.

The Complaint alleges that 3D and DTM are two of only three firms that produce industrial rapid prototyping ("RP") systems in the United States. Stereolithography ("SL") technology, utilized by 3D, forms a three-dimensional object through radiation from a liquid, photocurable material. DTM's RP systems use laser sintering ("LS") technology to heat and form a sinterable powder into a three-dimensional form. Both 3D and DTM hold extensive patent portfolios related to RP systems production. These patents have prevented firms that sell RP systems abroad from competing in the United States. The Complaint alleges that the transaction will substantially lessen competition in the development, production and sale of industrial RP systems in the United States, thereby harming consumers. Accordingly, the Complaint asks the Court to issue (1) a judgment that the proposed acquisition of DTM by 3D would violate section 7 of the Clayton Act, 15 U.S.C. 18; and (2) a permanent injunction that would prevent defendants from carrying out the acquisition or otherwise combining their operations.

After this suit was filed, the United States and defendants reached a proposed settlement that allowed 3D to complete its

acquisition of DTM, while preserving competition in the market for industrial RP systems by requiring defendants to license their RP-related patent portfolios. A Stipulation and proposed Final Judgment embodying the settlement were filed with the Court on August 17, 2001.

The proposed Final Judgment, also referred to as the "consent decree," orders 3D and DTM to grant a license to develop, manufacture and sell, and to supply any support or maintenance services for, products under the defendants' RP patent portfolios within a limited field of use matching either 3D's or DTM's technology. The licensee, referred to as the Acquirer, must be approved by the United States, and must be a firm that currently manufactures industrial RP systems, utilizing either the LS or SL technology. The defendants must complete the divestiture five (5) days after notice of entry of the Final Judgment by the Court. The United States may extend the time period for divestiture for up to sixty (60) days. If the defendants do not complete the divestiture within the prescribed period, the proposed Final Judgment provides that the Court will appoint a trustee to accomplish the divestiture.

The United States and the defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provision of the proposed Final Judgment and to punish violations thereof. In compliance with the APPA, the United States filed a Competitive Impact Statement ("CIS") on September 4, 2001. The proposed Final Judgment and the CIS were published in the **Federal Register** on September 26, 2001, and the *Washington Post* during the period September 17–23, 2001. In light of the recent disruptions to mail delivery, the United States published a supplemental notice in the **Federal Register** on December 21, 2001 and in the *Washington Post* from December 20–26, 2001, extending the comment period by fifteen days. The comment period has now expired, with the United States having received public comments from Aaroflex, Inc., Accelerated Technologies, Inc., Advanced Manufacturing & Engineering Services, Advanced Prototyping, Inc., and EOS GmbH Optical Systems, which are annexed hereto as Exhibits 1 through 5.

### II. Response to the Public Comments

#### A. Legal Standard Governing the Court's Public Interest Determination

The Tunney Act directs the Court to determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. 16(e). In making that determination, the "court's function is not to determine whether the resulting array of rights and liabilities is one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." *United States v. Western Elec. Co.,* 993 F.2d 1572, 1576 (D.C. Cir.), *cert. denied,* 510 U.S. 984 (1993)("Western Electric").

The Court's role under the APPA is limited to reviewing the remedy in relationship to

**11124**    **Federal Register** / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices

the violations that the United States alleges in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." U.S. v. Microsoft Corp., 56 F.3d 1448, 1459 (D.C. Cir. 1995). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that the Court "is only authorized to review the consent decree itself," and not to "effectively redraft the complaint" to inquire into other mattes that the United States might have but did not pursue. Id.

The Tunney Act does not empower the Court to reject the remedies in the proposed Final Judgment based on the belief that "other remedies were preferable," Microsoft, 56 F.3d at 1460, nor does it give the Court authority to impose different terms on the parties. See. e.g., United States v. American Tel. & Tel. Co., 552 F.Supp. 131, 153 n. 95 (D.D.C. 1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983) (mem.); accord H.R. Rep. No. 93–1463, at 8 (1974).

### B. Discussion of Comments

The most extensive of the five comments plaintiff received is from EOS GmbH Electro Optical Systems ("EOS"), "a competitor of 3D and DTM in countries other than the United States." EOS comment, p. 1. The EOS comment incorporates most, if not all, of the points made in the four other comments. Plaintiff will therefore address the arguments advanced by EOS in order, with references to the other four comments where appropriate.

(i) Interim Period of Monopoly

EOS first contends that the proposed Final Judgment permits a significant period of monopoly for the merged entity by allowing the merger to close prior to the divestiture. However, plaintiff's investigation into industrial RP equipment customers' buying practices disclosed that such customers typically consider a purchase over a protracted period of time, often waiting a year or more while obtaining quotes and making comparisons. Given these buying habits, a potential purchaser of industrial RP equipment would be able to use the imminent new entry of the Acquirer pursuant to the proposed Final Judgment to bargain for a better price from 3D on its industrial RP equipment. In fact, it appears that this kind of bargaining is occurring. Contrary to EOS' assertion that 3D is currently exercising monopoly power, EOS' Attachment E demonstrates that, during the pendency of the proposed Final Judgment, 3D has found it necessary to offer significant discounts to its customers. This discounting practice is discussed at page 9 of the EOS comment and also at page 2 of the comment submitted by Advanced Manufacturing, and is inconsistent with EOS' assertion at page 2 of its comment that 3D currently enjoys "unfettered monopoly power."

In accepting the consent decree, plaintiff balanced the likelihood of harm to consumers against the interests of the defendants in closing their transaction, and concluded that the time period specified in the decree for negotiating a divestiture and evaluating a proposed Acquirer was reasonable, given the characteristics of the market for industrial RP equipment as discussed above. Further, there was no need to require that the Divestiture Assets be held separate to ensure their viability, because the principal asset to be divested here is a license of intellectual property.

(ii) Market Saturation

EOS next argues that the competition lost by reason of the merger can only be replaced by licensing the LS technology offered by EOS, because U.S. demand for SL systems "has reached a point of saturation." EOS comment, p.9. Advanced Manufacturing offers the same observation in its comment at page 2. Were that proposition to be accepted, EOS would be the only firm that could qualify as an Acquirer within the meaning of Paragraph IV.C. of the proposed Final Judgment, because it is the only company in the world, other than 3D, that manufactures LS systems. There are two other companies that manufacture and sell RP industrial equipment outside the United States, but they both offer SL technology.

However, none of the comments disputes the facts that SL systems offer a competitive restraint on prices of LS systems and that customers might switch to SL systems in the face of a price increase in LS systems. In fact, EOS specifically notes at page 4 of its comment that since 1997 "3D and EOS have been significant competitors for RP systems in Europe and Asia."

Moreover, plaintiff's investigation has revealed that the SL system is the prevailing type of industrial RP equipment sold in the United States. EOS itself estimates that three out of every four industrial RP systems in the United States use SL technology (EOS comment, p. 9), and sales of SL systems have been increasing. 3D's most recent 10–K filing with the Securities & Exchange Commission recites that: "The increase in product sales over the prior year is due primarily to increased sales of SLA (SL) and related equipment * * *. The increase in machine sales results from increased sales of the higher-end SLA industrial systems, especially the SLA 7000. In 2000, we sold a total of 57 SLA 7000 systems compared to 29 in 1999. We expect sales of large frame machines to increase in 2001." 3D 10–K report dated March 16, 2001, p. 26. In fact, less than two months after the quoted 10–K was filed, 3D entered into the largest volume-purchase agreement in the company's history with a California customer, pursuant to which it contracted to deliver as many as 39 SLA 7000 systems over a two-year period. See 3D press release dated May 9, 2001, annexed as exhibit 6. This information runs counter to the assertion that demand for SL systems has reached a saturation point.

As the Complaint alleges, 3D's SL technology and DTM's LS technology compete directly against each other. Since they are substitute technologies in the market for industrial RP systems, the competitive concerns set forth in the Complaint may be addressed by licensing either one.

(iii) LS Materials Monopoly

EOS is joined by Accelerated Technologies, Advanced Manufacturing and Advanced Prototyping in asserting that, if the selected Acquirer uses SL technology, then 3D will retain its monopoly over the sale of LS materials in the United States. LS materials are the sinterable powders used by LS machines. Prior to the merger of DTM and 3D, DTM was the only U.S. supplier of LS materials. 3D succeeded to that sole supplier position through its acquisition of DTM. The Complaint in this case sought no relief with respect to LS materials, because the merger did not lessen competition with respect to LS materials; rather, it left the status quo unchanged. As the comments point out, if EOS is selected as the Acquirer, then there will be a second supplier of LS materials in the United States, and competition will have been created where none existed before. However, since 3D and DTM did not compete in the provision of LS materials, those materials cannot properly be addressed in the context of a remedy designed to resolve the competitive harm arising out of the merger of competing RP systems firms.

(iv) Aaroflex Patent Claims

Relying upon Aaroflex's comment, EOS next asserts that its LS technology should be favored over SL technology because the latter may face patent entry barriers. The "barriers" EOS cites are claims by Aaroflex that certain 3D patents on SL technology are invalid. In February 1997, 3D sued Aaroflex for patent infringement. Apparently as a result of this lawsuit, Aaroflex has never commercialized its technology. It has, however, asserted in that proceeding that certain 3D patents are invalid. The Aaroflex claims have not been treated as "barriers" by 3D, since it continues to commercialize its technology, and the brief discussion of the Aaroflex litigation in 3D's 10–K report does not even mention Aaroflex's invalidity claims. 3D 10–K report dated March 16, 2001, p. 12. Moreover, 3D is prepared to warrant to the Court and the Acquirer that it can "convey all intellectual property included in the Divestiture Assets free and clear of any encumbrances * * *." Proposed Final Judgment, Paragraph IV.D.

(v) Teijin Seiki/CMET Letter

The EOS comment includes as an attachment a copy of a letter EOS received from Teijin Seiki/CMET, a Japanese company that is a potential Acquirer. EOS construes the letter as an invitation to collude, either regarding the bidding process for the Divestiture Assets or regarding competition generally, and argues that this improper conduct should disqualify Teijin Seiki/CMET as a potential Acquirer. This is not a comment on whether entry of the proposed Final Judgment is in the public interest. Rather, it is a comment on whether plaintiff should approve Teijin Seiki/CMET as an appropriate buyer. Plaintiff agrees that, in the event Teijin Seiki/CMET is presented to it as the proposed Acquirer, plaintiff should weigh the letter and its meaning in exercising its discretionary authority to approve the Acquirer under Paragraph IV.N. of the proposed Final Judgment.

(vi) Pending Litigation Between EOS and 3D

In December 2000, EOS filed suit against DTM, seeking damages for infringement of certain 3D patents which 3D had licensed to EOS in 1997. The license agreement between

EOS and 3D contains what EOS characterizes as a "Non-Suit Provision," which bars EOS from asserting infringement claims against 3D based upon the patents 3D licensed to EOS "at any time, for any reason, during the term of the License Agreement." See Attachment A to EOS comment. Following consummation of the merger between 3D and DTM, 3D filed a motion invoking the Non-Suit Provision to prevent EOS from collecting damages for infringement after the date of the merger, because the allegedly infringing products are now being sold by 3D instead of DTM.

Citing United States v. Microsoft Corporation, 56 F.3d 1448 (D.C. Cir. 1995), EOS contends that the Court should take 3D's motion into account in making its public interest determination under 15 U.S.C. 16(e)(2) because "[a]mong the factors that the Court is to consider in conducting its public interest inquiry is whether entry of the proposed Final Judgment 'will result in any positive injury to third parties.'" EOS comment at p. 11, quoting Microsoft Corporation, 56 F.3d at 1461, n.9. However, whatever "positive injury" EOS may suffer results not from the proposed Final Judgment but from the broad language of the Non-Suit Provision. The meaning and effect of the contractual relationships between 3D and EOS are properly left to the court before which those issues are now pending.

(vii) Austin Plant and Service Personnel

EOS mistakenly asserts, at page 13 of its comment, that the Divestiture Assets include "an option for the Acquirer to purchase DTM's plant located in Austin, Texas," drawing from this an inference that the Department misunderstands fundamental concepts of the RP industry. In fact, the proposed Final Judgment merely recites that the plant can be included among the assets to be conveyed, meaning that the Acquirer may, at its option, assume whatever interest DTM had in the plant: owned property may be conveyed by purchase, and leased property may be conveyed by a lease assumption. EOS misconstrues the CIS reference to an "option to purchase the [DTM] plant" to mean the full assumption of ownership, when in reality it means the Acquirer has the option to "purchase" 3D's interest in the plant, whatever form that interest might take.

EOS also suggests that the consent decree should have done more to facilitate the hiring of service personnel from 3D by the Acquirer. The provisions contained in Paragraph IV.I. of the proposed Final Judgment adequately protect the Acquirer's ability to recruit 3D service personnel. That paragraph requires defendants to waive any non-compete clauses in agreements with present or former employees, and prohibits defendants from interfering with any negotiations by the Acquirer to employ any of defendants' present or former employees for a period of two years. Further, each firm that manufactures RP systems outside of the United States currently employs its own service personnel, and has developed its own programs and methods for training them on its own machines. It is not, therefore, a foregone conclusion that the Acquirer would rely upon recruitment of 3D personnel,

trained on 3D machines, to build up its U.S. service network.

(viii) Second Comment Period

EOS suggests that there be a second comment period in this case, following the proffer of a proposed Acquirer by 3D but preceding plaintiff's approval of an Acquirer. EOS comment, p. 15. Plaintiff objects to the proposed second round of comments for three principal reasons.

First, such a procedure would be inconsistent with procedures that courts have routinely applied in reviewing proposed Final Judgments. Since the Tunney Act was enacted in 1974, the United States has negotiated hundreds of consent decrees in merger cases. In each instance, the public had an opportunity to comment upon the terms of the proposed Final Judgment. Often the court has proceeded to review and then enter the proposed Final Judgment before the acquirer of the divestiture assets has been selected, relying upon the United States to monitor the divestiture process. Plaintiff has been unable to identify a single instance in which a court deferred entry of a proposed Final Judgment that was otherwise in the public interest in order to receive a second round of comments regarding the divestiture selection process. EOS has provided the Court with no reason to deviate from the procedures that are routinely followed in other cases subject to the Tunney Act.

Second, such a procedure is unnecessary given the incentives and ability plaintiff has to assure that divestitures are accomplished in a manner that protects competition. After concluding that the proposed transaction between 3D and DTM would be anticompetitive, plaintiff agreed to the proposed Final Judgment as a way to preserve the competition that existed prior to 3D's acquisition of DTM. Accordingly, the proposed Final Judgment is designed to ensure that the Acquirer of the license will compete effectively against 3D and others in the industry, and that plaintiff conducts a thorough investigation before approving any particular Acquirer.

The proposed Final Judgment contains provisions that (1) give the United States sole approval of the Acquirer of the license, Paragraph IV. A., (2) set forth the standards that the United States applies in evaluating proposed purchasers, paragraph IV. N., and (3) require defendants to provide information to plaintiff about the process undertaken to select an Acquirer, as well as requiring information from defendants and the prospective purchaser for evaluation of the purchaser in Section VI. After obtaining notice that defendants have entered into a proposed transaction with a prospective purchaser, plaintiff will investigate the transaction and prospective purchaser, reviewing the selection process and analyzing the managerial and financial ability of the purchaser. The proposed Final Judgment gives plaintiff considerable access to details, often highly confidential, about prospective purchasers. Without such access, comments on specific proposed purchasers will lack the information necessary to aid an informed decision. In sum, the proposed Final Judgment's provisions empower the United States to review and approve the

proposed Acquirer of the license, and with these provisions, the United States is able to ensure that the Acquirer is capable of competing effectively in the relevant market.

Third, a second round of comments would itself create problems that might make divestitures in antitrust cases more difficult to accomplish promptly. It would potentially delay the achievement of effective remedies to anticompetitive mergers by delaying entry of the proposed Final judgment, and extending the divestiture deadlines contained therein. Any needless delay in the consummation of divestitures would deny the public the benefits of the competition contemplated by the proposed Final Judgment. A second round of public comments would also risk involving the Court in an inquiry that is not envisioned by the Tunney Act. Courts have repeatedly held that it is not within the "public interest" standard of the Tunney Act to determine the "best" remedy. See Western Electric, 993 F.2d at 1576.

Finally, in this case, a second comment period is plainly unnecessary. There are only three firms in the world that qualify as potential Acquirers, and the comments plaintiff has received demonstrate that industry participants are familiar with the firms and their technologies. Any issues pertaining to a particular potential Acquirer could and should have been addressed in the comment period provided by law, as EOS itself did in its discussion of the Teijin Seiki/CMET letter.

For all of the foregoing reasons, the Court should reject EOS' proposal for a second round of public comments.

*C. Recommendations Made in the Comments*

Significantly, none of the five comments recommends rejection of the proposed Final Judgment. In their respective comments, Aaroflex, Accelerated Technologies, Advanced Manufacturing and Advanced Prototyping all recommend that the LS technology be licensed instead of the SL technology, and offer observations about perceived advantages of the LS technology and perceived disadvantages of the SL technology. Plaintiff will consider and weigh all such observations when exercising its discretionary authority to approve the Acquirer of the Divestiture Assets.

Advanced Prototyping also recommends that the consent decree be "amended in some fashion" to address the possibility that the Acquirer may not compete aggressively or maybe unsuccessful. Advanced Prototyping comment, p.3. However, the decree already directly addresses these concerns by providing that the Acquirer must be a "firm that currently manufactures RP industrial equipment" which, in plaintiff's sole discretion, "has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively * * *." Proposed Final Judgment, Paragraphs IV. C&N. Moreover, in the unlikely event that the entrant fails, the license is transferable.

EOS "recommends that DOJ or the Court modify the proposed Final Judgment so that a new competitor will be permitted to sell laser sintering (LS) RP systems and material

in the United States, without regard to whether 3D licenses its stereolithography [SL] technology." EOS comment, p. 16. The principal difficulty with the EOS recommendation is that it is inconsistent with the theory of liability pleaded in the Complaint and the evidence that supports that liability. The Complaint alleges that "[t]here are only three companies that develop, manufacture, and sell industrial RP systems in the United States" (¶20), and that 3D, with its SL technology, and DTM, with its LS technology, "compete directly against each other in the development, manufacture and sale of industrial RP systems and materials." (¶21). Because the merger reduces the number of U.S. competitors from three to two, the consent decree addresses that competitive concern by listing patent entry barriers so that another competitor using either the SL or LS technology can enter the U.S. market, thereby restoring the number of competitors to three.

To the extent EOS asserts that a divestiture of LS technology is needed to preserve competition for industrial RP systems, it overlooks the weight of the evidence that SL and LS compete directly against each other. Consistent with the Complaint, and indeed with the history of competition between 3D (an SL firm) and DTM (an LS firm), the license of either SL or LS technology will preserve competition in the industrial RP systems market. Accordingly, plaintiff submits the EOS' recommendation to modify the proposed Final Judgment to require the licensing of LS technology must be rejected because the Complaint in this case offers no basis for its implementation.

**III. Conclusion**

None of the comments received by plaintiff in this case takes the position that the proposed Final Judgment is not in the public interest within the meaning of 15 U.S.C. 16(e), and that it should accordingly be rejected by the Court. Instead, the comments offer suggestions for modification of the proposed Final Judgment or observations about which company might make the most suitable Acquirer in order to remedy the harm alleged in the Complaint.

After careful consideration of the comments, the United States has affirmed its conclusion that entry of the consent decree will provide an effective and appropriate remedy for the antitrust violation alleged in the Complaint, and is in the public interest. The proposed modifications that seek a different remedy are inconsistent with the theory of the Complaint in this case, and must therefore be rejected. The observations regarding factors that should be considered in determining whether a proposed Acquirer has the intent and capability of competing effectively in the business of selling and servicing RP Industrial Equipment can and will be taken into account when the United States fulfills its responsibilities to approve a buyer under Paragraph IV.N. of the proposed Final Judgment.

Accordingly, the United States will move the Court to enter the proposed Final Judgment after the public comments and this Response have been published in the **Federal Register** as 15 U.S.C. 16(d) requires.

Dated: February 15, 2002, Washington, DC
Dando B. Cellini,
Stephen A. Harris,
*U S. Department of Justice, Antitrust Division, Litigation II Section, 1401 H Street, NW., Suite 4000, Washington, DC 20530, (202) 307–0829.*

**Certificate of Service**

I hereby certify that I caused a copy of the foregoing Response to Public Comments to be served by mail and facsimile transmission, this 15 day of February, 2002, upon the following counsel of record for defendant 3D Systems Corporation:

Charles E. Biggio, Esq., Akin, Gump, Strauss, Hauer & Feld LLP, 590 Madison Avenue, New York, NY 10022, (212) 872–1010, *Fax:* (212) 407–3210.

David Donohoe, Esq. (#3426), Akin, Gump, Strauss, Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036, (202) 887–4000, *Fax:* (202) 887–4288.

John A. Herfort, Esq., Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, (212) 351–3832, *Fax:* (212) 351–3832.

Stephen A. Harris,
*U.S. Department of Justice, Antitrust Division, Litigation II Section, 1401 H Street, NW., Suite 3000, Washington, DC 20530 (202) 514–4901.*
November 19, 2001.

**Via Overnight Mail and Facsimile**

J. Robert Kramer II, Chief, Litigation II Section, Antitrust Division, U.S. Department of Justice, 1401 H Street, NW., Suite 3000, Washington, DC 20530.

*Re: Comment on Settlement Agreement Reached in United States v. 3D Systems Corporation and DTM Corporation*

Dear Mr. Kramer:

As the Chairman and Chief Executive Officer of Aaroflex, Inc., I submit the following comments on the settlement terms agreed to by the Department of Justice ("DoJ") to settle its case against the merger of 3D Systems, Inc. and DTM Corporation.

In 1995, DuPont granted North American rights under its stereolithography patents to Aaroflex. Aaroflex continued to develop the technology and began to offer an advanced sterolithography system for sale in the United States. In February of 1997, 3D Systems sued Aaroflex alleging that Aaroflex's very advanced stereolithography system infringed six of 3D Systems' patents. Specifically, 3D Systems asserted that Aaroflex's stereolithography products produced under the DuPont patents infringe the following patents: U.S. Patent Numbers 4,929,402; 5,174,931; 5,059,359; 5,137,662; 5,184,307; and 5,571,471. 3D Systems subsequently added two other patents, U.S. Patent Numbers 4,999,143 and 5,902,537. 3D Systems also removed one of the patents, U.S. Patent Number 5,571,471. Aaroflex has vigorously defended itself, and maintains that its products do not infringe any patents of 3D Systems. In fact, Aaroflex maintains that the patents being asserted by 3D Systems are invalid. Aaroflex's invalidity claims are presently pending in the action *3D Systems,*

*Inc. v. Aerotech Laboratories, Inc. et al*, United States District Court, Central District of California, Case No. 97–0231 AJW.

In reviewing the settlement agreement among the DoJ, 3D Systems, and DTM, I noticed that 3D Systems and DTM have warranted "that they have the authority to convey all intellectual property included in the Divestiture Assets *free and clear of any encumbrances. . . .*" Section IV(D) of the Settlement Agreement (emphasis added). Notably, each one of the patents subject to Aaroflex's invalidity claims is "included in the Divestiture Assets" as defined in the settlement agreement and identified in Appendix 1 to that agreement. Those patents are clouded by Aaroflex's invalidity claims. As a result, 3D Systems/DTM cannot convey them "free and clear of any encumbrances." On the contrary, should 3D Systems/DTM license its stereolithography patents to, for example, Teijin Seiki, then Aaroflex would assert its rights under the DuPont patents against Teijin Seiki (or any other licensee of 3D Systems' Stereolithography patents) if the licensee attempts to sell stereolithography equipment in the United States.

For your background, Teijin Seiki acquired the Asian rights to DuPont's stereolithography patents about two years before Aaroflex acquired its North American rights under the DuPont patents. 3D Systems filed a patent infringement action against Teijin Seiki in Osaka, Japan in 1997—the same year in which 3D Systems brought its patent infringement action against Aaroflex. Given that they were both licensees under DuPont's stereolithography patents, Aaroflex and Teijin Seiki cooperated in asserting their defenses against the patent infringement actions of 3D Systems. Teijin Seiki successfully asserted an invalidation claim against one of 3D System's patents. 3D Systems appealed that decision. Teijin Seiki has since acquired a company called NTT-Data CMET Inc. I believe that 3D Systems and CMET had entered into a cross-licensing agreement previously to settle patent litigation. Thus, as a result of its acquisition of CMET, Teijin Seiki effectively became a party to that cross licensing agreement with 3D. Based upon that cross-licensing agreement, I believe that 3D Systems has since settled its Japanese litigation with Teijin Seiki. Since its acquisition of CMET, Teijin Seiki will no longer cooperate with Aaroflex in defending the action brought by 3D Systems.

In order to comply with the DoJ settlement terms, I expect 3D Systems to license its U.S. Stereolithography patents to Teijin Seiki/ CMET. Such a licensing agreement will be a direct byproduct of the cross-licensing agreement between 3D Systems and Teijin Seiki/CMET and I believe it would be entered into with the intention to hinder Aaroflex's ability to succeed in its litigation with 3D Systems.

The United States District Court for the District of Columbia should modify the proposed Final Judgement to require that 3D Systems license (for use) DTM's sintering patents. The entry of the settlement terms as they currently exist would: (1) effectively encourage infringement of Aaroflex's patent rights under DuPont's patents; and (2) ensure

that any licensee of 3D Systems's stereolithography patents that attempts to sell products in the United States will have to defend itself against the assertion of Aaroflex's patent rights.

If you would like to discuss these comments, please contact me.

Yours truly,

Albert Young,

*Chairman & Chief Executive Officer, Aaroflex, Inc., 8511 Rixlew Lane, Manassas, VA 20109, (703) 573–0690.*

J. Robert Kramer II, Chief, Litigation II Section, Antitrust Division, U.S. Department of Justice, 1401 H Street, NW., Suite 3000, Washington, DC 20530.

Dear Mr. Kramer,

I am writing to you in regards to the United States V. 3D Systems Corporation proposed final judgment and competitive impact statement. (civil action no. 1:01CV01237)

I am the General Manager of a leading rapid prototyping service bureau, Accelerated Technologies, Inc., and have been in this type of business since 1989. We utilize both the SLS and SLA technologies that 3D Systems now offers. Of most interest to ATI is the availability of materials for both processes. Currently, there are several vendors besides 3D Systems that sell resin for the SLA process but the only materials available for SLS are those sold by 3D Systems. These SLS materials are sold at a substantially higher price that what they could be purchased for from foreign competition. 3D Systems has made it clear that they would seek legal action against any customer of theirs that buys material from anyone other than themselves. We are being forced to pay 40% more for materials than our foreign competitors and are therefore unable to compete in most foreign markets.

It is also our belief that the SLS technology has the most potential for growth, especially in the area of Rapid Manufacturing. The availability of materials with advanced mechanical properties, such as Nylon and metal, make SLS the logical choice for this type of application. There is currently SLS equipment available that will produce direct metal parts for manufacturing that ATI is unable to acquire because of 3D's monopoly.

It is our understanding that 3D Systems is required to license either the SLS or SLA process to a competitor to satisfy the aforementioned final judgement. If that license were to be for the SLA process, we would see little change in current conditions. There would still be multiple vendors selling SLA resins at competitive prices and 3D would maintain their monopoly of SLS materials. It would also be very difficult for any SLA vendor to penetrate the strong market share that 3D holds.

We believe that a license granted for the SLS process would encourage more competition and would be of greater benefit to the entire industry.

Please feel free to call me with any questions.

Dated: November 12, 2001.

Regards,

Mike Durham,

*General Manager.*

November 21, 2001.

J. Robert Kramer II, Chief, Litigation II Section, Antitrust Division, U.S. Department of Justice, 1401 H Street, NW., Suite 3000, Washington, DC 20530.

### Re: Public Comment on the Settlement of United States v. 3D Systems Corporation and DTM Corporation

Dear Mr. Kramer,

I am the president of Advanced Manufacturing & Engineering Services, hereinafter referred to as Advanced. Advanced is a corporation located in Nevada, Iowa providing design engineering, rapid prototyping and plastic injection molding services to its customers. I wish to make the following comments on the proposed Final Judgement in the Department of Justice's case against the merger of 3D Systems and DTM Corporation.

In order to promote competition in the United States rapid prototyping industry, the proposed Final Judgement must be amended to require that 3D license its newly acquired selective laser sintering technology. As I understand it, the proposed Final Judgement permits 3D to choose which technology (stereolithography or selective laser sintering) it will license. This a mistake. Based upon the present conditions in the United States RP industry, it is a certainty that 3D will license its stereolithography technology, and by doing so 3D will be able to maximize its market power.

First, the rapid prototyping market in the United States for stereolithography technology has reached a point of saturation. I would estimate that three out of every four industrial rapid prototyping system in operation in the United States utilizes stereolithography technology. As a result, for the foreseeable future, the growth potential for stereolithography systems in the United States is very low. As evidence of this state of market saturation, one only need to look at the present rebate program offered by 3D. 3D is offering a rebate of up to $200,000.00 on its largest stereolithography system, a 29% reduction. It is readily apparent that 3D is experiencing a significant decrease in sales of its stereolithography systems. A newly licensed stereolithography firm would have to contend with this state of market saturation as well as with 3D's installed based of customers. Given that, its prospects for any measurable success would be slim. More likely, the newly licensed stereolithography would have little to no pro-competitive effect on the market for industrial rapid prototyping systems in the United States.

On the other hand, there is a substantial opportunity for growth in the United States market for industrial rapid prototyping systems employing selective laser sintering (SLS) technology. SLS prototypes are more durable and have a larger range of applications due to the variety of materials available. SLS is also moving in the direction of rapid manufacturing, meaning companies will not only produce prototypes, but finished products using this technology. Second, 3D is now the only supplier of sintering powder material in the United States. By licensing its technology to a

stereolithography firm, 3D will maintain this monopoly position and continue to harm U.S. competition in the rapid prototyping industry. 3D currently charges extremely high prices for the powder material used in the SLS process. If allowed the powders could be purchased direct from the powder manufacturer for as little as $10.00/lb, 3D charges $65.00/lb. If competition were realized the cost of this material would level out to a more reasonable level. There is evidence of this in the European market where 3D competes with EOS. The same material there sells at $35.00/lb. This price differential in powder material does not allow U.S. companies the opportunities to compete on a global scale.

In conclusion, licensing a stereolithography firm will not promote competition in the United States rapid prototyping industry. Instead, it would only fortify 3D's present monopoly position. The proposed Final Judgement should be modified to require that 3D license its laser sintering patents to another company currently manufacturing and selling commercial SLS equipment. Presently EOS is the only other laser sintering firm in the world. Licensing EOS is the only way to replace the competition that has been lost by the merger of 3D and DTM.

I am willing to discuss these comments with you if you have any questions about the information that I have provided.

Sincerely,

Daryl Michael,

*President, Advanced Manufacturing & Engineering Services.*

### Advanced Prototyping, Inc.

November 21, 2001.

J. Robert Kramer II, Chief, Litigation II Section, Antitrust Division, U.S. Department of Justice, 1401 H Street, NW., Suite 3000, Washington, DC 20530.

### Re: Comment on Proposed Final Judgement in United States v. 3D Systems Corporation and DTM Corporation

Dear Mr. Kramer:

I write in response to the invitation for the submission of comments on the terms of the proposed final judgement in United States v. 3D Systems Corporation and DTM Corporation. I am the president of Advanced Prototyping, Inc. ("API"). API operates both stereolithography ("SL") and laser sintering ("LS") machines, which the Department of Justice refers to as rapid prototyping ("RP") industrial equipment. API is an RP service bureau. As the DOJ is aware, RP "service bureaus" produce prototypes of molds, models, prototypes, as well as other three-dimensional objects at their customer's request. API utilizes powders ("LS material") and resins ("SL material") in conjunction with its LS and SL RP equipment to produce those objects for its customers. API provides RP services to commercial customers in the United States and Canada. API has been in business for 5 years and has over 400 customers. Service bureaus, like API, account for a significant amount of 3D's and DTM's sales of RP equipment as well as the sales of LS material and SL material in the United States.

Since the announcement of the proposed merger of 3D Systems, Inc. ("3D") and DTM Corporation ("DTM"), API has been concerned about the adverse effects that the combination would have on the RP industry in the United States because of the elimination of competition between the SL and LS RP technologies. API was concerned that, as a result of the transaction, the merged company would have the ability to significantly raise the prices of its RP equipment as well as the LS material and the SL material (collectively "RP materials") used in the RP industrial equipment market to produce the three-dimensional objects. Additionally, API believed that the combination of 3D and DTM would hinder innovation in the RP industry. API was pleased to learn that the DOJ was similarly troubled by the proposed combination and filed a lawsuit to prevent it from occurring. However, after reviewing the proposed settlement terms agreed to by the DOJ, API remains concerned.

From its review of the proposed Final Judgement, API understands that the DOJ agreed to settle its lawsuit based upon a commitment from 3D to license (for use) either its LS-related patents or its SL-related patents to a company that is currently in the business of manufacturing and selling such RP equipment—leaving it to 3D to select which technology will be licensed. All such companies are located outside of the United States. Yet, the proposed Final Judgement does not seem to include any terms designed to ensure that the licensee successfully enters the United States RP market. Additionally, the DOJ apparently permitted the proposed transaction to close prior to the required licensing being finalized. The merger was completed in August of this year, and as a result the merged entity is presently enjoying the monopoly in the United States market for RP equipment and RP materials that the DOJ sought to eliminate.

Unfortunately, the proposed Final Judgement does not adequately address the adverse competitive effect of the combination of 3D and DTM. API's most significant concerns with the terms of the proposed Final Judgement are the following: (1) There remains a possibility of the permanent loss of a competing supplier of LS RP equipment and LS material in the United States; (2) it does not ensure that the licensee will successfully enter the United States; and (3) the monopoly position of 3D in the United States LS material market may remain undisturbed.

*A Competing Supplier of LS RP Equipment and LS Material May Be Lost*

As a result of the combination of 3D and DTM, the consumers in the United States RP industry have lost a competitive independent source of LS RP equipment and LS material. Nevertheless, the proposed Final Judgement does not require that 3D license its LS technology, but instead it permits 3D the option of licensing its SL technology. If 3D licenses its SL technology, then the competition in United States that existed prior to the merger will have been permanently lost. Moreover, after granting a license under its SL patents, 3D (an SL

company) will undoubtedly aggressively promote its SL technology even more in an attempt to maintain its strong position in the United States markets for SL RP equipment and SL material. Meanwhile, 3D can be expected to give little attention to its newly-acquired LS business. Such lack of attention would necessarily harm U.S. consumers of LS RP equipment and LS material.

LS technology is generally regarded in the RP industry as having greater growth potential than SL technology. The LS technology produces a more durable and functional object, while objects produced through SL technology are more malleable. Also, the accuracy of the LS technology has been greatly improving over the last several years. The LS technology and the LS material are closer to achieving what is expected to be the future of the United States RP industry: Rapid manufacturing. Without an independent entity pushing for innovative developments in LS technology, 3D will be allowed to dictate the pace of that innovation. Given that 3D would be competing with its SL licensee and otherwise occupied with maintaining its SL market position, it will have no incentive to take any action (such as efforts to develop its LS technology) that may further erode its strength in the United States SL market. Consequently, API expects that innovative activity in United States in the field of LS technology can be expected to slow to a crawl or stop completely unless 3D is required to license its LS technology to an independent entity. If 3D is not required to do so, then United States customers in the RP industry will undoubtedly be harmed by the lack of competition from an independent entity that has the ability and incentive to conduct research and development in the field of LS technology.

*Uncertainty of the Proposed Licensing Solution*

The proposed Final Judgement makes no provision for the possibility that the licensee may not aggressively undertake to exercise its rights under the license, or the possibility that the licensee's attempt to enter the United States RP industry is unsuccessful. In the event that either one of these possibilities becomes a reality, the settlement terms will be effectively meaningless and 3D will continue to have the monopoly they presently have. The proposed Final Judgement should be amended in some fashion to account for the occurrence of either contingency. There should be some oversight of the selected licensee's operations in the United States, and a requirement that 3D license their relevant technology to another company if the initial licensee does not successfully enter the United States within a certain time period. We suggest that if the licensee does not make at least $20 million of sales in the United States over its first complete year of operations, then the DOJ should revisit the situation and decide if 3D should license its technology to another company, in order to promote competition.

Moreover, if 3D were to license its SL patents instead of its LS patents then the likelihood of the licensee failing to successfully enter the United States market

would increase. Any SL licensee will be faced with the formidable task of penetrating 3D's well-established base of SL customers in the United States. The SL licensee would have to expend considerable time and resources before even having a hope of experiencing any success in the United States.

*3D Is Free to Keep Its Monopoly on LS Material*

The sale of RP materials represents a substantial portion of the costs for customers in the RP industry. For example, since we started our business API has spent 10% of our gross income on material. Following the merger of 3D and DTM, 3D is now one of two SL material suppliers in the United States. Should 3D choose to license its SL patents and not its LS patents, then 3D's monopoly of the United States market for LS material will continue. API believes that 3D will take aggressive action to exploit its position in the United States market for RP materials.

The District Court and the DOJ should be aware of the actions that 3D has taken since the settlement with the DOJ was reached and the merger was closed. Since that time, 3D has acquired RPC Ltd. (previously an independent Swiss SL material manufacturer and developer). Also, 3D's distribution and development agreement with Vantico Inc. (a manufacturer and developer of RP SL material) has terminated. 3D is currently involved in a dispute with Vantico about whether Vantico can sell its SL materials in the United States independent of 3D. Through those two actions, 3D has reduced the number of sellers of SL material in the United States from three to two. API expects to be paying more in the near future for the SL material that it must purchase in order to run its SL machines. When coupled with 3D's monopoly in the LS material market, United States consumers of RP material are harmed even further. In order to lessen the harm to competition in the United States RP materials market, the proposed Final Judgement should be modified to require that 3D license its patents that cover LS material regardless of whether it grants any license under its SL patent pursuant to its settlement with the DOJ.

*Conclusion*

The DOJ or the United States District Court for the District of Columbia should modify the proposed Final Judgement to require the licensing of 3D's LS technology in order to encourage innovation in SL technology, and to maintain a competing source of SL RP equipment and material. The proposed Final Judgement should also be modified so as to include terms that do more to ensure the successful entry of the licensee of 3D's RP technology into the United States RP market.

Please contact me if you have any questions about the information that API has provided in these Comments.

Sincerely yours,

Ernie Guinn,

*President, Advanced Prototyping, Inc., 2269 Star Court, Rochester Hill, MI 48309, (248) 853–8256.*

November 21, 2001.

**Via Courier and Facsimile**

J. Robert Kramer II, Chief, Litigation II
Section, Antitrust Division, U.S.
Department of Justice, 1401 H Street, NW.,
Suite 3000, Washington, DC 20530.

*Re: Proposed Final Judgment in United States
v. 3 D Systems Corporation and DTM
Corporation*

Dear Mr. Kramer:

EOS GmbH Electro Optical Systems
("EOS") submits the following comments to
the U.S. Department of Justice, Antitrust
Division ("DOJ" or the "Antitrust Division"),
regarding the settlement agreement reached
between the Antitrust Division and 3D
Systems Corporation ("3D") and DTM
Corporation ("DTM") to settle DOJ's antitrust
lawsuit against the merger of 3D and DTM.
United States v. 3D Systems and DTM Corp.,
Civil Action No. 1:01CV01237 (D.D.C. filed
June 6, 2001). EOS is a competitor of 3D and
DTM in countries other than the United
States, and EOS is a knowledgeable industry
participant.

**Introduction**

The proposed Final Judgment has already
permitted the merger of 3D and DTM (the
"Merger") to occur, subject to provisions of
the proposed Final Judgment, which DOJ
asserts will adequately cure the harm to
competition in the United States that the
Merger has caused. However, EOS has
serious concerns that the proposed Final
Judgment does not adequately address the
competitive problems that DOJ identified in
its Complaint.

First, the proposed Final Judgment permits
a significant period of monopoly for the
combined 3D and DTM. By allowing the
merger to be consummated prior to any
divestiture being made, DOJ has permitted
the creation, for at least a significant interim
period, of the very monopoly that DOJ had
challenged in its Complaint. 3D's unfettered
monopoly power since the merger is raising
additional barriers for potential new
competitors to enter into in the market for
industrial rapid prototyping ("RP") systems
and materials in the United States. Any
potential Acquirer of the Divestiture Assets
will face a thoroughly entrenched monopolist
by the time it possibly could begin U.S.
sales.[1]

Second, as a result of the Merger, the
United States industrial RP systems and
materials markets have lost the competition
supplied by an independent laser sintering
firm. The Antitrust Division's proposed Final
Judgment, however, does not require that the
specific type of competition that was lost be
replaced. Rather, the proposed Final
Judgment allows the merged parties to
determine which of two differing
technologies may be divested. Moreover, DOJ
seems to have overlooked the fact that any
Acquirer of the Divestiture Assets related to
stereolithography, one of the two relevant

technologies, may still encounter significant
patent barriers controlled by third parties.

Third, DOJ did not properly consider the
harm that the proposed Final Judgment is
causing to third parties. EOS' ability to
litigate certain intellectual property rights
that it owns is being harmed as a result of
the Merger, which the proposed Final
Judgment has permitted.

Finally, the proposed Final Judgment
contains several provisions that indicate that
the Antitrust Division does not correctly
understand what is required to begin
competing in the industrial RP systems and
materials market in the United States.

As a result of these infirmities in the
proposed Final Judgment, EOS requests that
DOJ or the Court modify the proposed Final
Judgment. Specifically, EOS requests that the
proposed Final Judgment be modified in
order to require that 3D license its laser
sintering patents regardless of whether 3D
licenses its stereolithography patents. Also,
EOS requests that the proposed Final
Judgment be modified in order to prevent its
entry from inflicting further injury on EOS.

In order to ensure that the issues presented
by the terms of the proposed Final Judgment
are adequately considered, EOS requests that
the Court hold a hearing to evaluate whether
the Antitrust Division has sufficiently
protected the public interest in reaching the
settlement agreement reflected in the
proposed Final Judgment.

*I. The RP Industry*

A. RP Industry Background and Description
of EOS

In its Complaint, DOJ accurately describes
the fundamental aspects of the RP industry
so that the public and the Court are able to
understand the competitive effects of the
Merger. To restate briefly these fundamental
aspects, RP systems utilize "computers and
computer automated equipment to rapidly
produce" prototypes, molds, models, and
other three-dimensional objects. See
Complaint ¶ 10. The combined 3D/DTM
manufactures and sells industrial RP systems
that utilize the two most sophisticated
technologies in the RP industry:
Stereolithography and laser sintering.
Stereolithography technology utilizes a
liquid, photocurable plastic resin to create
three-dimensional objects through radiation.
Laser sintering technology creates three-
dimensional objects by employing a plastic
powder that is solidified through the heat
and energy supplies by a laser. Consistent
with the Antitrust Division's allegation in its
Complaint, EOS estimates that 3D and DTM
have a combined eighty percent share, by
revenue, of the industrial RP systems and
materials market in the United States.

EOS is a German corporation,
headquartered near Munich. EOS
manufactures and sells industrial RP systems
and materials. The RP systems manufactured
by EOS utilize laser sintering technology.
EOS sells its laser sintering RP systems and
materials primarily in Europe and Asia. EOS
is the only company in the world other than
DTM (now part of 3D since the Merger) that
has developed and manufactured laser
sintering RP systems and materials. The
Antitrust Division has recognized that "3D

and DTM face rigorous competition from . . .
Electro Optical Systems, based in Germany."
See Competitive Impact Statement at 66 FR
49209.

However, EOS makes no sales of its laser
sintering RP systems in the United States.
This is primarily because of assertions by
DTM, and now by 3D following the Merger,
of certain U.S. patent barriers. This
intellectual property barrier to sales in the
United States by foreign companies is one
reason that DOJ concluded that the United
States constitutes a distinct geographic
market for RP systems and materials. See
Complaint ¶¶ 16–19. The DOJ also
recognized that the patent rights controlled
by 3D and DTM were a primary reason for
the anticompetitive effects caused by the
Merger. See Complaint ¶ 28. Similarly, 3D
and DTM recognized the large patent barrier
their combined portfolios represent.
According to the Complaint, the investment
banking firm retained by 3D to advise on the
Merger reported that 3D's management
believed that "following the merger, [3D] will
have a significantly strong patent portfolio to
prevent others from competing in the United
States." *Id.*

B. EOS's Relationship and Competition With
3D

EOS and 3D have a unusual relationship
that DOJ and the Court must understand in
order to appreciate the harm that the
proposed Final Judgment, as explained in
more detail below (see Section IV.), has had
on EOS specifically and on possible new
competition in the United States generally.
The unusual relationship between 3D and
EOS is that, while EOS is a competitor of 3D,
EOS is also a licensee under all of 3D's
patents. EOS utilizes the patents that it
licenses from 3D, as well as other technology
EOS owns, to produce laser sintering RP
systems that compete with 3D's RP Industrial
Equipment.

Prior to the Merger, 3D owned an extensive
patent portfolio that both 3D and EOS believe
cover significant portions of both the
stereolithography and the laser sintering
technologies used in the RP industry. In a
series of transactions between 3D and EOS in
1997, EOS licensed from 3D the exclusive
right to produce and sell laser sintering RP
systems under the 3D patents. See August 27,
1997 License Agreement between 3D Systems
Corporation and EOS GmbH ("1997 3D/EOS
Licensing Agreement") (Attachment A).
Following the execution of the 1997 3D/EOS
Licensing Agreement, and until the Merger,
3D manufactured and sold only
stereolithography RP systems. EOS
manufactures and sells only laser sintering
RP systems. As a result of the 1997 3D/EOS
Licensing Agreement, both companies in part
use technology protected by the same
patents. Since the 1997 3D/EOS Licensing
Agreement became effective, 3D and EOS
have been significant competitors for RP
systems in Europe and Asia, but not in the
United States, where DTM's assertions of
intellectual property barriers have inhibited
EOS from entering the market.

C. EOS Competition with DTM

At the time that 3D and EOS entered into
the 1997 3D/EOS Licensing Agreement, DTM

---

[1] To extent possible, EOS uses terms as defined
in the Complaint and the proposed Final Judgment.
Capitalized terms denote the definitions in the
Complaint and the proposed Final Judgment, unless
otherwise indicated.

was making commercial sales of its laser sintering RP systems and materials. DTM's and EOS' laser sintering RP systems use similar technologies and similar sintering RP material. DTM and EOS directly compete in Europe, Asia, and elsewhere, but not in the United States.

**D. The Inability of EOS To Compete in the United States Has Resulted in Much Higher U.S. Prices**

The competition between EOS and DTM has greatly benefited customers of industrial RP systems in Europe and Asia, the areas where EOS primarily competes with DTM (now with 3D). As a result of that competition in Europe, customers pay much less for sintering RP material in Europe than in the United States. Due to the lack of competition in the United States, sintering RP material has, on average over the last several years, cost United States customers about three times more than European customers. At the present, U.S. customers of DTM are paying $60 to $65 per pound for DTM's DuraForm , which EOS believes accounts for about 80% of the material used in DTM's laser sintering RP systems. European customers are paying about $20 to $22 per pound for the same DuraForm material. The cost of the sintering RP material, which is a continuing and substantial cost that users of RP systems incur, is a very important consideration in the purchase and use of RP systems. Over the life of an RP system, it is not unusual for a user to spend more for the material used in the RP system than the original cost of the RP system. The Antitrust Division has recognized this U.S./Europe price difference, and it was a significant reason that DOJ concluded that the United States is a separate market.

Due to the large discrepancy between the price of laser sintering RP material in the United States as compared to Europe, the growth of laser sintering technology has been inhibited in the United States. Laser sintering RP systems and materials now account for about 55% of all RP industry purchases in Europe. In the United States, however, laser sintering RP systems and materials account for only about 30% of all RP industry purchases. The United States is the largest market in the world for industrial RP systems and material, accounting for almost 45% of all purchases of industrial RP systems, material, and related services. EOS believes that the slower growth rate of laser sintering technology in the United States, despite being the largest market in the world for RP technology, is primarily (if not solely) a result of the much higher U.S. prices for laser sintering materials.

**E. EOS' Attempts To Enter U.S. Market**

As the United States is the largest market in the world for RP systems and materials, EOS has been attempting to enter into this large market in order to offer its line of laser sintering RP systems and materials. However, as described earlier, EOS has been confronted with DTM's assertion of patent barriers for laser sintering RP systems and materials. In order to settle the legal issues raised by DTM's aggressive position and in an attempt to gain open access to the United States

market for industrial RP systems and materials, EOS initiated a lawsuit against DTM in the Central District of California. DTM also filed a complaint against EOS in a related proceeding.

*II. The Final Judgment Permits a Significant Period of Monopoly for the Merged 3D and DTM*

The proposed Final Judgment has permitted 3D and DTM to merge, despite the adverse independent competitive effects of the Merger cited by DOJ in the Complaint. DTM's corporate existence has ceased, and it is now part of 3D. 3D now unquestionably enjoys a monopoly in the United States RP Industry, as described in the Complaint. See Complaint ¶ 20–30. The proposed Final Judgment purports to remedy the adverse competitive effects of this monopoly in the future by requiring that 3D license its patents to a new competitor. Regardless of the impact that the licensing will have, in the interim period, the merged 3D/DTM has a monopoly. Under the terms of the proposed Final Judgment, this interim period will be a minimum of 120 to 180 days, the time in which 3D has to affect the required divestitures. If the 3D does not affect the divestitures, a trustee will be appointed to divest the assets, which would take additional time. As a practical matter, it will take any Acquirer of the Divestiture Assets at least six months, and probably at least a year, from the date of obtaining the license to establish a sufficient sales and service force in the United States to begin meaningful competition with 3D's monopoly.

**A. The Merged Entity's Monopoly Period Will Create Additional Entry Barriers for Any Acquirer of the Divestiture Assets**

This period in which 3D enjoys an unchallenged monopoly will create additional barriers to any new competitor's successful entry into the U.S. market. The merged entity already has a large base of installed equipment in the United States. The period before which any new competitor in the United States can be expected to realistically begin competition will allow 3D to increase this installed base. This period provides an opportunity for 3D to bundle its systems, materials, and services without any competitive threat. For this period, which may well be as long as a year, U.S. customers of the merged entity will have no alternative source for RP systems or materials.

Additionally, any Acquirer of the Divestiture Assets will face vigorous competition from 3D, which now can offer a full range of stereolithography and laser sintering RP systems and materials. The proposed Final Judgment's requiring only that 3D divest either its stereolithography patents or its laser sintering patents to establish a new U.S. competitor will make successful entry against a 3D/DTM product line very difficult.

The proposed Final Judgment should have required that the merged 3D/DTM license *both* technologies to an appropriate Acquirer or Acquirers. The restrictions on competition in the United States caused by the Merger are so substantial that a more complete remedy should have been a fundamental condition for the Merger to proceed. This would be the

only way to ensure that a competitor or competitors could offer U.S. customers a range of competitive alternatives similar to what the merged 3D and DTM can offer.

**B. During the Period in Which 3D Has Had a Monopoly, 3D Has Engaged in Additional Anticompetitive Behavior**

Following the settlement with DOJ and during this period in which 3D has possessed a monopoly, 3D has engaged in additional conduct that by itself may violate the antitrust laws. Specifically, this conduct includes the acquisition of RPC Ltd. of Switzerland, previously a competitor of 3D for sales of plastic resins utilized in the stereolithography RP systems. See "3D Systems Completes Acquisition of RPC," September 19, 2001 News Release by 3D (Attachment B). During this period, 3D has also attempted to eliminate competing sales of plastic resins by Vantico Inc., 3D's current supplier of resins. See "3D Systems and Vantico Terminate Relationship, August 24, 2001 News Release by 3D (Attachment C)." By these actions, 3D, which currently makes about 80% of the U.S. sales of plastic resins, is attempting to reduce the number of plastic resin suppliers in the United States from three to two. This conduct may violate the same antitrust laws under which 3D was sued by DOJ. This conduct does not directly affect EOS, as EOS does not sell plastic resins, but DOJ and the Court should be aware of this conduct and consider it when evaluating the adequacy of the proposed Final Judgment.

*III. In Order To Preserve Competition in the Industrial RP Systems Market, the Acquirer Should Be an Independent Laser Sintering Firm*

**A. Actual Loss of Competition Is the Elimination of an Independent Laser Sintering Competitor**

Prior to the Merger, DTM was the only company in the United States that manufactured and sold industrial laser sintering RP systems and materials. As a result of the Merger permitted by DOJ, U.S. purchasers in the industrial RP systems and materials market have lost an independent laser sintering competitor. The proposed Final Judgment does not, however, include a requirement that 3D license its laser sintering patents to a competitor, which would directly replace the competition that has been lost.

The Antitrust Division has acknowledged the beneficial effects caused by the presence of an independent laser sintering firm in the United States industrial RP systems and materials market. In the Competitive Impact Statement, DOJ stated that "[c]urrently, 3D and DTM offer the most sophisticated systems in the industry and compete directly against each other in the development, manufacture, and sale of industrial RP systems." Competitive Impact Statement at 66 FR 49200, 49209 (September 26, 2001). In the Complaint, DOJ correctly recognized that: [t]he direct competition between 3D and DTM has benefited the purchasers and users of industrial RP systems through lower prices for systems, lower prices for materials, and improved products. In addition, the two

companies would likely remain the most vigorous competitors in the industrial RP systems market as the market continues to grow and mature, If 3D's acquisition of DTM is permitted to proceed, the substantial competition between the two leading manufacturers of industrial RP systems will be permanently eliminated, resulting in increased prices and lessened product innovation. Complaint ¶26.

DOJ also correctly described that "[t]he competition between 3D and DTM has been the driving force behind the innovative industrial RP system technology." Complaint ¶ 22 (emphasis added). See also Competitive Impact Statement at 66 FR 49209. The United States market for industrial RP systems and materials may permanently lose this "driving force" of competition between stereolithography and laser sintering technologies unless an independent laser sintering firm becomes a competitor in the United States. 3D licensing its laser sintering patents to a new U.S. entrant should be an absolute and minimum requirement of the proposed Final Judgment.

B. Licensing Only a Stereolithography Company Will Not Preserve Competition

Through the above-referenced statements in the Complaint and the Competitive Impact Statement, it is evident that DOJ understands the vigorous competition brought to the United States industrial RP systems and materials market by an independent laser sintering firm. Nevertheless, DOJ erroneously asserts that the proposed Final Judgment will "ensure that competition that would have otherwise been eliminated as a result of the proposed acquisition will be preserved." Competitive Impact Statement at 66 FR 49209. When the realities of the United States industrial RP systems marketplace are examined, it is also evident that 3D's divestiture to a stereolithography, company would not preserve competition in the United States market for RP systems and materials.

The United States market for industrial RP stereolithography systems has reached a point of saturation. There are substantially more stereolithography RP systems than laser sintering RP systems in operation in the United States. 3D is a stereolithography company, and it derived more than two times as much revenue as DTM during fiscal year 2000. Competitive Impact Statement at 66 FR 49208–09. 3D recently announced the sale of its 2,000th RP system. See "3D Systems Sells 2,000th Machine," May 29, 2001 News Release by 3D (Attachment D). Members of the RP Industry estimate that three out of every four industrial RP systems operating in the United States utilize 3D's stereolithography technology.

Through its present customer rebate program, 3D has effectively acknowledged that the U.S. industrial RP systems market for stereolithography has reached a point of saturation. 3D is currently offering customers cash rebates as high as $200,000, or about 20%–30% for purchasing 3D's stereolithography RP systems. Letter from Dwight Williams, Vice-President Sales for Americas, 3D Systems, dated October 23, 2001 (Attachment E). 3D has not offered

similar rebates on sintering RP systems. This indicates that 3D has to offer substantial rebates on its stereolithography systems in order to sell them into this market full of stereolithography RP systems, but 3D does not have to offer rebates in order to sell its sintering systems. Any stereolithography firm that acquires the Divestiture Assets would not only have to contend with 3D's large installed base of customers, but also with a saturated United States market. As a result, with its complete product line of industrial RP systems and materials, 3D will be able to leverage its considerable market power to adversely effect the newly-licensed stereolithography company's attempt to enter the United States market.

Laser sintering RP technology has greater growth prospects than stereolithography RP technology in the United States. Laser sintering RP systems currently account for approximately 55% of all RP industry purchases in Europe, but only about 30% of all industrial RP purchases in the United States. The principal cause of this slower growth in the United States is the much higher prices charged by DTM (now 3D) for laser sintering RP material in the United States than those charged in Europe. The price for laser sintering material is approximately 200% more than the price for the same material in Europe. See Section I.D above. Because of this price difference, many potential customers located in the United States have expressed an interest in purchasing EOS laser sintering industrial RP systems and materials. Moreover, United States customers who are familiar with EOS' industrial RP systems are attracted to its features (such as its large build volume and higher operating efficiency) that differentiate it from 3D's industrial RP laser sintering systems. However, because of DTM's aggressive assertion of its patents, EOS has been unable to meet this market demand opportunity. Without competition from an independent laser sintering RP company, the substantial growth prospects for laser sintering RP technology will not be realized, and competition in the RP industry will be irreparably harmed.

C. Any Stereolithography Acquirer May Encounter Additional Patent Barriers to U.S. Market Entry

Aside from having to contend with 3D's substantial installed base of stereolithography customers, a newly licensed stereolithography company would face an additional patent barrier controlled by a third party. Aaroflex, Inc. ("Aaroflex") is the exclusive North American licensee of the stereolithography technology of E.I. du Pont de Nemours and Company ("Du Pont"). Aaroflex is currently involved in litigation with 3D over the scope, enforceability, and validity of their respective stereolithography patent portfolios. Aaroflex has stated that it will assert its rights under the DuPont patents to prevent any other company from selling stereolithography RP systems in the United States. Consequently, should 3D divest its technology to a stereolithography company, the potential new competitor's entry into the United States market for industrial RP systems and materials could be substantially impeded by a patent dispute.

DOJ has overlooked this potential obstacle to successful U.S. competition by a new stereolithography company. Despite DOJ's statements in the Competitive Impact Statement, the proposed Final Judgment does not lift all of the patent entry barriers in the industrial RP systems and materials market in the United States for stereolithography equipment.

D. Teijin Sieki/CMET Is Not a Suitable Acquirer of 3D's Patent Rights

The Antitrust Division has recognized Teijin Seiki [2] of Japan as a potential Acquirer of the Divestiture Assets. Competitive Impact Statement at 66 Fed. Reg. 49209. Teijin Seiki currently manufactures and sells stereolithography RP Equipment in Asia. Teijin Seiki is therefore a potential Acquirer of the Divestiture Assets under the terms of proposed Final Judgment.

After DOJ filed the Complaint to challenges the Merger, but before the filing of the proposed Final Judgment, the president of Teijin Seiki sent a letter to EOS mentioning how both EOS and Teijin Seiki might be interested in bidding for assets that 3D and DTM might have to divest to resolve the antitrust challenge to the Merger. See Letter from Ken Sahara, President, CMET Inc. to Dr. Hans Langer, President, EOS GmbH, dated July 23, 2001 (Attachment F). Though Mr. Sahara acknowledged that "[a]t this stage, I am not sure, it is the proper time or not," he invited EOS to meet and to "discuss or exchange information about Market, Products, and others." EOS interprets this communication from Teijin Seiki as an invitation to collude, either regarding the bidding process for the Divestiture Assets or regarding competition generally. Demonstrating an awareness of the impropriety of the contact and the invitation, Mr. Sahara closed the letter with a request to "[p]lease treat this proposal as a confidential matter between you and I."

DOJ has previously challenged similar invitations to collude as an attempted violation of the antitrust laws. See, e.g., United States v. American Airlines, 570 F. Supp. 654 (N.D. Tex 1983), rev'd, 743 F.2d 1114 (5th Cir. 1984), cert. dismissed, 474 U.S. 1001 (1985). the willingness of the president of Teijin Seiki to engage in such potentially anticompetitive, apparently unethical or illegal conduct establishes that Teijin Seiki is not a suitable Acquirer of the Divestiture Assets. DOJ and the Court should consider this in the evaluation of a potential Acquirer.

IV. The Proposed Final Judgment Has Harmed EOS' Independent Attempt To Enter the Industrial RP Systems and Materials Market in the United States

Under the Antitrust Penalties and Procedures Act ("APPA"), the Court must evaluate the proposed Final Judgment submitted by DOJ. See 15 U.S.C. 16(b)–16 (h) (1994). It is well established that "Congress, in passing the (APPA), intended to prevent 'judicial rubber stamping' of the Justice Department's proposed consent decrees."

[2] Teijin Seiki recently acquired another Japanese company called NTT-Data CMET, Inc. Following the acquisition, Teijin Seiki has operated under the CMET trade name.

*United States v. Microsoft Corp.,* 56 F.3d 1448, 1458 (D.C. Cir. 1995) (citation omitted). Specifically, the Court must make an independent determination of whether entry of the proposed Final Judgment is "in the public interest." 15 U.S.C. 16(e). Among the factors that the Court is to consider in conducting its public interest inquiry is whether entry of the proposed Final Judgment "will result in any positive injury to third parties." 15 U.S.C. 16(e)(2); see also *Microsoft Corp.,* 56 F.3d at 1461–62. By permitting the Merger to close prior to remedying the competitive harm, the proposed Final Judgment is causing injury EOS that the Court should consider in its evaluation of whether the enter the proposed Final Judgment without modification.

A. The Proposed Final Judgment Is Hearing EOS' Ability To Litigate Issues Related to Certain Intellectual Property Rights of EOS

As described in Section I.B. above, EOS acquired certain intellectual property rights from 3D through the 1997 3D/EOS Licensing Agreement. These rights include an exclusive license to all 3D patents then existing and applied for prior to August 2002, applicable to a field of use for laser sintering. See Attachment A. The 1997 3D/EOS Licensing Agreement also contains a provision that EOS will not assert against 3D "any claims for infringement based on the manufacture, use, sale or offer for sale of any apparatus made or sold by [3D] under the licensed patents, at any time, for any reason, during the term of the License Agreement" (the "Non-Suit Provision"). See 1997 3D/EOS Licensing Agreement § 2.1(a) (Attachment A).

In December 2000, EOS filed a lawsuit against DTM in an attempt to open the United States industrial RP systems market to competition from EOS. Since 3D has acquired and merged with DTM, 3D has taken the position that EOS may not maintain any claim of patent infringement against 3D because of the Non-Suit Provision. In fact, 3D recently submitted a motion for summary judgment in the action based entirely on its interpretation of the Non-Suit Provision in the 1997 3D/EOS Licensing Agreement. See 3D Systems, Inc.'s Motion for Summary Adjudication Regarding Damages Under the 3D Patents and the accompanying Memorandum of Points and Authorities in Support Thereof (without attachments) (Attachment G). While EOS strongly disagrees with 3D's interpretation of the license agreement as well as its interpretation of the applicable law, at a minimum 3D's argument has complicated and will prolong the litigation. At worst, if the District Court of the Central District of California accepts 3D's position, EOS will effectively be stripped of its ability to enforce its patent rights in the United States that it acquired originally from 3D. As a result of the proposed Final Judgment's permitting the Merger, EOS is currently, and may be permanently, injured in its ability to enforce its intellectual property rights in the United States. This is an unusual and idiosyncratic anticompetitive effect, but this additional obstacle to a potential new U.S. competitor is a directly created by the Merger and the proposed Final Judgment.

EOS' ability to enforce its patents should not inhibited by the terms of the settlement agreement reached between DOJ and 3D/DTM. Accordingly, the proposed Final Judgment must be modified to prohibit 3D from asserting that EOS cannot enforce intellectual property rights that EOS acquired from 3D.

B. The Merger Has Created Additional Barriers for Any Potential Entrants Into the United States Market for Industrial RP Systems and Materials

As described above, the Merger has created a company that can offer both stereolithography and laser sintering industrial RP systems and materials. See Section II.A. above. Meanwhile the Acquirer will only be able to offer industrial RP systems that utilize either stereolithography technology or laser sintering products. As a result, EOS or any other Acquirer will be at a substantial disadvantage to 3D. This effect has been exacerbated by DOJ's permitting 3D and DTM to close the Merger before the Acquirer has obtained the Divestiture Assets. To correct this obstacle to either a stereolithography or a laser sintering competitor's entry, the proposed Fund Judgment should be modified to require both a stereolithography and a sintering Acquirer.

V. Several Miscellaneous Provisions of the Proposed Final Judgment Indicate that DOJ Misunderstands Some Fundamental Concepts of the RP Industry

A. DTM's Plant in Austin, Texas Cannot Be Acquired

Included among the Divestiture Assets is an option for the Acquirer to purchase DTM's plant located in Austin, Texas (the "Plant"). Proposed Final Judgment ¶ II.G(3); see also Competitive Impact Statement at 66 Fed. Reg. 49210. Through its due diligence, EOS has learned that DTM (now 3D) is merely a lessee of the Plant. As as result, contrary to DOJ's apparent belief, the Acquirer cannot purchase or acquire the Plant. The Acquirer may only assume DTM's lease. The proposed Final Judgment also contains a provision that reads as follows: "Defendants shall warrant to the Acquirer of the Divestiture Assets that each tangible asset will be operational on the date of sale." Proposed Final Judgment ¶ IV.K. In this type of industry, there are no tangible operating assets to transfer. Moreover, the proposed Final Judgment fails to include a requirement that 3D/DTM transfer any employment contracts associated with the Plant. So, DOJ has negotiated a divestiture that only amounts to an option to assume a lease. The inclusion of the option to "purchase" the Plant does not provide an Acquirer with any assistance in establishing a presence in the United States market for industrial RP systems and materials. This provision in the proposed Final Judgment suggests that DOJ does not understand what divestiture commitments it has extracted from 3D and DTM.

B. The Peoposed Final Judgment Does Not Permit Potential Acquirers To Obtain Information on Necessary Service Personnel of the 3D and DTM

Another aspect of the proposed Final Judgment which suggests that DOJ does not

comprehend the requirements of affecting a successful entry into the United States market for industrial RP systems and materials is its failure to include the service personnel of 3D/DTM as part of the required due diligence. The proposed Final Judgment only requires that 3D/DTM provide the Acquirer, after the Acquirer has been determined, "information relating to the personnel involved in sales, marekting and manufacturing of RP Industrial Equipment in the Selected Technology to enable the Acquirer to make offers of employment * * *." Proposed Final Judgment ¶ IV.I. Service personnel are omitted, and this omission is particularly troubling. EOS had previously conveyed to DOJ the importance of having access to service personnel. EOS had clearly communicated that obtaining competent and experienced service personnel was essential to establishing a viable presence in the United States market for industrial RP systems. In fact, EOS identified the task of identifying and hiring knowledgeable service personnel as one of the most significant barriers to entry in the United States industrial RP systems market. The Federal Trade Commission has recognized the importance of including a requirement in its orders involving the divestiture of technology that the defendants facilitate the transfer of knowledgeable personnel. Bureau of Competition, Federal Trade Commission, A Study of the Commission's Divestiture Process (1999) at 27–28, and at 36–37. Requiring the transfer of knowledgeable personnel is necessary to ensure that the Acquirer has the ability to exploit its newly acquired technological rights. *Id.*

Aside from its failure to include service personnel as part of the initial due diligence process, the Antitrust Division did not require that 3D/DTM share *any* personnel information with any potential Acquirer until the Acquirer has been identified. Proposed Final Judgment ¶ IV.I. Consequently, in submitting their offers to 3D, potential Acquirers must attempt to value the Divestiture Assets without any information on personnel. In light of the information that has been provided to DOJ and its experience with negotiating divestiture orders, it is difficult to conceive of a procompetitive explanation for DOJ's failure to require that 3D provide timely due diligence information on all types of its personnel (sales, marketing, manufacturing, and service) to potential Acquirers.

C. The Schedule Established by the Proposed Final Judgment Dictates That Public Comments Must be Submitted Prior to the Identification of an Acquirer

Finally, the schedule established for completing the divestiture required by the proposed Final Judgment allowed the deadline for the submission of public comments to pass before 3D selected an Acquirer. This schedule makes it impossible to address concretely the actual effect that the proposed Final Judgment will have on competition in the United States market for industrial RP systems and materials. There is no reason why DOJ could not have required that 3D identify its proposed Acquirer prior to the expiration of the period for submitting

Federal Register / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices

public comments. In fact, EOS submits that if DOJ had done so, then the public comments would have been much more useful to the Antitrust Division's evaluation of the competitive merits of 3D's proposed Acquirer and the Court's determination of whether the proposed Final Judgment sufficiently protects the public interest. The Court should modify the proposed Final Judgment to allow a 30-day comment period after an Acquirer has been selected by 3D, but before approval by DOJ.

**Conclusion**

EOS does not seek a better treatment for itself than the proposed Final Judgment allows other potential Acquirers. EOS is seeking to identify what is necessary to ensure that it or some other Acquirer has the resources required to compete adequately in the United States. For the reasons discussed above, EOS recommends that DOJ or the Court modify the proposed Final Judgment so that a new competitor will be permitted to sell laser sintering RP systems and material in the United States, without regard to whether 3D licenses its stereolithography technology. United States customers of laser sintering RP systems and material should be guaranteed an independent competitive source of supply. EOS also requests that the proposed Final Judgment be modified to prohibit 3D from asserting that EOS is precluded from enforcing its patent rights against 3D in the pending litigation.

Further, EOS requests that the court conduct a hearing to examine more carefully the adequacy of the competitive relief that DOJ has agreed to in the proposed Final Judgment.

Should you have any questions about the information that EOS has provided or if you would like additional information, please do not hesitate to contact me.

Sincerely yours,
Dr. Hans Langer,
*Chief Executive Officer, EOS GmbH Electro Optical Systems, 49 (89) 85685–111.*
David J. Laing,
*Baker & McKenzie, U.S. Antitrust Counsel to EOS GmbH Electro Optical Systems.*

**License Agreement**

*Agreement,* effective as of the 27th day of August, 1997, between 3D Systems Corporation, having its principal office at 26081 Avenue Hall, Valencia, California, and 3D Systems GmbH, having its principal office at Röntgenstraëette 41, D–64291, Darmstadt, Germany (both hereinafter called "*Licensor*") and EOS Gmbh Electro Optical Systems, having a place of business at Pasinger Str. 2, D–82152 Planegg, Munich, Germany (hereinafter called "*Licensee*") (being sometimes hereinafter referred to individually as a *Party* and collectively as the "*Parties*");

**Witnesseth**

*Whereas, Licensor* and *Licensee* are, contemporaneously herewith, entering into a settlement, purchase and transfer agreement ("Purchase Agreement") under which they are, *inter alia,* settling all Court and other patent-related proceedings pending between *Licensor* on the one hand, and *Licensee* and its customers on the other; and

*Whereas,* the Purchase Agreement also covers a purchase by *Licensor* of certain assets of *Licensee;* and

*Whereas,* in partial consideration of the settlement of litigation between the Parties, and the acquisition by *Licensor* of *Licensee's* business unit known as the "*Stereos*" product line, *Licensor* is willing to grant to *Licensee* throughout the world under its Licensed Patents a license upon the terms and conditions set forth hereinbelow;

*It is Agreed:*

**Article I—Definitions**

1.1 Licensed Patents shall mean the following patents to the extent, and only to the extent, applicable to the field of Laser Sintering:

(a) All U.S. and foreign patents, including reissued and reexamined patents and utility models owned by *Licensor* as of the effective date of this Agreement, and all patents and utility models assigned from EOS to 3D; and

(b) U.S. and foreign patents and utility models, which may issue to *Licensor* on patent and utility model applications filed prior to August 20, 2002, or filed subsequent thereto, but receiving, or entitled to receive, the benefit of a filing date prior to August 20, 2002, including any patents of addition and utility models, and further including any extensions, renewals, continuations, reexaminations, and/or reissues thereof.

1.2 Laser Sintering shall mean and include only apparatus, methods and supplies for producing three-dimensional objects, layer-by-layer, from (a) coated or uncoated powders not contained within a solidifiable fluid, through sintering by a laser or other heat source, (b) dry polymer-coated powders, through curing by an IR laser or other heat source, and (c) coated or uncoated powders in a mixture with a liquid, in which the liquid is no greater than 15 percent of the total volume;

1.3 Stereolithography shall mean and include apparatus, methods and supplies for producing three-dimensional objects layer-by-layer from photocurable fluids;

1.4 Jetting R.P. shall mean and include apparatus, methods and supplies for producing three-dimensional objects layer-by-layer from jettable materials for hot melt ink jet technology that are solid at room temperature.

**Article II—The License**

2.1 *License Grant.* Upon execution of this Agreement, *Licensor* hereby grants to *Licensee,* an exclusive, worldwide, personal, non-transferable and paid-up license under the Licensed Patents, to make, use, lease, sell, offer for sale, and import, products solely for use in the field of Laser Sintering; provided, however, that such license is subject to the following limitations:

(a) *Licensee* expressly agrees not to assert against *Licensor,* or vendees or customers, mediate or immediate, of *Licensor,* any claims for infringement based on the manufacture, use, sale or offer for sale of any apparatus made or sold by *Licensor* under the Licensed Patents, at any time, for any reason, during the term of this License Agreement;

(b) The license shall only be effective during the term of this License Agreement.

2.2 *Release. Licensor* hereby grants to *Licensee* and its prior customers, mediate and immediate, of products respectively sold and used, a paid-up release under the Licensed Patents.

2.3 *Sublicensing* During the term of this License Agreement, the license hereby granted shall include the right of *Licensee* to grant written sublicenses; provided, however, that *Licensee* agrees to deliver to *Licensor* a true and correct copy of each and every sublicense entered into by *Licensee* within thirty (30) days after execution thereof, and shall promptly advise *Licensor* in writing of any modification (and supply same) for termination of each sublicense. Upon termination of this License Agreement for any cause, any and all existing sublicenses hereunder shall thereupon be assigned to *Licensor.* This shall be made a condition of any such sublicense that may be granted by *Licensee. Licensee* agrees that one-half (½) of any royalty income received by *Licensee* in any form, whether in monies or other valuable consideration (but not including license rights as received, for example, under a cross-license agreement), whether by agreement or as a result of litigation or otherwise, shall be shared equality (i.e., 50/50) with *Licensor.*

2.4 No license is granted by *Licensor* to *Licensee,* either directly or by implication, estoppel or otherwise, under any patents other than patents included in the Licensed Patents, or for any field other than the field of Laser Sintering.

2.5 *Licensee* agrees to mark every licensed product manufactured or sold by it under this Agreement, and to require same of any sublicensees, in accordance with the applicable statutes of the country of manufacture and sale.

**Article III—Enforcement of Patents**

3.1 In the event *Licensee* becomes aware of any actual or threatened infringement of a patent which is included in the Licensed Patents, *Licensee* shall have the right to bring, at its own expense, an infringement action to enforce the infringed-upon patent. In the event it is determined by a court of competent jurisdiction, after all appeals or right to appeal have been completed, that *Licensor* is an indispensable party to any such litigation, then *Licensor* agrees to be joined in any such litigation, provided that *Licensee* agrees to pay for all costs incurred by *Licensor* in connection with such joinder, including *Licensor's* own attorneys' fees as well as any court costs, travel and living expenses, and all other costs incurred in connection therewith. Furthermore, in respect of any litigation under the Licensed Patents, whether brought by *Licensee* or brought pursuant to Article 3.2, in the event of any discovery proceedings involving *Licensor, Licensee* agrees to pay for all costs incurred by *Licensor,* including internal personnel costs involved in discovery at an hourly rate representing the cost to *Licensor* for any such employees, as well as any travel and living expenses, together with all other costs and expenses.

3.2 In the event a third party brings an action to obtain a declaration of patent invalidity or non-infringement (a "DJ

**11134**    **Federal Register** / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices

Action") based upon or related to allegations of infringement by *Licensee* with respect to the field of Laser Sintering, against either *Licensee* or *Licensor*, or both with respect to a patent which is included in the Licensed Patents:

3.2.1 *Licensee* shall be required to defend said DJ Action at its cost and expense, whether such DJ Action is against *Licensor* or *Licensee*, or both.

3.3 In the event a litigation subject to 3.1 or 3.2.1 involves an assertion of invalidity of any Licensed Patent, *Licensor* shall have the right, but not the obligation, to participate in such litigation at its own cost and expense, and thereby to control the litigation insofar as the issue of validity is concerned.

**Article IV—Term of License, Termination**

4.1 The term of this Agreement shall, unless otherwise terminated as provided in Article 4.2, extend for the life of the last to expire of the Licensed Patents and shall thereupon terminate.

4.2 *Licensor* may terminate this Agreement, in whole, or with respect to any patent included in the Licensed Patents, in the event of any breach of the non-compete provision (set forth in Article 2, paragraph 7, "Prohibition of Competition" of the Purchase Agreement between the Parties dated August 27, 1997), unless such breach with due regard to all circumstances is immaterial or unless the party in breach of Prohibition of Competition shows that such breach was committed for reasons beyond its reasonable control. Furthermore, *Licensor* shall have the right to terminate this Agreement, in whole or with respect to any patent included in the Licensed Patents, in the event that at any time during the term hereof, EOS or its affiliated companies, or Dr. Hans J. Langer (who shall indicate his agreement with this provision by his subscription hereto) engage in any manner in the manufacture, sale or use of Stereolithography products or Jetting R.P. (other than as permitted in the above-noted non-compete provision).

4.3 Any termination pursuant hereto shall not relieve *Licensee* from any obligation or liability accrued hereunder prior to such termination, not rescind or give rise to any right to rescind anything done or any payments made, or other consideration given hereunder, or in the Purchase Agreement dated August 27, 1997, or any other consideration given hereunder prior to the time of such termination, and shall not affect in any manner any remedies of *Licensor* arising out of this Agreement prior to such termination.

**V—Warranty**

5.1 *Licensor* warrants and represents that it has the full right and power to grant the license under the Licensed Patents as set forth herein, and that there are no outstanding agreements, assignments or encumbrances inconsistent with the provision of this Agreement other than as expressly set forth herein. Licensor makes no other representation or warranty, express or implied, nor does licensor assume any liability in respect of any infringement of any patent or other right of third parties due to licensee's activities under this agreement

except as expressly set forth herein. By way of example, but not of limitation, licensor makes no representation or warranty of commercial utility, merchantability or fitness for a particular purpose, or that operating under the license herein granted will not infringe any patent or other property right of others (other than the right to license hereunder). In no event shall licensor be liable for any claim or loss incurred by licensee (including, without limitation, compensatory or exemplary damages, lost profits, lost sales or business, expenditures, investments or commitments in connection with any business, or loss of any goodwill) irrespective of whether licensor has been informed of, knows of, or should have known of the likelihood of such damages, except as expressly otherwise provided in this agreement. This limitation applies to all causes of action in or with respect to the agreement, including, without limitation, breach of contract, breach of warranty, negligence, strict liability, misrepresentation and other sorts.

5.2 Nothing in this Agreement shall be construed as:

(a) A warranty or representation by LICENSOR as to the validity or scope of any Licensed Patent; or

(b) A warranty or representation that anything made, used, sold, or otherwise disposed of under any license granted in this Agreement is or will be free from infringement of patents of third persons; or

(c) A requirement that LICENSOR shall file any patent application, secure any patent, or maintain any patent in force; or

(d) An obligation to bring or prosecute actions or suits against third parties for infringement of any patent; or

(e) An obligation to furnish any technical or other information concerning pending patent applications; or

(f) Conferring a right to use in any advertising, publicity or otherwise, any trademark or trade name of LICENSOR; or

(g) Granting by implication, estoppel or otherwise, any licenses or rights under patents other than the Licensed Patents.

**Article VI—Assignments**

6.1 This Agreement shall not be assigned by *Licensee*, nor shall it pass by succession in ownership of all, substantially all or any part of *Licensee's* business interests, without the prior written consent of *Licensor*. Any attempted assignment or passage by succession shall be void.

**Article VII—Communication**

7.1 Any notice or other communication required or permitted to be made or given to a party hereto pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to the Party by certified or registered mail, postage prepaid, addressed to it at its address set forth, or to such other address as it shall designate by written notice to the other Party as follows:

In the case of Licensor: Chief Executive Officer, 3D Systems Corporation, 26081 Avenue Hall, Valencia, CA 91355.

In the case of Licensee: Geshäftsführer, EOS GmbH Electro Optical Systems, Pasinger Str. 2, D–82152 Planegg, Munich, Germany.

**VIII—Miscellaneous**

8.1 *Execution.* This Agreement will not be binding upon the Parties until it has been signed hereinbelow on behalf of each Party, in which event it shall be effective as of the date first above written. No amendment or modification hereof shall be valid or binding upon the Parties unless made in writing and signed as aforesaid. The effectiveness of this Agreement shall be subject to the completion of the Settlement, Purchase and Transfer Agreement between the Parties dated August 27, 1997 and, if such agreement is not completed, or is thereafter held invalid, void ab initio, or otherwise rendered ineffective, then this agreement shall be void ab initio as well.

8.2 *Integration.* This Agreement embodies the entire understanding of the Parties and shall supersede all previous communications, representations or undertakings, either verbal or written between the Parties relating to the subject matter hereof.

8.3 *Indemnification.* Licensee agrees to indemnify and hold harmless *Licensor*, its officers, employees and agents from and against any and all claims, damages and liabilities asserted by third parties, both government and private, arising from *Licensee's* assertion of rights under Licensed Patents and the sale and use of products licensed hereunder.

8.4 *Anonymity.* Licensee shall have no right to use the names or other designation of *Licensor* in connection with any sales or promotion of products licensed hereunder without the express consent of *Licensor*.

8.5 *Severability.* If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.6 *Governing Law and Dispute Resolution.* This Agreement shall be governed and interpreted in accordance with the substantive laws of the State of California irrespective of any choice of law rules in the State of California or in any other jurisdiction. The parties agree that any action for relief based in whole or in part on this Agreement (or the breach thereof) or otherwise relating in whole or in part to this Agreement shall be filed in, and the parties consent to personal jurisdiction and venue in, the Federal and State Courts closest to the above-identified place of business of 3D Systems, Inc. in Valencia (Los Angeles County), California having subject matter jurisdiction over such action. In any such action between the parties, the prevailing party shall be entitled to recover (in addition to any other relief awarded or granted) its reasonable costs and expenses (including attorneys' fees) incurred in the proceeding. This Agreement has been concluded in English (American legal usage) and if translated into German for any purpose, in case of discrepancy, the English text shall prevail.

8.7 *Headings, Tense and Gender.* The headings of the several sections are inserted for convenience of reference only, and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

Federal Register / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices     **11135**

In this Agreement, where the context so permits, the singular shall include the plural, and vice versa, and references to a particular gender shall include any other gender.

8.8  *No Waiver.* Failure by any Party to enforce any provision of this Agreement or assert a claim on account of breach hereof shall not be deemed a waiver of its right to enforce the same or any other provision hereof on the occasion of a subsequent breach.

8.9  *Remedies.* The remedies provided in this Agreement are not and shall not be deemed to be exclusive and shall be in addition to any other remedies which any Party may have at law or in equity.

8.10  *Independent Contractors.* The Parties hereto are independent contractors and are not and shall not be considered as joint venturers, partners, employers, or agents of each other, and none shall have the power to bind or obligate the other except as set forth in this Agreement.

8.11  *Force Majeure.* No Party hereto shall be liable in damages or have the right to cancel this Agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its control, including but not limited to acts of God, government restrictions, wars or insurrections.

8.12  *Counterparts.* This Agreement may be executed in three (3) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

*In Witness Whereof,* the Parties hereto have caused this Agreement to be duly executed as of the date first above written.

3D Systems Corporation.

Sid Alpert, Vice President, General Counsel.

Witness: Brenda L. Webb.

EOS GmbH Electro Optical Systems

Hans J. Langer, Chief Executive Officer.

Witness: Elmor Dimmelmeier.

**News Releases**

**3D Systems Completes Acquisition of RPC**

*Newly Branded Stereolithography Materials To be Developed and Manufactured in 2002*

*Contacts:* Jeff Krinks, Public Relations Manager,
  (661) 295–5600, ext. 2910,
  *Krinksj@3dsystems.com.*
  Trudy Self, Self & Associates, (818) 880–5437, *tmself@aol.com.*
  *Valencia, Calif., Sept. 19, 2001*—3D Systems Corp. (Nasdaq: TDSC) today announced it has completed its acquisition of materials developer and manufacturer RPC Ltd.

RPC, now a wholly owned subsidiary of 3D Systems, will continue to manufacture and distribute from its headquarters in Marly, Switzerland, where it has developed 16 stereolithography (SL) materials for SLA systems.

"When our current obligation for SL material development ends in February 2002, we will work with RPC to further enhance our SL material product lines and develop new materials," said Grant Flaharty, senior vice president of worldwide sales and marketing for 3D Systems. "The combination

of RPC and 3D Systems allows us to add a greater materials focus to the high-quality hardware customers have come to expect. We plan to provide a full range of materials with comparable or improved properties."

RPC's materials are fully compatible with 3D Systems' SLA product line and provide a variety of properties, including durability, heat resistance and detailed surface finish. Any questions regarding RPC materials should be directed to RPC at (41) 26 439 95 90 or *www.rpc.ch.*

About 3D Systems

Founded in 1986, 3D Systems provides solid imaging products and solutions that help reduce the time and cost of designing products and facilitate direct and indirect manufacturing. Its systems utilize patented technologies that create physical objects from digital input.

3D Systems currently offers the ThermoJet® solid object printer, stereolithography (SLA®) systems and selective laser sintering (SLS®) systems, as well as related software and materials. Product pricing in the U.S. ranges from $49,995, for the ThermoJet printer, to $799,000 for the high-end SLA 7000 system. The company licenses the complementary 3D Keltool® process, a method for producing steel mold inserts, and currently is developing systems that use composite paste materials for direct manufacturing. In August, 3D Systems merged with DTM Corp.

More information on the company is available at *www.3dsystems.com,* or by phoning 888/337–9786, extension 791, or 661/295–5600 internationally. An investor packet can be obtained by calling 800/757–1799.

About RPC

Based in Marly, Switzerland, RPC develops and distributes a complete range of materials used in SLA solid imaging systems. Since its founding in 1997, the company's R&D efforts have concentrated on thermosetting and photopolymer materials as well as laser technology. The company has introduced 16 resins for all three laser configurations on the SLA machines.

**Note to editors:** ThermoJet, SLA, SLS, Keltool and the 3D logo are registered trademarks of 3D Systems.

Certain statements in this news release may include forward-looking statements that express the expectation, prediction, belief or projection of 3D Systems. These statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance and achievement of 3D systems to be materially and adversely different from any future results, performance or achievement expressed or implied by these forward-looking statements. Factors that may cause actual results to differ from the forward-looking statements contained in this release and that may affect the company's prospects in general include, but are not limited to: worldwide economic conditions; successful enhancement of the current RPC product line in a timely manner; RPC's ability to produce sufficient quantities of material to meet customer needs; actions of competitors,

particularly materials producers, all of which have considerably more resources at their disposal than 3D Systems; actions of customers and their acceptance of RPC's products, and such other factors as are described in the companies' filings with the Securities and Exchange Commission, including annual reports on Form 10–K for the year ended Dec. 31, 2000, quarterly reports on Form 10–Q for the quarters ended March 31 and June 30, 2001, and 3D Systems' current reports on Form 8–K filed on April 6, April 10, and Sept. 4, 2001.

**News Releases**

**3D Systems and Vantico Terminate Relationship**

*3D Systems Agree To Acquire RPC Ltd.*

Contacts:
  Jeff Krinks, Public Relations Manager (3D Systems), (661) 295–5600, ext. 2910, *krinksj@3dsystems.com.*
  Trudy Self, Self & Associates (3D Systems), (818) 880–5437, *tmself@aol.com.*
  *Valencia, Calif., Aug. 24, 2001*—3D Systems Corp. (Nasdaq: TDSC) today announced the severance of its distributor and joint development agreements with Vantico Inc., a subsidiary of Vantico International. 3D Systems has been the exclusive worldwide distributor (except for Japan) of Vantico liquid resins use in stereolithography systems.

Under the terms of the distributor, 3D Systems will continue to distribute Vantico resins for a period of six months. After that period, the distribution agreement will no longer limit 3D Systems from sourcing and developing resins independently.

3D Systems' termination of the joint development agreement with Vantico will prohibit the two companies from exploiting, for a period of three years, any proprietary information owned or developed by the other party. However, the parties dispute the meaning and impact of this provision, and, though conversations between the parties continue, arbitration proceedings have begun regarding this matter.

3D Systems believe a significant portion of the Vantico resins currently used in 3D Systems machines were developed and enhanced by 3D Systems and that its proprietary information is pervasive in a substantial portion of Vantico's products currently being manufactured, as well as those under development. As a result, 3D Systems believes that Vantico would be prevented from separately marketing those products, unless the companies reach a subsequent agreement.

"These developments present a great opportunity for 3D Systems to further enhance the materials currently used in our systems while maintaining our existing base of materials recurring revenue," said Brian K. Service, 3D Systems' president and chief executive officer. "During this transition period and beyond, we expect to continue to provide quality materials to our customers and further position ourselves to be a much stronger supplier of materials in the future."

"We will continue to be the exclusive distributor of Vantico materials for the next six months and may arrange with Vantico to

**11136**    Federal Register / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices

continue to distribute its materials beyond that time," Service added. "We believe that we will continue to be able to offer our customers a full range of materials that are either substitutable or offer improved speed, accuracy, surface finish and functionality. It is our goal to provide as smooth a transition to our customers as possible."

3D Systems also announced it has signed a letter of intent to acquire Rapid Prototyping Chemicals (RPC) Ltd. of Marly, Switzerland. RPC is an independent supplier of stereolithography resins.

"We are excited about adding RPC's materials offerings to the 3D Systems family of solid imaging products," said Grant Flaharty, senior vice president of worldwide sales and marketing for 3D Systems. "This proposed acquisition reflects our focus on materials versatility and our commitment to providing the best solid imaging solutions for our customers."

"RPC offers a wide range of materials that have been well received in the market. Our intention is to continue this trend and further enhance the synergy of our systems and materials," Flaharty said.

About 3D Systems

3D Systems provides solid imaging products and services that substantially reduce the time and cost required to design, test and manufacture products. The company's systems utilize patented technologies that create physical objects from digital input.

3D Systems currently offers the ThermoJet® office printer and SLA® industrial systems, which include proprietary software and materials. Products pricing in the U.S. begins at $49,995 for the company's entry-level printer and extends up to $799,000 for its feature-rich industrial SLA 7000 system. The company also licenses the 3D Keltool® process, a complementary application that produces injection molding and die casting inserts from SLA system master patterns. In February 2001, 3D Systems announced it acquired OptoForm, a French company that has developed direct composite manufacturing systems that use paste materials. In April 2001, the company announced the signing of a definitive merger agreement to purchase DTM Corp., and it expects to complete the merger this month.

Based in Valencia, Calif., 3D Systems was founded in 1986 and is recognized as a world technology leader in solid imaging. For additional information, visit the company's website at *www.3dsystems.com* or phone 888/337–9786, ext. 788. For an investor packet, call the company's shareholder communications service at 800/757–1799.

About DTM Corporation

DTM develops, manufactures and markets advanced rapid prototyping and manufacturing systems, including the Sinterstation® 2500plus and Vanguard systems. A growing number of manufacturers and service bureaus worldwide use these systems to rapidly create 3–D prototypes, parts, molds, tooling and casting patterns.

All Sinterstation SLS® systems utilize a process called selective laser sintering to create 3–D objects from computer-aided design (CAD) data. The Sinterstation system

creates the part in a matter of hours using a CO2 laser to fuse together layers of powdered plastic, metal or ceramic powers. The results are durable 3–D parts produced in a fraction of the time it would typically take using other traditional methods.

Among the companies currently using Sinterstation systems are manufacturers such as BMW, Boeing, Pitney Bowes, Rockwell International, Volvo Penta and others. In addition, numerous service bureaus throughout the world include Sinterstation systems in their offerings to companies with only an occasional need for rapidly produced functional prototypes and parts. Parts and prototypes made on Sinterstation systems also are used in non-industrial settings, such as science and medicine. For more information on DTM's systems, customers and applications, visit the company's website at *www.dtm-corp.com.*

About RPC

Based in Marly, Switzerland, RPC develops and distributes a complete range of materials used in SLA solid imaging systems. Since its founding in 1997, the company's R&D efforts have concentrated on thermosetting and photopolymer materials as well as laser technology. The company has introduced 13 resins for all three laser configurations on the SLA machines and anticipates 7% to 10% market growth this year for its materials. For more information, visit *www.rpc.ch.*

Note to editors: ThermoJet, SLA, Keitool and the 3D logo are registered trademarks of 3D Systems. Sinterstation and SLS are registered trademarks, and DuraForm and Vanguard are trademarks, of DTM Corporation.

Certain statements in this news release may include forward-looking statements which express the expectation, prediction, belief or projection of 3D Systems. These statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance and achievement of 3D Systems to be materially and adversely different from any future results, performance or achievement expressed or implied by these forward-looking statements. Factors that may cause actual results to differ from the forward-looking statements contained in this release and that may affect the company's prospects in general include, but are not limited to: the funding of amounts of capital adequate to provide for the working capital needs of the company; actions of competitors and customers; reliance on single or limited suppliers, the ability to timely and cost-effectively identify and obtain or independently develop resins adequate for use with 3D Systems' products, the negotiation and execution of definitive documents to acquire RPC, the efficient integration of DTM into the business of 3D Systems, and such other factors as are described in the companies' filings with the Securities and Exchange Commission, including annual reports on Form 10–K for the year ended Dec. 31, 2000, quarterly reports on Form 10–Q for the quarters ended March 31 and June 30, 2001, and 3D Systems' current reports on Form 8–K filed on April 6 and April 10, 2001.

News Releases

3D Systems Sells 2,000th Machine

*Includes 100 SLA 7000 Systems Shipped
Contacts:*
 Jeff Krinks, Public Relations Manager, (661)
  295–5600, ext. 2910,
  *krinksj@3dsystems.com.*
 Trudy Self, Self & Associates, (818) 880–
  5437, *tmself@aol.com.*
 *Valencia, Calif., May 29, 2001*—3D
Systems Corp. (Nasdaq: TDSC) today announced the sale of its 2,000th solid imaging system. The company also reached a milestone by shipping its 100th high-end SLA 7000 system since its introduction in February 1999.

"We're pleased that, throughout 3D Systems' 15-year history, our products have continued to gain market acceptance," said Chuck Hull, company founder and chief technology officer. "Even as we celebrate the 2,000th system sold, we look forward to accelerating our growth via new technologies and solutions."

Hull added, "We anticipate the functionality of our new Viper si2™ SLA system will be attractive to the marketplace—much like its predecessor, the SLA 250 system. And we're excited about our current R&D work with non-liquid material systems, which will address the growing market for rapid tooling and direct and indirect in-line manufacturing applications."

The first solid imaging machine off 3D Systems' production line in 1986 was the SLA 1 system. Subsequent machines included the SLA 190, 250, 350 and 500 systems. In 1996, 3D Systems introduced its first solid object modeler, the Actua™ printer, which was replaced in 1999 by the ThermoJet printer.

In 2000, 3D Systems shipped 387 systems globally with revenues of $109.7 million. Its $27.9 million revenues for first-quarter 2001 were 21.3% greater than its first-quarter 2000 revenues.

100th SLA 7000 System Shipped

Reaching another milestone, 3D Systems shipped the 100th high-end SLA 7000 system to The Boeing Company for use at its PhantomWorks facility in St. Louis. 3D Systems introduced the SLA 7000 system in February 1999 and shipped 29 that year and 57 in 2000.

"We've used stereolithography technology since 1989 for aircraft configuration and marketing models," said Ed Langenderfer, prototype design specialist engineer at Boeing's PhantomWorks, "Our main application of the technology is wind-tunnel testing."

According to Langenderfer, the group recently used stereolithography for the development of the U.S. Air Force's Unmanned Combat Air Vehicle (UCAV). "We made various flaps and aileron configurations to verify computer analyses. And we're planning to move into more advanced tooling and manufacturing applications with our SLA systems."

Grant Flaharty, senior vice president of worldwide sales and marketing at 3D Systems, said, "We are pleased that the SLA 7000 system continues to gain acceptance in

**Federal Register** / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices      **11137**

the market. As our installed base of high-end systems grows, we have more opportunities for ongoing support and materials sales. In 2000, our materials sales accounted for 23% of total revenue.''

About 3D Systems

3D Systems provides solid imaging products and services that substantially reduce the time and cost required to design, test and manufacture products. The company's systems utilize patented technologies that create physical objects from digital input.

3D Systems currently offers the ThermoJet office printer and SLA industrial systems, which include proprietary software and materials. Product pricing in the U.S. begins at $49,995 for the company's entry-level printer and extends up to $799,000 for its feature-rich industrial SLA 7000 system. The company also licenses the 3D Keltool process, a complementary application that produces injection molding and die casting inserts from SLA system master patterns. In February 2001, 3D Systems announced it acquired OptoForm, a French company that developed stereolithography systems that use paste materials. In April 2001, the company announced the signing of a definitive merger agreement to purchase DTM Corporation, contingent on, among other conditions, closing the loan funding.

Based in Valencia, Calif., 3D Systems was founded in 1986 and is recognized as the world technology and market leader in solid imaging. For additional information, visit the company's website at *www.3dsystems.com* or phone 888/337–9786, ext. 775. For an investor packet, call the company's shareholder communications service at 800/757–1799.

Note to editors: Actua is a trademark; and ThermoJet, SLA, Keltool and the 3D logo are registered trademarks of 3D Systems.

Certain statements in this news release may include forward-looking statements which express the expectation, prediction, belief or projection of 3D Systems. These statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance and achievement of 3D Systems to be materially different from any future results, performance or achievement expressed or implied by these forward-looking statements. Factors that may cause actual results to differ from the forward-looking statements contained in this release and that may affect the company's prospects in general include, but are not limited to: changes in general and industry-wide economic and business conditions; the availability of capital on acceptable terms; the funding of amounts adequate to acquire DTM Corporation and provide for the working capital needs of 3D Systems under the definitive loan document; the results of the inquiry by the Department of Justice into the acquisition by 3D Systems of DTM Corporation; actions of competitors and customers; the uncertain outcome of litigation, including the class action lawsuit filed in connection with the acquisition of DTM Corporation; the impact of competitive products and pricing; the availability and

acceptance of products generally; the extent to which the companies are able to develop new products and markets for their products; and such other factors as are described in 3D Systems' filings with the Securities and Exchange Commission, including its annual report on Form 10–K for the year ended Dec. 31, 2000, its quarterly report on Form 10–Q for the quarter ended March 30, 2001, and its current reports on Form 8–K filed on April 6 and April 10, 2001.

October 23, 2001.

Dear Friend,

With the federal government taking steps to spur the economy, 3D Systems has developed various programs to provide our customer's with the solutions they need to continue their growth and expansion. This Instant Rebate Program * provides accessibility to solid imaging systems that have greatly enhanced the solid imaging and manufacturing process.

We believe that businesses will recover from these difficult conditions and there will be a continue demand for cost effective solutions.

THE INSTANT REBATE PROGRAM FOR SOLID IMAGING SYSTEMS

| Solid imaging system | Instant rebate offer |
| --- | --- |
| SLA 7000 system | $200,000 instant rebate*. |
| SLA 5000 system | $100,000 instant rebate*. |
| SLA 3500 system | $50,000 instant rebate*. |

* Instant Rebate Program is based on standard list U.S. prices, and may not be combined with any other promotions or discounts. Offer valid until December 15, 2001. The Instant Rebate Program is restricted to U.S.-based companies and the shipment of systems are limited to U.S. locations. All shipment of systems must occur by December 31, 2001.

3D Systems is offering the Instant Rebate Program for business that are making capital investments. Attractive leasing programs are available; including six-month free financing,[1] to assist you in making your year-end capital purchase decision and allow you to update or increase your solid imaging capacity.

To express your interest in these attractive offerings, please contact 3D Systems at 1 (888) 337–9786, or (661) 295–5600 ext 2882.

Sincerely,
Dwight Williams,
VP Sales for Americas, 3D Systems.

CMET

EOS GmbH, Pasinge, Strasse 2, D–82152 Planegg Munchen, Germany, President, Dr. Hans J. Langer.

Dear Dr. Langer,

Please accept my discourteous manner to write a letter directly to you. At first, I would like to introduce our company and myself.

My name is Ken Sahara and I am president of CMET Inc. CMET Inc. is not a big company but a leading company of the Stereolithography (SLA) market in Asia. Last

December NTT-Data CMET Inc. was acquired by TEIJIN SEIKI Co., Ltd. and changed its name to CMET Inc. I was dispatched to CMET Inc. as a president from TEIJIN SEIKI Co., Ltd. at that time. And, at this April Stereolithography business of TEIJIN SEIKI integrated to CMET.

At the beginning of this July, TEIJIN SEIKI and CMET were requested from United States Department of Justice (DOJ) regarding the Marge of 3D Systems and DTM to make a presentation about the will and the way to enter the SLA or SLS market in the USA.

At that time, we heard that your company, EOS also has a keen interest to enter the USA market and already made a good presentation to DOJ.

At the moment, we suppose that EOS and CMET are waiting for the judge of DOJ to step up the next stage.

At this stage, I am not sure, it is proper time or not. But, I believe that we can discuss or exchange information about Market, Products and others. Because, your company and our company is not competitive company in the market and I am convinced that such discussion will help to make each company's short or mid-term strategy.

If you can agree with my proposal to discuss, I am very happy to meet you soon in your company or in our company. Your E-mail answer is more convenient for me.

Again, please accept my apology to write you direct. I do hope that you will be able to spare time to write your answer. Please treat this proposal as a confidential matter between you and I.

Sincerely yours,
Ken Sahara,
*President, CMET Inc.*

THOMAS, WALTON & GRAVES LLP, Philip J. Graves (SB#: 153441), 550 South Hope Street, Suite 1000, Los Angeles, California 90071, Telephone: (213) 488–1600, Facsimile: (213) 228–0256.

Attorneys for Defendants 3D SYSTEMS, INC., DTM CORPORATION, and COMPRESSION, a division of MOLL INDUSTRIES, INC.

United States District Court for the Central District of California Southern Division

[Case No. SA CV 00–1230 DOC (MLGx)]

*EOS GMBH Electro Optical Systems, Plaintiff, v. 3d Systems, Inc., DTM Corporation, and Compression, a division of MOLL Industries, Inc., Defendants and Related Actions*

3D Systems, Inc.'s Notice of Motion and Motion in Support of its Motion for Summary Adjudication Re Damages Under the 3D Patents Against EOS GmbH Electro Optical Systems; Declaration of Philip J. Graves in Support Thereof

*Date:* December 10, 2001.
*Time:* 8:30 a.m.
*Ctrm:* 9D, Honorable David O. Carter.
*To All Parties and to Their Attorneys of Record:*

Please Take Notice that on December 10, 2001, at 8:30 a.m. or as soon thereafter as the matter may be heard, before the Honorable David O. Carter, in the above-entitled Court located at 411 West Fourth Street, Suite 1053,

[1] No payments for six-months, certain restrictions apply.

Santa Ana, California 92701, Defendant 3D Systems Inc. ("3D") will and hereby does move for summary adjudication under Rules 56(d) of the Federal Rules of Civil Procedure and Rule 56–4 of the Local Rules of the United States District Court for the Central District of California, that plaintiff EOS GmbH Electro Optical Systems ("EOS") shall recover no relief, by way of damages, injunction or otherwise, as against 3D under U.S. Patent No. 4,929,402, U.S. Patent No. 5,554,336, U.S. Patent No. 5,630,981, U.S. Patent No. 5,059,359, U.S. Patent No. 5,137,662, U.S. Patent No. 5,174,931, U.S. Patent No. 5,182,056, U.S. Patent No. 5,184,307, U.S. Patent No. 5,345,391, U.S. Patent No. 5,609,812, U.S. Patent No. 5,609,813, U.S. Patent No. 5,711,911, U.S. Patent No. 5,779,967, U.S. Patent No. 5,785,918 and U.S. Patent No. 5,814,265 based upon the manufacture, use, sale or offer for sale of any laser sintering system that has occurred or shall occur after August 31, 2001.

This Court should grant 3D summary adjudication as to this issue for the following reasons. First, EOS is precluded under the August 27, 1997 3D–EOS License Agreement from asserting any claim for infringement under the licensed 3D patents against 3D based on the manufacture, use, sale or offer for sale of any apparatus, including laser sintering systems. Second, on August 31, 2001, DTM was merged into 3D and ceased to exist; accordingly, it is now 3D, not DTM, that is making and selling the accused laser sintering systems. These facts are undisputed; indeed, this Court has already found both of these facts to be true in prior Orders entered in this case. Thus, there is no genuine issue regarding the fact that EOS is entitled to recover no damages or other relief as against 3D under the licensed 3D patents based upon the manufacture or sale of the accused laser sintering systems after August 31, 2001.

This motion is made following the conference of counsel pursuant to Rule 7–3 of the Local Rules of the United States District Court for the Central District of California, which took place on October 16 and November 7 and 9, 2001. Counsel for 3D informed counsel for EOS by letter on October 17, 2001, that 3D intended to move for summary adjudication that EOS may recover no damages based on 3D's manufacture, use, sale and offering for sale of laser sintering systems, and that therefore any damages recovered by EOS in this action shall only run for the period up to and including August 30, 2001. (Graves Decl. ¶ 2; Ex. 1) Subsequently, on November 7, 2001, counsel for 3D and counsel for EOS discussed the grounds for 3D's motion for summary adjudication and the evidence that would be pertinent to adjudication of the motion. (Graves Decl. ¶ 3) On November 9, 2001, counsel engaged in further discussion regarding these matters. (Graves Decl. ¶ 4) No resolution was accomplished. (Graves Decl. ¶ 5)

This Motion is based on this notice of motion, the supporting memorandum of points and authorities, the separate statement of uncontroverted facts and conclusions of law, the declarations of A. Sidney Alpert,

Karen Shotting and Philip J. Graves, the attached exhibits, all papers and pleadings on file herein, and such other evidence as the Court may receive at or before the hearing on this matter.

Dated: November 12, 2001.
Thomas, Walton & Graves LLP.
Philip J. Graves,
*Attorneys for Defendants 3D Systems, Inc., DTM Corporation, and Compression, a division of Moll Industries, Inc.*

### Declaration of Philip J. Graves

I, Philip Graves declare as follows:
1. I am a partner at the law firm of Thomas, Walton & Graves LLP ("TWG"), counsel of record for 3D Systems, Inc. ("3D") in the case entitled *EOS GmbH Electro Optical Systems, et al. v. DTM Corp., at al.,* Case No. SA CV 00–1230 DOC (MLGx). I am a member in good standing of the State Bar of California and have been admitted to practice before this Court. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.
2. On October 17, 2001, I notified Michael Gannon, counsel for EOS GmbH Electro Optical Systems ("EOS"), by letter of 3D's intention to move for summary adjudication that EOS may recover no damages based on 3D's manufacture, use, sale and offering for sale of laser sintering systems, and that therefore any damages recovered by EOS in this action shall only run for the period up to and including August 30, 2001. A true and correct copy of this letter is attached hereto as Exhibit 1.
3. On November 7, 2001, Mr. Gannon and I discussed the grounds for 3D's motion for summary adjudication and the evidence that would be pertinent to adjudication of the motion.
4. On November 9, 2001, Mr. Gannon and I engaged in further discussion regarding these matters.
5. No resolution was accomplished. Executed on November 12, 2001, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.
Philip Graves.

### Thomas, Walton & Graves LLP, Lawyers

October 17, 2001.

*By Facsimile*

Michael D. Gannon, Esq., Baniak Pine & Gannon, 150 North Wacker Drive, Ste. 1200, Chicago, Illinois 60606.

Re: EOS GmbH Electro Optical Systems v. DTM Corporation and *Compression, Case No. SACV 00–1230 DOC*

Dear Mike:

Supplementing my letter of yesterday on this subject, I am writing pursuant to Local Rule 7.4.1 to inform you that 3D Systems, Inc. ("3D") intends to move for leave to file a supplemental or amended pleading that seeks a declaratory judgment against EOS GmbH Electro Optical Systems ("EOS") to the effect that 3D's manufacture, use, sale and offering for sale of laser sintering systems (or any other type of rapid prototyping

system) does not and will not constitute infringement of any patents licensed to EOS pursuant to the August 27, 1997 3D–EOS License Agreement.

3D also intends to move for summary adjudication that EOS may recover no damages in the above-referenced action based on 3D's manufacture, use, sale and offering for sale of laser sintering systems, and that therefore if EOS establishes any right to damages based on 3D Corporation's manufacture, use, sale and offering for sale of laser sintering systems, such damages shall only run for the period up to and including August 30, 2001.

Please give me a call at your earliest convenience to discuss whether EOS is willing to stipulate to the filing of 3D's amended or supplemental pleading, and to entry of the other relief that will be sought by 3D.

Sincerely,

Philip J. Graves.

### Proof of Service

*State of California, County of Los Angeles*

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1511 West Beverly Blvd., Los Angeles, CA 90026.

On November 12, 2001, I served the foregoing document described as *3D Sytems, Inc.'s Notice of Motion and Motion in Support of its Motion for Summary Adjudication re Damages Under the 3D Patents Against EOS GmbH Electro Optical Systems; Declaration of Philip J. Graves in Support Thereof* on the interested parties in this action by placing a true copy thereof in a sealed envelope addressed as follows: Kenneth L. Wilton, Small Larkin LLP, 10940 Wilshire Boulevard, Suite 1800, Los Angeles, CA 90024.

I caused such envelope to be delivered by hand to the offices of each interested party.

Executed on November 12, 2001 at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct.
James McLean.

Thomas, Walton & Graves LLP, Philip J. Graves (SB#: 153441), 550 South Hope Street, Suite 1000, Los Angeles, California 90071, Telephone: (213) 488–1600, Facsimile: (213) 228–0256.

*Attorneys for Defendants 3D Systems, Inc., DTM Corporation, and Compression, a division of Moll Industries, Inc.*

**Federal Register** / Vol. 67, No. 48 / Tuesday, March 12, 2002 / Notices     **11139**

**United States District Court for the Central District of California Southern Division**

[Case No. SA CV 00–1230 DOC (MLGx)]

*EOS GMBH Electro Optical Systems, Plaintiff, v. 3D Systems, Inc., DTM Corporation, and Compression, a division of Moll Industries, Inc., Defendants And Related Actions*

3D Systems, Inc.'s; Memorandum of Points and Authorities in Support of its Motion for Summary Adjudication Re Damages Under the 3D Patents Against EOS GmbH Electro Optical Systems; Declarations of Karen Shotting, A. Sidney Alpert and Philip Graves in Support Thereof

> *Date:* December 10, 2001.
> *Time:* 8:30 a.m.
> *Ctrm:* 9D, Honorable David O. Carter.

**Proof of Service**

*State of California, County of Los Angeles*

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 550 S. Hope Street, Suite 1000, Los Angeles, CA 90071–2644.

On November 12, 2001, I served the foregoing document described as 3D Systems, Inc.'s Notice of Motion and Motion in Support of Motion for Summary Adjudication Re Damages Under the 3D Patents against EOS GmbH Electro Optical Systems; Declaration of Philip J. Graves in Support Thereof on each interested party, as follows: Michael H. Baniak, Michael D. Gannon, Baniak Pine & Gannon, 150 North Wacker Drive, S. 1200, Chicago, IL 60606.

I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. In the ordinary course of business under that practice, it would be deposited with U.S. Postal Service on the same day that it is collected and processed, with postage thereon fully prepaid at Los Angeles, California. I am aware that, on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing stated in the affidavit.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 12, 2001 at Los Angeles, California.

Nancy R. Fischer.

**Table of Contents**

I. Preliminary Statement

II. Statement of Facts

A. The 3D–EOS License Agreement
B. EOS' Infringement Suit
C. 3D's Merger with DTM

III. Statement of Law

IV. Argument

A. This Court Must Apply California

Substantive Law to the Interpretation of the 1997 3D–EOS License Agreement
B. EOS May Not Assert Any Claims for Infringement Under the Licensed 3D Patents Against 3D
C. Because EOS May Not Sue 3D Under the Licensed 3D Patents, EOS Cannot Obtain Damages Under those Patents for any Manufacturing or Sales of the Accused Laser Sintering Systems that Occurred After August 31, 2001, the Date that DTM was Merged into 3D

V. Conclusion

**Table of Authorities**

*Federal Cases*

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 1986
Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557 (Fed. Cir. 1988)
Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866 (9th Cir. 1979)
Chan v. Society Expeditions, Inc., 123 F.3d 1287 (9th Cir. 1997)
Government Systems Advisors, Inc. v. United States, 847 F.2d 811 (Fed. Cir. 1988)
Magnesystems, Inc. v. Nikken, Inc., 933 F. Supp. 944 (C.D. Cal. 1996)
McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917 (Fed. Cir. 1995)
Wang Laboratories, Inc. v. Kagan, 990 F.2d 1126 (9th Cir. 1993)

*State Cases*

Appalachian Ins. Co. v. McDonnell Douglas Corp., 214 Cal. App. 1, 262 Cal. Rptr. 716 (1989)
Nedlloyd Lines B.V. v. Seawinds Ltd., 3 Cal. 4th 459, 11 Cal. Rptr. 2d 330 (1992)
Parsons v. Bristol Development Co., 62 Cal. 2d 861, (1965)
Sunniland Fruit, Inc. v. Verni, 233 Cal. App. 3d 892, 284 Cal. Rptr. 824 (1991)

*Federal Statutes*

28 U.S.C. § 1338

*State Statutes*

Cal. Civ. Code § 1638
Cal. Civ. Code § 1639
Cal. Civ. Code § 1646.5
Cal. Corp. Code § 1107(a)
Cal. Corp. Code § 1108(b)

*Statutes*

C.D. Local Rule 7.14.4
Fed. R. Civ. P. 56(e)

**I. Preliminary Statement**

Defendant 3D Systems, Inc. ("3D") hereby moves for summary adjudication that plaintiff EOS GmbH Electro Optical Systems ("EOS") may recover no damages or other relief as against 3D or nominal defendant DTM under the 3D patents asserted by EOS in this action based upon the manufacture, use, sale or offer for sale of any of the accused laser sintering systems that occurs after August 31, 2001. 3D's motion rests on the following *two* undisputed facts:

EOS expressly agreed in the August 27, 1997 3D–EOS License Agreement that EOS shall not assert against 3D "any claims for infringement based on the manufacture, use, sale or offer for sale of any apparatus made or sold by [3D] under the Licensed Patents,

at any time, for any reason, during the term of this License Agreement."

DTM Corporation ("DTM") was merged into 3D on August 31, 2001, with 3D as the surviving entity.

EOS cannot create a genuine issue as to either of these facts; indeed, this Court has already found them to be true, in rulings on prior motions in this case. These facts foreclose any opportunity that EOS might otherwise have had to recover damages or other relief under the licensed 3D patents based upon the manufacture or sale of the accused laser sintering systems after August 31, 2001, because those activities are now being carried on by 3D, which succeeded as a matter of law to DTM's laser sintering operations.

Accordingly, this Court should grant 3D's motion for summary adjudication that EOS is entitled to no relief under the licensed 3D patents as against 3D or nominal defendant DTM for any manufacture, use, sale or offer for sale of the accused laser sintering systems that occurs after August 31, 2001.

**II. Statement of Facts**

*A. The 3D–EOS License Agreement*

On August 27, 1997, 3D and EOS[1] entered into an agreement pursuant to which 3D licensed EOS under (i) all U.S. and foreign patents "owned by LICENSOR as of the effective date of this Agreement," and (ii) all U.S. and foreign patents "which may issue to LICENSOR," on applications filed prior to August 20, 2002, but only in the field of laser sintering. (SUF No. 1; Alpert Decl. ¶ 2; Ex. 1, ¶ 1.1, at p. 31) EOS expressly agreed not to assert against 3D "any claims for infringement based on the manufacture, use, sale or offer for sale of any apparatus made or sold by LICENSOR under the Licensed Patents, at any time, for any reason, during the term of this Licensed Agreement." (SUF No. 2; Ex. 1, ¶ 2.1(a), at p. 31) The License Agreement has an integration clause, and a provision stating that it is to be interpreted according to the substantive law of California. (SUF Nos. 3–4; Ex. 1, ¶ 8.2, at p. 36)

*B. EOS' Infringement Suit*

On December 14, 2000, EOS filed suit against DTM and Compression, alleging infringement of certain of the 3D patents that 3D had licensed to EOS. On March 16, 2001, this Court ordered EOS to join 3D (the licensor of the patents under which EOS is suing DTM and Compression) as an involuntary plaintiff, because 3D had not licensed all substantial rights under the patents to EOS. (Graves Decl. ¶ 2; Ex. 2 at p. 40) Central to this Court's ruling was its determination that *"3D itself may still make products using the licensed patents"*, citing to paragraph 2.1 of the License Agreement. (Ex. 2, at p. 40) EOS filed and served its

[1] While the License Agreement identifies EOS, 3D Systems GmbH and 3D Systems Corporation ("3D Corp.") as the contracting parties, 3D contemplated that 3D (the entity that owned the licensed patents) would be bound by and receive the benefit of the License Agreement. (Alpert Decl. ¶ 5) In any event, the License Agreement was assigned from 3D Corp. to 3D as of August 31, 2001. (SUF No. 5; Ex. 5 at p. 54)

Third Amended Complaint, naming 3D as an involuntary plaintiff, on May 7, 2001; in its Third Amended Complaint, EOS asserted fifteen licensed 3D patents against DTM and Compression. (SUF No. 6; Graves Decl. ¶ 3; Ex. 6, ¶¶ 6–20, 22)

*C. 3D's Merger with DTM*

On August 31, 2001, 3D filed with the California Secretary of State an Agreement of Merger between 3D and DTM. (SUF No. 7; Ex. 3 at pp. 45–46) 3D also filed a Certificate of Approval of Agreement of Merger executed by the CEO and President and Secretary of 3D, and a Certificate of Approval of Agreement of Merger executed by the CEO and President and Secretary of DTM. (SUF No. 7; Ex. 3 at pp. 47–50) Pursuant to these documents, DTM was merged into 3D, and its corporate existence extinguished. [SUF No. 8] Cal. Corp. Code § 1107(a). The laser sintering operations of the now-defunct DTM were acquired by 3D as a result of the merger. Cal. Corp. Code § 1107(a).

On October 17, this Court granted 3D's motion for reconsideration regarding realignment, and realigned 3D as a defendant. The Court explicitly held that "On August 31, 2001, 3D merged DTM into 3D. DTM now no longer exists." (Ex. 4, at p. 52)

**III. Statement of Law**

Summary adjudication is appropriate on particular facts and issues as to which no genuine issue of material fact exists, regardless of whether the motion disposes of an entire claim. Rule 56–4, C.D. Cal. Local Rules. "Summary judgment is as appropriate in a patent case as in any other." *Avia Group Int'l Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988) (affirming summary adjudication of willful infringement). Once the movant has shown the absence of a genuine issue of fact, the non-moving party has the burden of coming forth with specific evidence to demonstrate the existence of a genuine issue of material fact; mere denials or conclusory statements are insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); Fed. R. Civ. P. 56(e). "To create a genuine issue of fact, the nonmovant must do more than present some evidence on an issue it asserts is disputed." *Avia Group*, 853 F.2d at 1560. As explained by the Supreme Court: "If the evidence is merely colorable, * * * or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50 (citations omitted)

**IV. Argument**

*A. This Court Must Apply California Substantive Law to the Interpretation of the 1997 3D–EOS License Agreement*

The License Agreement provides that "[t]his Agreement shall be governed and interpreted in accordance with the substantive laws of the State of California irrespective of any choice of law rules in the State of California or in any jurisdiction" (Ex. 1, ¶ 8.6 at p. 36) Thus, this Court must apply California law in interpreting paragraph 2.1(a) of the License Agreement.

Because jurisdiction in this case is predicated on 28 U.S.C. § 1338 rather than on diversity, the Court should look to federal common law rather than state law to determine the enforceability of the choice of law provision contained in the License Agreement. *Wang Laboratories, Inc. v. Kagan*, 990 F.2d 1126, 1128 (9th Cir. 1993). Federal courts generally apply the choice of law rules set forth in the Restatement (Second) of Conflicts of Laws. *Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997). Under the Restatement, "courts should enforce the parties' choice of law if the issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." *Id.* (quoting Restatement (Second) Conflict of Laws § 187(1)). Here, the issue is whether EOS may sue 3D under the licensed patents, and the parties did in fact resolve that issue by an explicit provision in the contract—paragraph 2.1(a). (Ex. 1, at p. 31) Accordingly, this Court must enforce the parties' choice of California substantive law.

In addition, even if the issue were not subject to explicit resolution in the License Agreement (and, of course, it is), this Court would still be impelled to enforce the parties' choice of California law:

"unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and that state would be the state of applicable law in the absence of a choice-of-law clause."

*Id.* (quoting Restatement (Second) Conflict of Laws § 187(2)). Here, California has a substantial relationship to the parties and the transaction because 3D is headquartered and incorporated in California. (Shotting Decl. ¶ 4) Similarly, EOS can make no showing that Germany has a materially greater interest than California in the interpretation of the License Agreement—indeed, in light of the fact that the particular provision at issue protects the right of a California corporation to make and sell products in California and elsewhere, it is difficult to divine how any other jurisdiction could have an interest in this matter as substantial as that of California. Accordingly, this Court must enforce the parties' choice of California substantive law.

Finally, it bears noting that even if this Court were to find California law applicable to the choice of law question, California courts routinely enforce such choice of law provisions under the standards set forth in the Restatement. E.g., *Nedlloyd Lines B.V. v. Seawinds Ltd.*, 3 Cal. 4th 459, 464–65, 11 Cal. Rptr. 2d 330 (1992) ("In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 198, which reflects a strong policy favoring enforcement of such provisions."); Cal. Civ. Code § 1646.5 ("the parties to any contract, agreement, or undertaking, contingent or otherwise, relating to a transaction involving in the aggregate" at least $250,000, "may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not the contract, agreement, or undertaking or transaction bears a reasonable relation to this state.").

*B EOS May Not Assert Any Claims for Infringement Under the Licensed 3D Patents Against 3D*

The 3D–EOS License Agreement provides as follows:

"LICENSEE expressly agrees not to assert against LICENSOR any claims for infringement based on the manufacture, use, sale or offer for sale of any apparatus made or sold by LICENSOR under the Licensed Patents, at any time, for any reason, during the term of this License Agreement."

(SUF No. 2; Ex. 1, ¶ 2.1(a), at p. 31) The licensee is EOS; the licensor is 3D. The language could not possibly be more clear: EOS may not sue 3D for infringement based on the manufacture, use, sale or offer for sale of any apparatus—including laser sintering systems—under the licensed 3D patents.

This Court has already examined paragraph 2.1 of the License Agreement and ruled that it means exactly what it says: "3D itself may still make products using the licensed patents." (Ex. 2, at p. 40) In January, DTM filed a motion to dismiss EOS' complaint on the ground, inter alia, that EOS lacked standing to sue under the licensed 3D patents without joining 3D as a plaintiff because the 1997 3D–EOS License Agreement did not grant to EOS "all substantial rights" in the patents. EOS opposed the motion, arguing that it did in fact obtain all substantial rights in the patents. On March 16, this Court granted DTM's motion in part, ruling that EOS lacked standing to sue without joining 3D because its rights in the patents were insubstantial. The Court, as an initial matter, noted that the limitations of paragraph 2.1(a) "prohibit EOS from asserting claims in infringement against 3D and its vendees or customers during the term of the Agreement." (Ex. 2, at 39) The Court reviewed EOS' arguments, and then held as follows:

"However, the Court agrees with Defendants that other provisions of the Agreement render the rights obtained by EOS insubstantial. First, 3D itself may still make products using the licensed patents. Agreement § 2.1(a). This right is a significant one when considering whether substantial rights have been transferred."

(Ex. 2, at 40) Thus, this Court has already visited the issue of whether EOS may assert the licensed 3D patents against 3D based on 3D's manufacture and sale of the accused laser sintering systems, and has held that it may not. The Court's determination that paragraph 2.1(a) prohibits EOS from asserting claims of infringement against 3D, and that 3D itself may make and sell products using the licensed patents, is entitled to finality as law of the case because EOS can show no grounds on which to reopen the issue. *Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 948–49 (C.D. Cal. 1996).

Moreover, even if this Court had not already resolved this issue in its March 16 Order, application of California contract law would lead ineluctably to the same result. A patent license is a contract governed by

ordinary principles of state contract law. *McCoy* v. *Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed. Cir. 1995). California law provides that "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. In addition, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; . . . ." Cal. Civ. Code § 1639. Thus, a party's "subjective intent or understanding cannot be used to establish an intent independent from the express written terms of the agreement." *Sunniland Fruit, Inc.* v. *Verni,* 233 Cal. App. 3d 892, 898, 284 Cal. Rptr. 824 (1991).

It is well established that the interpretation of an unambiguous contract is solely a question of law, unless the interpretation turns on the credibility of extrinsic evidence. *Brobeck, Phleger & Harrison* v. *Telex Corp.,* 602 F.2d 866, 871–72 (9th Cir. 1979) (applying California law; citation omitted); *Parsons* v. *Bristol Development Co.,* 62 Cal. 2d 861, 865 (1965). Extrinsic evidence is not admissible to vary the terms of the contract, but only to prove a meaning to which the language of the contract is "reasonably susceptible." *Brobeck,* 602 F.2d at 871–72; *Sunniland Fruit,* 233 Cal. App. 3d at 898. If the court finds that the language of the contract is unambiguous and not reasonably susceptible to the meaning suggested by the extrinsic evidence, then the case is particularly amenable to disposal on summary judgment because interpretation of the unambiguous contract is solely a question of law. *Brobeck,* 602 F.2d at 871–72; *Government Systems Advisors, Inc.* v. *United States,* 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) (noting that under Federal Circuit law "[c]ontract interpretation is a matter of law and thus amenable to decision on summary judgment.").

Thus, California courts enforce unambiguous contracts containing exculpatory provisions similar to that contained in the 3D–EOS License Agreement according to their terms. For example, in *Appalachian Ins. Co.* v. *McDonnell Douglas Corp.,* 214 Cal. App. 1, 262 Cal. Rptr. 716 (1989), Western Union entered into a contract with McDonnell Douglas pursuant to which McDonnell was to manufacture an upper stage rocket for a Western Union communications satellite. The contract contained a provision stating that "under no circumstances will [McDonnell] be liable to Purchaser under or in connection with this Agreement, for any tort, negligence, strict liability, contract or other legal or equitable theory, . . . ." *Id.* at 12. In addition, the parties agreed to extend their inter-party waiver of liability "to their respective contractors and subcontractors . . ." *Id.* at 14. After the rocket failed, five insurance companies that paid a portion of the resulting claim filed suit against McDonnell and two of the subcontractors. The trial court granted summary adjudication in favor of the defendants, based on exculpatory clauses in the contract between the insured and McDonnell, and the court of appeals affirmed. Noting that "[t]he language of the instrument must govern its

interpretation if it is clear and explicit," the court rejected the plaintiffs' argument that the exculpatory provision regarding the subcontractors should be construed to reflect the intent set forth in the contrary provision of a related agreement:

"To ignore the differences in the language used in the two agreements would violate a fundamental rule of contract interpretation, that is, the words of a contract, if clear, must govern its interpretation. The words of the McDonnell Douglas/Western Union contract are clear; they unambiguously preclude a suit by Western Union against McDonnell Douglas' respective contractors and subcontractors, i.e., against Morton Thiokol and Hitco."

*Id.* at 18. Similarly, here, EOS has unambiguously agreed not to sue 3D under the licensed patents based on 3D's manufacturing and sales activities at any time, for any reason. Under California law, the Court must enforce the contract. Accordingly, EOS cannot assert its patent infringement claims against 3D based upon 3D's manufacture and sale of the accused laser sintering systems.

*C. Because EOS May Not Sue 3D Under the Licensed 3D Patents, EOS Cannot Obtain Damages Under Those Patents for any Manufacturing or Sales of the Accused Laser Sintering Systems That Occurred After August 31, 2001, the Date That DTM was Merged Into 3D*

The undisputed evidence shows that on August 31, 2001, 3D filed with the California Secretary of State an Agreement of Merger between 3D and DTM. (SUF No. 7; Ex. 3) 3D also filed a Certificate of Approval of Agreement of Merger executed by the CEO and President and Secretary of 3D, and a Certificate of Approval of Agreement of Merger executed by the CEO and President and Secretary of DTM. (SUF. No. 7; Ex. 3) Pursuant to these filings, DTM was merged into 3D as of August 31, 2001, with 3D as the surviving entity. (SUF No. 8) The legal effect of these filings was that DTM's corporate existence was extinguished as of August 31, 2001.[2] Cal. Corp. Code §§ 1103, 1107(a); *Asher* v. *Pacific Power and Light Co.,* 249 F. Supp. 671, 677 (N.D. Cal. 1965). In recognition of these facts, this Court ruled on October 17 that "[o]n August 31, 2001, 3D merged DTM into 3D. *DTM now no longer exists.*" (Ex. 4, at p. 52) Thus, the Court need not revisit this issue, because its prior ruling is entitled to finality as law of the case. *Magnesystems,* 933 F. Supp. at 948–49.

As a result of the merger, 3D succeeded to the assets of DTM, including its laser sintering manufacturing and sales operations. Cal. Corp. Code § 1107(a). EOS cannot possibly fabricate a genuine issue as to the fact that it is now 3D, *not* DTM, that is making and selling the accused laser sintering systems, because the merger extinguished the existence of DTM *as a matter of law.* Cal. Corp. Code ¶ 1107(a). Accordingly, EOS is not entitled to obtain

[2] California law governs the effect of the merger, because the surviving entity–3D–is a California corporation. Cal. Corp. Code § 1108(b). (Shotting Decl. ¶ 4)

any damages or other relief based on the conduct of 3D in manufacturing and selling the accused laser sintering systems after August 31, 2001, because EOS agreed in paragraph 2.1(a) of the License Agreement not to assert any of the licensed patents against 3D "based on the manufacture, use, sale or offer for sale of any apparatus made or sold by [3D] under the Licensed Patents, at any time, for any reason." (Ex. 1, ¶ 2.1(a), at p. 31)

**V. Conclusion**

For the reasons set forth above, the Court should grant 3D's motion for summary adjudication that EOS may recover no damages or other relief as against 3D or nominal defendant DTM under the licensed 3D patents based upon the manufacture, use, sale or offer for sale of any of the accused laser sintering systems that occurs after August 31, 2001.

Dated: November 12, 2001.

Thomas, Walton & Graves LLB.

*Philip J. Graves,*

*Attorneys for Defendants 3D Systems, Inc., DTM Corporation, and Compression, a division of Moll Industries, Inc.*

[FR Doc. 02–4699 Filed 3–11–02; 8.45 am]

BILLING CODE 4410–11–M

---

# DEPARTMENT OF JUSTICE

## Drug Enforcement Administration

### Manufacturer of Controlled Substances; Application

Pursuant to § 1301.33(a) of Title 21 of the Code of Federal Regulations (CFR), this is notice that on October 12, 2001, Chiragene, Inc., Technology Centre of New Jersey, 661 Highway One, North Brunswick, New Jersey 08902, made application by renewal to the Drug Enforcement Administration (DEA) for registration as a bulk manufacturer of the basic classes of controlled substances listed below:

| Drug | Schedule |
|---|---|
| N-Ethylamphetamine (1475) ........ . | I |
| 2,5-Dimethoxyamphetamine (7396) .......... | I |
| 3,4-Methylenedioxyamphetamine (7400) .......... | I |
| 4-Methoxyamphetamine (7411) .... | I |
| Amphetamine (1100) ................... | II |
| Methylphenidate (1724) ................ | II |
| Morphine (9300) .......................... | II |
| Fentanyl (9801) ............................ | II |

The firm plans to manufacture the listed controlled substances to supply their customers.

Any other such applicant and any person who is presently registered with DEA to manufacture such substances may file comments or objections to the issuance of the proposed registration.

Tab D

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                      )
                                               )
                              Plaintiff,        )
                                               )
              v.                               )    Civil No: 1:01CV01237 (GK)
                                               )
3D SYSTEMS CORPORATION and                     )
DTM CORPORATION,                               )    **FILED**
                                               )
                              Defendants.       )    APR 1 6 2002
                                               )

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## ORDER

WHEREAS, on March 13, 2002, EOS GmbH Electro Optical Systems ("EOS") filed a

Motion to Intervene as of right in this proceeding; and

WHEREAS, Plaintiff United States of America and the defendants opposed EOS's

motion;

Therefore, upon consideration of the motion and the opposition thereto, it is this 15th day

of April, 2002,

ORDERED, that the Motion of EOS GmbH Electro Optical Systems to Intervene is

hereby denied.


Gladys Kessler
United States District Judge

17