RECEIVED

MAY 2 2 2003

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

FILED

MAY 2 2 2003

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Board of Regents, The University of Texas System, and 3D Systems, Inc. | § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. A03 CA 113 SS |
| EOS GmbH Electro Optical Systems | § § | |
| Defendant | § | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS
THE ANTITRUST COUNTERCLAIMS (COUNTS V AND VI)**

Defendant EOS GmbH Electro Optical Systems ("EOS") responds to Plaintiffs' Motion to Dismiss the Antitrust Counterclaims (Counts V and VI) for Failure to State a Claim Upon Which Relief Can Be Granted Pursuant to Federal Rule of Civil Procedure 12(b)(6) by the Board of Regents, the University of Texas System ("UT"), and 3D Systems, Inc. ("3D Systems").

24

# TABLE OF CONTENTS

**Page**

I.     DISMISSAL OF ANTITRUST CLAIMS ON THE PLEADINGS IS DISFAVORED. . 1

II.    COUNT V SHOULD NOT BE DISMISSED. ................................................................... 2

    A.     EOS Has Sufficiently Defined the Relevant Market. ............................................ 4

    B.     EOS Has Sufficiently Alleged Antitrust Injury. .................................................... 7

    C.     EOS Has Sufficiently Alleged its Sherman Act Section 2 Claim. ...................... 10

        1.     EOS has sufficiently alleged a monopolization claim. ........................... 10

        2.     EOS has sufficiently alleged 3D's attempt to monopolize. ................... 11

III.   COUNT VI SHOULD NOT BE DISMISSED ............................................................... 13

    A.     *Noerr-Pennington* Doctrine Does Not Bar Count VI ........................................ 13

    B.     The Exception to the Noerr-Pennington Doctrine Does Apply Because EOS Has Alleged Sufficient Facts to Meet the Exception. ................................ 14

    C.     EOS has sufficiently alleged a *Handgards* Claim. ............................................ 16

    D.     EOS Has Sufficiently Alleged Its Claims Against UT. ....................................... 17

        1.     EOS Has Stated a §1 Claim Against UT. ............................................... 18

        2.     EOS Has Stated a §2 Claim Against UT. ............................................... 19

    E.     EOS's Claims Are Not Precluded by the Doctrine of Laches. ........................... 20

IV.    CONCLUSION ............................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Laboratories v. Brennan*
  952 F.2d 1346 (Fed. Cir. 1991) ................................................................ 3

*Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*
  64 F. Supp. 2d 1097 (D. Kan. 1999) ......................................................... 6

*Advanced Cardiovascular Systems v. Scimed Life Systems, Inc.*
  988 F.2d 1157 (Fed. Cir. 1993) ................................................................ 2

*Advanced Health-Care Servs., Inc. v. Radford Community Hosp.*
  910 F.2d 139 (4th Cir. 1990) .................................................................... 9

*Alberta Gas Chemicals Ltd. v. E.I. Du Pont de Nemours & Co.*
  826 F.2d 1235 (3d Cir. 1987) ................................................................... 8

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.*
  690 F.2d 411 (4th Cir. 1982) ................................................................. 19

*American Tobacco Co. v. United States*
  328 U.S. 781, 66 S. Ct. 1125 (1946) ...................................................... 20

*Anago, Inc. v. Tecnol Medical Products, Inc.*
  976 F.2d 248 (5th Cir. 1992) ................................................................... 7

*Ancar v. Sara Plasma, Inc.*
  964 F.2d 465 (5th Cir. 1992) ............................................................. 1, 18

*Ansell Inc. v. Schmid Lab., Inc.*
  757 F. Supp. 467 (D. N.J. 1991) .............................................................. 8

*Apani Southwest Inc. v. Coca-Cola Enterprises*
  300 F.3d 620 (5th Cir. 2002) ................................................................... 6

*Associated General Contractors of California, Inc. v. California
State Council of Carpenters*
  459 U.S. 519, 103 S. Ct. 897 (1983) ........................................................ 3

*Baxter, Inc. v. McGaw, Inc.*
  149 F.3d. 1321 (Fed. Cir. 1998) ............................................................ 14

*Bayou Bottling, Inc. v. Dr. Pepper Co.*
  725 F.2d 300 (5th Cir. 1984) ............................................................... 7, 9

*Bayou Fleet, Inc. v. Alexander*
  234 F.3d 852 (5th Cir. 2000) ................................................................. 14

*Brader v. Allegheny General Hosp.*
  64 F.3d 869 (3d Cir. 1995) ...................................................................... 7

**TABLE OF AUTHORITIES, continued**

<u>Page(s)</u>

*Broyles v. Wilson*
   812 F. Supp. 651 (M.D. La. 1993) ................................................................. 19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
   429 U.S. 477, 97 S. Ct. 690 (1977) .............................................................. 7, 8

*C.R. Bard, Inc. v. M3 Systems, Inc.*
   157 F.3d 1340 (Fed. Cir. 1998) ................................................................... 16

*California v. American Stores Co.*
   495 U.S. 271 (1991) ...................................................................................... 20

*Cargill, Inc. v. Monfort of Colorado, Inc.*
   479 U.S. 104 (1986) ........................................................................................ 7

*City of Columbia v. Omni Outdoor Advertising, Inc.*
   499 U.S. 365, 111 S. Ct. 1344 (1991) ............................................................ 9

*Commercial Data Servers, Inc. v. Int'l Business Machines Corp.*
   166 F. Supp. 2d 891 (S.D.N.Y. 2001) ............................................................ 6

*Conley v. Gibson*
   355 U.S. 41 (1957) ...................................................................................... 2, 3

Costello v. United States
   365 U.S. 265, 81 S. Ct. 534 (1961) .............................................................. 21

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*
   136 F.3d 554 (8th Cir. 1998) .......................................................................... 6

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*
   365 U.S. 127, 365 U.S. 127, 81 S. Ct. 523 (1961) ....................................... 13

*Eastman Kodak Co. v. Image Technical Services, Inc.*
   504 U.S. 451, 112 S.Ct. 2072 (1992) ............................................................. 6

*Electronic Data Syst. Corp. v. Computer Assoc. Int'l, Inc.*
   802 F. Supp. 1463 (N.D. Tex. 1992) ................................................... 1, 10, 13

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*
   129 F.3d 240 (2nd Cir. 1997) ......................................................................... 8

*Eleven Line, Inc. v. North Texas State Soccer Assn., Inc.*
   No. 3-95-CV-3120, 1998 U.S. Dist. LEXIS 581 (N.D. Tex. 1/13/1998) ........... 5, 19

*Estate Contr. Co. v. Miller & Smith Holding Co.*
   14 F.3d 212 (4th Cir. 1994) .......................................................................... 19

*Foundation. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*
   244 F.3d 521 (6th Cir. 2001) .......................................................................... 6

*Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.*
   789 F. Supp. 760 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993) ............ 18

**TABLE OF AUTHORITIES, continued**

Page(s)

*Gianna Enters. v. Miss World (Jersey) Ltd.*
    551 F. Supp. 1348 (S.D.N.Y. 1982) .................................................................. 6

*Glass Equip. Dev., Inc. v. Besten, Inc.*
    174 F.3d 1337 (Fed. Cir. 1999) ...................................................................... 15

*Great W. Directories v. Southwestern Bell Tel. Co.*
    63 F.3d 1378 (5th Cir. 1995) .......................................................................... 20

*Hack v. President and Fellows of Yale College*
    16 F. Supp. 2d 183 (D. Conn. 1998).................................................................. 6

*Handgards, Inc. v. Ethicon, Inc*
    601 F.2d 986 (9th Cir. 1979) .......................................................................... 16

*Handgards, Inc. v. Ethicon, Inc.*
    743 F.2d 1282 (9th Cir. 1984) ................................................................. 13, 16

*Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co.*
    964 F. Supp. 624 (D. Conn. 1997).................................................................. 14

*Heart Disease Research Foundation v. General Motors Corp.*
    463 F.2d 98 (2d Cir. 1972) ............................................................................ 18

*Heatransfer Corp. v. Volkswagenwerk, A.G.*
    553 F.2d 964 (5th Cir. 1977) ................................................................ 8, 10, 11

*Heidelberger Druckmaschines AG v. Hantscho Commercial Prods., Inc.*
    21 F.3d 1068 (Fed. Cir. 1994) ....................................................................... 14

*Hison v. King & Spalding*
    467 U.S. 69 (1984)........................................................................................... 3

*Hittman Nuclear & Dev. Corp. v. ChemNuclear Sys.*
    No. CIV.A.N-78-2570, 1979 WL 1749 (D. Md. 1979) ........................................ 6

*Hospital Bldg. Co. v. Rex Hosp. Trustees*
    425 U.S. 738, 96 S. Ct. 1848 (1975)................................................................. 1

*Hospital Bldg. Co. v. Trustees*
    425 U.S. 738 (1976)......................................................................................... 3

*Hydranautics v. FilmTec Corp.*
    70 F.3d 533 (9th Cir. 1995) ........................................................................... 14

*International Distrib. Centers, Inc. v. Walsh Trucking Co.*
    812 F.2d 786 (2d Cir. 1987) .......................................................................... 19

*J.P. Stevens & Co. v. Lex Tex Ltd.*
    747 F.2d 1553 (Fed. Cir. 1984) ..................................................................... 14

*JM Computer Servs., Inc. v. Schlumberger Technologies, Inc.*
    No. C 95 20349 JW, 1996 WL 241607 (N.D. Cal. May 3, 1996)......................... 6

**TABLE OF AUTHORITIES, continued**

<u>Page(s)</u>

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*
   677 F.2d 1045 (5th Cir. 1962) ................................................................. 1

*Kalmanovitz v. G. Heileman Brewing Co.*
   595 F. Supp 1385 (D. Del. 1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985) ................................... 9

*Lone Star Milk Producers Inc. v. Dairy Farmers of America, Inc.*
   No. 5:00-CV-191, 2001 U.S. Dist. LEXIS 18716 (E.D. Tex. 1/22/2001)...................... 1, 7, 11

*Mathias v. Daily News, L.P.*
   152 F. Supp. 2d 465 (S.D.N.Y. 2001) ................................................................. 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986)................................................................................. 7

*McCormack v. Citibank, N.A.*
   979 F.2d 643 (8th Cir. 1992) ................................................................. 2

*MCM Partners v. Andrews-Bartlett & Assoc.*
   62 F.3d 967 (7th Cir. 1995) ................................................................. 7, 10

*Medtronic, Inc. v. Daig Corp.*
   789 F.2d 903 (Fed. Cir. 1986) ................................................................. 14

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*
   795 F. Supp. 639 (S.D.N.Y. 1992) ................................................................. 7, 8

*Millcreek Assoc., L.P. v. Bear, Stearns & Co.*
   205 F. Supp. 2d 664 (W.D. Tex. 2002) ................................................................. 4

*Morales-Villalobos v. Garcia-Llorens*
   316 F.3d 51 (1st Cir. 2003)................................................................. 6

*Muenster Butane, Inc. v. Stewart Co.*
   651 F.2d 292 (5th Cir. 1981) ................................................................. 7

*North Jersey Secretarial School v. McKiernan*
   713 F. Supp. 577 (S.D.N.Y. 1989) ................................................................. 6

*Pearl Brewing Co. v. Miller Brewing Co.*
   1993 U.S. Dist. LEXIS 16844 (W.D. Tex. 1993)................................................................. 7

*Phototron Corp. v. Eastman Kodak Co.*
   842 F.2d 95 (5th Cir. 1988) ................................................................. 7

*Poller v. Columbia Broadcasting Sys.*
   368 U.S. 464 (1962)................................................................. 3

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*
   508 U.S. 49, 113 S. Ct. 1920 (1993)................................................................. 14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*
   124 F.3d 430 (3d Cir. 1997) ................................................................. 6

# TABLE OF AUTHORITIES, continued

<u>Page(s)</u>

*Remington Prods. Inc. v. North American Philips Corp.*
  755 F. Supp. 52 (D. Conn. 1991)..................................................................8

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*
  802 F. Supp. 1544 (S.D. Tex. 1991)............................................................14

*Spectrum Sports, Inc. v. McQuillan*
  506 U.S. 447, 113 S. Ct. 884 (1993)...........................................................11

*St. Bernard Gen. Hosp., Inc. v. Hospital Serv. Ass'n*
  712 F.2d 978 (5th Cir. 1983) .........................................................................1

*Sugar Busters, L.L.C. v. Brennan*
  No. 98-1562, 1999 WL 109564 (E.D. La. Feb. 19, 1999).........................15

*TCA Building Co. v. Northwestern Resources Co.*
  861 F. Supp. 1366 (S.D. Tex. 1994)..............................................................8

*Todd v. Exxon Corp.*
  275 F.3d 191 (2d Cir. Dec. 20, 2001) ...........................................................6

*United Mine Workers of America v. Pennington*
  381 U.S. 657, 85 S. Ct. 1585 (1965)...........................................................13

*United States v. Grinnell Corp.*
  384 U.S. 563, 86 S. Ct. 1698 (1966)...........................................................10

*United States v. Sungard Data Systems, Inc.*
  172 F. Supp. 2d 172 (D. D.C. 2001) ..............................................................7

*United States v. United States Gypsum Co.*
  438 U.S. 422, 98 S. Ct. 2864 (1978)...........................................................19

*Westman Comm'n Co. v. Hobart Int'l, Inc.*
  796 F.2d 1216 (10th Cir. 1986) ......................................................................7

**Statutes**

15 U.S.C. § 1.......................................................................................... 16, 25

15 U.S.C. § 2............................................................................ 15, 16, 18, 27, 28

**Rules**

Fed. R. Civ. P. 8 ...........................................................................................13

## I.    DISMISSAL OF ANTITRUST CLAIMS ON THE PLEADINGS IS DISFAVORED.

When considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint, and the complaint (or in this case, the counterclaim) must be liberally construed in favor of EOS. *Electronic Data Syst. Corp. v. Computer Assoc. Int'l, Inc.*, 802 F. Supp. 1463, 1465 (N.D. Tex. 1992) (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1962)).[1] Thus, the Court must accept as true both the allegations raised in the complaint and "any reasonable inferences that may be drawn therefrom." *Lone Star Milk Producers Inc. v. Dairy Farmers of America, Inc.*, No. 5:00-CV-191, 2001 U.S. Dist. LEXIS 18716 at * 4 (E.D. Tex. 1/22/2001) (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)). In this Circuit, "[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Electronic Data Sys.*, 802 F. Supp. at 1465 (*quoting Kaiser Aluminum*, 677 F.2d at 1050).

This standard is equally applicable to antitrust claims. *Electronic Data Sys.*, 802 F. Supp. at 1466 (citing *St. Bernard Gen. Hosp., Inc. v. Hospital Serv. Ass'n*, 712 F.2d 978, 985 n. 13 (5th Cir. 1983)). As a general rule of claim interpretation, antitrust allegations are to be liberally construed by courts of the Fifth Circuit. *Ancar v. Sara Plasma, Inc.*, 964 F.2d 465, 468 (5th Cir. 1992). Courts have recognized that in antitrust cases "dismissals prior to giving the [complainant] ample opportunity for discovery should be granted very sparingly," because the detailed information necessary to ultimately prove an antitrust claim is often in the possession of the [other party]. *Electronic Data*, 802 F. Supp. at 1466 (quoting *Hospital Bldg. Co. v. Rex Hosp. Trustees*, 425 U.S. 738, 746, 48 L. Ed. 2d 338, 96 S. Ct. 1848 (1975)).

---

[1] Cited cases discuss Rule 12(b) motions in the context of antitrust claims.

Plaintiffs must establish beyond doubt that EOS can prove no set of facts in support of the claim which would entitle EOS to relief. In addition, all well-pleaded allegations of the complaint are accepted as true, and all reasonable inferences therefrom must be construed favorably to the pleader. *Advanced Cardiovascular Systems v. Scimed Life Systems, Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) (Citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *McCormack v. Citibank, N.A.*, 979 F.2d 643, 646 (8th Cir. 1992). Yet Plaintiffs continuously ignore these well-established principles, and instead ask this Court to consider the weight of this evidence and resolve issues of fact.

Plaintiffs' attack on the antitrust claims, Counts V and VI, fails for a multitude of reasons. First and foremost is that EOS has met every alleged technical defect Plaintiffs have raised. Plaintiffs have simply chosen to ignore the pleading and/or the applicable law establishing its sufficiency. Each and every element of EOS's *Handgards*-type claim – that the antitrust laws have been violated through Plaintiffs' enforcement of patent claims they know to be invalid and having a claim construction which they know to be unsupportable – has been set forth with particularity, including more than enough factual support. There is no *Noerr-Pennington* immunity applicable. Plaintiffs' position on the law and the facts on this point is simply wrong.

## II.    COUNT V SHOULD NOT BE DISMISSED.

In moving to dismiss Count V of the Counterclaim, Plaintiffs seek to hold EOS to a standard much higher than that required by the Federal Rules of Civil Procedure. Many of the issues they raise are fact-intensive and not appropriate for resolution through a motion to dismiss. If EOS's allegations, and the reasonable inferences that arise from those allegations, are accepted as true, as is required by the Rules, it is clear that EOS has adequately stated an

antitrust claim.  EOS has sufficiently pleaded the factual allegations required to allow its

antitrust claims to proceed.  *See Associated General Contractors of California, Inc. v.*

*California State Council of Carpenters*, 459 U.S. 519, 528, 74 L. Ed. 2d 723, 103 S. Ct. 897

(1983) ("[W]e must assume that the Union can prove the facts alleged in its amended

complaint").

    Dismissal of EOS's antitrust claim is not appropriate under the governing legal

standard.  The Supreme Court has stated:

> a complaint should not be dismissed for failure to state a claim unless it appears
> beyond doubt that the Plaintiff can prove no set of facts in support of his claim
> that would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 51, 45-46 (1957); *see also, Hison v. King & Spalding*, 467 U.S. 69,

73 (1984).  The Court also stated:

> [t]he Federal Rules of Civil Procedure do not require a claimant to set out in
> detail the facts upon which he bases his claim.  To the contrary, all the Rules
> require is 'a short and plain statement of the claim' that will give the defendant
> fair notice of what the plaintiff's claim is and the grounds upon which it rests ....
> Such simplified 'notice pleading' is made possible by the liberal opportunity for
> discovery and the other pretrial procedures established by the Rules to disclose
> more precisely the basis of both claim and defense and to define more narrowly
> the disputed facts and issues.

*933Conley*, 355 U.S. at 47-48 (citations omitted).

    This dismissal standard is even higher in antitrust cases than it is generally: "Summary

procedures should be used sparingly in complex antitrust litigation where motive and intent

play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile

witnesses thicken the plot." *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473 (1962);

*see also, Hospital Bldg. Co. v. Trustees*, 425 U.S. 738, 746 (1976) ("In antitrust cases, ...

dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very

sparingly."); *Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1354 (Fed. Cir. 1991) ("In an

antitrust action, 'the complaint need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws.'" (citation omitted)).

EOS's Counterclaim V alleges anticompetitive conduct on the part of the Plaintiffs in the U.S. market for Laser Rapid Prototyping ("Laser RP") *and* Industrial Rapid Prototyping ("Industrial RP") Systems. The Counterclaim also incorporates by reference the Verified Complaint filed by the United States Department of Justice against 3D and DTM Corporation ("DTM") on June 6, 2001 ("DOJ Complaint") (incorporated by reference at ¶41 and attached hereto as Exhibit "A").[2] The Counterclaim and incorporated DOJ Complaint sufficiently allege the scope of the relevant market(s) at issue, the nature of EOS's antitrust injury, the nature of the Plaintiffs' actions, and the anticompetitive effects resulting from these actions. Where required, the intent of the parties has also been alleged. As is reflected in a Private Placement Memorandum prepared for 3D prior to its acquisition of DTM, an express purpose of the Plaintiffs' actions has been "to prevent others from competing in the U.S." (Counterclaim ¶ 39) (quoting Private Placement Memorandum.)

### A.   EOS Has Sufficiently Defined the Relevant Market.

Plaintiffs assert that Count V must be dismissed because EOS has failed to plead the existence of a relevant market. Because there is no heightened pleading standard for antitrust claims, however, EOS's definition of the market "must simply suffice to put defendants on notice of [its] claims." *Eleven Line, Inc. v. North Texas State Soccer Assn., Inc.*, No. 3-95-CV-

---

[2] In ruling upon this motion to dismiss, this Court can consider the complete copies of documents referenced in and incorporated by reference in the Counterclaim. *Millcreek Assoc., L.P. v. Bear, Stearns & Co.*, 205 F. Supp. 2d 664, 680 (W.D. Tex. 2002). Plaintiffs concede this point in their brief. *See* Plaintiffs' Motion to Dismiss the Antitrust Counterclaims (Counts V and VI) at p. 6. Indeed, Plaintiffs seek to have this Court take judicial notice of related filings made in the Department of Justice proceedings. *See* Plaintiffs' Request for Judicial Notice.

3120, 1998 U.S. Dist. LEXIS 581 (N.D. Tex. 1/13/1998). EOS's allegations more than satisfy this standard of notice pleading.

EOS's definition of the market at issue is clearly stated and properly defined. EOS alleges anticompetitive behavior in the market for the development, manufacture and sale of Laser RP Systems in the U.S. or, alternatively, the market for the development, manufacture and sale of Industrial RP Systems in the U.S. (Counterclaim ¶¶ 33, 37.) These markets are also defined to include associated materials and services (*e.g.*, Counterclaim ¶¶ 31-32, 38). This is not news to Plaintiffs: the scope of the product market and geographic market is further contained in the DOJ Complaint. (Exhibit "A.")

Plaintiffs' contention that EOS has failed to allege sufficient facts showing "substitutability" or "interchangeability" is without merit. As explained by the Justice Department in the DOJ Complaint, non-laser prototyping systems are not substitutes for RP systems, which are unique in that they "can generate initial prototypes and later iterations at far greater speed and at significantly less cost than traditional technologies." (DOJ Complaint ¶ 10.) Additionally, the DOJ Complaint discusses cross-elasticity, noting that increases in the price of RP systems would not lead customers to switch back to other traditional technologies. (DOJ Complaint ¶ 14.)

EOS's market definition is easily distinguishable from those asserted in cases cited by Plaintiffs, in which antitrust plaintiffs offered no plausible basis for their market limitations. [3] EOS's market definition is also distinguishable from cases cited by Plaintiffs in which Rule 12(b) dismissals were granted because the plaintiffs sought to limit their market definitions to a single brand, single purchaser or single institution.[4]

To the extent there remains a putative question as to whether EOS has properly defined a relevant market, dismissal at this stage in the proceedings in inappropriate. As the federal Circuit courts have widely recognized, market definition is a fact-intensive inquiry not suited for resolution on a motion to dismiss. *See, e.g., Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51 (1st Cir. 2003); *Foundation. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 119 L. Ed. 2d 265, 112 S.Ct. 2072 (1992)) (holding "[i]t is true that in most cases, proper market definition can be determined only after a factual inquiry into the

---

[3] *Cf. Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348 (S.D.N.Y. 1982) (defining market as international beauty pageants but failing to explain why numerous state and national beauty pageants should be excluded); *North Jersey Secretarial School v. McKiernan*, 713 F. Supp. 577 (S.D.N.Y. 1989) (market defined to include all adult vocational schools too broad because included schools wholly unrelated to plaintiff's claims); *Commercial Data Servers, Inc. v. Int'l Business Machines Corp.*, 166 F. Supp. 2d 891 (S.D.N.Y. 2001) (failing to explain why computers other than "mainframes" compatible with defendant's operating system should be excluded); *Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 64 F. Supp. 2d 1097 (D. Kan. 1999) (failing to explain why market for sports promotional rights should be limited to NCAA); *Hittman Nuclear & Dev. Corp. v. ChemNuclear Sys.*, No. CIV.A.N-78-2570, 1979 WL 1749, at *4 (D. Md. 1979) (no authority was provided for combining two or more distinct markets into one larger market); *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. Dec. 20, 2001) (" The Court found plaintiff's proposed market to be both over-inclusive and under-inclusive."); *JM Computer Servs., Inc. v. Schlumberger Technologies, Inc.*, No. C 95 20349 JW, 1996 WL 241607, at *5 (N.D. Cal. May 3, 1996) (relevant market defined in terms so vague that they are meaningless and inconsistent).

[4] *Cf. Apani Southwest Inc. v. Coca-Cola Enterprises*, 300 F.3d 620 (5th Cir. 2002) (dismissing antitrust claims because plaintiff sought to define market in terms of bottled water consumed by a single purchaser, the City of Lubbock, Texas); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) (plaintiff sought to limit market to products approved by Domino's for Domino's stores); *Hack v. President and Fellows of Yale College*, 16 F. Supp. 2d 183 (D. Conn. 1998) (finding that Yale University competes with other schools and thus is not its own product market).

commercial realities faced by consumers"); *MCM Partners v. Andrews-Bartlett & Assoc.*, 62

F.3d 967, 977 (7th Cir. 1995) (reversing dismissal and criticizing lower court for "look[ing]

behind [plaintiff's] allegations because it believed [plaintiff] had not alleged facts to support

the complaint's market definition"). Thus, Plaintiffs' challenges to EOS's market definition

are not grounds for dismissal at this juncture. *Lone Star Milk Producers*, 2001 U.S. Dist.

LEXIS 18716 at *14-16 (E.D. Tex.) (noting that defendant's challenges to market definition are

better reserved for a summary judgment motion); *Michael Anthony Jewelers, Inc. v. Peacock*

*Jewelry, Inc.*, 795 F. Supp. 639, 647 (S.D.N.Y. 1992) (denying motion to dismiss antitrust

counterclaim, noting that "[w]hile arguments concerning substitutability or 'cross-elasticity of

supply' may be appropriate on a motion for summary judgment, they seem inappropriate in the

context of a motion to dismiss").[5]

**B.    EOS Has Sufficiently Alleged Antitrust Injury.**

Plaintiffs also contend that EOS has failed to adequately allege that it has suffered

antitrust injury. Here again, the existence of antitrust injury is an issue not appropriate for

resolution on a motion to dismiss. *See, e.g., Brader v. Allegheny General Hosp.*, 64 F.3d 869,

875-77 (3d Cir. 1995).[6]  Regardless, as a competitor alleging exclusion from the relevant

market, EOS's antitrust injury could not be more clear.

---

[5] To the extent that Plaintiffs rely upon court decisions rendered after trial, and not at the motion to dismiss stage, such decisions are inapplicable. *See United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172 (D. D.C. 2001); and *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216 (10th Cir. 1986).

[6] The vast majority of cases cited by Plaintiffs in support of their antitrust injury argument involve findings made after the taking of evidence, or even after full trial on the merits. Additionally, the courts in many of the cases were ruling on requests for preliminary injunctions, which required proof of "likelihood of success on the merits." Not only are these decisions therefore inapposite, they further reflect that the existence of antitrust injury is not properly resolved via a motion to dismiss. *See, e.g., Brunswick*, 429 U.S. 477; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anago, Inc. v. Tecnol Medical Products, Inc.*, 976 F.2d 248 (5th Cir. 1992); *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95 (5th Cir. 1988); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292 (5th Cir. 1981); *Pearl Brewing Co. v. Miller Brewing Co.*, 1993 U.S. Dist. LEXIS 16844 (W.D. Tex. 1993). In fact, Plaintiffs cite only one case involving a resolution of the antitrust

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 697, 50 L. Ed. 2d 701 (1977). Here, EOS contends that it, along with other competitors, has been excluded from the relevant market by Plaintiffs' pattern of anticompetitive conduct.[7] "As a competitor for sales of [RP technology] in a market which the Plaintiffs have allegedly monopolized, which has allegedly lost sales due to the defendant's allegedly unlawful agreement to exclude competitors, no party is in a better position to vindicate the purposes of the antitrust laws than [EOS]." *TCA Building Co. v. Northwestern Resources Co.*, 861 F. Supp. 1366, 1380 (S.D. Tex. 1994); *see also Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 985 (5th Cir. 1977) (finding antitrust injury where defendant's acquisition of a competitor virtually precluded other competitors in the market from openly competing).

In fact, it is hard to imagine a more classic example of antitrust injury than that asserted by a competitor barred from competing. *See, e.g., Michael Anthony Jewelers*, 795 F. Supp. at 646 (finding sufficient allegations of antitrust injury based on cost of defending against allegedly bad faith copyright litigation and market exclusion caused by pattern of improperly

---

injury issue on a motion to dismiss, but that case is factually distinguishable. (*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 245 (2nd Cir. 1997) (finding that allegation of reduced intrabrand competition established "nothing more than a run-of-the mill exclusive distributorship controversy, where a former exclusive distributor is attempting to protect its competitive position vis a vis its supplier"); *Alberta Gas Chemicals Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1236 (3d Cir. 1987) (on appeal of summary judgment, plaintiffs' alleged loss of anticipated sales and further collateral loss of sales as a result of a merger amounts to only a *de minimis* foreclosure, and does not constitute antitrust injury.); *Ansell Inc. v. Schmid Lab., Inc.*, 757 F. Supp. 467, 481 (D. N.J. 1991) (plaintiffs' request for divestiture or rescission was denied because they failed to convince the Court both as to their factual proof and as to the legal merit of its antitrust claims); *Remington Prods. Inc. v. North American Philips Corp.*, 755 F. Supp. 52, 58 (D. Conn. 1991) (plaintiffs' motion for summary judgment was granted because "Remington has not alleged the appropriate type of harm to constitute 'antitrust injury'").

[7] Though EOS has now begun to sell some materials and Laser RP Systems in the U.S. (Counterclaim ¶ 44), its sales have been greatly restricted by Plaintiffs' anticompetitive behavior, as set forth in the Counterclaim. The fact that EOS has managed to get a small toe-hold in the U.S. market in spite of Plaintiffs' concerted efforts cannot be held against it on this pleading.

securing and enforcing copyrights); *Advanced Health-Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990) (plaintiff's "colorable allegations that it has lost income as a direct result of defendants' anti-competitive actions and monopolization ... states a causal antitrust injury with sufficient specificity to survive a motion to dismiss").

In addition to 3D's acquisition of DTM, EOS has alleged a multitude of actions taken by Plaintiffs with the intent of excluding competition, which are enumerated in paragraph 42 of the Counterclaim, for instance. Confusingly, Plaintiffs characterize these actions as "effects," arguing that these "effects" do not constitute antitrust injury to EOS. These events are not alleged "effects" of Plaintiffs' anticompetitive behavior; rather, they are examples of anticompetitive behavior itself.[8] The deleterious "effects" of this behavior are clearly stated in the Counterclaim: the number of competitors in the relevant market has been reduced (Counterclaim ¶ 36); EOS and other competitors have been excluded from the relevant market (Counterclaim ¶ 47); Plaintiffs' improper assertion of their patent rights has been used as a barrier to imports (Counterclaim ¶ 38) and has caused EOS to incur costs and fees (Counterclaim ¶ 43); customers have been forced to pay higher prices (Counterclaim ¶ 46) and have been denied access to alternative products and services (Counterclaim ¶ 48); and the

---

[8] In light of the examples of anticompetitive behavior that EOS has pleaded, Plaintiffs' cited cases in this regard are irrelevant. *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984) (competing soft drink bottler that provided free maintenance service on machine and coolers to businesses that stocked machines and coolers solely with its products were competitive acts); *Kalmanovitz v. G. Heileman Brewing Co.*, 595 F. Supp 1385, 1401 (D. Del. 1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985) (Heileman/Pabst Offer substantially lessened competition but did not in any manner *injure them* ); *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 367, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991) (mayor and other member of the city council occasionally contributed funds and free billboard space to their campaigns that were part of a "longstanding", "secret anticompetitive agreement").

market has or will suffer from lessened innovation in the RP field (DOJ Complaint ¶¶ 22-24, 26).[9]

EOS clearly has satisfied the requirement that it provide a "short and plain statement" of its antitrust injury and the anticompetitive effects on the relevant market. Fed. R. Civ. P. 8(a)(2); *MCM Partners*, 62 F.3d at 976. The reasonableness of the restraints EOS alleges are to be taken as true. *Advanced Health-Care*, 910 F.2d at 145.

### C.    EOS Has Sufficiently Alleged its Sherman Act Section 2 Claim.

Plaintiffs' assertion that EOS has failed to state a claim for monopolization or attempted monopolization of the relevant market, in violation of §2 of the Sherman Act, also must fail.

### 1.    EOS has sufficiently alleged a monopolization claim.

To state a §2 claim for monopolization, a party must show: (1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident. *Electronic Data*, 802 F. Supp. at 1466 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)). Plaintiffs do not appear to challenge EOS's pleading of the first element, which is clearly satisfied by 3D's possession of virtually 100% of the Laser RP market and at least 80% of the Industrial RP market (Counterclaim ¶¶ 30, 36); *Heatransfer Corp.*, 553 F.2d at 981 (once the relevant market

---

[9] Plaintiffs' attempts to downplay the anticompetitive effects of the actions enumerated in ¶ 42 of the Counterclaim are without merit. For example, Plaintiffs contend that their selection of a New Licensee, in accordance with the settlement of the DOJ proceedings, did not cause EOS antitrust injury because EOS was not entitled to be selected as the licensee and because any anticompetitive effect is the fault of the government. In so arguing, Plaintiffs miss the point – EOS does not assert that it was entitled to be selected as Plaintiffs' licensee. Rather, EOS identifies Plaintiffs' intentional selection of a licensee that posed a limited competitive threat in the relevant market as yet another example of Plaintiffs' efforts to unlawfully preserve their monopoly. Further, it was not the government's requirement that Plaintiffs select a licensee that is at issue here (in fact, this requirement was meant to encourage competition), but it was the actual selection made by Plaintiffs that constituted an act designed to exclude EOS from the relevant market(s).

has been determined, existence of monopoly power "ordinarily may be inferred from the predominant share of the market").

EOS also has properly stated the second element of its monopoly claim against 3D – willful acquisition or maintenance of monopoly power – by alleging "conduct designed to barricade access to markets." *Heatransfer Corp.*, 553 F.2d at 981. EOS has abundantly alleged the actions taken by 3D to bar competition in the relevant market including, by way of example, 3D's acquisition of DTM, the baseless assertion of its patent rights, and the pattern of conduct outlined in ¶ 42 of its Counterclaim. EOS has alleged that this conduct has suppressed or eliminated domestic competition in the market for Laser RP Systems and Industrial RP Systems and related materials and services, thus reducing innovation, raising prices for customers, excluding competition, and barring access to lower-priced equipment and services. Additionally, a violation of §1 of the Sherman Act, which prohibits agreements in restraint of trade, may satisfy the §2 conduct requirement when the party has monopoly power in the relevant market; thus, adequately pleading a §1 violation and monopoly power sufficiently states a §2 claim for monopolization. *Lone Star Milk Producers*, No. 5:00-CV-191, 2001 U.S. Dist. LEXIS 18716, at * 24 (E.D. Tex., 1/22/2001).

## 2.    EOS has sufficiently alleged 3D's attempt to monopolize.

EOS also has satisfied its burden of pleading an attempted monopolization claim against 3D. To state such a claim, EOS must show: (1) that 3D has engaged in predatory or anti-competitive conduct; (2) with a specific intent to monopolize; (3) and a dangerous probability of achieving monopoly power. *Lone Star Milk*, 2001 U.S. Dist. LEXIS 18716 at *25 (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993)). Plaintiffs challenge only the pleading of the first two elements of this claim: anti-competitive conduct and specific intent to monopolize.

As set forth *supra*, EOS has sufficiently alleged 3D's persistent pattern of anticompetitive behavior and the resulting adverse effect on competition, thus satisfying the first element. Additionally, EOS has alleged 3D's specific intent to monopolize. EOS has alleged that 3D acquired DTM, in part, because of its management's belief that the merger would strengthen 3D's patent portfolio "to prevent others from competing in the U.S. with respect to key technologies." (Counterclaim ¶ 39) (quoting Private Placement Memorandum prepared for 3D.) It is reasonable to infer from this express statement of a desire to bar competition, combined with 3D's pattern of conduct, that 3D had specific intent to monopolize.

3D, with UT, have engaged in a pattern of conduct through which 3D has intended to exclude competitors in the Laser RP Systems and Industrial RP Systems markets from competition in the U.S. (Counterclaim ¶ 42). Among the acts that 3D and UT have committed with the intent of excluding competition are the following: entering into agreements with manufacturers of materials that are necessary for the operation of Laser RP Systems and Industrial RP Systems through which 3D acquired exclusive distribution rights of such materials in the U.S. (Counterclaim ¶ 42(a)); terminating distribution and development agreements with a manufacturer of materials that are necessary for the operation of Laser RP Systems and Industrial RP Systems in order to exclude competition for sale of such materials in the U.S. (Counterclaim ¶ 42(b)); acquiring a manufacturer of materials that are necessary for the operation of Laser RP Systems and Industrial RP Systems in order to exclude competition from that competitor for sale of such materials in the U.S. (Counterclaim ¶ 42(c)); threatening not to honor warranty or service claims made by customers of 3D's Laser RP Systems unless the customers agreed to purchase materials and services solely from 3D. (Counterclaim ¶ 42(d)).

These allegations *in support of attempted monopolization* (not just injury, as Plaintiffs try to characterize them) must be construed liberally and accepted as true, and dismissal prior to affording EOS an opportunity to explore these allegations through discovery is inappropriate. *Advanced Health-Care*, 910 F.2d at 145; *Electronic Data*, 802 F. Supp. at 1466.

## III.    COUNT VI SHOULD NOT BE DISMISSED

Plaintiffs' patent infringement claims are "based upon knowingly wrongful assertions of infringement that are objectively baseless with the intent by 3D Systems and UT of restricting competition for the sale in the United Sates of Laser RP Systems and Industrial RP Systems." (EOS Counterclaims ¶ 52.)  Plaintiffs' lawsuit is in violation of §2 of the Sherman Act.  (*Id.*, ¶ 51-55.)  Both statements are true, and, more important, both allegations are sufficient to prevent immunity under the *Noerr-Pennington* doctrine.

### A.    Noerr-Pennington Doctrine Does Not Bar Count VI

The *Noerr-Pennington* doctrine is not applicable to the facts of this case.  Under the *Noerr-Pennington* doctrine, retaliation in the form of an antitrust suit for the exercise of the First Amendment right to petition the Government is prohibited.  *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961) ("*Noerr*"); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965) ("*Pennington*").  However, this immunity does not apply to "sham proceedings." *Handgards II*, 743 F.2d at 1294-95 ("*Handgards II*").

The *Noerr-Pennington* doctrine is subsumed in a *Handgards* antitrust action, which is premised on the bad faith of a party attempting to enforce a patent (a) known to be invalid; or (2) beyond its permissible scope.  *See Handgards II*, 743 F.2d at 1294 ("[w]e believe that *Handgards I* establishes a standard that embodies the *Noerr-Pennington* immunity.");

*Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 538 (9th Cir. 1995) (there is no *Noerr-Pennington* immunity where a patent obtained by fraud is enforced).[10] Plaintiffs' argument that *Noerr-Pennington* vitiates this count is simply wrong.

**B.    The Exception to the Noerr-Pennington Doctrine Does Apply Because EOS Has Alleged Sufficient Facts to Meet the Exception.**

EOS has alleged sufficient facts to demonstrate that this suit is objectively baseless so as to meet the *Noerr-Pennington* exception, and *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993), and in distinction to *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 862 (5th Cir. 2000) (granting motion for summary judgment, finding that Bayou Fleet did not assert that the Cluelees' endeavors were objectively unreasonable), *Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co.*, 964 F. Supp. 624 (D. Conn. 1997) (Plaintiffs' motion to dismiss was granted because the defendants failed to plead facts which show the lawsuit is objectively baseless). *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544 (S.D. Tex. 1991) (a complaint did not contain certain allegations demonstrating that the *Noerr-Pennington* protections do not apply).

First, a Settlement, Purchase and Transfer Agreement between EOS and 3D granted EOS "exclusive and worldwide royalty-free license for all patent rights applicable to the field of laser sintering." (EOS Counterclaims ¶ 8.) That includes these patents. In addition, 3D and UT know the '589 and '070 Patent claims are invalid based upon invalidity and nullification of

---

[10] Plaintiffs incorrectly assert that prosecution of related foreign patents is not relevant to their knowledge of the patents-in-suit's invalidity. (Plaintiffs' Mem., p. 24 n. 12). In support, plaintiffs merely cite to *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907 (Fed. Cir. 1986) and *Heidelberger Druckmaschines AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994), which, in this context, basically confirm that other countries' patent laws do not control in the United States; however, this misses the point. A patentee's experiences in foreign prosecution can put the patentee on notice as to the patent's validity. *See, e.g., J.P. Stevens & Co. v Lex Tex Ltd.*, 747 F.2d 1553, 1556 (Fed. Cir. 1984), *overruled on other grounds, Baxter, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1331 (Fed. Cir. 1998) (holding that prior art cited and relied on by a foreign patent office to reject claims in a foreign application corresponding to a U.S. application "should have caused a reasonable applicant to have so recognized its materiality in the PTO as to have led to its disclosure").

corresponding patents. (*Id.* ¶ 53.) Consequently, EOS's allegations are based, in part, on 3D

and UT's knowledge of threatened and instituted infringement litigation based upon knowingly

wrongful assertions of infringement that are objectively baseless with the intent by 3D and UT

of restricting competition for the sale in the United States of Laser RP Systems and Industrial

RP Systems. (*Id.*, ¶ 52.) 3D and UT have improperly maintained and exercised market power

and unreasonable restrained trade in the relevant markets. (*Id.*) Therefore, Plaintiffs' suit is

objectively baseless so as to meet the *Noerr-Pennington* exception.

      EOS alleges facts that are easily distinguishable from *Sugar Busters, L.L.C. v. Brennan*,

No. 98-1562, 1999 WL 109564 (E.D. La. Feb. 19, 1999). In *Sugar Busters*, the defendants'

federal and state antitrust counterclaims were dismissed because they did not allege facts to

identify any activity in unreasonable restraint of trade or competition. (*Id.* *3.) EOS alleges

such facts as set forth *supra*.

      Finally, the second standard in *Professional Real Estate Investors* – that the suit itself

has been used to directly interfere with EOS's business relationships – is satisfied. EOS's

counterclaims support allegations that the underlying purpose of the infringement suit is no

more than an attempt to interfere directly with the business relationships of a competitor. *See*

*Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343 (Fed. Cir. 1999). 3D's

management believed the merger with DTM would create a "sufficiently strong patent

portfolio to prevent others from competing in the United States." (Counterclaim ¶ 39.) 3D's

and UT's acts of, *inter alia*, accusing EOS of infringing the patents in suit under which EOS is

licensed and filing the patent infringement suit based on knowingly invalid patent claims, with

the intent to exclude competition in the United States for sales of Laser RP Systems and

Industrial RP Systems, (*Id.* ¶ 54), meets this standard.

Although the law presumes an assertion of a duly granted patent is made in good faith; this presumption is overcome by evidence of bad faith. *C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1369 (Fed. Cir. 1998). All that is required for a finding of bad faith in the context of an infringement suit is that the patent holder knew that its patent was invalid in which the patent holder attempts to enforce a government granted monopoly to which the patent holder knows he has no right. *Handgards II,* 743 F.2d at 1289. At the pleading stage, the bad faith element has been adequately set forth.

### C.    EOS has sufficiently alleged a Handgards Claim.

The following factors are considered in finding a *Handgards* claim: (1) attempt to enforce a patent known to be invalid; (2) specific intent to monopolize, *i.e.*, to control prices or destroy competition; (3) anti-competitive conduct directed at accomplishing the unlawful purpose; (4) dangerous probability of succeeding in achieving monopoly power in the relevant market; and (5) have caused Defendant "antitrust injury." *See Spectrum,* 506 U.S. at 447 (1993); *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (9th Cir. 1979) ("*Handgards I*").

Tracking the *Handgards* elements above, EOS's Counterclaim Count VI asserts that, as to the first element:

> (1) During the course of prosecuting the U.S. patents, Plaintiffs did not disclose to the United States Patent and Trademark Office that a European patent (EP 0 542 729), Japan patent (JP 2620353), and German patent (G 8718128) that all share the same priority (US 920580 and US 105316) as the '589 and '070 Patents, have been deleted or declared invalid by the corresponding patent offices and courts. (*Handgards* Counterclaim ¶ 53.) In addition, European patent (EP 0 287 657) that also shares the same priority (US 920580 and US 105316) as the '589 and '070 Patents, has been further restricted to the original disclosure.

> *Handgards* elements 2-4 have been covered *supra*.

After the DTM merger, 3D equipment accounted for virtually 100% of the sales in the U.S. of Laser RP Systems with a U.S. market share of at least 80% of the revenues from sales of industrial RP systems. 3D's acquisition of DTM eliminated any competition between the two companies, and substantially lessened competition and created an unlawful monopoly in interstate trade and commerce. 3D and DTM, by merging, through the agreement and active participation of UT, improperly maintained and exercised market power and unreasonably restrained trade in the relevant markets in the U.S. Plaintiffs have attempted to monopolize, and in fact have monopolized the foregoing markets, with an ongoing probability of continuing to successfully monopolize these markets in the future. (Counterclaim ¶¶ 36, 40.)

3D acquired and merged with DTM in part because 3D's management believed that, following the merger with DTM, "[3D] will have a sufficiently strong patent portfolio to prevent others from competing in the U.S. with respect to key technologies" for Laser RP Systems and Industrial RP Systems. (Counterclaim ¶ 39.)

Counterclaim VI clearly alleges 3D and UT's knowingly wrongful assertions of infringement that are objectively baseless with the intent by 3D and UT of restricting competition for the sale in the U.S. of Laser RP Systems and Industrial RP Systems. (*Id.*, ¶ 52.) Plaintiffs' acts of accusing EOS of infringing the patents in suit and filing this patent infringement suit based on knowingly invalid patent claims, indeed patents licensed to EOS, and continuing to maintain their claim of infringement, are in bad faith. (*Id.*, ¶ 54.)

D.    **EOS Has Sufficiently Alleged Its Claims Against UT.**[11]

Plaintiffs contend that EOS has failed to state a claim against UT. Applying the liberal pleading standard afforded, however, it is clear that EOS's allegations are sufficient to survive

---

[11] EOS is not bringing a claim against UT for violation of Section 7 of the Clayton Act.

this motion to dismiss. EOS is entitled to discovery in order to more fully explore UT's role in the antitrust claims at issue.

### 1.    EOS Has Stated a §1 Claim Against UT.

Section 1 of the Sherman Act provides that "every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 U.S.C. § 1.  A claim under §1 requires: (1) the existence of a contract, combination or conspiracy; (2) affecting interstate commerce; (3) that imposes an unreasonable restraint of trade. *Ancar*, 964 F.2d at 469.

EOS has sufficiently alleged the first element: the existence of a combination between 3D and UT.[12]  The Counterclaim alleges that UT was an active participant in the merger between 3D and DTM, which the involved parties knew would create "a sufficiently strong patent portfolio to prevent others from competing ...." (Counterclaim ¶¶ 35, 39.)  EOS has alleged that UT's agreement to the transfer of licensing rights to its intellectual property was integral to the merger of 3D and DTM, which is a significant element of the anticompetitive behavior at issue in this case.  UT's participation in the combination in restraint of trade continues today – as EOS alleges, UT, by initiating the instant patent litigation, is improperly using its patent rights as a barrier to competition. (Counterclaim ¶¶ 38, 52-54.)  Plaintiffs contend that UT's consent to the assignment of its intellectual property rights cannot form the basis of an antitrust claim because it was "facially lawful." (Motion to Dismiss at p. 17.) However, this is not the case if UT's consent was given as part of a contract that materially

---

[12] Plaintiffs' cases only stand for the general proposition that facts must be pleaded to support a § 1 claim. Plaintiffs' cases do not, however, bear on EOS's counterclaim where EOS has pleaded facts sufficient to support its § 1 counterclaims far in excess of bare allegations. *Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 771 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993) ("[E]nough data must be pleaded so that each element of the alleged antitrust violation can be properly identified.") *Heart Disease Research Foundation v  General Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972) ("a bare bones statement of conspiracy or injury under the antitrust laws without any supporting facts permits dismissal".)

restrains competition in the relevant market(s). This is true even if UT did not have a specific intent to restrain competition, because "[i]n a Section One action, a plaintiff is not required to show specific intent." *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.*, 690 F.2d 411, 416 n. 5 (4th Cir. 1982) (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n. 13, 57 L. Ed. 2d 854, 98 S. Ct. 2864 (1978)); *see also International Distrib. Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987); *Eleven Line, Inc.*, 1998 U.S. Dist. LEXIS 581, at *12. It is the adverse effect on competition, not the specific intent of the parties, that is relevant for a §1 claim. *Id.* Additionally, as discussed extensively *supra*, EOS has more than sufficiently alleged the second and third elements of its §1 claim: that the agreements between 3D and UT have affected interstate commerce and have imposed an unreasonable restraint of trade. The cases cited by Plaintiffs are thus inapposite because they only involve bare allegations, whereas EOS has provided specific facts to support its § 1 Counterclaim. *See Estate Contr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 212, 221 (4th Cir. 1994) (plaintiffs failed to provide *any* factual support to allege conspiracy); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 484 (S.D.N.Y. 2001) (plaintiff failed to allege *any* acts aimed at accomplishing an anticompetitive objective); *Broyles v. Wilson*, 812 F. Supp. 651, 655 (M.D. La. 1993) (plaintiff provided only "conclusionary" facts which, if proved, still would not establish a conspiracy).

### 2.    EOS Has Stated a §2 Claim Against UT.

In a single sentence in their brief, Plaintiffs contend that UT cannot be liable for monopolization or attempted monopolization under §2 of the Sherman Act because it was not a "producer of the equipment or related items." (*See* Motion to Dismiss at p. 16.) However, Plaintiffs cite no authority in support of this proposition and provide no further argument in defense of their position. Contrary to Plaintiffs' assertions, UT's actions fit squarely within the

constraints of §2, which provides that "[e]very person who shall monopolize, or attempt to

monopolize, *or combine or conspire with any other person or persons*, to monopolize any part

of the trade or commerce among the several States" shall be guilty of a felony. 15 U.S.C. § 2

(emphasis added). EOS has pleaded the elements of a conspiracy to monopolize: that UT, in

combination with 3D, has intentionally engaged in monopolistic conduct in violation of §2.

Acts in furtherance of a combination to restrain trade need not themselves be predatory.

*Advanced-Health Care*, 910 F.2d at 150. Additionally, specific intent may be inferred from

conduct. *See, e.g.*, *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S. Ct. 1125,

90 L. Ed. 1575 (1946); *Great W. Directories v. Southwestern Bell Tel. Co.*, 63 F.3d 1378, 1385

(5th Cir. 1995). Because Plaintiffs offer no explanation as to why UT's actions should not fall

within the scope of §2, their motion to dismiss should be denied.

### E.    EOS's Claims Are Not Precluded by the Doctrine of Laches.

Plaintiffs' argument that the doctrine of laches bars EOS's request for equitable relief is

without merit.[13]  Plaintiffs characterize the equitable relief EOS seeks as relief that would

"undo" or "halt" the merger between 3D and DTM. However, EOS does not in this action seek

a rescission of the merger between 3D and DTM. Rather, EOS seeks monetary damages for its

exclusion from the U.S. markets, and EOS seeks to enjoin future agreements, plans, contracts

or practices (in particular with regard to the enforcement of acquired patent rights), resulting

from the merger, which have an anticompetitive effect on EOS in the relevant market. Thus,

Plaintiffs' defense of laches should be rejected.

For the equitable defense of laches to apply there must be "(1) lack of diligence by the

party against whom the defense is asserted, and (2) prejudice to the party asserting the

---

[13] As such, plaintiffs' citation to *California v American Stores Co.*, 495 U.S. 271, 296 (1991), is without merit because "A private litigant must prove "threatened loss or damage" to his own interests in order to obtain relief".

defense." *Costello v. United States*, 365 U.S. 265, 282, 81 S. Ct. 534, 5 L. Ed. 2d 551 (1961). Neither of the elements required to establish the laches defense is present here. First, EOS acted diligently. Though Plaintiffs argue that EOS unnecessarily delayed the assertion of its antitrust claims, EOS was in fact an active participant in the administrative proceedings that preceded and followed the merger. Additionally, EOS timely asserted its antitrust claims to enjoin current and future anticompetitive agreements and practices resulting from the merger, such as Plaintiffs' bad faith attempts to enforce these patents. Further, the Plaintiffs will not be prejudiced if the equitable relief EOS seeks is granted. Plaintiffs argue solely that the unwinding of the merger will prejudice them; however, EOS is not seeking this relief, and Plaintiffs' argument on this point is irrelevant. EOS seeks monetary damages and an injunction to prohibit Plaintiffs from future unlawful anticompetitive behavior, relief that will in no way prejudice them.

## IV.    CONCLUSION

Counterclaim Counts V and VI meet all the requirements for pleading, and more. The motion to dismiss should be denied.

Respectfully submitted,


HILGERS & WATKINS, P.C.
1300 San Jacinto Center
98 San Jacinto Boulevard
P.O. Box 2063
Austin, Texas 78768-2063
(512) 476-4716
(512) 476-5139 (Telecopier)


By: _____
   THOMAS H. WATKINS
   State Bar No. 20928000
   ALBERT A. CARRION, JR.
   State Bar No. 03883100

MICHAEL H. BANIAK
MICHAEL D. GANNON
BANIAK PINE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois 60606
(312) 673-0360
(312) 673-0361 (Telecopier)

ATTORNEYS FOR DEFENDANT
EOS GMBH ELECTRO OPTICAL SYSTEMS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was provided to counsel of record by the method indicted below on this the 22nd day of May 2003:

Thomas R. Jackson                                                    *via first-class mail*
JONES DAY
2727 North Harwood St.
P.O. Box 660623
Dallas, Texas 75266

Philip E. Cook                                                       *via first-class mail*
Robert W. Dickerson
JONES DAY
555 W. Fifth Street, Suite 4600
Los Angeles, California 90013-1025

Alan D. Albright                                                     *via first-class mail*
Elizabeth J. Brown Fore
GRAY CARY WARE & FREIDENRICH, LLP
1221 South Mopac Expressway, Suite 400
Austin, Texas 78746-6875

_____
ALBERT A. CARRION, JR.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W.
Suite 4000
Washington, D.C. 20530,

               *Plaintiff,*

      v.

3D SYSTEMS CORPORATION
26081 Avenue Hall
Valencia, California 91355

 and

DTM CORPORATION,
1611 Headway Circle
Building 2
Austin, Texas 78754,

               *Defendants.*

Civil Action No. _____

CASE NUMBER  1:01CV01237

JUDGE: Gladys Kessler

DECK TYPE: Antitrust

DATE STAMP: 06/06/2001

### <u>VERIFIED COMPLAINT</u>

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain equitable relief against Defendants, and alleges as follows:

1.      The United States seeks to enjoin the acquisition by 3D Systems Corporation ("3D") of DTM Corporation ("DTM"). Unless enjoined, 3D's acquisition of DTM will substantially lessen competition in the development, manufacture and sale of industrial Rapid Prototyping ("RP") systems in the United States in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

**EXHIBIT A**

2.     Rapid prototyping is a process by which a machine transforms a computer design for a mechanical or other part into a three-dimensional prototype or model. Rapid prototyping is significantly faster and less expensive than traditional methods of creating a prototype, such as machining, milling or grinding. There are two types of RP systems: industrial and professional. Industrial machines are large, cost hundreds of thousands of dollars and are able to create functional prototypes, tooling inserts, and low volume production quantities of parts. Professional machines are smaller, less expensive, use "ink jet" printing technology, and are geared toward the creation of concept models in an office setting.

3.     The acquisition would reduce the number of competitors in the U.S. industrial RP systems market from three to two and would result in the combined company having a U.S. market share, by revenue, of 80% of the industrial RP systems market. It would entirely eliminate the dynamic competition that exists between 3D and DTM in the development, manufacture and sale of industrial RP systems -- competition which has resulted in technological improvements to industrial RP systems as well as lower prices to companies and governmental entities that purchase these systems.

# I.

## JURISDICTION AND VENUE

4.      This action is filed by the United States under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

5.      3D and DTM develop, manufacture, sell, and service industrial RP systems in the flow of interstate commerce.  3D's and DTM's activities in developing, manufacturing, selling, and servicing industrial RP systems substantially affect interstate commerce.  This Court has jurisdiction over the subject matter of this action and the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a) and 1345.

6.      3D and DTM transact business and are found within this district in that they sell goods and services to customers located in the District of Columbia and receive revenue from contracts entered into in the District of Columbia.  Therefore, venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

# II.

## DEFENDANTS

7.      3D Systems Corporation is a Delaware corporation with its principal place of business in Valencia, California.  3D is a leading manufacturer and supplier of industrial and professional RP systems and related equipment, proprietary materials used in RP systems, and associated services.  For the year ending December 31, 2000, 3D had worldwide sales of $110

million, $59 million of which came from the United States. All or virtually all of 3D's sales were RP-related.

8.        DTM is a Texas corporation with its principal place of business in Austin, Texas. DTM designs, manufactures, markets and supports, on an international basis, industrial RP systems and related materials used in industrial RP systems. For the year ending December 31, 2000, DTM had worldwide sales of $40 million, $19 million of which came from the United States. All or virtually all of DTM's sales were RP-related.

## III.

## THE PROPOSED TRANSACTION

9.        On April 2, 2001, 3D and DTM entered into an agreement and plan of merger, pursuant to which 3D intends to acquire DTM in a cash tender offer. The merger agreement provides that 3D will commence a tender offer for all outstanding shares of DTM's common stock at a purchase price of $5.80 per share. DTM will then become a wholly owned subsidiary of 3D. The value of the transaction is estimated to be $45 million. The parties have announced that they intend to complete the transaction on June 8, 2001.

## IV.

## TRADE AND COMMERCE

**A.        The Relevant Product Market**

10.        Rapid prototyping (also known as solid imaging) is a relatively new field embodying the use of computers and computer automated equipment to rapidly produce three-

dimensional prototypes, models, and even low-volume production quantities of physical objects that traditionally have been produced by machining and other methods. For many applications, speed and flexibility in prototype development are exceptionally important, and RP systems can generate initial prototypes and later iterations at far greater speed and at significantly less cost than traditional technologies.

11.    There is a broad range of uses for the technology employed in an RP system. For example, a less sophisticated RP system can be used to create a non-functional model of a hand-held calculator, used for visual inspection in early design phases. Or an automobile manufacturer can use a more sophisticated RP system to create a prototype of an exhaust manifold for an automobile, which can actually be bolted in place and tested by starting the car.

12.    Sales of industrial RP systems and associated materials represent the largest and most profitable segment of the RP industry. Of the approximately $110 million in RP-related sales in the United States last year, industrial RP systems and materials accounted for approximately $93 million, or 85% of the total.

13.    The customers for industrial RP systems include original equipment manufacturers, governmental entities, and "service bureaus," which are companies that purchase industrial RP systems and then create prototypes for customers on an as-needed basis.

14.    In the event of a small but significant increase in the price of industrial RP systems, manufacturers, governmental entities and service bureaus would not switch back to other traditional technologies, such as machining, milling or grinding, in sufficient numbers to defeat the profitability of the price increase. Nor would these customers switch to professional RP systems.

5

15.     The development, manufacture and sale of industrial RP systems is a line of commerce or relevant product market within the meaning of Section 7 of the Clayton Act.

**B.     The Relevant Geographic Market**

16.     3D manufactures industrial RP systems for sale throughout the U.S. at a facility located in Grand Junction, Colorado.  DTM manufactures industrial RP systems for sale throughout the U.S. at a facility located in Austin, Texas.

17.     There are no imports of industrial RP systems into the United States.  Although there are producers of industrial RP systems in other countries (in Japan and Germany, for example), there are patent barriers which prevent imports into the United States.  Even though industrial RP systems manufactured outside of the United States are in some cases less expensive than those made in the United States, U.S. customers have not been able to turn to foreign producers because of these patent barriers, which are aggressively enforced by the parties.

18.     A small but significant price increase of industrial RP systems would not cause a sufficient number of purchasers to switch to industrial RP systems manufactured outside the United States to make the price increase unprofitable.

19.     The United States is a section of the country or relevant geographic market within the meaning of Section 7 of the Clayton Act.

**C.     Anticompetitive Effects**

20.     There are only three companies that develop, manufacture and sell industrial RP systems in the United States.  3D is by far the largest of these three, accounting for approximately 60% of U.S. sales of industrial RP systems.  The other two manufacturers are DTM and

6

Stratasys, Inc. ("Stratasys"), each of which has approximately 20% of U.S. sales of industrial RP systems.

21.     3D and DTM offer the most sophisticated systems in the industry, and compete directly against each other in the development, manufacture and sale of industrial RP systems and materials.  Customers have directly benefited from the price competition that exists between 3D and DTM in the sale of industrial RP systems.

22.     The competition between 3D and DTM has been the driving force behind the development of innovative industrial RP system technology, which has in turn enabled the industry to succeed in displacing older methods of creating prototypes, such as machining, milling or grinding.  For example, 3D developed a material called "QuickCast" for use in the investment casting process.  As QuickCast's popularity increased, DTM responded by introducing a new approach to producing patterns for investment casting called "CastForm."  CastForm rapidly gained popularity, and is now taking away some of the QuickCast business.

23.     As a second example, DTM developed a process called "Laserform ST-100" that enables direct fabrication of complex metal parts and tooling inserts.  Simultaneously, 3D spent over five years and considerable resources developing "Keltool" as a solution for rapid fabrication of tooling inserts; more recently, 3D developed a "Rapid Metal Fabrication" process for producing metal parts using Keltool-based methods.  3D developed the Rapid Metal Fabrication process in order to eliminate DTM's perceived advantage in the area of metals.

24.     3D and DTM compete directly with each other to improve and expand the quality and attributes of their machines over time.  In many dimensions, the innovations of each company are intended to match and improve over the productivity gains of the other and therefore

maximize the ability of each to satisfy the diverse needs of the customers for whom they compete. Through this dynamic competition, a customer whose needs are best met by one technology today could be persuaded to purchase the new and improved technology of the other in the future.

25.    3D and DTM are the only two companies to have successfully commercialized the use of lasers in their industrial RP systems.  The use of laser technology gives 3D and DTM a significant competitive advantage over Stratasys, their only competitor in the industrial systems market.  3D and DTM are each other's closest competitors in the industrial RP systems market.

26.    The direct competition between 3D and DTM has benefited the purchasers and users of industrial RP systems through lower prices for systems, lower prices for materials, and improved products. In addition, the two companies would likely remain the most vigorous competitors in the industrial RP systems market as the market continues to grow and mature.  If 3D's acquisition of DTM is permitted to proceed, the substantial competition between the two leading manufacturers of industrial RP systems will be permanently eliminated, resulting in increased prices and lessened product innovation.

**D.    Entry Is Unlikely to Deter the Exercise of Market Power**

27.    Successful entry into the industrial RP systems market would not be timely, likely or sufficient to deter any exercise of market power resulting from the transaction.  Entry into the production and sale of industrial RP systems in the United States is difficult, time consuming, and expensive.  In order to develop and manufacture industrial RP systems, a company would need sophisticated and advanced technological capabilities that take years to develop.  Much of the technology in use by current industrial RP system manufacturers is protected by patents or

8

licensing agreements. A new entrant would face substantial costs and time -- well over two years at a minimum -- in order to successfully produce an industrial RP system that could have any chance of competing effectively in the marketplace.

28.    Moreover, the merger will enhance 3D's already formidable patent position. According to a Private Placement Memorandum prepared by the investment banking firm of A.G. Edwards & Sons, Inc. for 3D, the company's management believes that, following the merger, "it will have a sufficiently strong patent portfolio to prevent others from competing" in the United States with respect to the key stereolithographic, selective laser sintering, and multi-jet modeling technologies.

29.    Even after development of specialized equipment sufficient to manufacture an industrial RP system, an entrant would need to gain the confidence and trust of purchasers. An entrant must demonstrate that its industrial RP system produces prototypes that are accurate and suitable for their intended use. Developing a reputation for quality, reliability, and performance of industrial RP systems could take years.

30.    Because of the years of effort and considerable expense it would take a new entrant to establish itself as a reputable provider of industrial RP systems, any attempted new entry would not be timely, likely or sufficient to deter the likely exercise of post-merger market power in the sale of industrial RP systems by 3D in the reasonably foreseeable future.

# V.

## VIOLATIONS ALLEGED

31.     The effect of 3D's proposed acquisition of DTM may be substantially to lessen competition and tend to create a monopoly in interstate trade and commerce in violation of Section 7 of the Clayton Act.

32.     The transaction will likely have the following anticompetitive effects, among others:

      a.     Competition generally in the development, manufacture and sale of industrial RP systems in the United States would be substantially lessened;

      b.     Actual and potential competition between 3D and DTM in the development, manufacture and sale of industrial RP systems and related materials in the United States would be eliminated; and

      c.     Prices for industrial RP systems and related materials sold in the United States would likely increase, and the quality, innovation, and service currently provided would likely decline.

33.     Unless prevented, the acquisition of DTM by 3D would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## VI.

## **REQUESTED RELIEF**

34.    Plaintiff requests:

a.    That the acquisition of DTM by 3D be adjudged and decreed to be

unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.    That Defendants and all persons acting on their behalf be permanently

enjoined and restrained from carrying out any contract, agreement,

understanding or plan, the effect of which would be to combine DTM with

the operations of 3D;

c.    That Plaintiff recover its costs of this action; and

d.    That Plaintiff be granted such other and further relief as the case requires

and this Court may deem just and proper.

Dated: 6 June 2001
       Washington, D.C.

11

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
John M. Nannes
Acting Assistant Attorney General

_____
J. Robert Kramer, II
Chief, Litigation II Section

_____
Willie L. Hudgins (D.C. Bar #37127)
Assistant Chief, Litigation II Section

_____
Constance K. Robinson
Director of Merger Enforcement
and Operations

_____
Dando B. Cellini
Trial Attorney

U.S. Department of Justice,
Antitrust Division
Litigation II Section
1401 H Street, N.W., Suite 4000
Washington, D.C. 20530
Tel.:    202/307-0829

12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W.
Suite 4000
Washington, D.C. 20530,

                         *Plaintiff,*

            v.

3D SYSTEMS CORPORATION
26081 Avenue Hall
Valencia, California 91355

 and

DTM CORPORATION,
1611 Headway Circle
Building 2
Austin, Texas 78754,

                      *Defendants.*

Civil Action No. _____

Judge _____

## VERIFICATION OF COMPLAINT

I, Willie L. Hudgins, declare:

    1.     I am an attorney with the United States Department of Justice, Antitrust Division.

    2.     The foregoing Complaint for and on behalf of the United States of America was duly prepared under the direction of the Attorney General of the United States. The facts stated therein have been assembled by authorized employees and counsel for the United States of America. The allegations therein are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on June 6, 2001.


Respectfully Submitted,


_Willie L. Hudgins_

Willie L. Hudgins, Esquire
D.C Bar # 37127
Assistant Chief, Litigation II Section
Department of Justice
1401 H Street, N.W.
Suite 3000
Washington, D.C.  20530
(202) 307-0207

2