IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
AUSTIN DIVISION

2003 JL -2 PM 4:00

U.S. CLERK'S OFFICE

BOARD OF REGENTS, THE UNIVERSITY OF
TEXAS SYSTEM, and 3D SYSTEMS, INC.,
Plaintiffs,

-vs-                                                    Case No.  A-03-CA-113-SS

EOS GmbH ELECTRO OPTICAL SYSTEMS,
Defendant.

## O R D E R

BE IT REMEMBERED on the 25th day of June 2003 the Court called the above-styled cause

for hearing, and the parties appeared through counsel of record.  Before the Court are the Plaintiffs'

Motion to Dismiss the Antitrust Counterclaims for Failure to State a Claim [#17], the Defendant's

Opposition thereto [#24] and the Plaintiffs' reply [#39]; the Plaintiffs' Motion to Bifurcate and Stay

Antitrust Counterclaims [#18], the Defendant's Opposition thereto [#26] and the Plaintiffs' reply

[#41]; Plaintiffs' Request for Judicial Notice [#16] and declaration in support thereof [#19]; and the

Plaintiffs' Second Request for Judicial Notice [#36] and declaration in support thereof [#37].

Having considered the motions, responses and replies, the arguments of counsel at the hearing, the

case file as a whole and the applicable law, the Court enters the following opinion and orders.

### Background

The Plaintiffs in this case, the Board of Regents of The University of Texas System ("UT")

and 3D Systems, Inc. ("3D") sue EOS GmbH Electro Optical Systems ("EOS"), a German entity,

for infringement of United States Patent Numbers 5,639,070 and 5,597,589, which are owned by UT

51

and licensed exclusively to 3D. *See* Complaint at ¶¶ 3, 8, 9, 13 & 14. The patents-in-suit relate to laser sintering technology, a manufacturing technique that uses a computer-controlled laser to build physical parts from a computer design by melting layers of powder. *See* Plaintiffs' Concise Statement of Alleged Infringement [#46] at 2. According to the Plaintiffs, DTM Corporation ("DTM"), an Austin-based corporation, introduced the first laser sintering machines in the early 1990s as UT's exclusive patent licensee. *Id.*

3D acquired DTM by merger on August 31, 2001. *See* Counterclaim at ¶ 4. After 3D and DTM entered into an agreement and plan of merger in April 2001, the Department of Justice filed a complaint challenging the merger under antitrust law in the United States District Court for the District of Columbia on June 6, 2001. *Id.* at ¶¶ 34, 41. The parties reached a settlement whereby the Justice Department allowed the merger to go forward and 3D and DTM agreed to license a third party to develop, manufacture and sell products using their rapid prototyping technology. *See* Fore Decl. [#19], Ex. C. After the Justice Department received and responded to comments on the settlement, the District Court entered the final judgment on August 16, 2001. *Id.*, Ex. A.

EOS asserts counterclaims against 3D for breach of the parties' settlement agreement and license agreement, legal and equitable estoppel, specific performance under the settlement and license agreements and breach of fiduciary duty. Additionally, it raises two antitrust counterclaims. In Count V, EOS contends the 3D-DTM merger eliminated competition in the laser sintering field, and 3D and UT's conspiring to eliminate competition violated sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act. In Count VI, EOS alleges 3D and UT are unlawfully maintaining their monopoly power by enforcing patents they know to be invalid. Finally, EOS seeks a declaratory judgment that the patents are invalid and it is not infringing them. The Plaintiffs have

moved to dismiss EOS's antitrust claims or, alternatively, to bifurcate and stay them until the patent claims are tried.

## Analysis

### I.    Motion to Dismiss

#### A.    Standard for Motion to Dismiss under 12(b)(6)

In deciding whether to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "the Court must take the factual allegations as true, resolving any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The Court should then dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 78 S. Ct. 99, 102 (1957).

EOS contends dismissal prior to discovery is inappropriate in an antitrust case, because the necessary proof of facts is within the counterplaintiffs' control. *See, e.g., Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848 (1976) ("[I]n antitrust cases, . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."), *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486 (1962) (rejecting summary judgment in antitrust case, stating "[s]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plots."). The Fifth Circuit has emphasized antitrust plaintiffs are not held to a heightened pleading standard and need not include the particulars of their claims in their complaints but must provide a short and plain statement of their claims in which they allege facts sufficient to support an antitrust violation. *Apani*, 300 F.3d

at 633. However, while an antitrust plaintiff need not present proof of an antitrust violation in its complaint, it must allege facts that, if true, would present an antitrust violation. This is the essence of the *Conley* standard.

### B.    Motion to Dismiss Count V of EOS's Counterclaim

In Count V, EOS alleges 3D and UT violated sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act in connection with the merger between 3D and DTM in 2001. Section 1 of the Sherman Act provides that every contract or conspiracy in restraint of trade or commerce is illegal. *See* 15 U.S.C. § 1. To prove a claim under section 1, an antitrust plaintiff must show: (1) the defendants engaged in a conspiracy; (2) the conspiracy had the effect of restraining trade; and (3) trade was restrained within the relevant market. *See Spectators' Comm. Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001). Section 2 of the Sherman Act prohibits actions to monopolize or attempt to monopolize any part of trade or commerce. *See* 15 U.S.C. § 2. To prove monopolization under section 2, a plaintiff must show the defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to growing as a product of business acumen. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Section 7 of the Clayton Act prohibits a corporation from acquiring a part or whole of a corporation if such acquisition may substantially reduce competition or tend to create a monopoly. *See* 15 U.S.C. § 18. To establish a section 7 violation, a plaintiff must make a prima facie showing of probable anticompetitive impact of a merger by showing the size of the entities involved is inherently suspect or that other aspects of the market make the merger more harmful to the relevant market than the bare market share would indicate. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 492 (5th Cir. 1984).

1.    **Failure to Plead a Relevant Market**

The counterplaintiffs move to dismiss Count V because EOS has failed to plead the existence of a relevant market. Before determining a defendant's market power under section 2, the court must define the relevant geographic and product market. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir. 1984). Likewise, determining the relevant market is the first step in a case under section 7 of the Clayton Act. *See Domed Stadium*, 732 F.2d at 491.

EOS argues dismissal based on a failure to define the relevant market is inappropriate at this stage in the proceedings because defining the market is a fact-intensive inquiry. In some cases, courts have found a factual inquiry necessary to define the market, but in other cases factual inquiry has not been necessary. *Compare Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072 (1992) ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.") *with Found. for Interior Design Educ. Interest v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery. Here, however, definition of the relevant market requires relatively little factual analysis." (citations omitted)). Thus, the necessity of conducting discovery before defining the relevant market does not arise in every case. In fact, one appellate case EOS cites in support of its declaration that "[a]s the federal Circuit courts have widely recognized, market definition is a fact-intensive inquiry not suited for resolution on a motion to dismiss," explicitly states: "Plaintiffs err, however, when they try to turn this general rule into a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market." EOS' Response, at 6; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.

1997). Therefore, the Court will consider the facts of this specific case to determine whether dismissal is appropriate.

While the sufficiency of a plaintiff's definition of the relevant market is generally a fact question, a court may dismiss a plaintiff's complaint if the plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir. 2002). The test for determining the relevant market is the same under the Sherman Act and Clayton Act. *Apani*, 300 F.3d at 626 n.4.

EOS defines the relevant product market as the development, manufacture and sale of Laser RP (rapid prototyping) Systems or, alternatively, the development, manufacture and sale of Industrial RP Systems (which include Laser RP Systems) in the United States. *See* Counterclaim at ¶ 37. It contends the merger of 3D and DTM, with the active participation of UT, virtually eliminated competition in these markets within the United States by giving 3D a 100 percent market share of Laser RP Systems and 80 percent share of Industrial RP Systems. *Id.* at ¶¶ 36, 40.

3D and UT contend this definition of the relevant market is insufficient because EOS does not allege the products do not have competitive substitutes, as required by *Apani*. Specifically, they challenge EOS's failure to assert non-laser systems cannot be substituted for the laser sintering machines. EOS responds its definition of the market is sufficient because it matches the Justice Department's definition of the relevant market in its antitrust complaint against 3D and DTM in a federal district court in Washington, D.C. *See* EOS's Response, Ex. A. That case settled, and the

-6-

court never ruled on the sufficiency of the complaint's definition of the relevant market. Therefore, EOS cannot rely on the government's definition of the relevant market as support for its argument that its own definition is legally sufficient. On the other hand, 3D and UT provide no support for their argument that non-laser systems can be substituted for laser sintering machines, except a reference to Stratsys in the Justice Department's complaint as a competitor with 3D. Plaintiffs state "everyone knows" Stratasys produces non-laser systems. Again, the Court sees no reason to treat a complaint filed in another district court as any authority whatsoever. Making all factual inferences in EOS's favor, the Court has no reason to believe Laser RP Systems could be substituted with non-laser systems and will refrain from dismissing the complaint at this time.

EOS also defines Industrial RP Systems as a relevant market, which include the Laser RP Systems and other rapid prototyping systems. While 3D and UT do not allege there are substitutes for Industrial RP Systems, they argue the Industrial RP Systems market is not "plausible" because EOS cannot lump together equipment, materials and services into a single market. The district court case UT and 3D cite for this argument deals with a definition of relevant market as "the business of adult vocational education . . . in New Jersey and Puerto Rico." *North Jersey Secretarial Sch. v. McKiernan*, 713 F.Supp. 577, 583 (S.D.N.Y. 1989). EOS defines the relevant market in the counterclaim as the market for the development, manufacture and sale of Industrial RP Systems, a term that includes the equipment, materials and services that make up the system. *See* Counterclaim at ¶ 37. This term is not overly broad or undefined simply because EOS includes equipment, materials and services in its description of the systems. It certainly does not rival the market definitions set forth in the cases UT and 3D cite for support. As above, the Court finds this definition of relevant market sufficient at this stage in the proceedings, when there is no evidence

that the definition is sufficient or insufficient. However, if EOS wishes to amend its pleading, as

EOS's counsel indicated to the Court at the hearing it may want to do, the Court allows it to file an

amended pleading within ten days.

### 2.    Failure to Plead Antitrust Injury

UT and 3D contend EOS has not alleged an adequate antitrust injury. Again, EOS argues

dismissal based upon the existence of an antitrust injury is inappropriate. And again, the Court

recognizes EOS need not prove its injury at this stage of the proceeding but rather must allege a

legally adequate injury in its counterclaim. *See, e.g., Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869,

876 (3d Cir. 1995) ("We are not in a position to predict whether [plaintiff] will ultimately be able

to sustain his burden of proof on this issue since [plaintiff] has not yet had an opportunity to obtain

evidence.").

The Supreme Court defines antitrust injury as "'injury of the type the antitrust laws were

intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Cargill,*

*Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109, 107 S.Ct. 484 (1986) (quoting *Brunswick Corp.*

*v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690 (1977)). Antitrust injury "should

reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by

the violation." *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690. The Fifth Circuit "has narrowly

interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition"

as well as "the loss of independent decision making." *Anago, Inc. v. Tecnol Med. Prod., Inc.*, 976

F.2d 248, 249, 250-51 (5th Cir. 1992). The circuit has found antitrust injury when a company

"virtually precluded any of the competitors in the [market] from openly competing" with it.

*Heatransfer Corp. v. Volkswagonwek, A.G.*, 553 F.2d 964, 985 (5th Cir. 1977).

In its counterclaim, EOS contends the DTM-3D merger resulted in the combined company having virtually 100 percent of the market share of sales of Laser RP Systems and 80 percent of the revenues from sales of Industrial RP Systems. *See* Counterclaim at ¶ 36. EOS claims to have been injured because it has been planning to enter the United States market to sell Laser RP Systems since 1997 and has expended substantial resources toward that end. *Id.* at ¶ 44. EOS contends it and other competitors have (a) been excluded from participating in the U.S. markets for RP equipment, materials and services, and (b) lost substantial profits as a result of this exclusion. *Id.* at ¶ 47. Additionally, EOS claims RP customers have been injured by having to pay higher prices for Laser RP Systems and Industrial RP Systems. *Id.* at ¶ 46.

Most of the injuries EOS describes in its counterclaim are not appropriate antitrust injuries. First, EOS cannot claim to be injured by the alleged higher prices customers have been forced to pay for RP systems, because it is not a customer. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583, 106 S.Ct. 1348 (1986) (plaintiffs cannot recover for conspiracy by their competitors to "charge higher than competitive prices in the American market" because "as petitioner's competitors, respondents stand to gain from any conspiracy to raise the market price."). Likewise, the fact that EOS lost its bid to become 3D's licensee as a result of the Justice Department consent decree is not an antitrust injury. Finally, EOS's expenditure of resources to break into the U.S. market for RP systems is simply a cost of doing business: any business must expend resources to break into a new market in a new country.

EOS points to the description of its injuries in paragraph 47 of its counterclaim, where it states it has been excluded from participating in the RP market in the United States and has lost substantial profits as a result. *See* Counterclaim at ¶ 47. UT and 3D contend EOS's alleged loss of

profits is not a sufficient antitrust injury. It is true the Supreme Court has found loss of profits to be

an inadequate allegation of antitrust injury when the loss of profits is due to continued competition,

although it noted loss of profits stemming from practices forbidden by antitrust laws is adequate.

*See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115-116, 107 S.Ct. 484 (1986); *Brunswick*

*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88, 97 S.Ct. 690 (1977). EOS does allege its

lost profits resulted from 3D and UT's anticompetitive behavior, not from continued competition.

Accordingly, the Court finds this allegation of antitrust injury is sufficient to withstand a motion to

dismiss at this stage of the proceedings. As above, EOS may replead its injury within ten days of

the date of this Order if it wishes to do so.

### 3.    Failure to State a Claim of Monopolization or Attempted Monopolization

3D and UT contend EOS has not stated a claim of actual or attempted monopolization under

Section 2 of the Sherman Act. An actual monopolization claim has two elements: (1) possession of

monopoly power in the relevant market, and (2) willful acquisition or maintenance of that power

distinct from growth as a result of business acumen or accident. *See Grinnell Corp.*, 384 U.S. at

570-71. The counterclaim alleges 3D has 100 percent of the sales of Laser RP Systems and 80

percent of the sales of Industrial RP Systems. *See* Counterclaim at ¶ 36. Additionally, EOS alleges

3D and UT acquired DTM in order to prevent competition within the United States. *Id.* at ¶ 39.

Therefore, the Court finds the counterclaim alleges the necessary elements to state a claim for

Section 2 monopolization.

To state a claim for attempted monopolization, EOS must allege three elements: (1) 3D and

UT engaged in predatory or exclusionary conduct; (2) they had a specific intent to monopolize; and

(3) there was a dangerous probability they would successfully obtain monopoly power. *Taylor*

*Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000). UT and 3D claim EOS does not show

they had a specific intent to monopolize. While EOS may not be able to prove intent at this point

in the proceedings, it does allege in the complaint that 3D acquired DTM for the purpose of

maintaining a monopoly over RP systems in the United States and has engaged in predatory conduct

in order to exclude competition. *See* Counterclaim at ¶¶ 39, 42. Accordingly, the Court finds EOS

has alleged sufficient facts to state a claim under Section 2 of the Sherman Act.

### 4.    Failure to State a Claim against UT

UT argues EOS fails to state a claim against it under Count V because UT was not involved

in the merger. First, Section 7 of the Clayton Act only applies to parties to a merger, so UT cannot

be implicated under that section. *See* 15 U.S.C. § 18. Sections 1 and 2 of the Sherman Act prohibit

conspiracy to restrain trade and conspiracy to monopolize. *See* 15 U.S.C. §§ 1, 2. UT contends EOS

submits nothing more than a "bare bones statement of conspiracy" without any supporting facts. *See*

*Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972). A mere

conclusory allegation of conspiracy is insufficient; to state a claim for conspiracy, a plaintiff must

plead specific facts constituting the conspiracy. *E.g., Futurevision Cable Sys. of Wiggins, Inc. v.*

*Multivision Cable TV Corp.*, 789 F. Supp. 760, 772 (S.D. Miss. 1992) (quoting *Larry R. George*

*Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979); *Elliott v. Foufas*, 867 F.2d 877, 881

(5th Cir. 1989).

> Paragraph 35 of the counterclaim describes UT's involvement in the alleged conspiracy thus:
>
> On information and belief, UT consented to the transfers of certain intellectual property that
> was required in order for the merger to occur. UT was an active participant in seeing that the
> merger occurred, and without UT's consent, the Merger Agreement would not have been
> entered into and the merger of 3D and DTM would not have taken place.

Counterclaim at ¶ 35. While other paragraphs refer to UT, there are no further factual allegations as to UT's role in the conspiracy. The claim against UT boils down to its approval of the transfer of its exclusive patent license with DTM to 3D. The counterclaim does not allege UT intended to harm competition or give 3D a monopoly or shared an anticompetitive motive or common design with 3D. *E.g., Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125 (1946). Licensing a patent to another who then uses the license for anticompetitive purposes does not constitute engaging in a conspiracy to monopolize or restrain trade, without awareness of the anticompetitive conduct. *See, e.g., Syufy Enter. v. Am. Multimedia, Inc.*, 793 F.2d 990, 1000-01 (9th Cir. 1986) ("a supplier who licenses a product to another does not join the licensee in a conspiracy to monopolize merely because the licensee turns around and exploits the license for its own monopolistic purposes."). The complaint simply does not allege sufficient facts connecting UT to the 3D-DTM merger or any conspiracy to monopolize or restrain trade. Accordingly, EOS's claim against UT in Count V is dismissed without prejudice for failure to state a claim.

### 5.    Laches

The counterdefendants claim EOS's challenge to the 3D-DTM merger is barred by laches because EOS did not sue until eighteen months after the merger took place. While it is undisputed EOS was aware of the merger when it occurred (since it unsuccessfully moved to intervene in the Justice Department's suit challenging the merger and subsequently filed a public comment concerning the consent decree in the case), UT and 3D have not shown they have been prejudiced by EOS's failure to raise its antitrust claim until now. *See Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534 (1961). Additionally, EOS is not suing to undo the merger but to recover damages it has allegedly suffered from the anticompetitive effects of the merger and to enjoin future

-12-

anticompetitive behavior. The counterdefendants are free to keep laches as a defense to Count V, although the defense appears to the Court to be worth less than its weight in paper, but the Court will not dismiss Count V on this basis.

### C.    Motion to Dismiss Count VI of EOS's Counterclaim

In Count VI of the counterclaim, EOS alleges 3D and UT have unlawfully maintained their monopoly power by suing for infringement of the patents-in-suit when they know the patents are invalid. *See* Counterclaim at ¶¶ 53-54. Specifically, EOS contends corresponding foreign patents have been "deleted or declared invalid" by foreign patent offices and courts. *Id.* at ¶ 53.

3D and UT move to dismiss Count VI as a matter of law under the *Noerr-Pennington* doctrine. Under that doctrine, the antitrust laws do not apply to activities associated with mere solicitation of government action, including bringing a lawsuit. *See Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609 (1972); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523 (1961). However, the *Noerr-Pennington* doctrine does not apply to "sham proceedings," in which the lawsuit was "instituted without probable cause and in complete disregard of the law to interfere with the business relationships of a competitor." *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1294 (9th Cir. 1984). To fall within this sham exception, the lawsuit must (1) be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (2) if the suit is objectively baseless, the Court determines whether the subjective intent of the litigant is to interfere with a competitor's business relationships through use of a governmental process. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508

-13-

U.S. 49, 59-61, 113 S.Ct. 1920 (1993). If the litigation is not a sham, the litigant is immune from antitrust suit under the *Noerr-Pennington* doctrine.

EOS contends the Plaintiffs' patent infringement suit is objectively baseless because EOS has a license to use 3D's patents under a settlement agreement and the patents-in-suit have been declared invalid by foreign patent offices and courts. EOS's allegation that it has a license to use the patents-in-suit is merely a defense to the Plaintiffs' patent infringement claims; it does not demonstrate the suit is objectively baseless. *See, e.g., Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co., Inc.*, 964 F.Supp. 624, 628 (D. Conn. 1997) ("Stripped of everything but its essentials, [defendant's] argument is that because its defenses will ultimately prevail, [the plaintiff's] lawsuit must be 'objectively baseless' within the meaning of the sham exception."). From the pleadings, which do not include the purported license, the Court cannot tell whether the infringement claim or the license defense, if either, is objectively baseless.

EOS also argues UT and 3D's patent infringement claims are objectively baseless because corresponding patents have been declared invalid in other countries, so 3D and UT should expect them to be declared invalid in this Court as well. Whether the patents were actually found invalid in other countries is in dispute: the Plaintiffs contend courts in France and Italy upheld the patents' validity, a German court held the patent was not infringed, and a Japanese court narrowed the patent but did not find it invalid. Nonetheless, EOS has provided no authority requiring this Court to treat foreign decisions on patent validity as precedential or even persuasive authority. *See Heidelberger Druckmaschinen AG v. Hantscho Commercial Prod., Inc.*, 21 F.3d 1068, 1072 n.2 (Fed. Cir. 1994) ("We take notice of the fact that the theories and laws of patentability vary from country to country, as do examination practices. Caution is required when applying the action of a foreign patent

-14-

examiner . . . for international uniformity in theory and practice has not been achieved."). On the contrary, under the patent statute in the United States, patents are entitled to a presumption of validity. *See* 35 U.S.C. § 282. Even if the patents have been found invalid by several countries, the Court sees no reason to believe only an unreasonable, unrealistic plaintiff would seek to enforce them in this country. Accordingly, because EOS has not shown the Plaintiffs' patent infringement suit is objectively baseless, Count VI must be dismissed under the *Noerr-Pennington* doctrine.

## II.     Motion to Bifurcate and Stay Antitrust Claims

The Plaintiffs also move to bifurcate and stay EOS's antitrust claims pursuant to Rule 42(b) of the Federal Rules of Civil Procedure. Under Rule 42(b), a court may order a separate trial of any counterclaim "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." FED. R. CIV. P. 42(b). In this case, the Plaintiffs contend bifurcation is appropriate because the antitrust issues are unrelated to the patent infringement claims and will confuse the jury.

The Federal Circuit upheld a trial court's separation of patent issues from an antitrust counterclaim in *In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986), and noted such bifurcation reflected a "now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim." 800 F.2d at 1084. In that case, the antitrust counterclaim related to the plaintiff's knowing enforcement of an invalid patent, similar to the counterclaim the Court dismissed above, not a standard antitrust claim. The Federal Circuit found economy would be served by bifurcation because the validity of the patent would be adjudicated in the first trial, becoming law of the case for the antitrust counterclaim. *Innotron*, 800 F.2d at 1085. Additionally, the court found convenience would be served in trying the "less complex" patent issues first; expedition would be

-15-

served because the patent claims would be ready for trial before the antitrust claim; and confusion would be avoided because the antitrust counterclaim would require different proof and witnesses. *Innotron*, 800 F.2d at 1085.

None of these justifications for bifurcation are apparent in this case. Trying the patent infringement claims first would provide no law of the case to assist the antitrust trial. There is no evidence the patent issues will be less complex than the antitrust issues in this case; in fact, the contrary could very well be true. Likewise, there is no reason to believe the patent claims will be ready for trial first, since the case is currently set for trial in June 2004. If the case were bifurcated, the patent claims would be tried as scheduled and the antitrust counterclaim could not go to trial until sometime in 2005, causing great inconvenience to the parties and to this Court's docket. Finally, the Plaintiffs have not provided concrete examples of confusion that would result from different proof or witnesses. In fact, the record indicates many witnesses will overlap and several issues will require similar proof. Therefore, the Court finds convenience and expedition would not be served by bifurcating the trials and staying discovery, and bifurcation could result in prejudice to the Defendant and the public.

In accordance with the foregoing:

IT IS ORDERED that the Plaintiffs' Motion to Dismiss the Antitrust Counterclaims for Failure to State a Claim [#17] is GRANTED as to Count VI of the Counterclaim and Count V against the University of Texas, and DENIED as to Count V against 3D Systems, Inc.;

IT IS FURTHER ORDERED that if the Defendant wishes to replead its allegations of antitrust injury and relevant market in Count V, it may file an amended pleading within ten (10) days of the date of this Order;

-16-

IT IS FURTHER ORDERED that the Plaintiffs' Motion to Bifurcate and Stay Antitrust Counterclaims [#18] is DENIED;

IT IS FURTHER ORDERED that Plaintiffs' Request for Judicial Notice [#16] is GRANTED as unopposed;

IT IS FINALLY ORDERED that Plaintiffs' Second Request for Judicial Notice [#36] is DENIED in accordance with the Defendant's objections.

SIGNED this the 2ᴺᴰ day of July 2003.


SAM SPARKS
UNITED STATES DISTRICT JUDGE