**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Board of Regents, The University of Texas System, and 3D Systems, Inc. | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No.  A03 CA 113SS |
| EOS GmbH Electro Optical Systems, | § § | |
| Defendant. | § § § | |

## COUNTERCLAIM DEFENDANTS' REPLY IN SUPPORT OF
## MOTION TO STRIKE OR TO DISMISS COUNT V

Plaintiff and counterclaim defendant 3D Systems, Inc. and counterclaim defendant 3D Systems Corporation (collectively "3D Systems") hereby reply to defendant EOS GmbH Electro Optical Systems' ("EOS") Opposition to Plaintiff's Motion to Strike Allegations In and To Dismiss Amended Counterclaim V (the "Opposition").

## I.
## INTRODUCTION

EOS's Amended Count V suffers from three principal defects:

(1)    EOS continues to base its antitrust claim on alleged conduct that the Court has ruled did not cause anti-competitive effects;

(2)    EOS has added a new allegation regarding a grand jury investigation that cannot constitute anti-competitive harm to EOS; and

(3)    EOS has failed to plead facts regarding causation and antitrust injury in support of any of its allegations regarding 3D Systems' conduct.

76

The Opposition not only underscores these fatal deficiencies, but shows that EOS's real agenda is to pursue harassing discovery into issues – such as the Department of Justice consent decree and the Department of Justice grand jury proceedings – as to which there is plainly no basis for a claim.

At bottom, the Opposition fails to show how the conduct alleged in Count V of the amended counterclaims – and particularly Paragraph 40, which is its core – has harmed EOS. Because EOS itself would certainly know what harm it could have suffered, this abject showing merely confirms what EOS's counsel conceded during the June 24, 2003 hearing, that the contents of paragraph 40 (then numbered "42") were "for the purpose of showing the monopolistic intent . . . not injury to EOS, but the injury to the public that is going on and that's what's being set forth in paragraph 42." (Jun. 24, 2003 Hearing Transcript at 38, attached hereto as Exhibit A.) As the Supreme Court stated in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983), "[c]ertainly in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."

## II.
## ARGUMENT

### A.    Motions to Strike Are Granted In Antitrust Cases to Remove Irrelevant Matters From the Pleadings.

This Court unquestionably may strike allegations that do not state a claim for an antitrust violation or that ignore the Court's prior rulings. *See Paul M. Harrod Co. v. A.B. Dick Co.*, 194 F. Supp. 502, 504 (N.D. Ohio 1961); *Reyn's Pasta Bella, L.L.C. v. Vista U.S.A., Inc.*, 259 F. Supp. 2d 992, 1001-1003 (N.D. Cal. 2003); *Rieter's Beer Distrib., Inc., v. Christian Schmidt Brewing Co.*, 657 F. Supp. 136, 143-45 (E.D.N.Y. 1987). Rather than discussing these cases,

EOS merely posits that motions to strike are often disfavored. (Opp. at 2.) But none of EOS's

authority addresses the circumstances at bar: where amended allegations (i) ignore prior rulings

of the Court, and (ii) are irrelevant and are plainly made solely to prejudice the opposing party.

**B.**     **The Grand Jury Investigation Is Irrelevant To These Proceedings and Should Be Stricken.**

EOS's Opposition confirms that its new allegation about a grand jury is simply an

attempt to cast aspersions and seek massive discovery, admitting that "[w]hat the grand jury is

specifically investigating about 3D is unknown to EOS[.]" (Opp. at 8.) EOS does not even say

that the existence of the grand jury demonstrates 3D Systems' anti-competitive acts, only that "it

could support EOS's claims." (*Id.*; emphasis added.) This is neither sufficient basis upon which

to rest an antitrust claim, nor sufficient basis to justify harassing discovery.

Receiving a grand jury subpoena does not signify any violation of law, *In re 1979 Grand*

*Jury Subpoena*, 478 F. Supp. 59, 62 (M.D. La. 1979), and certainly not one that has caused

antitrust injury to EOS. Since EOS has no idea what the grand jury is looking at – and there is

no suggestion that the grand jury has concluded anything – there is no basis for a claim of

antitrust injury,[1] or for the discovery into secret grand jury proceedings that EOS apparently

intends to engage in. In short, the grand jury allegation in Paragraph 40(e)(3) must be stricken

because it is immaterial and cannot conceivably support a claim.

**C.**     **EOS's Lost Bid For A License under the DOJ Consent Decree From 3D Systems Cannot Constitute Antitrust Injury.**

EOS ignores this Court's ruling that "the fact that EOS lost its bid to become 3D

Systems' licensee as a result of the Justice Department consent decree is not antitrust injury."

---

[1]  Many items often before an antitrust grand jury – such as whether competitors agreed to raise prices or divide customers – could not injure EOS. *E.g.,* Order at 9 ("EOS cannot claim to be injured by . . . alleged higher prices . . . because it is not a customer.").

(Order at 9, attached hereto as Exhibit B.) Instead, EOS reasserts its rejected allegation that the license under the consent decree somehow constitutes an anti-competitive act.

The consent decree did not obligate 3D Systems to license EOS, but instead provided only that 3D Systems divest a license for certain rapid prototyping patents "in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States in its sole discretion." (*United States v. 3D Systems Corp.*, Aug. 16, 2001 Final Judgment, §§ IV-A, IV-N(1)-(2).)[2] Thus, any license <u>decision</u> was that of the U.S. Department of Justice, pursuant to its power to disapprove it or to determine that the license met the decree's requirements to restore competition. (*Id*). If the Department believed that EOS was the only qualified licensee (as EOS alleges here that it was), the Department had the power to force that result. Thus, EOS is challenging an act of the United States, and its claim is barred by the state action doctrine. *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379, 382-83 (1991).[3]

Further, because 3D Systems' participation in the license process involved making a proposal to the Department for its approval, that suggestion constitutes First Amendment activity protected by *Noerr-Pennington* doctrine (subject to the "sham" exception, which EOS does not invoke).[4] *Id.*, at 383-84. As the Supreme Court stated in *City of Columbia*, even deception by a

---

[2] The Final Judgment was filed with the Court as Exhibit A to the April 24, 2003 Declaration of Elizabeth J. Brown Fore. The Court took judicial notice of the Final Judgment, without objection, in its July 2, 2003 Order.

[3] There is no allegation that 3D Systems agreed with the licensee that 3D Systems would not license anyone else.

[4] EOS's reliance on *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002) is misguided. That case held that the *Noerr-Pennington* doctrine does not apply "where the government does not perform any independent review of the validity of the statements, does not make or issue any intervening judgment and instead acts in direct reliance on the private party's representations." 185 F. Supp. 2d at 370. Here, the Department of Justice, far from rubber stamping any 3D Systems' choice, had "sole discretion" under the consent decree in approving a licensee. And there no allegation here — nor could there be — that the Department abandoned the consent decree.

private party seeking favorable action from a public agency, "can be of no consequence as far as the Sherman Act is concerned." *Id.* (quoting *Noerr-Pennington*).

EOS's complaint – already rejected once by this Court – is that 3D Systems did not provide the consent decree license to EOS. But, as the Department of Justice and Federal Trade Commission's *Antitrust Guidelines for the Licensing of Intellectual Property* (1995) make clear, even possession of market power does not "impose on the intellectual property owner an obligation to license the use of that property to others." *Id.* at § 2.2; *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999) ("[T]he antitrust laws do not negate the patentee's right to exclude others from patent property."); *In re Independent Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327-28 (Fed. Cir. 2000) (upholding "refus[al] to sell a license in markets within the scope of the statutory patent grant"). In short, the license allegations in Paragraph 40(e)(1)-(2) must be stricken because they are immaterial and cannot support a claim.

**D.    EOS's Allegations Regarding Its Own Incurred Costs and Increased Prices Should Be Stricken.**

EOS continues to rely on its alleged "entry cost" as part of its alleged antitrust injury (Amended Counterclaims, ¶ 46), despite the Court's ruling that entry costs cannot constitute antitrust injury. (Order at 9.) Citing no case, EOS attempts to salvage this allegation by claiming that its damages are based only on the cost of U.S. entry insofar as those costs were increased as a result of 3D Systems' alleged antitrust violations. (Opp. at 10.) Yet EOS provides no inkling as to what kind of costs constituted damages or what acts by 3D Systems caused them.[5] EOS's vague and unexplained damages theory cannot support an antitrust claim; the

---

[5] EOS relies on *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995), for the proposition that it need not "quantify" its damages. (Opp. at 11.) EOS misses the point. EOS has not just failed to quantify its damages, but has to date failed to even suggest what kind of damages it might have sustained or how any act of 3D Systems caused those damages.

expenditure of funds by EOS is not antitrust injury because it does not reflect reduced output or loss of competition. *See Viacom Int'l, Inc. v. Tele-Communications, Inc.*, No. 93 Civ. 6658 (LAP), 1994 WL 561377, at *4-6 (S.D.N.Y. Oct. 12, 1994).[6] Indeed, EOS does not even suggest that these alleged costs caused consumer harm or prevented it from competing.

EOS also attempts to rely on the allegation that 3D Systems' alleged conduct caused consumers to pay higher prices (Opp. at 9), despite the Court's ruling that "EOS cannot claim to be injured by the alleged higher prices customers have been forced to pay." (Order at 9.) The Court was correct. EOS's insistence on focusing on consumers should be rejected, particularly in view of its continued failure to plead causation for any of 3D Systems' challenged acts.

**E.    EOS's Amended Counterclaims Still Fail to Plead Antitrust Injury and Causation.**

EOS also suggests that the Court need not focus on EOS's particular allegations of conduct because, taken together, 3D Systems' alleged acts form a pattern of conduct that violates Section 2 of the Sherman Act even if the acts taken individually are not unlawful. (Opp. at 3-4.) EOS is wrong. Monopoly power alone is, of course, not sufficient. There must additionally be a showing of actual exclusionary acts that proximately cause antitrust injury to EOS. *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 484-85 (5th Cir. 2000) (Section 2 claim fails where plaintiff

---

[6] EOS attempts to brush aside *Viacom* in a footnote (Opp. at 9, n.2), in which EOS appears to acknowledge that the expenditure of funds cannot constitute antitrust injury but then curiously suggests the Court take such an expenditure of funds into account when considering the effects of 3D Systems' "anti-competitive and exclusionary conduct." But if the "effects" of the alleged bad conduct do not include antitrust injury to EOS, then those effects are not relevant since EOS does not have standing to claim antitrust injury on behalf of anyone but itself, as this Court has recognized. (Order, at 9.)

did not show that its injuries were <u>caused</u> by defendant).[7] EOS's "pattern of conduct as a whole

argument" begs the question of its failure to allege (i) facts indicating that 3D Systems' alleged

acts were exclusionary or predatory acts, and (ii) facts indicating that those acts have

proximately caused antitrust injury to EOS. Both *Taylor*, 216 F.3d at 475-86, and *Aspen Skiing*

*Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-10 (1985), each of which EOS cites,

establish that the Court should focus on specific exclusionary and injury-causing characteristics

of the challenged acts when evaluating a private antitrust claim. *Accord Phototron Corp. v.*

*Eastman Kodak Co.*, 842 F.2d 95, 99-102 (5th Cir. 1988). Because EOS has not alleged any

<u>facts</u> indicating how any of the briefly described acts – frequently found to be benign – that are

alleged in Paragraph 40 was exclusionary <u>or</u> caused it antitrust injury,[8] then the claims cannot be

valid. *Taylor*, 216 F.3d at 475, 477, 484-85; *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207-13

& n. 19 (4th Cir. 2002) (affirming district court dismissal of antitrust pleading for failure to

---

[7] Unlike cases that EOS relies on for its "pattern of conduct" argument, (Opp. at 3-4.) (citing *Avery Dennison Corp v. Acco Brands, Inc.*, No.CV99-1877DT(MCX), 2000 WL 986995 (C.D. Cal Feb. 22, 2002); *City of Mishawaka v. American Elec. Power Co.*, 616 F.2d 986 (7th Cir. 1980); and *Illinois ex rel. Hartigan v. Panhandle E. Pipeline Co.*, 730 F. Supp. 826 (C.D. Ill. 1990)), each of which involved a careful analysis of specific conduct, EOS's allegations never suggest how the items of objectionable conduct it alleges here somehow work individually or together to hurt EOS or anyone else. *Compare City of Mishiwaka*, 616 F.2d at 986 (rejecting contention that one must "consider each separate act of its conduct separately and in a vacuum"). *See also Avery Dennison*, 2000 WL 986995, at *18-23 (analyzing items of challenged conduct).

[8] EOS has not provided these facts because it cannot. For instance, the alleged agreement between 3D Systems and a materials manufacturer (Amended Counterclaims, ¶ 40(a)), termination of an agreement with a materials manufacturer (*id.*, ¶ 40(b)),and acquisition of a materials manufacturer (*id.*, ¶ 40(c)) are all vertical arrangements that are rarely of antitrust concern and are presumptively legal. *See* VII Areeda & Hovenkamp, ANTITRUST LAW, ¶ 1437a ("vertical agreements between actual or would-be suppliers and customers are everywhere . . . Their very ubiquity indicates that only few will be of antitrust concern . . . . As a general matter, a purely vertical arrangement does not increase anyone's market power[.]"); IVA Areeda, Hovenkamp & Solow, ANTITRUST LAW, ch. 10A-2, ¶ 1020 ("Most instances of vertical integration, including those that result from merger, are economically beneficial. As a result the presumptions in favor of vertical mergers should be stronger than the presumptions favoring horizontal mergers."). As to the alleged pressure to encourage materials and services sales (Amended Counterclaims, ¶ 40(d)), there is no conceivable illegality unless, at a minimum, it has a major impact on such sales. IX Areeda, ANTITRUST LAW, ¶ 1704a.

allege facts indicating likely anti-competitive effects and antitrust injury with respect to vertical transactions between Microsoft, an alleged monopolist, and certain personal computer manufacturers).

## III.
## CONCLUSION

EOS's amended Count V and its Opposition lead to the conclusion that EOS is simply trying to act as a public prosecutor. Asked to explain EOS's injury to the Court at the June 24, 2003 hearing on 3D Systems' initial Rule 12(b)(6) motion, EOS's counsel admitted that "[i]t's the effect of that monopoly power, not injury to EOS, but the injury to the public that is going on and that's what's being set forth in paragraph 42 [now Amended Paragraph 40]. That's the injury." (Jun. 24, 2003 Hearing Transcript at 38.)

Putting aside the conclusory allegations of "exclusion" in amended Paragraph 45 and 46, EOS has pleaded no facts to show any of 3D Systems' alleged acts caused harm to anyone. Thus, at the least, the Court should grant 3D Systems' Motion to Strike Paragraphs 40(e)(1)-(3), 44 and the last sentence of Paragraph 46 of the Amended Counterclaims pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Indeed, because of the continuing gap between alleged conduct and any proximately caused antitrust injury to EOS, the Court should grant 3D Systems' Motion to Dismiss Count V of the Amended Counterclaims in its entirety pursuant to Rule 12(b)(6).

Dated:    September 22, 2003

Respectfully submitted,

*Philip E. Cook, by permission EJBF*

PHILIP E. COOK
California State Bar No. 149067
Admitted *pro hac vice*
ROBERT W. DICKERSON
California State Bar No. 89367
Admitted *pro hac vice*
JONES DAY
555 West Fifth Street
Suite 4600
Los Angeles, California 90013-1025
Telephone: (213) 489-3939

ROBERT W. TURNER
Texas State Bar No. 20329000
JONES DAY
2727 North Harwood Street
P.O. Box 660623
Dallas, Texas 75266-0623
Telephone: (214) 220-3939
Facsimile:  (214) 969-5100

GRAY, CARY, WARE & FREIDENRICH LLP
ALAN D. ALBRIGHT
Federal Bar No. 13048
Texas State Bar No. 00973650
ELIZABETH J. BROWN FORE
Texas State Bar No. 24001795
1221 South MoPac Expressway, Suite 400
Austin, TX 78746-6875
Telephone: (512) 457-7000
Facsimile:  (512) 457-7001

Attorneys for Plaintiff
BOARD OF REGENTS, THE
UNIVERSITY OF TEXAS SYSTEM,
Plaintiff and Counterclaim Defendant
3D SYSTEMS, INC., and
Counterclaim Defendant
3D SYSTEMS CORPORATION

OF COUNSEL:

JOHN A. HERFORT
Admitted *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone: (212) 351-3832
Facsimile: (212) 351-5258

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent via facsimile and by United States certified mail, return receipt requested to the following counsel of record on this 22nd day of September, 2003.

Thomas H. Watkins
State Bar No. 20928000
Albert A. Carrion, Jr.
State Bar No. 03883100
HILGERS & WATKINS P.C.
98 San Jacinto Boulevard
San Jacinto Center, Suite 1300
Austin, Texas 78701
(512)476-4716
(512) 476-5139 Facsimile

Michael H. Baniak
Michael D. Gannon
BANIAK PIKE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois 60606
(312) 673-0360
(312) 673-0361 Facsimile

Attorneys for Defendant
EOS GMBH ELECTRO OPTICAL SYSTEMS

ELIZABETH J. BROWN FORE

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                    AUSTIN DIVISION

 3  BOARD OF REGENTS, THE   ) Docket No. 03-CA-113 SS
    UNIVERSITY OF TEXAS     )
 4  SYSTEM, 3D SYSTEMS, INC.)
                            )
 5  vs.                     ) Austin, Texas
                            )
 6  EOS GMBH ELECTRO        )
    OPTICAL SYSTEMS         ) June 24, 2003

 7
              TRANSCRIPT OF ALL PENDING MATTERS
 8            BEFORE THE HONORABLE SAM SPARKS

 9  APPEARANCES:

10  For the Plaintiff:          Mr. Alan D. Albright
                                Gray, Cary, Ware & Freidenrich
11                              1221 South MoPac, Suite 400
                                Austin, Texas 78746
12
                                Mr. Philip E. Cook
13                              Jones, Day, Reavis & Pogue
                                555 West Fifth Street, Suite 4600
14                              Los Angeles, California 90013

15                              Mr. John A. Herfort
                                Gibson, Dunn & Crutcher
16                              200 Park Avenue
                                New York, New York 10166
17
    For the Defendant:          Mr. Michael H. Baniak
18                              Mr. Andrew Pratt
                                Baniak, Pine & Gannon
19                              150 N. Wacker Drive, Suite 1200
                                Chicago, Illinois 60606
20
                                Mr. Thomas H. Watkins
21                              Hilgers & Watkins
                                P.O. Box 2063
22                              Austin, Texas 78768

23  Court Reporter:             Lily Iva Reznik, RPR, CRR
                                (512)916-5564
24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
```

11:32:10  1  did not set up any competitor.  There is no competition in

11:32:14  2  that market other than EOS attempting to get into that market

11:32:18  3  now.

11:32:20  4      What's in paragraph 42 is in there for the purposes of

11:32:22  5  showing the monopolistic intent and exactly what 3D is now

11:32:28  6  doing with that monopoly power.  It's the effect of that

11:32:32  7  monopoly power, not injury to EOS, but the injury to the

11:32:34  8  public that is going on and that's what's being set forth in

11:32:38  9  paragraph 42.  That's the injury.  And we've cited to your

11:32:44  10  Honor the TCA Building case and the Heatransfer case, out of

11:32:48  11  the Fifth Circuit, that have recognized that EOS really is in

11:32:52  12  the best position to vindicate that right.

11:32:56  13      Insofar as the intent, you know, 3D, again, argues

11:33:00  14  facts in their reply.  Arguing facts is not what is to be done

11:33:06  15  here, and I think that is, in part, what is wasting your

11:33:10  16  Honor's time.

11:33:10  17      THE COURT:  No.  If the facts were as you alleged,

11:33:16  18  wherein would there be liability unless you inferred it?  And

11:33:22  19  you could infer either way.  You could infer they didn't know

11:33:24  20  and wanted it, or they didn't know and you could infer that

11:33:34  21  somebody at the University said, well, they already had the

11:33:36  22  right to use it.  If they want to go into this partner, we

11:33:40  23  won't object, as long as they pay their license fees, maybe

11:33:42  24  even get a better license fee.  If you want U.T. in here,

11:33:48  25  you're going to have to amend your pleadings on that.

```
 1                        * * * * * *

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   WESTERN DISTRICT OF TEXAS     )

 6

 7        I, LILY I. REZNIK, Official Court Reporter, United States

 8   District Court, Western District of Texas, do certify that the

 9   foregoing is a correct transcript from the record of

10   proceedings in the above-entitled matter.

11        I certify that the transcript fees and format comply with

12   those prescribed by the Court and Judicial Conference of the

13   United States.

14        WITNESS MY OFFICIAL HAND this the 30th day of June, 2003.

15

16

17

18                              LILY I. REZNIK, RPR, CRR
                                Official Court Reporter
19                              United States District Court
                                Austin Division
20                              200 W. 8th Street, 2nd Floor
                                Austin, Texas 78701
21                              (512)916-5564
                                Certification No. 4481
22                              Expires:  12-31-04

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
AUSTIN DIVISION

2003 JL -2 PM 4:00

U.S. CLERK'S OFFICE

BOARD OF REGENTS, THE UNIVERSITY OF
TEXAS SYSTEM, and 3D SYSTEMS, INC.,
Plaintiffs,

-vs-                                                    Case No. A-03-CA-113-SS

EOS GmbH ELECTRO OPTICAL SYSTEMS,
Defendant.

## O R D E R

BE IT REMEMBERED on the 25th day of June 2003 the Court called the above-styled cause

for hearing, and the parties appeared through counsel of record. Before the Court are the Plaintiffs'

Motion to Dismiss the Antitrust Counterclaims for Failure to State a Claim [#17], the Defendant's

Opposition thereto [#24] and the Plaintiffs' reply [#39]; the Plaintiffs' Motion to Bifurcate and Stay

Antitrust Counterclaims [#18], the Defendant's Opposition thereto [#26] and the Plaintiffs' reply

[#41]; Plaintiffs' Request for Judicial Notice [#16] and declaration in support thereof [#19]; and the

Plaintiffs' Second Request for Judicial Notice [#36] and declaration in support thereof [#37].

Having considered the motions, responses and replies, the arguments of counsel at the hearing, the

case file as a whole and the applicable law, the Court enters the following opinion and orders.

### Background

The Plaintiffs in this case, the Board of Regents of The University of Texas System ("UT")

and 3D Systems, Inc. ("3D") sue EOS GmbH Electro Optical Systems ("EOS"), a German entity,

for infringement of United States Patent Numbers 5,639,070 and 5,597,589, which are owned by UT

and licensed exclusively to 3D. *See* Complaint at ¶¶ 3, 8, 9, 13 & 14. The patents-in-suit relate to laser sintering technology, a manufacturing technique that uses a computer-controlled laser to build physical parts from a computer design by melting layers of powder. *See* Plaintiffs' Concise Statement of Alleged Infringement [#46] at 2. According to the Plaintiffs, DTM Corporation ("DTM"), an Austin-based corporation, introduced the first laser sintering machines in the early 1990s as UT's exclusive patent licensee. *Id.*

3D acquired DTM by merger on August 31, 2001. *See* Counterclaim at ¶ 4. After 3D and DTM entered into an agreement and plan of merger in April 2001, the Department of Justice filed a complaint challenging the merger under antitrust law in the United States District Court for the District of Columbia on June 6, 2001. *Id.* at ¶¶ 34, 41. The parties reached a settlement whereby the Justice Department allowed the merger to go forward and 3D and DTM agreed to license a third party to develop, manufacture and sell products using their rapid prototyping technology. *See* Fore Decl. [#19], Ex. C. After the Justice Department received and responded to comments on the settlement, the District Court entered the final judgment on August 16, 2001. *Id.*, Ex. A.

EOS asserts counterclaims against 3D for breach of the parties' settlement agreement and license agreement, legal and equitable estoppel, specific performance under the settlement and license agreements and breach of fiduciary duty. Additionally, it raises two antitrust counterclaims. In Count V, EOS contends the 3D-DTM merger eliminated competition in the laser sintering field, and 3D and UT's conspiring to eliminate competition violated sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act. In Count VI, EOS alleges 3D and UT are unlawfully maintaining their monopoly power by enforcing patents they know to be invalid. Finally, EOS seeks a declaratory judgment that the patents are invalid and it is not infringing them. The Plaintiffs have

-2-

moved to dismiss EOS's antitrust claims or, alternatively, to bifurcate and stay them until the patent claims are tried.

**Analysis**

I.    **Motion to Dismiss**

   A.    **Standard for Motion to Dismiss under 12(b)(6)**

   In deciding whether to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "the Court must take the factual allegations as true, resolving any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The Court should then dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 78 S. Ct. 99, 102 (1957).

   EOS contends dismissal prior to discovery is inappropriate in an antitrust case, because the necessary proof of facts is within the counterplaintiffs' control. *See, e.g., Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848 (1976) ("[I]n antitrust cases, . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."), *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486 (1962) (rejecting summary judgment in antitrust case, stating "[s]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plots."). The Fifth Circuit has emphasized antitrust plaintiffs are not held to a heightened pleading standard and need not include the particulars of their claims in their complaints but must provide a short and plain statement of their claims in which they allege facts sufficient to support an antitrust violation. *Apani*, 300 F.3d

-3-

at 633. However, while an antitrust plaintiff need not present proof of an antitrust violation in its

complaint, it must allege facts that, if true, would present an antitrust violation. This is the essence

of the *Conley* standard.

### B.    Motion to Dismiss Count V of EOS's Counterclaim

In Count V, EOS alleges 3D and UT violated sections 1 and 2 of the Sherman Act and

section 7 of the Clayton Act in connection with the merger between 3D and DTM in 2001. Section

1 of the Sherman Act provides that every contract or conspiracy in restraint of trade or commerce

is illegal. *See* 15 U.S.C. § 1. To prove a claim under section 1, an antitrust plaintiff must show: (1)

the defendants engaged in a conspiracy; (2) the conspiracy had the effect of restraining trade; and

(3) trade was restrained within the relevant market. *See Spectators' Comm. Network Inc. v. Colonial

Country Club*, 253 F.3d 215, 220 (5th Cir. 2001). Section 2 of the Sherman Act prohibits actions to

monopolize or attempt to monopolize any part of trade or commerce. *See* 15 U.S.C. § 2. To prove

monopolization under section 2, a plaintiff must show the defendant (1) possessed monopoly power

in the relevant market and (2) willfully acquired or maintained that power as opposed to growing as

a product of business acumen. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Section 7 of the Clayton Act prohibits a corporation from acquiring a part or whole of a corporation

if such acquisition may substantially reduce competition or tend to create a monopoly. *See* 15 U.S.C.

§ 18. To establish a section 7 violation, a plaintiff must make a prima facie showing of probable

anticompetitive impact of a merger by showing the size of the entities involved is inherently suspect

or that other aspects of the market make the merger more harmful to the relevant market than the

bare market share would indicate. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d

480, 492 (5th Cir. 1984).

-4-

### 1.    Failure to Plead a Relevant Market

The counterplaintiffs move to dismiss Count V because EOS has failed to plead the existence of a relevant market. Before determining a defendant's market power under section 2, the court must define the relevant geographic and product market. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir. 1984). Likewise, determining the relevant market is the first step in a case under section 7 of the Clayton Act. *See Domed Stadium*, 732 F.2d at 491.

EOS argues dismissal based on a failure to define the relevant market is inappropriate at this stage in the proceedings because defining the market is a fact-intensive inquiry. In some cases, courts have found a factual inquiry necessary to define the market, but in other cases factual inquiry has not been necessary. *Compare Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072 (1992) ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.") *with Found. for Interior Design Educ. Interest v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery. Here, however, definition of the relevant market requires relatively little factual analysis." (citations omitted)). Thus, the necessity of conducting discovery before defining the relevant market does not arise in every case. In fact, one appellate case EOS cites in support of its declaration that "[a]s the federal Circuit courts have widely recognized, market definition is a fact-intensive inquiry not suited for resolution on a motion to dismiss," explicitly states: "Plaintiffs err, however, when they try to turn this general rule into a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market." EOS' Response, at 6; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.

-5-

1997). Therefore, the Court will consider the facts of this specific case to determine whether dismissal is appropriate.

While the sufficiency of a plaintiff's definition of the relevant market is generally a fact question, a court may dismiss a plaintiff's complaint if the plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir. 2002). The test for determining the relevant market is the same under the Sherman Act and Clayton Act. *Apani*, 300 F.3d at 626 n.4.

EOS defines the relevant product market as the development, manufacture and sale of Laser RP (rapid prototyping) Systems or, alternatively, the development, manufacture and sale of Industrial RP Systems (which include Laser RP Systems) in the United States. *See* Counterclaim at ¶ 37. It contends the merger of 3D and DTM, with the active participation of UT, virtually eliminated competition in these markets within the United States by giving 3D a 100 percent market share of Laser RP Systems and 80 percent share of Industrial RP Systems. *Id.* at ¶¶ 36, 40.

3D and UT contend this definition of the relevant market is insufficient because EOS does not allege the products do not have competitive substitutes, as required by *Apani*. Specifically, they challenge EOS's failure to assert non-laser systems cannot be substituted for the laser sintering machines. EOS responds its definition of the market is sufficient because it matches the Justice Department's definition of the relevant market in its antitrust complaint against 3D and DTM in a federal district court in Washington, D.C. *See* EOS's Response, Ex. A. That case settled, and the

-6-

court never ruled on the sufficiency of the complaint's definition of the relevant market. Therefore, EOS cannot rely on the government's definition of the relevant market as support for its argument that its own definition is legally sufficient. On the other hand, 3D and UT provide no support for their argument that non-laser systems can be substituted for laser sintering machines, except a reference to Stratsys in the Justice Department's complaint as a competitor with 3D. Plaintiffs state "everyone knows" Stratasys produces non-laser systems. Again, the Court sees no reason to treat a complaint filed in another district court as any authority whatsoever. Making all factual inferences in EOS's favor, the Court has no reason to believe Laser RP Systems could be substituted with non-laser systems and will refrain from dismissing the complaint at this time.

EOS also defines Industrial RP Systems as a relevant market, which include the Laser RP Systems and other rapid prototyping systems. While 3D and UT do not allege there are substitutes for Industrial RP Systems, they argue the Industrial RP Systems market is not "plausible" because EOS cannot lump together equipment, materials and services into a single market. The district court case UT and 3D cite for this argument deals with a definition of relevant market as "the business of adult vocational education . . . in New Jersey and Puerto Rico." *North Jersey Secretarial Sch. v. McKiernan*, 713 F.Supp. 577, 583 (S.D.N.Y. 1989). EOS defines the relevant market in the counterclaim as the market for the development, manufacture and sale of Industrial RP Systems, a term that includes the equipment, materials and services that make up the system. *See* Counterclaim at ¶ 37. This term is not overly broad or undefined simply because EOS includes equipment, materials and services in its description of the systems. It certainly does not rival the market definitions set forth in the cases UT and 3D cite for support. As above, the Court finds this definition of relevant market sufficient at this stage in the proceedings, when there is no evidence

-7-

that the definition is sufficient or insufficient. However, if EOS wishes to amend its pleading, as EOS's counsel indicated to the Court at the hearing it may want to do, the Court allows it to file an amended pleading within ten days.

###     2.    Failure to Plead Antitrust Injury

UT and 3D contend EOS has not alleged an adequate antitrust injury. Again, EOS argues dismissal based upon the existence of an antitrust injury is inappropriate. And again, the Court recognizes EOS need not prove its injury at this stage of the proceeding but rather must allege a legally adequate injury in its counterclaim. *See, e.g., Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) ("We are not in a position to predict whether [plaintiff] will ultimately be able to sustain his burden of proof on this issue since [plaintiff] has not yet had an opportunity to obtain evidence.").

The Supreme Court defines antitrust injury as "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109, 107 S.Ct. 484 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690 (1977)). Antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690. The Fifth Circuit "has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition" as well as "the loss of independent decision making." *Anago, Inc. v. Tecnol Med. Prod., Inc.*, 976 F.2d 248, 249, 250-51 (5th Cir. 1992). The circuit has found antitrust injury when a company "virtually precluded any of the competitors in the [market] from openly competing" with it. *Heatransfer Corp. v. Volkswagonwek, A.G.*, 553 F.2d 964, 985 (5th Cir. 1977).

-8-

In its counterclaim, EOS contends the DTM-3D merger resulted in the combined company having virtually 100 percent of the market share of sales of Laser RP Systems and 80 percent of the revenues from sales of Industrial RP Systems. *See* Counterclaim at ¶ 36. EOS claims to have been injured because it has been planning to enter the United States market to sell Laser RP Systems since 1997 and has expended substantial resources toward that end. *Id.* at ¶ 44. EOS contends it and other competitors have (a) been excluded from participating in the U.S. markets for RP equipment, materials and services, and (b) lost substantial profits as a result of this exclusion. *Id.* at ¶ 47. Additionally, EOS claims RP customers have been injured by having to pay higher prices for Laser RP Systems and Industrial RP Systems. *Id.* at ¶ 46.

Most of the injuries EOS describes in its counterclaim are not appropriate antitrust injuries. First, EOS cannot claim to be injured by the alleged higher prices customers have been forced to pay for RP systems, because it is not a customer. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583, 106 S.Ct. 1348 (1986) (plaintiffs cannot recover for conspiracy by their competitors to "charge higher than competitive prices in the American market" because "as petitioner's competitors, respondents stand to gain from any conspiracy to raise the market price."). Likewise, the fact that EOS lost its bid to become 3D's licensee as a result of the Justice Department consent decree is not an antitrust injury. Finally, EOS's expenditure of resources to break into the U.S. market for RP systems is simply a cost of doing business: any business must expend resources to break into a new market in a new country.

EOS points to the description of its injuries in paragraph 47 of its counterclaim, where it states it has been excluded from participating in the RP market in the United States and has lost substantial profits as a result. *See* Counterclaim at ¶ 47. UT and 3D contend EOS's alleged loss of

-9-

profits is not a sufficient antitrust injury. It is true the Supreme Court has found loss of profits to be an inadequate allegation of antitrust injury when the loss of profits is due to continued competition, although it noted loss of profits stemming from practices forbidden by antitrust laws is adequate. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115-116, 107 S.Ct. 484 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88, 97 S.Ct. 690 (1977). EOS does allege its lost profits resulted from 3D and UT's anticompetitive behavior, not from continued competition. Accordingly, the Court finds this allegation of antitrust injury is sufficient to withstand a motion to dismiss at this stage of the proceedings. As above, EOS may replead its injury within ten days of the date of this Order if it wishes to do so.

### 3.    Failure to State a Claim of Monopolization or Attempted Monopolization

3D and UT contend EOS has not stated a claim of actual or attempted monopolization under Section 2 of the Sherman Act. An actual monopolization claim has two elements: (1) possession of monopoly power in the relevant market, and (2) willful acquisition or maintenance of that power distinct from growth as a result of business acumen or accident. *See Grinnell Corp.*, 384 U.S. at 570-71. The counterclaim alleges 3D has 100 percent of the sales of Laser RP Systems and 80 percent of the sales of Industrial RP Systems. *See* Counterclaim at ¶ 36. Additionally, EOS alleges 3D and UT acquired DTM in order to prevent competition within the United States. *Id.* at ¶ 39. Therefore, the Court finds the counterclaim alleges the necessary elements to state a claim for Section 2 monopolization.

To state a claim for attempted monopolization, EOS must allege three elements: (1) 3D and UT engaged in predatory or exclusionary conduct; (2) they had a specific intent to monopolize; and (3) there was a dangerous probability they would successfully obtain monopoly power. *Taylor*

-10-

*Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000). UT and 3D claim EOS does not show they had a specific intent to monopolize. While EOS may not be able to prove intent at this point in the proceedings, it does allege in the complaint that 3D acquired DTM for the purpose of maintaining a monopoly over RP systems in the United States and has engaged in predatory conduct in order to exclude competition. *See* Counterclaim at ¶¶ 39, 42. Accordingly, the Court finds EOS has alleged sufficient facts to state a claim under Section 2 of the Sherman Act.

### 4.   **Failure to State a Claim against UT**

UT argues EOS fails to state a claim against it under Count V because UT was not involved in the merger. First, Section 7 of the Clayton Act only applies to parties to a merger, so UT cannot be implicated under that section. *See* 15 U.S.C. § 18. Sections 1 and 2 of the Sherman Act prohibit conspiracy to restrain trade and conspiracy to monopolize. *See* 15 U.S.C. §§ 1, 2. UT contends EOS submits nothing more than a "bare bones statement of conspiracy" without any supporting facts. *See Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972). A mere conclusory allegation of conspiracy is insufficient; to state a claim for conspiracy, a plaintiff must plead specific facts constituting the conspiracy. *E.g., Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 772 (S.D. Miss. 1992) (quoting *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979); *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989).

Paragraph 35 of the counterclaim describes UT's involvement in the alleged conspiracy thus:

On information and belief, UT consented to the transfers of certain intellectual property that was required in order for the merger to occur. UT was an active participant in seeing that the merger occurred, and without UT's consent, the Merger Agreement would not have been entered into and the merger of 3D and DTM would not have taken place.

-11-

Counterclaim at ¶ 35. While other paragraphs refer to UT, there are no further factual allegations as to UT's role in the conspiracy. The claim against UT boils down to its approval of the transfer of its exclusive patent license with DTM to 3D. The counterclaim does not allege UT intended to harm competition or give 3D a monopoly or shared an anticompetitive motive or common design with 3D. *E.g., Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125 (1946). Licensing a patent to another who then uses the license for anticompetitive purposes does not constitute engaging in a conspiracy to monopolize or restrain trade, without awareness of the anticompetitive conduct. *See, e.g., Syufy Enter. v. Am. Multimedia, Inc.*, 793 F.2d 990, 1000-01 (9th Cir. 1986) ("a supplier who licenses a product to another does not join the licensee in a conspiracy to monopolize merely because the licensee turns around and exploits the license for its own monopolistic purposes."). The complaint simply does not allege sufficient facts connecting UT to the 3D-DTM merger or any conspiracy to monopolize or restrain trade. Accordingly, EOS's claim against UT in Count V is dismissed without prejudice for failure to state a claim.

### 5.    Laches

The counterdefendants claim EOS's challenge to the 3D-DTM merger is barred by laches because EOS did not sue until eighteen months after the merger took place. While it is undisputed EOS was aware of the merger when it occurred (since it unsuccessfully moved to intervene in the Justice Department's suit challenging the merger and subsequently filed a public comment concerning the consent decree in the case), UT and 3D have not shown they have been prejudiced by EOS's failure to raise its antitrust claim until now. *See Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534 (1961). Additionally, EOS is not suing to undo the merger but to recover damages it has allegedly suffered from the anticompetitive effects of the merger and to enjoin future

-12-

anticompetitive behavior. The counterdefendants are free to keep laches as a defense to Count V, although the defense appears to the Court to be worth less than its weight in paper, but the Court will not dismiss Count V on this basis.

### C.    Motion to Dismiss Count VI of EOS's Counterclaim

In Count VI of the counterclaim, EOS alleges 3D and UT have unlawfully maintained their monopoly power by suing for infringement of the patents-in-suit when they know the patents are invalid. *See* Counterclaim at ¶¶ 53-54. Specifically, EOS contends corresponding foreign patents have been "deleted or declared invalid" by foreign patent offices and courts. *Id.* at ¶ 53.

3D and UT move to dismiss Count VI as a matter of law under the *Noerr-Pennington* doctrine. Under that doctrine, the antitrust laws do not apply to activities associated with mere solicitation of government action, including bringing a lawsuit. *See Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609 (1972); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523 (1961). However, the *Noerr-Pennington* doctrine does not apply to "sham proceedings," in which the lawsuit was "instituted without probable cause and in complete disregard of the law to interfere with the business relationships of a competitor." *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1294 (9th Cir. 1984). To fall within this sham exception, the lawsuit must (1) be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (2) if the suit is objectively baseless, the Court determines whether the subjective intent of the litigant is to interfere with a competitor's business relationships through use of a governmental process. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508

-13-

U.S. 49, 59-61, 113 S.Ct. 1920 (1993). If the litigation is not a sham, the litigant is immune from antitrust suit under the *Noerr-Pennington* doctrine.

EOS contends the Plaintiffs' patent infringement suit is objectively baseless because EOS has a license to use 3D's patents under a settlement agreement and the patents-in-suit have been declared invalid by foreign patent offices and courts. EOS's allegation that it has a license to use the patents-in-suit is merely a defense to the Plaintiffs' patent infringement claims; it does not demonstrate the suit is objectively baseless. *See, e.g., Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co., Inc.*, 964 F.Supp. 624, 628 (D. Conn. 1997) ("Stripped of everything but its essentials, [defendant's] argument is that because its defenses will ultimately prevail, [the plaintiff's] lawsuit must be 'objectively baseless' within the meaning of the sham exception."). From the pleadings, which do not include the purported license, the Court cannot tell whether the infringement claim or the license defense, if either, is objectively baseless.

EOS also argues UT and 3D's patent infringement claims are objectively baseless because corresponding patents have been declared invalid in other countries, so 3D and UT should expect them to be declared invalid in this Court as well. Whether the patents were actually found invalid in other countries is in dispute: the Plaintiffs contend courts in France and Italy upheld the patents' validity, a German court held the patent was not infringed, and a Japanese court narrowed the patent but did not find it invalid. Nonetheless, EOS has provided no authority requiring this Court to treat foreign decisions on patent validity as precedential or even persuasive authority. *See Heidelberger Druckmaschinen AG v. Hantscho Commercial Prod., Inc.*, 21 F.3d 1068, 1072 n.2 (Fed. Cir. 1994) ("We take notice of the fact that the theories and laws of patentability vary from country to country, as do examination practices. Caution is required when applying the action of a foreign patent

-14-

examiner . . . for international uniformity in theory and practice has not been achieved."). On the contrary, under the patent statute in the United States, patents are entitled to a presumption of validity. *See* 35 U.S.C. § 282. Even if the patents have been found invalid by several countries, the Court sees no reason to believe only an unreasonable, unrealistic plaintiff would seek to enforce them in this country. Accordingly, because EOS has not shown the Plaintiffs' patent infringement suit is objectively baseless, Count VI must be dismissed under the *Noerr-Pennington* doctrine.

## II.    Motion to Bifurcate and Stay Antitrust Claims

The Plaintiffs also move to bifurcate and stay EOS's antitrust claims pursuant to Rule 42(b) of the Federal Rules of Civil Procedure. Under Rule 42(b), a court may order a separate trial of any counterclaim "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." FED. R. CIV. P. 42(b). In this case, the Plaintiffs contend bifurcation is appropriate because the antitrust issues are unrelated to the patent infringement claims and will confuse the jury.

The Federal Circuit upheld a trial court's separation of patent issues from an antitrust counterclaim in *In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986), and noted such bifurcation reflected a "now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim." 800 F.2d at 1084. In that case, the antitrust counterclaim related to the plaintiff's knowing enforcement of an invalid patent, similar to the counterclaim the Court dismissed above, not a standard antitrust claim. The Federal Circuit found economy would be served by bifurcation because the validity of the patent would be adjudicated in the first trial, becoming law of the case for the antitrust counterclaim. *Innotron*, 800 F.2d at 1085. Additionally, the court found convenience would be served in trying the "less complex" patent issues first; expedition would be

-15-

served because the patent claims would be ready for trial before the antitrust claim; and confusion would be avoided because the antitrust counterclaim would require different proof and witnesses. *Innotron*, 800 F.2d at 1085.

None of these justifications for bifurcation are apparent in this case. Trying the patent infringement claims first would provide no law of the case to assist the antitrust trial. There is no evidence the patent issues will be less complex than the antitrust issues in this case; in fact, the contrary could very well be true. Likewise, there is no reason to believe the patent claims will be ready for trial first, since the case is currently set for trial in June 2004. If the case were bifurcated, the patent claims would be tried as scheduled and the antitrust counterclaim could not go to trial until sometime in 2005, causing great inconvenience to the parties and to this Court's docket. Finally, the Plaintiffs have not provided concrete examples of confusion that would result from different proof or witnesses. In fact, the record indicates many witnesses will overlap and several issues will require similar proof. Therefore, the Court finds convenience and expedition would not be served by bifurcating the trials and staying discovery, and bifurcation could result in prejudice to the Defendant and the public.

In accordance with the foregoing:

IT IS ORDERED that the Plaintiffs' Motion to Dismiss the Antitrust Counterclaims for Failure to State a Claim [#17] is GRANTED as to Count VI of the Counterclaim and Count V against the University of Texas, and DENIED as to Count V against 3D Systems, Inc.;

IT IS FURTHER ORDERED that if the Defendant wishes to replead its allegations of antitrust injury and relevant market in Count V, it may file an amended pleading within ten (10) days of the date of this Order;

-16-

IT IS FURTHER ORDERED that the Plaintiffs' Motion to Bifurcate and Stay Antitrust Counterclaims [#18] is DENIED;

IT IS FURTHER ORDERED that Plaintiffs' Request for Judicial Notice [#16] is GRANTED as unopposed;

IT IS FINALLY ORDERED that Plaintiffs' Second Request for Judicial Notice [#36] is DENIED in accordance with the Defendant's objections.

SIGNED this the 2ⁿᵈ day of July 2003.

SAM SPARKS
UNITED STATES DISTRICT JUDGE