**ORIGINAL**

**FILED**

**DEC 2 2003**

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
         DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| Board of Regents, The University of Texas System, and 3D Systems, Inc., § § § § Plaintiffs, § § v. § § EOS GmbH Electro Optical Systems, § § Defendant. § § § | Civil Action No. A03 CA 113SS |

## MOTION OF PLAINTIFFS BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, AND 3D SYSTEMS, INC. TO DISQUALIFY DEFENDANT EOS GmbH ELECTRO OPTICAL SYSTEMS' EXPERT WITNESS ALLAN J. LIGHTMAN

Plaintiffs Board of Regents, University of Texas System ("UT") and 3D Systems, Inc. ("3D Systems") hereby respectfully request that the Court (i) disqualify Defendant EOS GmbH Electro Optical Systems' ("EOS") expert witness Allan J. Lightman, Ph.D.; (ii) strike from the record Dr. Lightman's October 23, 2003 declaration, filed October 27, 2003, in support of EOS's Opening *Markman* Brief; (iii) order that all copies of materials Defendant has received from Dr. Lightman be returned to him, including electronic copies; and (iv) order that no further communications take place between Defendant or any of its representatives (including its attorneys) and Dr. Lightman on the subject matter of this case or the pending California litigation between Defendant and Plaintiff 3D Systems.

121

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION AND FACTUAL BACKGROUND | 1 |
| | A. The Midwest Litigation | 1 |
| | B. The California EOS Litigation | 3 |
| II. | DR. LIGHTMAN SHOULD BE DISQUALIFIED AS DEFENDANT'S EXPERT WITNESS. | 5 |
| | A. Dr. Lightman Should Be Disqualified From Acting as Defendant's Expert Because He Has, On Two Prior Occasions, Acted as an Expert For Plaintiff 3D Systems. | 6 |
| | B. Dr. Lightman Should Be Disqualified Because 3D Systems Was Objectively Reasonable In Concluding That It Had A Confidential Relationship with Dr. Lightman and Because He Both Received and Had Access to 3D Systems' Confidential Information. | 10 |
| |     1. 3D Systems and DTM Were Objectively Reasonable in Concluding that Their Relationship with Dr. Lightman Was a Confidential One. | 10 |
| |     2. Dr. Lightman Received and Had Reasonable Access to 3D Systems' Confidential or Privileged Information. | 12 |
| III. | CONCLUSION | 14 |

# TABLE OF AUTHORITIES

## CASES

*Conforti & Eisele, Inc. v. Dept. of Treasury*,
    405 A.2d 487 (N.J. Super. Ct. Law Div. 1979) ................................................................. 13

*Cordy v. Sherwin-Williams, Co.*,
    156 F.R.D. 575 (D.N.J. 1994) ............................................................................................... 7

*Healy v. Counts*,
    100 F.R.D. 493 (D. Co. 1984) ............................................................................................... 3

*Koch Refining Co. v. Jennifer L. Boudreaux MV*,
    85 F.3d 1178 (5th Cir. 1996) ................................................................................... 5, 6, 7, 10

*Marvin Lumber & Cedar Co. v. Norton Co.*,
    113 F.R.D. 588 (D. Miss. 1986) ......................................................................................... 6, 9

*Sporck v. Peil*,
    759 F.2d 312 (3d Cir.), *cert. denied*, 474 U.S. 903 (1985) .................................................... 8

## STATUTES

35 U.S.C. § 112 .............................................................................................................................. 5

## I.   INTRODUCTION AND FACTUAL BACKGROUND

Laser sintering was first commercialized in the early 1990s by DTM Corporation, a start-up company that began in Austin, Texas. DTM's laser sintering products were based upon research conducted in the late 1980s at UT, who patented and licensed that technology to DTM. In August 2001, DTM was acquired by and merged into 3D Systems. As a result, 3D Systems acquired all of DTM's patents, and by virtue of an agreement with UT, became the exclusive licensee for UT's laser sintering patents. Before appearing as EOS's expert in this case, Dr. Lightman was retained as an expert by 3D Systems and its predecessor DTM in two different cases, each of which have a substantial relationship to the instant case: the Midwest Litigation and the California EOS Litigation.

### A.   The Midwest Litigation

In 1996, DTM retained Dr. Lightman as an expert for a patent infringement case that DTM had filed against Midwest Composite Technologies, Inc., Midwest Fiberglass Supply, Inc., and Helmut Keidl (the "Midwest Litigation"). DTM accused the Midwest parties of infringing U.S. Patent No. 5,342,919 (the "'919 patent"), which covers certain laser-sinterable powders. (Cook Decl., ¶¶ 4-6 & Ex. B.)[1]

Dr. Lightman's work as an expert in the Midwest Litigation — totaling over 100 hours at a cost to DTM exceeding $30,000 (Lightman Depo. at 135:20-136:15 & Ex. 12)[2] — resulted in an initial Expert Witness Report and a Rebuttal Expert Witness Report. (*See* Lightman Depo. at

---

[1] The '919 patent was at the time owned by DTM, and is now owned by 3D Systems as a result of the DTM merger in August 2001. (Cook Decl., ¶ 5.)

[2] References to the November 17, 2003 deposition of Allan J. Lightman, Ph.D. ("Lightman Depo.") are included in Exhibit A to the Declaration of Philip E. Cook filed concurrently in support of this Motion.

124:16-22 & Ex. 9 [Expert Report]; 133:16-24 & Ex. 11 [Rebuttal Expert Report].) In those expert reports, Dr. Lightman opined that the Midwest parties infringed the '919 patent. He analyzed two types of nylon laser sintering powders the Midwest parties were using, and concluded that those powders met claim limitations that included, among others, "a bed of *laser-sinterable* powder . . ." and a "*laser sintered* article or 'part' of arbitrary shape *sintered* in a selective *laser sintering* machine . . . ." (Lightman Depo., Ex. 9 at p.1 [3D 374849], p. 4 [3D 374852]; emphasis added.) Thus, Dr. Lightman proffered for DTM an expert opinion that "plastics and polymers" are capable of "sintering," despite the fact that after initially being retained as an expert for DTM, he told DTM's attorneys that he did not believe the use of the term "sintering" as it was used in the '919 patent was consistent with the definition he was accustomed to. (Lightman Depo. at 130:4-21.)

Having changed sides as an expert, Dr. Lightman's October 23, 2003 Declaration on behalf of Defendant attacks claim language from one of the patents-in-suit, U.S. Patent No. 5,639,070 ("'070 patent"), which describes "a temperature below the sintering temperature." (Lightman Depo., Ex. 2.) In essence, he opines that one skilled in the art cannot determine the "sintering temperature" of a nylon powder because nylon (and other plastic or polymer materials) do not "sinter."[3] To explain the contradictions between his opinions in the Midwest Litigation and those he offers on Defendant's behalf here, Dr. Lightman claims he has always disagreed with the use of the term "sintering" as applied to laser sintering technology, even when working with DTM and its attorneys in the Midwest Litigation. (Lightman Depo. at 129:21-130:21.)[4]

---

[3] The irrelevance of this opinion to the question of patent invalidity for indefiniteness is addressed in Plaintiffs' November 20, 2003 Supplemental *Markman* Brief.

[4] This illustrates one of the primary problems that results when a party's expert switches sides, particularly when the expert offers an opinion for an opposing party on subject matter that

In short, Dr. Lightman's work in the Midwest Litigation and the opinion he has offered for Defendant here are plainly related.

### B. The California EOS Litigation

In May 2002, 3D Systems retained Dr. Lightman as a consulting expert for a patent infringement case against EOS, a case that to this day remains pending in California (the "California EOS Litigation"), and in which EOS is represented by the same lead counsel who represent EOS in the instant case.[5] EOS initiated the California EOS Litigation, suing DTM for infringing certain patents. (Cook Decl., ¶ 9.) Following the DTM merger, 3D Systems has defended the claims EOS brought against DTM, and itself asserted a counterclaim against EOS, accusing it of infringing U.S. Patent Nos. 5,990,268 (the "'268 patent") and 6,136,948 (the "'948 patent") by importing and selling its PA2200 and PA3200GF nylon laser sintering materials in the United States. (Graves Decl., ¶ 3 [attached as Ex. D to the Cook Decl.].) In large part because of Dr. Lightman's prior work for DTM in the Midwest Litigation, 3D Systems' then counsel of record in the California EOS Litigation contacted him in February 2002 to see if he would be qualified and willing to act as a consultant, and possibly an expert witness for 3D Systems. (Graves Decl., ¶¶ 3-4 & Ex. 1.)

---

(continued...)
is related to the work he previously performed for the party seeking disqualification. Plainly, since 3D Systems has retained Dr. Lightman as a testifying expert in the past, it will be prejudiced in now attacking Dr. Lightman's qualifications, credentials, methodology, or conclusions. *See, e.g., Healy v. Counts*, 100 F.R.D. 493, 496-97 (D. Co. 1984) (the side seeking disqualification of a "side switching" expert may be concerned with attacking the expert's qualifications or credentials because opposing counsel could rehabilitate the witness by showing that the expert had been previously retained by the side seeking disqualification). Here, for instance, Dr. Lightman tries to blame the inconsistency between his opinion for Defendant in this case and the one he rendered for DTM in the Midwest Litigation on DTM's attorneys and what he believes is an improper use of the term "sintering" in the '919 patent.

[5] EOS is represented by different *local* counsel in this case and the California EOS Litigation. (Cook Decl., ¶ 11.)

There is a substantial relationship between the matters for which Dr. Lightman was consulted by 3D Systems in the California EOS Litigation and his work for EOS in this litigation. The '268 and '948 patents are continuations-in-part of, and share the same common disclosures as the '919 patent that Dr. Lightman studied and analyzed in connection with his work for DTM in the Midwest Litigation. And, Dr. Lightman admits that the powder patents at issue in the Midwest Litigation and the California EOS Litigation, as well as his opinion on "sintering temperature" here, are all laser sintering material issues:

> Q: The question was did you discuss with anyone that represents EOS the difference between what you are doing in this case and what you may have done for 3D or DTM?
>
> MR. GANNON: Objection, vague.
>
> A. I explained to them that in the Midwest case, I had looked only at materials issues . . . .
>
> Q. The phrase that you have offered an opinion about, a temperature below the sintering temperature of the powder is a materials-related issue; is that correct?
>
> A. Yes.

(Lightman Depo. at 113:21-114:10.)

But the nexus between the subject matter of Dr. Lightman's prior work for DTM and 3D Systems and his current work as EOS's expert in this case involves more that just a substantial relationship. Dr. Lightman has been used by EOS's lead counsel here to obtain confidential and privileged information that is relevant *only* to EOS's infringement defense in the California EOS Litigation. The '268 patent that remains in suit in California claims a laser sintering powder with certain characteristics, including a thermal property called the "window of sinterability," which is measured with a Differential Scanning Calorimeter ("DSC") that displays traces or "curves" showing a material's thermal characteristics when it is heated or cooled. (Cook Decl., ¶ 12; *e.g.*,

Lightman Depo., Ex. 9 at 3D 374874 – 3D 374877 [DSC curves].) In the California EOS Litigation, EOS presented testimony from an expert witness and argued during June 2003 *Markman* proceedings that, based on that expert's review of DSC curves, the claim limitation "window of sinterability" in the '268 patent is incapable of construction and thus indefinite under 35 U.S.C. § 112. (Cook Decl., ¶ 13 & Ex. F.) Like Dr. Lightman here, EOS's expert in the California EOS Litigation claimed to be skilled in the art, yet professed confusion about how to read the patent's claims limitations, and particularly the limitation "window of sinterability" — which the patent's specification teaches can be measured with a DSC. (*Id.*)

Dr. Lightman went through portions of his Midwest Litigation file with EOS attorney Michael Gannon and showed him various records from that file. (Lightman Depo. at 9:12-12:9.) During part of that review, EOS's counsel discussed DSC curves with Dr. Lightman, and even obtained his views on the interpretation of DSC curves for various characteristics of laser sintering powders. (*Id.* at 11:20-12:9.) EOS's counsel also discussed with Dr. Lightman the terms "zone" (which relates to a claim limitation of the '919 patent) or "window" (which relates to the claim limitation of the '268 patent that EOS contends in the California EOS Litigation is indefinite). (*Id.* at 137:23-138:20.) These issues are not relevant here, but instead are related to EOS's invalidity challenge to 3D Systems' '268 patent in the California EOS Litigation.

## II.    DR. LIGHTMAN SHOULD BE DISQUALIFIED AS DEFENDANT'S EXPERT WITNESS.

Federal courts have the inherent power to disqualify expert witnesses. *Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996). The Fifth Circuit has held that when an expert witness has "switched sides," there is a "clear case for disqualification" of the expert. *Id.* Disqualification is required here because Dr. Lightman has been retained by 3D Systems and its predecessor DTM in the past, and his retention by Defendant here constitutes

switching sides. *See Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 590–91 (D. Miss. 1986) (disqualifying testing laboratory as defendant's expert witness where it had been engaged by plaintiff in the past and matters in the current case were "substantially related" to the prior work with plaintiff).

Even if Dr. Lightman's retention by Defendant is found not to constitute "switching sides" as a technical matter, disqualification is still required because (i) it was objectively reasonable for 3D Systems to believe that its confidential relationship with Dr. Lightman still existed; and (ii) while retained by 3D Systems, Dr. Lightman received or had reasonable access to 3D Systems' (and its predecessor's) confidential or privileged information. *Koch Refining Co.*, 85 F.3d at 1182.

### A. Dr. Lightman Should Be Disqualified From Acting as Defendant's Expert Because He Has, On Two Prior Occasions, Acted as an Expert For Plaintiff 3D Systems.

First, Dr. Lightman should be disqualified as Defendant's expert because he has switched sides. Dr. Lightman has twice been retained and provided services as an expert for 3D Systems and its predecessor. Despite this relationship, EOS has now retained him as an expert for EOS *against 3D Systems* in litigation on substantially similar issues. Simply put, switching sides is not permitted, *Marvin Lumber & Cedar Co.*, 113 F.R.D. at 590–91, and Dr. Lightman's disqualification on this ground alone is required. *Koch Refining Co.*, 85 F.3d at 1181.

It is clear now why Defendant filed its November 12, 2003 Motion for Protective Order and asked the Court to restrict those subjects upon which Plaintiffs could depose Dr. Lightman. At his November 17, 2003 deposition, Dr. Lightman admitted that he believed working for Defendant would present a conflict, and he even told EOS attorney Michael Baniak of this concern when he was first contacted regarding Defendant's interest in retaining him for this case. (Lightman Depo. at 103:16-24.) In fact, Dr. Lightman learned during that first conversation with

lead counsel for Defendant that the California EOS Litigation *was still pending*. (*Id.* at 104:25-105:13.)[6] Yet apart from being told that Dr. Lightman had formally terminated his relationship with 3D Systems two weeks earlier (*id.*, 103:22-104:2), EOS's counsel surprisingly did not ask about the nature of any ongoing confidentiality obligations he might have to 3D Systems, or any other information that might indicate Dr. Lightman would have a conflict working as an expert for Defendant. (*Id.* at 104:17-24; 149:5-150:5.)[7]

It is manifest that a conflict exists, and that Dr. Lightman has "switched sides," in light of Dr. Lightman's disclosure to EOS's counsel of confidential information and privileged work product relating to his work for 3D Systems in the California EOS Litigation (and before that for DTM in the Midwest Litigation). First, although Dr. Lightman claimed at his deposition that he had not had any conversations with EOS's counsel about the California EOS Litigation, he admitted that he does not know all of the issues involved in that case and thus would not have known if he was discussing a relevant issue. (*Id.* at 114:18-115:16.) For instance, Dr. Lightman admitted that he discussed DSC curves and "window" with EOS's counsel (*id.*, 11:20-12:9, 137:23-138:20), which are irrelevant to the issues in this case but forms the basis for EOS's attack on the validity of 3D Systems' '268 patent in the California EOS Litigation. (Cook Decl.,

---

[6] If Dr. Lightman was confused and believed there was only one case between EOS and 3D Systems (Lightman Depo. at 8:17-9:5), his belief that there was a possible conflict should have been explored further — with 3D Systems' counsel.

[7] Because Dr. Lightman has had no legal training (Lightman Depo. at 150:6-7), and his representation to EOS's counsel that he had not received any confidential information was limited in Dr. Lightman's view to *technical* information (Lightman Depo. at 123:15-124:1), it was incumbent on EOS's counsel to make sure — before retaining Dr. Lightman — that he did not in fact have a conflict, and had not received privileged work product during the course of his engagement as a consultant for Defendant's adversary, 3D Systems, in the California EOS Litigation. *Cordy v. Sherwin-Williams, Co.*, 156 F.R.D. 575, 584 (D.N.J. 1994) (disqualifying defense counsel for hiring plaintiff's former expert and failing to discover the "nature of the relationship" between expert and plaintiff); *see, e.g. Koch Refining Co.*, 85 F.3d at 1181 (describing confidential information broadly as including discussions of the retaining party's strategies in the litigation, the kinds of experts the retaining party expects to retain, the retaining party's views of the strengths and weaknesses of each side, and anticipated defenses).

¶ 12.) Further, Dr. Lightman's handwritten notes of a conversation he had with EOS attorney Andrew Pratt lists the '919, '268, and '948 powder patents. (*Id.* at 107:4-17.) Why those patents were even mentioned by Mr. Pratt is unclear, but it shows that even EOS's counsel recognized some relationship between Dr. Lightman's work on those powder patents and the work he is doing for Defendant here.[8]

Dr. Lightman has also shared with EOS's counsel privileged and undisclosed work product from the California EOS Litigation and the Midwest Litigation. For instance, he gave to EOS's counsel copies of patents that had been provided for his review by 3D Systems' counsel in the California EOS Litigation. EOS attorney Michael Gannon showed up at Dr. Lightman's November 17, 2003 deposition with those two patents in his possession. (*Id.* at 82:16-19, 84:8; *see also id.* at 144:15-19 (Mr. Gannon: the documents are "in our possession"), 146:22 (Mr. Gannon: "I produced the documents").) This disclosure to EOS's lead counsel — that the patents were provided to Dr. Lightman by 3D Systems' counsel in the California EOS Litigation — is both privileged work product, and confidential information under the terms of Dr. Lightman's retainer agreement. *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir.), *cert. denied*, 474 U.S. 903 (1985) (documents which evidence the selection, organization and marshalling of material by counsel in preparation for litigation constitute opinion work product subject to "almost absolute protection"). Even more alarming is Dr. Lightman's admission that he has shown to Mr. Gannon his file copy of the '919 patent and discussed that patent with him in

---

[8] Dr. Lightman claims that Mr. Pratt *only* mentioned the patent numbers and stated that these are the powder patents, which Dr. Lightman seems to have then dutifully recorded. (Lightman Depo. at 107:13-17; Cook Decl., ¶ 16, Ex. H.) However, Dr. Lightman's timekeeping records show that on October 22, 2003 — only *three days* before he signed the declaration that EOS submitted in this case — he had two ½ hour conversations with Mr. Pratt. (Cook Decl., ¶ 17, Ex. I.) So, even if it were credible that these patent numbers were simply stated to Dr. Lightman by EOS's counsel and nothing more, there plainly was no reason for EOS's counsel to have even mentioned them, or for Dr. Lightman to have written them down, unless they were somehow relevant to their discussion.

connection with his work for EOS in this case. (Lightman Depo. at 10:6-23; 114:11-17 (in going through his Midwest Litigation expert reports, EOS's counsel "kept asking me why I was keyed on the issue of sintering temperature").) Dr. Lightman's copy of the '919 patent (Cook Decl., ¶ 6, Ex. B), which was never disclosed during the course of the Midwest Litigation and remained confidential until it was shown to EOS's counsel here, has extensive highlighting and marginalia.

Finally, EOS has indicated its intent, pursuant to the terms of the October 16, 2003 Protective Order in this case, to provide Dr. Lightman with Classified Information produced by 3D Systems in this case, including both "CONFIDENTIAL" and "CONFIDENTIAL – ATTORNEY'S EYES ONLY" information. (Cook Decl., ¶ 18 & Ex. J.) By virtue of an agreement between the parties, that disclosure would extend to documents produced as confidential under the protective order in the California EOS Litigation. (*Id.*) Although Plaintiffs have timely objected to Dr. Lightman's receipt of any such confidential information (and under the terms of the Protective Order, Defendant is not permitted to disclose any without an order from the Court), 3D Systems now finds itself in the untenable position of possibly having its former expert being given access to 3D Systems' own confidential information as he works as an expert for EOS and its counsel both in this case *and* the California EOS Litigation.

In sum, because Dr. Lightman has on two separate occasions been retained as an expert by 3D Systems (or its predecessor DTM) on issues that are substantially related to those in this case for which he has now offered an opinion for Defendant, Dr. Lightman has switched sides and must be disqualified. *Marvin Lumber & Cedar Co.*, 113 F.R.D. at 591 (disqualifying defendant's expert due to a series of interactions with plaintiff which "have more than likely coalesced to create a basic understanding of plaintiff's modus operandi, patterns of operation, decision-making processes and the like.")

**B.    Dr. Lightman Should Be Disqualified Because 3D Systems Was Objectively Reasonable In Concluding That It Had A Confidential Relationship with Dr. Lightman and Because He Both Received and Had Access to 3D Systems' Confidential Information.**

Even if the Court were to find that Dr. Lightman was not a side-switching expert, Dr. Lightman must still be disqualified. Under the Fifth Circuit's two-prong test, an expert must be disqualified if: (i) it was objectively reasonable for the party seeking disqualification to conclude that a confidential relationship existed with the expert; and (ii) the expert received or had reasonable access to that party's confidential or privileged information. *Koch Refining Co.*, 85 F.3d at 1181. Both prongs of this test are met here.

**1.    3D Systems and DTM Were Objectively Reasonable in Concluding that Their Relationship with Dr. Lightman Was a Confidential One.**

In the Midwest Litigation, none of the confidential information and work product Dr. Lightman obtained from DTM's attorneys and employees during the course of his work on that case was ever disclosed. Although Dr. Lightman did submit expert reports, he never testified at a deposition or at trial (Cook Decl., ¶ 8), and the confidentiality of the information and work product he received was thus maintained. *Koch Refining Co.*, 85 F.3d at 1181. (disqualifying testifying expert because, although he was designated as a testifying expert, he was never deposed nor did he testify at trial). Thus, DTM — and 3D Systems after it acquired DTM and engaged Dr. Lightman in the California EOS Litigation — had reason to expect that the confidential information and work product provided to Dr. Lightman in connection with the Midwest Litigation would remain confidential.

In the California EOS Litigation, the first conversation Dr. Lightman had with 3D Systems' counsel was expressly premised on an expectation of confidentiality. (Graves Decl., ¶¶ 5-6.) After two separate conversations with 3D Systems' counsel (*id.* ¶ 5), Dr. Lightman agreed to act as a consultant for 3D Systems in the California EOS Litigation, and was sent a

draft retainer agreement. (Lightman Depo. at 140:2-18 & Ex. 13; Graves Decl., ¶ 11 & Ex. 3.) Apparently concerned about restrictions on using *technical* information he might learn as 3D Systems' consultant, Dr. Lightman proposed alternative language that addressed such technical information (Lightman Depo. at 117:24-118:15, 139:23-141:18; Graves Decl., ¶ 11 & Ex. 4), and his proposed language was incorporated into the final retainer agreement, which was dated May 24, 2002 and signed by Dr. Lightman on May 28, 2002. (Lightman Depo., Ex. 7.) Notably, what Dr. Lightman did not propose changing in this provision was his promise to keep "*strictly confidential*" anything he learned from 3D Systems' attorneys.[9] In short, Dr. Lightman's written retainer agreement establishes that a confidential relationship had been created: "anything that we say to you, that you say to us, or that you learn from anyone else is to remain strictly confidential." (*Id.*)

Moreover, none of the confidential information or work product that was provided to Dr. Lightman by 3D Systems' counsel of record, or even the fact that such information was provided, was ever disclosed during the course of the California EOS Litigation; Dr. Lightman was not disclosed as an expert, did not submit an expert report, and was never deposed. (Cook Decl., ¶ 14.) Thus, 3D Systems had reason to expect that the confidential information and privileged work product provided to Dr. Lightman in connection with the California EOS Litigation would remain confidential.

---

[9] *See* Lightman Depo. at 140:19-141:18 (Q: "Let me read from the original draft [of Dr. Lightman's original retention letter]." Q: "As noted above, you have been retained in order to assist with litigation. In that capacity, anything we say to you that you say to us or that you learn from anyone else is to remain strictly confidential. Any documents provided to you during the course of your consultation are also to be kept confidential and shall be returned to the law firm at the conclusion of the consultation." A: "Yes." Q: "When you revised this language, you did not change the first two sentences of that agreement, correct, of the initial draft?" A: "I didn't change them." Q: "So you didn't have any problem with the portion of your agreement that anything that was told you or that you learned from anyone else was to remain strictly confidential?" A: "Subject to the provisions that I inserted." Q: "Which related, as you have indicated, to technical information?" A: "Yes.") (attorney comments omitted).

## 2. Dr. Lightman Received and Had Reasonable Access to 3D Systems' Confidential or Privileged Information.

There can be little doubt that Dr. Lightman received confidential information and undisclosed work product from DTM relating to the Midwest Litigation during his three years as an expert in that case. Although Dr. Lightman testified that all of the opinions he expressed in the Midwest Litigation were independently formulated, he also admitted that he did work with DTM's attorneys in framing those opinions. (Lightman Depo. at 127:15-129:19.) In fact, Dr. Lightman's timekeeping records from his work on the Midwest Litigation that he produced to 3D Systems at his deposition show that he spent over 19 hours meeting with and discussing the case with DTM's attorneys and its employees, reviewing litigation materials sent to him by DTM's attorneys (separate from and in addition to his review of technical references, test results, and the Midwest parties' expert report), and even preparing questions for DTM's attorneys to ask the Midwest parties' experts during their depositions. (Cook Decl., ¶ 7, Ex. C.) All of this information was privileged and confidential, at least until EOS retained Dr. Lightman here.

Dr. Lightman also received confidential information and undisclosed work product from 3D Systems relating to the California EOS Litigation when he was retained as an expert consultant. In conversations that took place in early March 2002 (Graves Decl., ¶ 5), Dr. Lightman was told by 3D Systems' counsel what he thought were (a) the most important characteristics of EOS's laser sintering powder, including those pertinent to the claim limitations of the '268 and '948 patents-in-suit; and (b) the most important claims-at-issue from the '268 and '948 patents being asserted against EOS. (*Id.*, ¶ 7.) Dr. Lightman was also told about test results on the accused EOS laser sintering powders that had been performed to measure their characteristics. (*Id.*, ¶ 9.) And Dr. Lightman was told what 3D Systems' counsel thought were

the strengths of 3D Systems' infringement claims against EOS for its importation and sale of nylon powders in the United States. (*Id.*, ¶ 10.)[10]

At deposition, Dr. Lightman admitted that he was told certain things about the California EOS Litigation by 3D Systems' counsel. (Lightman Depo. at 119:11-19.) However, he denied being told anything about test results on EOS's nylon powders (*id.* at 120:16-25), and claimed *he did not even know EOS had brought nylon powders into the United States*, even though that was the basis for the California EOS Litigation. (*Id.* at 121:9-18.) But the one page of notes from Dr. Lightman's California EOS Litigation file that appears to relate to at least one of these conversations with 3D Systems' counsel includes the following notations that show otherwise:

> 3D countersuit regarding use of nylon in sintering
> EOS PA2200, PA3200 are the focus

(Cook Decl., Ex. ¶ 16, Ex. H.) Dr. Lightman seems to have forgotten about being told of EOS's importation and sale of laser sintering powders. Other testimony shows that, in fact, he did not recall much about his conversations with 3D Systems' counsel.[11] For instance, Dr. Lightman did not remember discussing with 3D Systems' counsel whether he had been in contact with EOS, yet that subject is expressly identified in the May 24, 2002 retainer agreement as having been

---

[10] Dr. Lightman only terminated his consulting relationship with 3D Systems in the California EOS Litigation in July 2003 — a mere two weeks before he first was contacted by EOS's counsel regarding the instant case. (Lightman Depo. at 122:6-23 & Ex. 8.) Although Dr. Lightman's termination letter recites that he had not received any confidential information from 3D Systems' counsel, those statements were expressly limited to *technical* information. (*See id.*, Ex. 8 ("there is no written technical information relevant to the terms of my consulting agreement;" "there are no orally transmitted technical details that fall within the scope of confidentiality"); *see also id.* at 123:15-124:1, 124:11-15 (Q: "So your understanding was that the scope of confidentiality that you were bound by under your prior arrangement dealt with written or orally transmitted technical details, correct?" A: "Yes.").

[11] Whether Dr. Lightman consciously remembers these conversations is irrelevant to the disqualification issue. *Conforti & Eisele, Inc. v. Dept. of Treasury*, 405 A.2d 487, 492 (N.J. Super. Ct. Law Div. 1979) (stating that even if the side switching expert does not specifically disclose defendant's confidential information to plaintiff, the plaintiff would still obtain the benefit of the confidential information because it would "shape or effect, either consciously or unconsciously" the information provided to plaintiff).

part of their conversations. (Lightman Depo. at 117:3-14 & Ex. 7.) Apart from any notes he might have made, Dr. Lightman testified that he had no recollection of when he spoke with 3D Systems' counsel, or whether counsel had conducted an interview of him. (*Id.* at 117:15-23, 118:16-18.)

All of the information Dr. Lightman learned from 3D Systems' counsel when he was interviewed and hired as an expert consultant for the California EOS Litigation was privileged and confidential, and thus Dr. Lightman received and had access to 3D Systems' (and before that DTM's) confidential or privileged information.

## III.    CONCLUSION

For each of the reasons set forth above, Plaintiffs UT and 3D Systems respectfully request that the Court (i) disqualify defendant EOS's expert witness Allan J. Lightman, Ph.D.; (ii) strike from the record his October 23, 2003 declaration filed in support of EOS's Opening *Markman* Brief; (iii) order that all copies of materials Defendant or any of its representatives (including its attorneys) have received from Dr. Lightman be returned to him, including electronic copies; and (iv) order that no further communications take place between Defendant or any of its representatives (including its attorneys) and Dr. Lightman on the subject matter of this case or the California EOS Litigation.

## CERTIFICATE OF CONFERENCE

The parties have conferred and the defendant opposes this Motion.

Dated: December 2, 2003

*Philip E. Cook, by permission*
PHILIP E. COOK (admitted *pro hac vice*) *Elizabeth J.*
Calif. State Bar No. 149067                    *Brown Fore*
ROBERT W. DICKERSON (admitted *pro hac vice*)
Calif. State Bar No. 89367
JONES DAY
555 West Fifth Street, Suite 4600
Los Angeles, CA 90013-1025
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

ALAN D ALBRIGHT
Federal Bar No. 13048
Texas State Bar No. 00973650
ELIZABETH J. BROWN FORE
Texas State Bar No. 24001795
GRAY, CARY, WARE & FREIDENRICH LLP
1221 South MoPac Expressway, Suite 400
Austin, TX 78746-6875
Telephone: (512) 457-7000
Facsimile: (512) 457-7001

Attorneys for Plaintiffs
BOARD OF REGENTS, THE
UNIVERSITY OF TEXAS SYSTEM,
and 3D SYSTEMS, INC.

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing document was sent to the following counsel of record on this 2nd day of December, 2003 in the following manner:

| | |
|---|---|
| Thomas H. Watkins<br>Albert A. Carrion, Jr.<br>BROWN MCCARROLL LLP<br>98 San Jacinto Boulevard<br>San Jacinto Center, Suite 1300<br>Austin, Texas 78701<br>(512)476-4716<br>(512) 476-5139 Facsimile | *Via United States Mail* |
| Michael H. Baniak<br>Michael D. Gannon<br>Andrew F. Pratt<br>BANIAK PINE & GANNON<br>150 N. Wacker Drive, Suite 1200<br>Chicago, Illinois 60606<br>(312) 673-0360<br>(312) 673-0361 Facsimile | *Via Overnight Delivery* |

Attorneys for Defendant
EOS GMBH ELECTRO OPTICAL SYSTEMS

_____
ELIZABETH J. BROWN FORE