**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

**DEC 3 1 2003**

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| Board of Regents, The University of Texas System, and 3D Systems, Inc., | § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. A03 CA 113SS |
| EOS GmbH Electro Optical Systems, | § § | |
| Defendant. | § § § | |

## MOTION OF PLAINTIFFS BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM AND 3D SYSTEMS, INC. FOR SUMMARY JUDGMENT ON EOS'S THIRD AFFIRMATIVE DEFENSE OF EXPRESS LICENSE

Plaintiffs Board of Regents, University of Texas ("UT") and 3D Systems, Inc. ("3D Systems") hereby respectfully request that, pursuant to Federal Rule of Civil Procedure 56, the Court grant summary judgment on the third affirmative defense of express license asserted by defendant EOS GmbH Electro Optical Systems ("EOS"). Plaintiffs also respectfully request a hearing on this motion.

157

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................ 1

    A.    The Rise of Rapid Prototyping and Manufacturing ................................. 1

    B.    The UT Patents ........................................................................................ 2

    C.    3D Systems' Patent Portfolio .................................................................. 3

    D.    European Infringement Actions Against EOS .......................................... 3

    E.    Settlement of 3D Systems' Infringement Claims Against EOS ............... 3

    F.    The License Agreement ........................................................................... 4

    G.    3D Systems' Merger With DTM .............................................................. 5

    H.    The Instant Motion .................................................................................. 5

III.  SUMMARY JUDGMENT STANDARDS ..................................................... 6

IV.   THERE IS NO GENUINE ISSUE AS TO WHETHER EOS IS LICENSED TO
     THE UT PATENTS ...................................................................................... 7

    A.    The Intentions of the Parties, as Gathered From the Four Corners of the
        License Agreement, Establish that EOS Is Not Licensed to the UT Patents ........ 8

        1.    The Phrase "Issue To" Refers to the PTO's Initial Creation of
            Patent Rights in an Inventor or the Inventor's Assignee .......................... 8

        2.    The Clear Meaning of the Term "Issue To" Dictates that
            Section 1.1(b) of the License Agreement Must Be Construed to
            Mean EOS Has a License Only to Future Patents "Issued To"
            3D Systems from the PTO — Not Those "Licensed To" 3D
            Systems ........................................................................................ 10

    B.    The License Agreement Is Not Reasonably Susceptible To Any
        Interpretation That Extends EOS's License To The UT Patents ....................... 12

        1.    The Parol Evidence Rule Bars the Use of Extrinsic Evidence to
            Change or Alter the Terms of the License Agreement .......................... 12

        2.    The Term "Issue To" Is Not Reasonably Susceptible To Any
            Interpretation That Would Extend EOS's License To The UT
            Patents ........................................................................................ 13

    C.    The Objective Manifestations of the Parties' Intentions Further Confirm
        That EOS Is Not Licensed To The UT Patents ..................................................... 16

        1.    The Circumstances at the Time of Contracting Show Why EOS
            Obtained a License to Future Patents that "Issue To" 3D Systems ......... 16

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.    The Object, Nature and Subject Matter of the License Agreement Show Why EOS Obtained a License to Future Patents that Were to "Issue To" 3D Systems ........................................................................... 16

3.    EOS's Subsequent Conduct Belies Its Claim That Future Patents Include the UT Patents........................................................................... 17

V.    CONCLUSION................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alling v. Universal Mfg. Corp.,*
  5 Cal. App. 4th 1412 (1992) ........................................................................... 13

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..................................................................................... 6, 7

*Avia Group Intern., Inc. v. LA Gear California, Inc.,*
  853 F.2d 1557 (1988)........................................................................................ 7

*Banco Do Brasil, S.A. v. Latian, Inc.,*
  234 Cal. App. 3d 973 (1991) ...................................................................... 13, 14

*Bank of the West v. Superior Court,*
  2 Cal. 4th 1254 (1992) ..................................................................................... 7

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)..................................................................................... 6, 7

*City of Manhattan Beach v. Superior Court,*
  13 Cal. 4th 232 (1996) ............................................................................... 7, 10

*Cold Metal Prods. Co. v. Crucible Steel Co.,*
  126 F. Supp. 546 (D. N.J. 1954) .................................................................... 10

*Continental Heller Corp. v. Amtech Mechanical Servs., Inc.,*
  53 Cal. App. 4th 500 (1997) ........................................................................... 11

*Copeman Laboratories Co. v. General Motors Corp.,*
  36 F. Supp. 755 (E.D. Mich. 1941)................................................................ 10

*CQL Original Products, Inc. v. National Hockey Players' Association,*
  39 Cal. App. 4th 1347 (1995) ......................................................................... 11

*Crestview Cemetery Ass'n v. Dieden,*
  54 Cal. 2d 753 (1960) ..................................................................................... 17

*Estate of Klauenberg,*
  32 Cal. App. 3d 1067 (1973) .......................................................................... 14

*Ferris v. Commissioner of Int. Rev.,*
  1968 WL 1293 (Tax Ct. 1968)....................................................................... 10

*Hernandez v. Badger Constr. Equip. Co.,*
  28 Cal. App. 4th 1791 (1994) ............................................................... 14, 17, 18

*Hilleary v. Garvin,*
  193 Cal. App. 3d 322 (1987) .......................................................................... 14

## TABLE OF AUTHORITIES
(continued)

Page

*In re Cox Estate,*
 8 Cal. App. 3d 168 (1970) ................................................................................................ 11

*Kennecott Corp. v. Union Oil Co.,*
 196 Cal. App. 3d 1179 (1987) ....................................................................................... 17, 18

*Lathrop v. Rice & Adams Corp.,*
 17 F. Supp. 622 (W.D.N.Y. 1936) ................................................................................ 10

*Lucent Technologies, Inc. v. Newbridge Networks Corp.,*
 168 F. Supp. 2d 181 (D. Del. 2001) ............................................................................... 5

*Machado v. Southern Pac. Transp. Co.,*
 233 Cal. App. 3d 347 (1991) ........................................................................................... 7

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
 475 U.S. 574 (1986) ..................................................................................................... 6, 7

*Merck & Co. v. Smith,*
 261 F.2d 162 (3d Cir. 1958) .......................................................................................... 10

*Morey v. Vannucci,*
 64 Cal. App. 4th 904 (1998) ................................................................................. 13, 14, 16

*Pacific Gas & Elec. Co. v. Zuckerman,*
 189 Cal. App. 3d 1113 (1987) ....................................................................................... 13

*Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,*
 69 Cal. 2d 33 (1968) ....................................................................................................... 13

*Parsons v. Bristol Development Co.,*
 62 Cal. 2d 861 (1965) ....................................................................................................... 7

*Phillips Petroleum Co. v. U. S. Steel Corp.,*
 566 F. Supp. 1093 (D. Del. 1983) ................................................................................. 10

*Price v. Wells Fargo Bank,*
 213 Cal. App. 3d 465 (1989) ........................................................................................... 13

*Rockwell Int'l Corp. v. United States,*
 31 Fed. Cl. 70 (1994) ..................................................................................................... 10

*Ross v. Communications Satellite Corp.,*
 759 F.2d 355 (4th Cir. 1985) ........................................................................................... 7

*Salas v. Carpenter,*
 980 F.2d 299 (5th Cir. 1992) ........................................................................................... 6

## TABLE OF AUTHORITIES
(continued)

Page

*Sharlin v. Superior Court,*
    9 Cal. App. 4th 162 (1992) ................................................................ 11

*Shaw v. Regents of University of Cal.,*
    58 Cal. App. 4th 44 (1997) .............................................................. 7, 14

*Syndia Corp. v. Lemelson Med.,*
    165 F. Supp. 2d 728 (N.D. Ill. 2001) ................................................ 10

*Tollefson v. Roman Catholic Bishops,*
    219 Cal. App. 3d 843 (1990) ............................................................ 13

*Universal Sales Corp. v. California Press Mfg. Co.,*
    20 Cal.2d 751 (1942) ........................................................................ 17

*Western Med. Enterp., Inc. v. Albers,*
    166 Cal. App. 3d 383 (1985) ............................................................ 17

*Zurich General Accid. & Liability Assurance Co. v. Industrial Accid. Comm'n,*
    132 Cal. App. 101 (1933) .................................................................. 14

**Statutes**

35 U.S.C. § 152 ........................................................................................ 9

35 U.S.C. § 153 ........................................................................................ 8

35 U.S.C. § 154(a)(2) ............................................................................ 8, 9

35 U.S.C. § 287 ...................................................................................... 18

37 C.F.R. § 3.81 ....................................................................................... 9

Cal. Civ. Code § 1635 ............................................................................ 14

Cal. Civ. Code § 1641 ............................................................................ 12

Cal. Civ. Code § 1645 ............................................................................ 11

Cal. Civ. Code § 1656 ............................................................................ 14

Cal. Civ. Proc. Code § 1856(a) .............................................................. 13

Cal. Civ. Proc. Code § 1859 .................................................................. 14

Cal. Civ. Proc. Code § 1860 .................................................................. 14

Cal. Civ. Proc. Code § 1861 .................................................................. 14

Cal. Civ. Proc. Code § 1864 .................................................................. 14

Fed. R. Civ. P. 56(c) ............................................................................. 6, 7

## TABLE OF AUTHORITIES
(continued)

Page

Fed. R. Civ. P. 56(e) ................................................................................................................ 6

**Other Authorities**

1 B. Witkin, SUMMARY OF CAL. LAW, "Contracts," § 119 at 144 (9th ed. 1987) ....................... 14

1 Witkin, SUMMARY OF CAL. LAW, "Contracts,"
   §§ 688-689 at 621 (9th ed. 1987).......................................................................................... 14

2 B. Witkin, CALIFORNIA EVIDENCE, § 963 at 911 (3d ed. 1986)................................................. 13

2 Witkin, CAL. EVIDENCE, "Documentary Evidence," §§ 960 at 908 (3d ed. 1986)..................... 13

MANUAL OF PATENT EXAMINING PROCEDURE § 307 ................................................................... 10

REST.2D CONTRACTS, § 209(1) ................................................................................................... 13

## I.    INTRODUCTION

On August 27, 1997, EOS and 3D Systems entered into a License Agreement that gave

EOS a license to two categories of patents: (1) patents that were "owned by" 3D Systems at the

time of the agreement, on August 27, 1997; and (2) patents that might "issue to" 3D Systems on

applications filed (or applications entitled to a priority filing date) before August 20, 2002.

Here, EOS in its third affirmative defense claims that its license with 3D Systems extends

to the two University of Texas ("UT") patents-in-suit — U.S. Patent Nos. 5,639,070 (the "'070

patent") and 5,597,589 (the "'589 patent"). However, the patents-in-suit issued to UT, and not

3D Systems. Since being issued, the patents-in-suit have been owned by UT, and not 3D

Systems. UT simply licensed the patents-in-suit exclusively to 3D Systems in August 2001,

together with other UT laser sintering patents. Thus, as a matter of law, the License Agreement

cannot extend to the patents-in-suit, which never "issued to" 3D Systems.

Because there is no genuine issue of material fact raised by EOS's third affirmative

defense of express license, UT and 3D Systems bring this motion asking the Court to enter

summary judgment on that defense.

## II.    STATEMENT OF FACTS

### A.    <u>The Rise of Rapid Prototyping and Manufacturing</u>

Although there are various rapid prototyping technologies, most start with computer-

assisted design (or "CAD") files created on a computer and use that data to create a physical,

three-dimensional part. (Ervin Decl. [Ex. 1], ¶ 4.) Two leading methods for rapid prototyping

are laser sintering and stereolithography. Laser sintering was developed and commercialized by

Austin-based DTM Corporation ("DTM") based in large part on research conducted at UT.[1]

Stereolithography was pioneered by 3D Systems in the mid- to late 1980s.[2]

Benefiting from the pioneering work of UT and DTM, EOS began a laser sintering

business from its headquarters in Germany (using the label "EOSint"), selling its first EOSint

laser sintering machine in Europe in 1994. (Ex. 2 [Langer Depo.] at 564:13-18; Ervin Decl.

[Ex. 1], ¶ 5.) EOS similarly used the pioneering efforts of 3D Systems and began a

stereolithography business (using the label "STEREOS"), selling its first STEREOS

stereolithography machine in Europe in 1991. (Ex. 2 [Langer Depo.] at 563:4-14, 563:24-

564:10.)

**B.    The UT Patents**

Since the late 1980s, UT has built a portfolio of patents in the art of laser sintering (the

"UT Patents"). Of those UT Patents-in-suit, the '589 patent issued to UT on January 28, 1997;

the '070 patent issued to UT on June 17, 1997. (Exs. 3 & 4.) UT licensed the UT Patents

exclusively to DTM pursuant to a license agreement dated December 3, 1987,[3] but retained

ownership of the patents. UT still owns the patents. (Ex. 5 [*filed under seal*].)

---

[1] Laser sintering uses an "additive" process to build parts layer-by-layer, using a solid powder as a build material, which is fused when the heat energy of a carbon-dioxide laser scans the surface of the powder and causes at least the surface of the powder particles to melt and adhere to each other (as well as adhering that layer to the portions of the part below that have already been fused).

[2] Stereolithography also uses an "additive" manufacturing process that builds parts, layer-by-layer, but uses a liquid resin build material that forms each new layer of a part when the resin cures, or hardens, at locations that are exposed to a laser beam. The curing occurs because the resins are photosensitive or photocurable, forming polymers (or chains of molecules) when exposed to certain frequencies of laser energy in the ultraviolet spectrum.

[3] UT entered into the December 3, 1987 license agreement with DTM's predecessor, Nova Automation Corporation. (Ex. 5.)

### C.    3D Systems' Patent Portfolio

Through 1997, 3D Systems' business was limited to stereolithography, and it did not sell

products in the field of laser sintering. (Alpert Decl. [Ex. 6], ¶ 2.) From the mid- to late 1980s

when 3D Systems was started through the mid-1990s, it aggressively prosecuted and was issued

a large portfolio of patents that arose from its stereolithography business (the "Stereolithography

Patents"). (Ervin Decl. [Ex. 1], ¶ 4; Alpert Decl. [Ex. 6],¶ 2.)

### D.    European Infringement Actions Against EOS

In the mid-1990s, EOS was sued repeatedly by DTM for infringement of the UT Patents

(by EOS's laser sintering products), and by 3D Systems for infringement of the

Stereolithography Patents (by EOS's stereolithography products). (Alpert Decl. [Ex. 6], ¶ 3;

Ervin Decl. [Ex. 1], ¶ 6.) DTM brought actions against EOS in French, German, and Italian

courts. (Ervin Decl. [Ex. 1], ¶ 6.) 3D Systems brought actions against EOS in French and

German courts, as well as the German and European Patent Offices. (Alpert Decl. [Ex. 6], ¶ 3.)[4]

### E.    Settlement of 3D Systems' Infringement Claims Against EOS

From December 1996 through August 1997, EOS and 3D Systems negotiated a possible

resolution of 3D Systems' then-pending claims against EOS. On August 27, 1997, EOS and 3D

Systems entered into three separate but related agreements: (1) a Settlement, Purchase and

Transfer Agreement ("Settlement Agreement"); (2) the License Agreement; and (3) a Non-

Competition Agreement.

In the Settlement Agreement, EOS admitted it had infringed certain 3D Systems patents.

(Ex. 7 [Settlement Agr.], art. 1.) EOS also transferred to 3D Systems its entire stereolithography

business (*id.*, art. 2), and agreed not to compete with 3D Systems in the stereolithography field

---

[4] At this time, there was no affiliation between DTM or UT and 3D Systems.

for five years. (*Id.*, § 2.7.) EOS and 3D Systems also agreed to enter into a *separate*

license agreement, and made clear that the terms of that *separate* license agreement would

prevail over any inconsistent terms in the Settlement Agreement. (*Id.*, art. 5.)[5] In the Non-

Competition Agreement, 3D Systems agreed not to engage in the laser sintering business for a

period of three years. (Ex. 8 [Non-Competition Agr.].)

### F.    The License Agreement

In the License Agreement, EOS obtained certain rights to the Stereolithography Patents,

but only to the extent they applied to the field of laser sintering.[6] Section 1.1 of the License

Agreement, which is found in the "DEFINITIONS" section of the agreement, provides that

> Licensed Patents shall mean the following patents to the extent and
> only to the extent, applicable to the field of Laser Sintering:
>
> a)    All U.S. and foreign patents, including reissued and
> reexamined patents and utility models *owned by* LICENSOR
> [3D Systems] as of the effective date of this Agreement, and all
> patents and utility models assigned from EOS to 3D Systems; and
>
> b)    U.S. and foreign patents and utility models, which
> may *issue to* LICENSOR [3D Systems] on patent and utility model
> applications filed prior to August 20, 2002, or filed subsequent
> thereto, but receiving, or entitled to receive, the benefit of a filing
> date prior to August 20, 2002, including any patents of addition
> and utility models, and further including any extensions, renewals,
> continuations, reexaminations, and/or reissues thereof.

(Ex. 9, § 1.1 (emphasis added).) In other words, the patents that were licensed to EOS — to the

extent they apply to the field of laser sintering — were (1) those "owned by" 3D Systems as of

August 27, 1997 (the "Existing Patents"), and (2) those which "issue to" 3D Systems "on . . .

---

[5]  Article 5 expressly provided that "[a]ny inconsistency between this Art. 5 and the terms of the License Agreement shall be resolved in favor of the License Agreement." *Id.*

[6]  The parties defined "Laser Sintering" to mean "apparatus, methods and supplies for producing three-dimensional objects, layer-by-layer, from (a) coated or uncoated powders not contained within a solidifiable fluid, through sintering by a laser or other heat source, (b) dry polymer-coated powders, through curing by an IR laser or other heat source, and (c) coated or uncoated powders in a mixture with a liquid, in which the liquid is no greater than 15 percent of

applications" filed (or entitled to a priority filing date) before August 20, 2002 (the "Future Patents"). The parties also agreed the License Agreement "embodie[d] the entire understanding of the Parties" and "supercede[d] all previous communications, representations or undertakings, either verbal or written between the Parties relating to the subject matter hereof." (Ex. 9, § 8.2.) It also contained a choice of law clause providing it would be governed and interpreted in accordance with California substantive law. (*Id.*, § 8.6.)

G.     **3D Systems' Merger With DTM**

On August 31, 2001, more than a year after the expiration of the three-year non-compete period under the Non-Competition Agreement, 3D Systems merged with DTM. 3D Systems paid over $46 million in the transaction, and acquired a substantial portfolio of patents owned by DTM (the "DTM Patents").[7]  In contrast to 3D Systems' acquisition of the DTM Patents, the UT Patents were *merely licensed* by UT to DTM, and could not be assigned without UT's consent. (Ex. 5.)  UT consented to the assignment to 3D Systems of the license to the UT Patents on August 30, 2001. (Ex. 10.)

H.     **The Instant Motion**

In this action, UT and 3D Systems allege that EOS is infringing the UT Patents-in-suit by importing, offering for sale, and selling laser sintering machines into the United States. EOS's defense is that it has a license to the UT Patents-in-suit under Section 1.1(b) of the License Agreement. *See Lucent Tech., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181 (D. Del.

---

(continued...)

the total volume." (Ex. 9, § 1.2.)

    [7]  One of the DTM Patents (U.S. Patent No. 5,990,268 (the "'268 patent")) is presently being asserted by 3D Systems against EOS in litigation pending between the parties in the United States District Court for the Central District of California (the "California Action"). There, EOS has asserted an affirmative defense of express license to the '268 patent, claiming that 3D Systems' acquisition of the DTM Patents on August 31, 2001, including the '268 patent, resulted in those patents being "issued" to 3D Systems and thus licensed under Section 1.1(b) of the License Agreement.

2001) (the existence of an express license is an affirmative defense to patent infringement, for which the party asserting that defense has the burden of establishing).

This motion seeks a ruling from the Court that EOS's license to the Future Patents does not include the UT Patents. Because the UT Patents were neither "owned by" 3D Systems as of August 27, 1997 (or at any time for that matter), nor "issued to" 3D Systems, they are not covered by the License Agreement, and EOS's affirmative defense fails as a matter of law.[8]

## III.    SUMMARY JUDGMENT STANDARDS

Summary judgment under Federal Rule of Civil Procedure 56 is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment must be entered where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party is not required to negate or disprove matters on which the opponent will have the burden of proof at trial, but merely to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323; *Salas v. Carpenter*, 980 F.2d 299, 304 (5th Cir. 1992). To avoid summary judgment, the non-movant must present "specific facts showing that there is a *genuine issue for trial*."[9]

---

[8] In August 2003, the California Court denied 3D Systems' motion for summary judgment on whether the License Agreement covered the DTM Patents. However, the California Court did not even consider the question of whether the License Agreement extends to the UT Patents. And, EOS has made clear that its affirmative defenses of express license in the two cases "are only applicable to the claims in each case." (Dec. 4., 2003 EOS Opposition to Motion to Sever at 6 [an excerpt of which is attached as Ex. 11].) Explaining the difference, EOS states that "in the California action, EOS asserts that it is licensed under the *DTM* patent being asserted by 3D. In this case, . . . EOS asserts that it is licensed under the two *UT patents-in-suit*." (*Id.*; emphasis in original.)

[9] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(e).

Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Anderson*, 477 U.S. at 249 (to establish a genuine issue for trial, the nonmoving party must submit evidence sufficient for a jury to return a verdict for that party).[10] "A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

## IV.    THERE IS NO GENUINE ISSUE AS TO WHETHER EOS IS LICENSED TO THE UT PATENTS.

Under California law, which governs the License Agreement, "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties."[11] "When a contract is reduced to writing, the mutual intention is "the objective intent as evidenced by the words of the instrument."[12] Indeed, "[t]he cardinal requirement in the construction of . . . contracts is that the intention of the parties *as gathered from the four corners of the instrument* must govern."[13]

---

[10] To survive a summary judgment motion, "the nonmovant must do more than present *some* evidence on an issue it asserts is disputed." *Avia Group Intern., Inc. v. LA Gear California, Inc.*, 853 F.2d 1557, 1561 (1988). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252. A genuine issue of material fact does not exist "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp..*, 475 U.S. 574, 587 (1986).

[11] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992); *Parsons v. Bristol Development Co.*, 62 Cal. 2d 861, 865 (1965)).

[12] *Shaw v. Regents of University of Cal.*, 58 Cal. App. 4th 44, 55 (1997).

[13] *City of Manhattan Beach v. Superior Court*, 13 Cal. 4th 232, 252 (1996) (Mosk, J., concurring and dissenting) (citing *Machado v. Southern Pac. Transp. Co.*, 233 Cal. App. 3d 347, 352 (1991) (emphasis in original).

**A.    The Intentions of the Parties, as Gathered From the Four Corners of the License Agreement, Establish that EOS Is Not Licensed to the UT Patents.**

       1.     **The Phrase "Issue To" Refers to the PTO's Initial Creation of Patent Rights in an Inventor or the Inventor's Assignee.**

For at least two hundred years, the term "issue" has meant the initial creation of patent rights by the government (*e.g.*, the U.S. Patent and Trademark Office or "PTO") in granting a patent application. When Congress enacted the first United States patent statute in 1790, it used the term "issue" to describe the governmental functions associated with the granting of a patent application. *See* Patent Act of 1790 (setting forth grounds for challenges to the validity of "any patent which shall be issued in pursuance of this act," and requiring that such challenges be brought "within one year after *issuing* . . . .").[14] The second patent statute, passed by Congress three years later, once again used of the term "issue" to refer to the same governmental function. *See* Patent Act of 1793.[15]

That meaning of the term "issue" has remained unchanged throughout the history of the United States. Under current law, a patent "issues" when the PTO initially creates patent rights on a patent application. Section 153, which is aptly entitled "How Issued," describes the functions performed by the PTO in issuing a patent:

> Patents shall be *issued* in the name of the United States of America, under the seal of the Patent and Trademark Office, and . . . shall be recorded in the Patent and Trademark Office.

35 U.S.C. § 153. The meaning of the term "issue" is further reinforced by Congress's use of a patent's "issue" date to trigger the commencement of the patent's 20-year term. Under Section 154(a)(2), a patent's 20-year term "begin[s] on the date on which the patent *issues* . . . ."

---

[14]  A copy of this statute is attached as Exhibit 12.

[15]  A copy of this statute is attached as Exhibit 13.

35 U.S.C. § 154(a)(2) (emphasis added).  Clearly, in the United States, only the PTO can "issue" a patent.

It is also well-established that the term "issue to" refers to the initial creation of patent rights by the PTO in an inventor or an inventor's assignee, such as UT.  For example, Section 152 is entitled "Issue of Patent to Assignee," and confirms that a patent will "issue to" an assignee where there is evidence of a valid assignment of patent rights.  That section provides as follows:

> **Issue of patent to assignee.**  Patents may be granted to the assignee of the inventor of record in the [PTO], upon the application made and the specification sworn to by the inventor . . . .

35 U.S.C. § 152.  The same "issue to" language is used in the Code of Federal Regulations to mean the same thing as Section 152 — the initial granting of patent rights by the PTO to an assignee such as UT:

> **Issue of patent to assignee**...  (a) With payment of the issue fee: An application may *issue in the name(s) of the assignee(s)* with the application's assignment where a request for such issuance is submitted with payment of the issue fee, provided the assignment has been previously recorded . . .  (b) After payment of the issue fee:  An application may *issue in the name(s) of the assignee(s)* consistent with the application's assignment where a request for such issuance along with the processing fee . . . is submitted . . . prior to the issuance of the patent, provided the assignment has been previously recorded in the [PTO].

37 C.F.R. § 3.81 (emphasis added).  And the same "issue to" language is used in the Manual of Patent Examining Procedure ("M.P.E.P.") to describe the initial granting of patent rights by the PTO to an assignee:

> [n]ormally, for the patent to *issue to* an assignee, the assignment must be recorded in the [PTO] at a date not later than the day on which the issue fee is paid.  If the assignment is submitted for recording after the day on which the issue fee is paid, the patent may *issue to* an assignee upon granting a petition . . . .

M.P.E.P. § 307 (emphasis added).[16]

Finally, the use of the term "issue" to mean the initial creation of patent rights by the

PTO to an inventor or an inventor's assignee is manifest in case law governing patents, including

cases involving licenses to patents that "issue to" the licensor.[17]

**2. The Clear Meaning of the Term "Issue To" Dictates that
Section 1.1(b) of the License Agreement Must Be Construed to Mean
EOS Has a License Only to Future Patents "Issued To" 3D Systems
from the PTO — Not Those "Licensed To" 3D Systems.**

Here, the intention of the parties as gathered from the four corners of the License

Agreement "must govern."[18] The License Agreement grants EOS a license to Future Patents that

"issue to" 3D Systems, using language that has been applied uniformly in the patent law context

for over 200 years. When legal terms such as "issue to" are used in a patent license, such as the

---

[16]  A copy of this section of the M.P.E.P. is attached as Exhibit 14.

[17]  *See, e.g., Syndia Corp. v. Lemelson Med.*, 165 F. Supp. 2d 728, 735 (N.D. Ill. 2001)
(the agreement "grants a license to all 'Licensed Patents.' Licensed Patents, in turn, are defined
as Lemelson patents that *had issued* or which were in the future *issued to* Lemelson . . . ."); 
*Rockwell Int'l Corp. v. United States*, 31 Fed. Cl. 70 (1994) (patent license can be granted in
patent application, so that license is granted to practice any invention claimed in patent when,
and if, it *issues from application*); *Phillips Petroleum Co. v. U. S. Steel Corp.*, 566 F. Supp.
1093, 1100 (D. Del. 1983) (licensor alleged to have "intended to provide its licensee and
immunity holders a continuing right to have a license under any patent which might *issue to*
Phillips covering polypropylene products"); *Ferris v. Commissioner of Int. Rev.*, 1968 WL 1293
(Tax Ct. 1968) (individual "*was issued*" a U.S patent); *Merck & Co. v. Smith*, 261 F.2d 162, 163
(3d Cir. 1958) ("patent *issued* from the patent office"); *Cold Metal Prods. Co. v. Crucible Steel
Co.*, 126 F. Supp. 546, 548 (D. N.J. 1954) (in deciding license agreement dispute, court decided
whether defendant's activities "were within the scope of certain patents *issued to* plaintiff");
*Copeman Laboratories Co. v. General Motors Corp.*, 36 F. Supp. 755, 757-59 (E.D. Mich. 1941)
(where under the license agreement before the court, licensor was obligated to notify licensee of
the "*issuance*" of each patent the license could cover, after which licensee had right to extend
license to patents "*which issued*" after a certain date "*upon an application* for a patent which was
pending"; one patent application listed in the license agreement "*issued into Patent
No. 1,817,544, to* Copeman"; another patent "*issued upon [a particular] application*"); *Lathrop
v. Rice & Adams Corp.*, 17 F. Supp. 622, 625 (W.D.N.Y. 1936) (license agreement provided that
"each party licensed the other to use any future inventions on which patents *issued to* the several
parties"; the court noted in accepting one party's contentions that "the license covered the use
not only of the patents specified, but of such other improvements therein on which patents *issued
to* licensor").

[18]  *City of Manhattan Beach*, 13 Cal. 4th at 252.

License Agreement, those terms are interpreted as those terms are usually understood in the field of patents, "unless clearly used in a different sense."[19]  This is especially true where a patent license has been drafted by competent lawyers and entered into by sophisticated parties.[20]

During the negotiations and drafting of the License Agreement, EOS received input on the License Agreement from at least four sources:  EOS's outside patent counsel, its outside corporate counsel (the international law firm of Baker & McKenzie), its senior official on patent matters, and its CEO.  (Ex. 15 [Langer Depo.] at 123:16-124:17; 127:20-130:10.)  EOS was also encouraged to consult with U.S. patent counsel.  (Ex. 16 [Alpert Depo.] at 15:4-16:18.)  Additionally, EOS had the opportunity to review and negotiate the language of the License Agreement, requesting several changes to the License Agreement.  (*E.g.*, Ex. 17 [*filed under seal*].)

Against that backdrop, the License Agreement must be interpreted as giving EOS a license only to Future Patents that the PTO granted directly to 3D Systems.  Construing Future Patents "issued to" 3D Systems to include the UT Patents, which have merely been licensed to 3D Systems, would require a radical departure from the clear meaning of the term "issue to" as it has been used uniformly over the past 200 years.[21]  It would require nothing short of a rewriting

---

[19]  Cal. Civ. Code § 1645 ("Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."); *see also Sharlin v. Superior Court*, 9 Cal. App. 4th 162, 168 (1992) (legal terms are presumed to be used in their legal sense); *Continental Heller Corp. v. Amtech Mechanical Servs., Inc.*, 53 Cal. App. 4th 500, 507 (1997) (in construing an agreement between "two large, sophisticated construction enterprises," the court stressed that the enterprises "could be expected to review, understand, and bargain over their . . . agreement."); *see also CQL Original Prods., Inc. v. National Hockey Players' Ass'n*, 39 Cal. App. 4th 1347, 1354 (1995).

[20]  *See, e.g., In re Cox Estate*, 8 Cal. App. 3d 168, 191 (1970) (where an instrument is drafted by a competent lawyer, it is presumed that legal terms embodied in the instrument are used in their legal sense).

[21]  Despite EOS's assertions that its license of Future Patents includes the UT Patents, EOS has conceded in the California Action that "issue to" means the grant of patent rights directly from the PTO.  (*See* Ex. 18 [excerpts from EOS's Feb. 26, 2002 Supp. Memo. in Opposition to 3D Systems' Motion for Summary Judgment] at 5:10-11) ["[T]here is no magic to

of the License Agreement — and a substitution of the phrase "issue to *or be licensed to*" in place

of the "issue to" phrase. It would also ignore that, in the same Section 1.1 that contained the

"issue to" language, EOS and 3D Systems showed that they knew how to confer broader license

rights when they wanted to. That section granted EOS a license to Existing Patents "owned by"

3D Systems as of August 27, 1997, which is significantly broader than the words "issue to" used

to define EOS's rights to Future Patents. The parties' use of narrower language cannot be

ignored, particularly in light of the parties' sophistication and representation by experienced

counsel.[22] If, as EOS claims, the parties and their counsel actually intended to confer to EOS a

much broader license to patents that "issue to *or are licensed to*" 3D Systems, they could easily

have done so. They did not.

The License Agreement can be, and should be, interpreted based on the well-understood

meaning of the phrase "issue to" in the patent context. Since there is no question that the

UT Patents "issued to" UT, not to 3D Systems (or even DTM), the UT Patents fall outside the

scope of EOS's license under the License Agreement. Hence, 3D Systems' motion for summary

judgment should be granted.

**B.      The License Agreement Is Not Reasonably Susceptible To Any
           Interpretation That Extends EOS's License To The UT Patents.**

     1.      **The Parol Evidence Rule Bars the Use of Extrinsic Evidence to
                     Change or Alter the Terms of the License Agreement.**

The parol evidence rule is a rule of substantive law that "generally prohibits the

introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms

---

(continued...)

the use of the 'issue to' language, beyond the obvious meaning that *all patents must issue to
begin life.*"].) And EOS's counsel admitted as much during Dr. Langer's July 2002 deposition in
that case. (Ex. 15 [Langer Depo.] at 93:24-94:1 ["MR. BANIAK: All the patents have to issue
from a patent office."].)

    [22] Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give

of an integrated written instrument intended by the parties thereto as the final expression of their agreement."[23] The parol evidence rule is a substantive rule of law that does not really govern *how* an agreement may be proved. Rather, it is based upon the principle that the parties' writing *is* the agreement as a matter of law.[24] It makes the integrated written agreement of the parties their exclusive and binding contract, no matter how persuasive the evidence of additional oral understandings. Such evidence is legally irrelevant and cannot support a judgment.[25]

Here, the License Agreement contains a "merger" clause and is an integrated written agreement. (Ex. 9, § 8.2.)[26] Thus, extrinsic evidence that contradicts the terms of the License Agreement, and the "issue to" language in particular, is inadmissible. *See* Cal. Civ. Proc. Code § 1856(a).

### 2.    The Term "Issue To" Is Not *Reasonably Susceptible* To Any Interpretation That Would Extend EOS's License To The UT Patents.

Although extrinsic evidence is inadmissible to vary, alter or change the License Agreement, the Court may consider limited types of extrinsic evidence, but only if such evidence supports an interpretation to which the agreement is *reasonably susceptible*.[27] "If a writing is deemed integrated, extrinsic evidence is admissible only if it is relevant to prove a meaning to

---

(continued...)

effect to every part, if reasonably practicable, each clause helping to interpret the other.")

[23] *Morey v. Vannucci*, 64 Cal. App. 4th 904, 913 n. 4 (1998) (citing Cal. Civ. Proc. Code § 1856(a); *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1433-34 (1992); *Price v. Wells Fargo Bank*, 213 Cal. App. 3d 465, 486 (1989); REST.2D CONTRACTS, § 209(1); 2 Witkin, CAL. EVIDENCE, "Documentary Evidence," §§ 960, 967 at 908, 915-16 (3d ed. 1986).)

[24] *Tollefson v. Roman Catholic Bishops*, 219 Cal. App. 3d 843 (1990); 2 B. Witkin, CALIFORNIA EVIDENCE, § 963 at 911 (3d ed. 1986).

[25] *Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal. App. 3d 973, 1000 (1991).

[26] Pursuant to Section 8.2, the License Agreement expressly "embodies the entire understanding of the Parties and . . . supersede[s] all previous communications, representations or undertakings, either verbal or written between the Parties . . . ." (*Id.*)

[27] *Morey*, 64 Cal. App. 4th at 912-913 (1998) (citing *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39-40 (1968)) (emphasis added); *Pacific Gas & Elec. Co. v. Zuckerman*, 189 Cal. App. 3d 1113, 1140-41 (1987).

which the language of the instrument is reasonably susceptible."[28] Even then, the extrinsic

evidence must prove the "*objective* manifestations of the parties' intent."[29] "[T]he intent of the

Parties determines the meaning of a contract . . ., [but] the relevant intent is *objective* — that is,

the objective intent *as evidenced by the words of the instrument, not a party's subjective

intent.*"[30] Extrinsic evidence of a party's uncommunicated, subjective intent is inadmissible for

any purpose.[31]

Here, the "issue to" language used in the License Agreement is not "reasonably

susceptible" to *any* interpretation that would result in EOS being licensed to the UT Patents. For

EOS's license to extend to the UT Patents, the license would have to be interpreted to extend

beyond patents that "issue to [3D Systems]" to encompass patents "licensed to" 3D Systems.

But such an interpretation would be entirely *unreasonable* because it would depart radically from

the ordinary and well-understood meaning of "issue to" in the patent context.

A separate question is what relevance, if any, the Settlement Agreement and an August 6,

1997 letter of intent ("Letter of Intent") may have to the meaning of "issue to" as it appears in

the License Agreement.  (*See* Exs. 7 & 19.)  Article 5 of the Settlement Agreement states that

---

[28] *Banco Do Brasil, S. A.*, 234 Cal. App. 3d at 1001.

[29] *Morey*, 64 Cal. App. 4th at 912 (citing Cal. Civ. Code, §§ 1635-56; Cal. Civ. Proc. Code, §§ 1859-61, 1864; *Hernandez v. Badger Constr. Equip. Co.*, 28 Cal. App. 4th 1791, 1814 (1994); 1 Witkin, SUMMARY OF CAL. LAW, "Contracts," §§ 688-89 at 621-23 (9th ed. 1987)) (emphasis added).

[30] *Shaw*, 58 Cal. App. 4th at 54-55 (citations omitted; emphasis added); 1 B. Witkin, SUMMARY OF CAL. LAW, "Contracts," § 119 at 144 (9th ed. 1987) (emphasis in original) (citing *Zurich General Accid. & Liability Assurance Co. v. Industrial Accid. Comm'n*, 132 Cal. App. 101, 104 (1933)) ("By the modern law of contract, the mere state of mind of the parties – with reference to the 'meeting of minds' – is not the essential object of inquiry, the terms of the promised act being determinable by an external and not by an internal standard . . . or by what distinguished writers have termed the objective rather than the subjective test").

[31] *Hilleary v. Garvin*, 193 Cal. App. 3d 322, 327 (1987) ("[U]ncommunicated subjective intent is not relevant.  The existence of mutual assent is determined by objective criteria.") (citations omitted); *see also Shaw*, 58 Cal. App. 4th at 55 ("The true intent of a contracting party is irrelevant if it remains unexpressed."); *Estate of Klauenberg*, 32 Cal. App. 3d 1067, 1068 (1973).

EOS will receive a license to patents "held by" 3D Systems. But, the parties agreed that the Settlement Agreement was not intended to define the terms of EOS's license when they concluded that provision with the following: "Any inconsistency [with] . . . the terms of the License Agreement shall be resolved in favor of the License Agreement." (Ex. 7, art. 5.)[32] Thus, the Settlement Agreement plainly contemplates the possibility of inconsistencies between the two agreements, and resolves them in favor of the License Agreement (which uses the "issue to" language). The Letter of Intent is inadmissible parol evidence, and by its terms expressly precludes any attempt by EOS to rely on it: "This letter shall not constitute an agreement and is not binding upon the signatures [sic] thereto. The final terms . . . shall be contained in a definitive . . . agreement which shall be subject to the approval of all parties hereto . . . ." (Ex. 19.)

At bottom, EOS's attempt to expand the scope of its license under the License Agreement must fail because the "issue to" phrase is not reasonably susceptible to *any* interpretation that would give EOS a license to the UT Patents. It would be entirely unreasonable to depart so radically from the well-understood meaning of "issue to" in the patent context — especially given EOS's sophistication, representation by experienced counsel, and active participation in the drafting process of the License Agreement. It would also be unreasonable to impart a broader meaning to the term "issue to" when the parties used the term "owned by" in the same section, showing that they know how to confer that broader scope of rights when they intended to. EOS simply has no right to get from this Court what it failed to get from 3D Systems in the License Agreement, and 3D Systems' motion should be granted.

---

[32] The Settlement Agreement states in Article 5 that "EOS and 3D [Systems] will enter into a *separate license agreement* . . . by which EOS is granted . . . [a] license for all patent rights applicable to the field of laser sintering . . . held by 3D [Systems]." (Ex. 7; emphasis added.)

C.    **The Objective Manifestations of the Parties' Intentions Further Confirm That EOS Is Not Licensed To The UT Patents.**

The Court may properly consider evidence of "such *objective* matters as [i] the surrounding circumstances under which the parties negotiated or entered into the contract; [ii] the object, nature and subject matter of the contract; and [iii] the subsequent conduct of the parties." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998). As explained below, that evidence further confirms that EOS is *not* licensed to the UT Patents.

1.    **The Circumstances at the Time of Contracting Show Why EOS Obtained a License to Future Patents that "Issue To" 3D Systems.**

When the parties entered into the License Agreement, 3D Systems' only business was stereolithography, and the development of its patent portfolio was limited to that technology. (Alpert Decl. [Ex. 6], ¶ 2.) Thus, EOS could not reasonably have expected to receive from 3D Systems anything more than a license to 3D Systems' Stereolithography Patents and any additional patents resulting from 3D Systems' continued innovation in that field — and then only for a limited period. And that is precisely what EOS received with the "issue to" language. EOS could not have reasonably expected to receive a license to patents owned by an unrelated entity such as UT and merely licensed to 3D Systems *after* the expiration of the non-compete period.

2.    **The Object, Nature and Subject Matter of the License Agreement Show Why EOS Obtained a License to Future Patents that Were to "Issue To" 3D Systems.**

EOS got the full benefit of its bargain from its license to the Stereolithography Patents. For instance, EOS obtained access to the fruits of 3D Systems' research and development in the stereolithography field, as well as the freedom to practice those inventions in the laser sintering field.[33] Between August 27, 1997 and August 20, 2002, the PTO issued to 3D Systems a total of

---

[33]  Fundamentally, a patentee has the right to exclude others from making, selling or using the claimed invention. Without the grant of Future Patents to EOS in the License

47 Stereolithography Patents. (D'Alessandro Decl. [Ex. 20], ¶¶ 3-6.) Thus, the "issue to"

language gave EOS freedom from suit under the newly "issued to" patents, as well as the right

to assert them against others.

### 3. EOS's Subsequent Conduct Belies Its Claim That Future Patents Include the UT Patents.

"The conduct of the parties after execution of the contract and before any controversy has

arisen as to its effect affords the *most reliable evidence* of the parties' intentions."[34] As the

California Supreme Court has explained,

> "This rule of practical construction is predicated on the common
> sense concept that "actions speak louder than words." . . . When
> the parties to a contract perform under it and demonstrate by their
> conduct that they knew what they were talking about the courts
> should enforce that intent.

*Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 753-754 (1960) (citation omitted).[35] Here,

EOS's "practical construction" of the License Agreement belies any claim that the License

Agreement extends to the UT Patents.

In order to recover damages for infringement of a patent, the accused infringer must have

notice of the patent. One way of establishing notice is to mark articles which are manufactured

---

(continued...)

Agreement, 3D Systems patents that applied to laser sintering could have issued to 3D Systems
after the License Agreement was signed and "blocked" EOS from making, selling, or using
claimed inventions it already had a license to. By providing a license to EOS for patents that
"issued to" 3D Systems, EOS protected its reasonable expectation that it would continue to be
free to make, sell, or use in the field of laser sintering those patents it had licensed from 3D
Systems.

[34] *Hernandez*, 28 Cal. App. 4th at 1814 (citing *Kennecott Corp. v. Union Oil Co.*, 196
Cal. App. 3d 1179, 1189 (1987)) (emphasis added); *see also Crestview Cemetery Ass'n v.
Dieden*, 54 Cal. 2d 744, 753-754 (1960) ("[t]he acts of the parties under the contract afford one
of the *most reliable means* of arriving at their intention") (emphasis added).

[35] *See also Hernandez*, 28 Cal. App. 4th at 1814 (quoting *Universal Sales Corp. v.
California Press Mfg. Co.*, 20 Cal. 2d 751, 762 (1942)); *Kennecott Corp.*, 196 Cal. App. 3d at
1189-1190; *Western Med. Enterp., Inc. v. Albers*, 166 Cal. App. 3d 383, 389 (1985).

or sold under a patent with the patent number.[36] The License Agreement imposes upon EOS an obligation "to mark every *licensed* product manufactured or sold by it under this Agreement[.]" (Ex. 9, § 2.5; emphasis added).) Yet while EOS contends it is licensed to the UT Patents here, EOS has not marked the EOSINT P-700 laser sintering machine it has sold in the United States with *any* UT Patent, including the patents-in-suit.  (Ervin Decl. [Ex. 21], ¶ 5 & Ex. 22.)  EOS's failure to mark shows that, despite its affirmative defense, it has always understood that the License Agreement does not extend to the UT Patents.

## V.    CONCLUSION

For the reasons set forth above, 3D Systems asks the Court to find that under Section 1.1(b) of the License Agreement, EOS's license to 3D Systems' Future Patents does not include the UT Patents, and EOS's third affirmative defense fails as a matter of law.

---

[36] *See* 35 U.S.C. § 287; Lipscomb, LIPSCOMB'S WALKER ON PATENTS, § 8:16 at 532 (3rd ed. 1985).

Dated:  December 31, 2003

PHILIP E. COOK (admitted *pro hac vice*)
Calif. State Bar No. 149067
ROBERT W. DICKERSON (admitted *pro hac vice*)
Calif. State Bar No. 89367
JONES DAY
555 West Fifth Street, Suite 4600
Los Angeles, CA  90013-1025
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539

ALAN D ALBRIGHT
Federal Bar No. 13048
Texas State Bar No. 00973650
ELIZABETH J. BROWN FORE
Texas State Bar No. 24001795
GRAY, CARY, WARE & FREIDENRICH LLP
1221 South MoPac Expressway, Suite 400
Austin, TX  78746-6875
Telephone:  (512) 457-7000
Facsimile:  (512) 457-7001

Attorneys for Plaintiffs
BOARD OF REGENTS, THE
UNIVERSITY OF TEXAS SYSTEM,
and 3D SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served in the following manner to the following counsel of record on this 31st day of December, 2003.

Thomas H. Watkins                    *Via Certified Mail*
Albert A. Carrion, Jr.
HILGERS & WATKINS P.C.
98 San Jacinto Boulevard
San Jacinto Center, Suite 1300
Austin, Texas 78701
(512)476-4716
(512) 476-5139 Facsimile

Michael H. Baniak                    *Via Federal Express*
Michael D. Gannon
BANIAK PIKE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois 60606
(312) 673-0360
(312) 673-0361 Facsimile

Attorneys for Defendant
EOS GMBH ELECTRO OPTICAL SYSTEMS

ELIZABETH J. BROWN FORE