

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

Board of Regents, The University of Texas
System, and 3D Systems, Inc.

§
§
§
§
Plaintiffs, §
§
v. §
§
EOS GmbH Electro Optical Systems, §
§
Defendant. §
§

Civil Action No. A03 CA 113SS

## MOTION OF COUNTERCLAIM DEFENDANTS 3D SYSTEMS, INC. AND 3D SYSTEMS CORPORATION FOR SUMMARY JUDGMENT ON EOS'S ANTITRUST COUNTERCLAIM COUNT V

Plaintiff and counterclaim defendant 3D Systems, Inc. ("3D Systems") and counterclaim defendant 3D Systems Corporation hereby respectfully request that, pursuant to Federal Rule of Civil Procedure 56(a), the Court grant summary judgment on Count V of the counterclaim asserted by EOS GmbH Electro Optical Systems ("EOS"). Counterclaim defendants also respectfully request a hearing on this motion.

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................... 2

III.  ARGUMENT ...................................................................................................... 6

    A.    EOS CANNOT DEMONSTRATE THAT ANY OF THE ALLEGED ACTS HAD AN ANTICOMPETITIVE EFFECT OR CAUSED EOS TO SUFFER ANTITRUST INJURY ....................................................... 7

        1.    Exclusive Distributorship (Paragraph 40(a)) ............................................ 8

        2.    Stereolithography Resin Suppliers (Paragraph 40(b) and 40(c)) ............. 10

        3.    Warranty Policy (Paragraph 40(d)) ......................................................... 13

    B.    EOS'S SECTION 2 CLAIM ALSO FAILS BECAUSE THE ALLEGED "ANTICOMPETITIVE CONDUCT" IS SIMPLY COMPETITION ON THE MERITS ................................................................................... 16

    C.    WITHOUT A CONSPIRACY, EOS HAS NO SECTION 1 CLAIM ................. 21

IV.   CONCLUSION ................................................................................................. 22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................................................ 7

*Aspen Skiing Co. v. Aspen Highlands,*
472 U.S. 585 (1985).............................................................................................. 19

*Atlantic Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990)........................................................................................... 9, 18

*Austin v. McNamara,*
979 F.2d 728 (9th Cir. 1992) ............................................................................... 17

*Bayou Bottling, Inc. v. Dr. Pepper Co.,*
725 F.2d 300 (5th Cir. 1984) ................................................................. 10, 16, 18

*Bob Maxfield, Inc. v. American Motors Corp.,*
637 F.2d 1033 (5th Cir. 1981) ............................................................................ 15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)........................................................................................... 7, 22

*Cargill, Inc. v. Monfort of Colo., Inc.,*
479 U.S. 104 (1986)............................................................................................... 22

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)............................................................................................... 6, 7

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
433 U.S. 36 (1977).................................................................................................. 8

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984)......................................................................................... 21, 22

*Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.,*
129 F.3d 240 (2d Cir. 1997) .................................................................................. 8

*Fruehauf Corp. v. FTC,*
603 F.2d 345 (2d Cir. 1979) .......................................................................... 11, 20

*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.,*
789 F. Supp. 760 (S.D. Miss. 1992) ...................................................................... 1

*Hayes v. Solomon,*
597 F.2d 958 (5th Cir. 1979) ............................................................................... 12

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
466 U.S. 2 (1984)............................................................................................... 15, 16

*Martin v. Phillips Petroleum Co.,*
365 F.2d 629 (5th Cir. 1966) ............................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Marts v. Xerox, Inc.,*
  77 F.3d 1109 (8th Cir. 1996) ........................................................................ 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ........................................................................................ 7

*Muenster Butane, Inc. v. Stewart Co.,*
  651 F.2d 292 (5th Cir. 1981) ..................................................................... 9, 10

*Northeastern Tel. Co., v. AT&T,*
  651 F.2d 76 (2d Cir. 1981) ........................................................................... 18

*Northern Pacific Ry. v. United States,*
  356 U.S. 1 (1958) ..................................................................................... 14, 16

*Phototron Corp. v. Eastman Kodak Co.,*
  842 F.2d 95 (5th Cir. 1988) ................................................................... 1, 7, 22

*Ross v. Communications Satellite Corp.,*
  759 F.2d 355 (4th Cir. 1985) .......................................................................... 7

*Salas v. Carpenter,*
  980 F.2d 299 (5th Cir. 1992) .......................................................................... 7

*Sicor Ltd v. Cetus Corp.,*
  51 F.3d 848 (1st Cir. 1995) ..................................................................... 19, 21

*Sound Ship Building Corp. v. Bethlehem Steel Co.,*
  533 F.2d 96 (3d Cir. 1976) ........................................................................... 18

*Spectrum Sports, Inc. v. McQuillan,*
  506 U.S. 447 (1993) ................................................................................. 7, 21

*Stearns Airport Equip. Co. v. FMC Corp.,*
  170 F.3d 518 (5th Cir. 1999) ............................................................. 17, 18, 19

*T. Harris Young & Assocs., Inc. v. Marquette Electronics, Inc.,*
  931 F.2d 816 (11th Cir. 1991) ................................................................. 15, 16

*T.O. Bell v. Dow Chem.,*
  847 F.2d 1179 (5th Cir. 1988) ...................................................................... 18

*Taylor Publishing Co. v. Jostens, Inc.,*
  216 F.3d 465 (5th Cir. 2000) ........................................................................ 21

*Tops Markets, Inc. v. Quality Markets, Inc.,*
  142 F.3d 90 (2d Cir. 1998) ........................................................................ 9, 11

*Trace X Chem., Inc. v. Canadian Indus., Ltd.,*
  738 F.2d 261 (8th Cir. 1984) ........................................................................ 18

*United States v. E.I. du Pont de Nemours & Co.,*
  351 U.S. 377 (1956) ...................................................................................... 17

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966)................................................................................................ 17

*United States v. Microsoft,*
    253 F.3d 34 (D.C. Cir. 2001)............................................................................. 7, 17

*Virgin Atlantic Airways Ltd. v. British Airways PLC,*
    257 F.3d 256 (2d Cir. 2001) ................................................................................ 2, 7

*Washington v. Allstate Ins. Co.,*
    901 F.2d 1281 (5th Cir. 1990) ................................................................................. 6

**Statutes**

15 U.S.C. § 1................................................................................................................ 21

Fed. R. Civ. Proc. 56(b) ................................................................................................ 6

Fed. R. Civ. Proc. 56(c) ................................................................................................ 6

Fed. R. Civ. Proc. 56(e) ................................................................................................ 7

**Rules**

III Phillip E. Areeda & Herbert Hovenkamp,
    *Antitrust Law*, § 657, at 113 (2d ed. 2002) ........................................................... 12

IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*,
    § 1700a (2d ed. 2003) ........................................................................................... 14

XI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*,
    § 1810, at 121 (1998)......................................................................................... 8, 20

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of
Intellectual Property,*
    at 4 (1995).............................................................................................................. 10

U.S. Dep't of Justice, *Non-Horizontal Merger Guidelines,*
    § 4.21 (1984).......................................................................................................... 11

# I.
## INTRODUCTION

The Court has invited EOS to amend its Counterclaim to properly allege, if it can, facts showing the existence of the claimed relevant markets, actual injury to competition in such markets, and antitrust injury to EOS proximately caused by 3D Systems' acts. *See* Jul. 2, 2003 Order at 8, 10, 16.[1]  Yet EOS has failed to even allege, let alone plead with any factual support, how the acts it attributes to 3D Systems affected competition and caused antitrust injury to EOS. As the Court itself noted when reviewing EOS's amended Counterclaims, "I gave EOS an opportunity to plead allegations that brought them under the antitrust law damages, and I haven't seen that they have done that." Sept. 23, 2003 Hearing Transcript at 48.[2]

No facts support EOS's conclusory allegations of antitrust injury and restraint of competition in a properly established relevant market, and summary judgment is proper. *See Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 99 (5th Cir. 1988) (dismissing antitrust claims based on merger because there was insufficient evidence to warrant a trial); *Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 769-70 (S.D. Miss. 1992) (dismissing antitrust claim because plaintiff failed to plead how defendant's alleged conduct had an anticompetitive effect on a relevant market or caused antitrust injury to plaintiff).  Even accepting for the purposes of this motion EOS's vague and contradictory allegations of market definition, EOS has no evidence supporting the critical elements, under Sections 1 and 2 of the Sherman Act, and Section 7 of the Clayton Act, of (i) an adverse anticompetitive effect on competition as a whole in a relevant market; and (ii) antitrust injury to EOS reflecting such

---

[1]  A copy of the July 2, 2003 Order is attached as Exhibit 4.  All of the declarations and exhibits cited in this brief are included in the concurrently filed Appendix in Support of 3D Systems' Motion for Summary Judgment on EOS's Counterclaim Count V.

[2]  Excerpts from the September 23, 2003 hearing transcript are attached as Exhibit 6.

effects and proximately caused by 3D Systems' allegedly wrongful acts. For these reasons, 3D Systems and 3D Systems Corporation ask the Court to enter summary judgment on Count V of the Counterclaim.[3]

## II.
## STATEMENT OF FACTS

3D Systems designs and manufactures systems for rapid prototyping and manufacturing ("RP&M").[4] (D'Alessandro Decl., ¶ 3.) RP&M refers generally to the physical modeling of an object from computer-aided designs. (*Id.*) 3D Systems' RP&M systems use several different technologies: stereolithography, laser sintering, direct composite manufacturing, and three-dimensional multi-jet modeling printing processes. (*Id.*) Two of those RP&M technologies — stereolithography and laser sintering — are germane to this motion:

• *Stereolithography.* Stereolithography machines use an "additive" manufacturing process that builds parts, layer-by-layer, with a liquid resin build material that forms each new layer of a part when the resin cures, or hardens, at locations that are exposed to a laser beam. (*Id.*, ¶ 4.) The curing occurs because the resins are photosensitive or photocurable, forming polymers when exposed to certain frequencies of laser energy in the ultraviolet spectrum. (*Id.*)

• *Laser Sintering.* Laser sintering machines also use an "additive" process to build parts layer-by-layer, but use a solid powder as a build material, which is fused when the heat energy of a carbon-dioxide laser scans the surface of the powder and causes at

---

[3] EOS should not be permitted to keep its deficient claims shrouded in a veil of ambiguity and rhetoric lacking specific evidentiary support. *See Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) ("Wasteful trials and prolonged litigation that may have a chilling effect on procompetitive market forces should be avoided.").

[4] 3D Systems Corporation is the publicly traded parent corporation of 3D Systems, Inc. (D'Alessandro Decl., ¶ 2.) It is only a holding company, and has no operations relevant to EOS's antitrust allegations. (*Id.*)

least the surface of the powder particles to melt and adhere to each other (as well as adhering that layer to the portions of the part below that have already been fused). (*Id.*, ¶ 12.)

In February 2003, 3D Systems and the University of Texas ("UT") brought this lawsuit against EOS for infringement of United States Patent Nos. 5,597,589 and 5,639,070, which claim an apparatus and method for producing parts by laser sintering. In March 2003, EOS answered the complaint and filed several counterclaims against 3D Systems, including two antitrust-related claims (Counts V and VI). On 3D Systems' motion to dismiss Counts V and VI, the Court dismissed Count VI in its entirety and Count V as alleged against UT. *See* Jul. 2, 2003 Order. The Court denied the motion to dismiss Count V as to 3D Systems, but invited EOS to amend its counterclaim to include more detailed factual allegations. *Id.* at 8, 10, 16.

EOS then filed its Answer and First Amended Counterclaims on July 17, 2003. On 3D Systems' motion to strike certain allegations in Count V of the counterclaim, on the grounds that they failed to comply with the Court's July 2, 2003 Order and did not support requisite antitrust injury, the Court struck several of the allegations. *See* Oct. 16, 2003 Order.[5] Accordingly, Count V now rests *entirely* on the following four alleged exclusionary acts of 3D Systems:

(1)    entering into an exclusive distributorship agreement with a supplier of RP&M raw materials;

(2)    terminating a distribution and development agreement with a supplier of RP&M raw materials;

(3)    acquiring a supplier of RP&M raw materials; and

(4)    threatening not to honor warranty and service contracts on 3D Systems RP&M machines if customers used materials and supplies provided by other parties.

(Counterclaim, ¶ 40(a)-(d).) Each of these four alleged acts are described in detail below.

---

[5]  A copy of the October 16, 2003 Order is attached as Exhibit 5.

(1) *Entering into an exclusive distributorship agreement with a supplier of RP&M raw materials.* On June 10, 2002, 3D Systems entered into an agreement under which it became the exclusive worldwide distributor of its own DuraForm™ PA, CastForm™ PS, and DuraForm™ GF powder materials, which are blended for it by Valspar Corporation for use as build material in *laser sintering machines.* (*See* D'Alessandro Decl., ¶¶ 13-14 & Ex. 11 [Distribution Agr.], ¶ 2.)[6] The blended nylon powders that Valspar sells to 3D Systems under this agreement are acquired from German manufacturer DeGussa AG. (D'Alessandro Decl., ¶ 14.)[7] EOS sells a competing line of nylon laser sintering powders that it also acquires from DeGussa. (*See* Ex. 12 [Oberhofer Depo.] at 151:13-152:19; *id.* at 223:1-224:5, 258:17-262:4; Ex. 23 [Langer Depo.] at 105:12-19.)[8] There is no evidence that 3D Systems' exclusive distribution rights have affected EOS's ability to purchase its powder from DeGussa.

(2) *Terminating distribution and development agreements with a supplier of RP&M raw materials.* Until early 2002, 3D Systems was a party to a development agreement with Vantico International SA (and its predecessors). That agreement provided for joint research and development of liquid photocurable resins for use as a build material in *stereolithography equipment.* (D'Alessandro Decl., ¶ 6 & Exs. 13-14.) In a companion agreement with Vantico Inc. (and its predecessors), 3D Systems had the exclusive right to distribute the liquid resins that

---

[6] DuraForm PA is a polyamide or nylon powder used primarily for prototyping and for direct manufacturing, CastForm PS is a polystyrene material used primarily for making casting patterns, and DuraForm GF is a glass-filled polyamide or nylon material that is used in applications similar to those for which DuraForm PA is used, but requiring different material properties. (D'Alessandro Decl., ¶ 13.)

[7] After obtaining nylon material from Degussa, Valspar then blends in certain ingredients, such as anti-oxidants and flow agents, to produce the proprietary DuraForm powders for 3D Systems. (D'Alessandro Decl., ¶ 14.)

[8] In addition to 3D Systems and EOS, other companies selling competing powders, including nylon, to customers or developing powders in the United States include, among others, ATP, Sibco, DSM Somos Corporation, and Boeing Corporation. (D'Alessandro Decl., ¶ 15)

resulted from the parties' joint efforts under the Development Agreement. (D'Alessandro Decl.,

¶¶ 5-6 & Exs. 15-16.)

EOS incorrectly alleges that 3D Systems terminated the Distribution Agreement.

(Counterclaims, ¶ 40(b).) Instead, Vantico Inc. first notified 3D Systems on July 16, 2001 that it

was terminating the Distribution Agreement. (D'Alessandro Decl., ¶ 7 & Ex. 17.) In addition to

terminating the Distribution Agreement, Vantico International SA and Vantico Inc. (collectively,

"Vantico") initiated arbitration proceedings to determine the parties' rights and obligations upon

termination. (D'Alessandro Decl., ¶ 8 & Ex. 18.)

In response to Vantico's termination of the Distribution Agreement, 3D Systems

terminated the Development Agreement in order to prevent Vantico from having continued

access to 3D Systems' proprietary resin development expertise while keeping for itself the

profits generated by sales of the jointly developed stereolithography resin products' commercial

success. (Ex. 19.) On March 19, 2002, 3D Systems and Vantico settled the arbitration, and the

Development and Distribution Agreements were effectively terminated. (D'Alessandro Decl.,

¶ 9 & Ex. 20.)

(3) *Acquiring a supplier of RP&M raw materials.* With the impending loss of its right

to distribute jointly developed stereolithography resins under the Vantico agreement, 3D Systems

looked for alternative resin producers to supply it with liquid resins it could sell to its

*stereolithography customers.* On September 19, 2001, 3D Systems' parent company, 3D

Systems Corporation, purchased all the shares of RPC Ltd., a Swiss stereolithography resin

manufacturer. (D'Alessandro Decl., ¶ 10 & Ex. 21.)[9]

---

[9] In addition to RPC and Vantico, during this time period, DSM Somos sold
stereolithography liquid resin (and still does today). (D'Alessandro Decl., ¶ 11.) Additionally,
in 2002, Tuxedo Photopolymers began selling stereolithography resin in the United States. (*Id.*;
*see also* Ex. 7 [*Materials Roundup 2003*].) In 2003, Sony Corporation, through its Sony

(4) *Threatening to void warranty claims on 3D Systems' laser sintering machines if customers used materials and supplies provided by other parties.* Although EOS alleges that 3D Systems threatened to void warranty claims on laser sintering machines if customers used third-party powders, EOS's designated Rule 30(b)(6) witness was unable to provide any evidence in support of this claim. (Ex. 23 [Langer Depo.] at 160-166.) Moreover, 3D Systems has not threatened to void warranties or service contracts if a customer used non-3D Systems powder in its laser sintering machines. (D'Alessandro Decl., ¶ 16; McAlea Decl., ¶¶ 2-3.) 3D Systems' policy is and has been at all relevant times that its laser sintering customers are free to use any powder they want, but if a third-party's powder causes malfunction or damage to a 3D Systems' machine, the customer is charged for servicing or repairing the equipment. (*Id.*) EOS has an identical warranty policy. (Ex. 23 [Langer Depo.] at 167:9-168:7.)

## III.
## ARGUMENT

Summary judgment under Federal Rule of Civil Procedure 56 is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment must be entered where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party against whom a counterclaim has been asserted may move for summary judgment "at any time," including prior to the close of discovery. *See* Fed. R. Civ. P. 56(b); *see also Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990) ("Rule 56 does not require that any discovery take place before summary judgment can be granted. . . . ").

---

(continued...)

Manufacturing Systems America group, also began offering for sale stereolithography resins.

The moving party is not required to negate or disprove matters on which the opponent will have the burden of proof at trial, but merely to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323; *Salas v. Carpenter*, 980 F.2d 299, 304 (5th Cir. 1992). To avoid summary judgment, the non-movant must present "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(e). "A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

## A.   EOS CANNOT DEMONSTRATE THAT ANY OF THE ALLEGED ACTS HAD AN ANTICOMPETITIVE EFFECT OR CAUSED EOS TO SUFFER ANTITRUST INJURY.

Summary judgment should be granted on Count V because EOS cannot show antitrust injury — *i.e.*, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Phototron*, 842 F.2d at 99 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). It is well established that the antitrust laws are concerned not with harm to competitors but harm to competition itself. *See United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)); *Phototron*, 842 F.2d at 100 n.7. It is that harm to competition that is the "injury of the type the antitrust laws were intended to prevent." *Id.*; *see also Virgin Atlantic*, 257 F.3d at 264 ("The fact that the defendants' actions prevent a plaintiff from competing in a market is not enough . . . to satisfy this initial burden of proof [of showing] . . . an actual adverse effect on competition as a whole in the relevant market.")

(continued...)
(Ex. 8 [*Wohlers Report 2003*], pp. 112-13.)

(citations omitted). Proof of antitrust injury, in sum, requires EOS to show that 3D Systems' conduct has harmed competition generally *and* that any injury to EOS derives directly from the anticompetitive effects of the conduct found unlawful.

As set forth above, Count V rests on four acts allegedly taken by 3D Systems that EOS claims constitute anticompetitive conduct. (Counterclaim, ¶ 40(a)-(d).) EOS alleges that these four acts excluded EOS from the United States market. (*See id.*, ¶ 46.) But it has no evidence to show how these four acts had an effect on competition or, importantly, how they proximately caused EOS antitrust injury.

### 1. Exclusive Distributorship (Paragraph 40(a)).

The primary concern of antitrust laws is the promotion of interbrand, and not intrabrand, competition. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977). In other words, the focus is on protecting competition among different manufacturers or brands of the same type of product (i.e. Compaq computers versus Dell Computers), not on competition between the various distributors of the product of a particular manufacturer (i.e. Compaq computers sold by Best Buy versus Compaq computers sold by Circuit City). *See id.* Because exclusive distributor relationships typically affect only intrabrand competition, they are "presumptively legal." *See Electronics Communications Corp. v. Toshiba Amer. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) (affirming dismissal because reduction in intrabrand competition would not significantly affect market as a whole); *see also* XI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 1810, at 121 (1998) ("[I]t seems clear that the potential of exclusive dealing arrangements to produce beneficial results greatly exceeds their potential for harm, and they should be presumptively lawful in all but a few carefully defined circumstances."). To rebut this presumption of legality, EOS must come forward with facts demonstrating both *significant* anticompetitive effect in a relevant market and proximately

caused antitrust injury specific to EOS. *See Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 296-98 (5th Cir. 1981). It has failed to do so.

The June 10, 2002 distribution agreement with Valspar gives 3D Systems the exclusive right to sell certain nylon laser sintering powders that are blended by Valspar. EOS sells a competing line of laser sintering powders and, like Valspar, acquires the nylon used in those powders from DeGussa. Thus, while the Valspar distribution agreement could at most affect **intrabrand** competition by limiting sellers of *Valspar* product, it does not affect **interbrand** competition for nylon powders, which continues to involve a host of competing sellers.

The Fifth Circuit's decision in *Muenster Butane* is instructive. Muenster Butane complained that its competitor was allowed to distribute certain Zenith televisions while it was not (much like EOS's complaint that only 3D Systems is allowed to distribute Valspar product). The Fifth Circuit distinguished between intrabrand and interbrand competition, and held that no antitrust violation existed because the restriction on Zenith intrabrand competition did not have an anticompetitive effect on the interbrand competition for televisions generally. *Id.*, 651 F.2d at 296-97. Likewise, here, EOS remains free to market its competing line of nylon powders and customers remain free to choose between competing brands of powder sold by 3D Systems, EOS, DSM Somos, or other competitors.[10] Thus, EOS has not presented a genuine issue of fact as to anticompetitive effect.

---

[10] EOS does not claim that as a result of the agreement with Valspar, 3D Systems has achieved the ability to restrict output with respect to the powders used in laser sintering machines, to raise prices without regard to competition for such powders, or reduce quality with respect to such powder sales in any relevant market. *See, e.g., Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998). Nor does EOS claim that consumers are harmed by being deprived of access to powders they need for their machines, which is a critical element of any violation. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). Indeed, the record indicates that competition appears to be vibrant, given the large number of competitors.

Similarly, EOS has not shown that it has suffered injury of the type the antitrust laws were meant to prevent. EOS's inability now to acquire the Valspar exclusive distributorship that 3D Systems has cannot form the basis of requisite antitrust injury. *See Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (failure to acquire exclusive franchise does not constitute antitrust injury). Nor can EOS's inability to gain access to 3D Systems' proprietary know-how — as reflected in the constitution of the Valspar laser sintering powders — constitute antitrust injury. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property,* at 4 (1995) (intellectual property owners have no obligation under the antitrust laws to license the use of that property to others). EOS's attempt to base its antitrust claim on these facts is specious, particularly since EOS admits it would not permit 3D Systems to obtain EOS's proprietary know-how contained in the formulation of EOS's laser sintering powders. (Ex. 23 [Langer Depo.] at 105:17-19.)

### 2.    Stereolithography Resin Suppliers (Paragraph 40(b) and 40(c)).

In Paragraph 40(b), EOS alleges that 3D Systems excluded competition by terminating a distribution agreement with a manufacturer of materials used in RP&M. Paragraph 40(c) alleges that 3D Systems excluded competition in that same market by acquiring a manufacturer of such materials. EOS has no evidence establishing that these "vertical" transactions had an anticompetitive effect in a relevant market, or proximately caused antitrust injury to EOS.[11]

When Vantico indicated in mid-2001 that it intended to terminate the liquid resin Distribution Agreement, 3D Systems began searching for a new supplier of stereolithography resins to ensure that it could continue supplying its customers, ultimately leading to the purchase

---

[11]   Vertical restraints are imposed by firms at different levels of the distribution chain for a specific product and are tested under the rule of reason. *See Muenster Butane*, 651 F.2d at 295. Conversely, horizontal restraints are imposed by competitors at the same level of distribution and are illegal per se where they involve price-fixing, market or customer division. *Id.*

of RPC by 3D Systems Corporation. Vantico's termination of the Distribution Agreement and 3D Systems' concomitant acquisition of RPC had no anticompetitive effect in the market, and even EOS admits that the number of resin suppliers remained equal. (Ex. 23 [Langer Depo.] at 151:5-152:19.) For a vertical transaction to be unlawful, there must be substantial foreclosure of either suppliers or customers with the effect of adversely affecting competition by reducing output or raising prices. *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 351-52 (2d Cir. 1979); *see also* U.S. Dep't of Justice, *Non-Horizontal Merger Guidelines*, § 4.21 (1984). There is no evidence that, as a result of the transactions alleged in Paragraph 40(b) and (c), any customer of stereolithography resins was foreclosed from supplies or that any supplier of resins was foreclosed from the ability to sell. To the contrary, since the Vantico agreement was terminated and 3D Systems Corporation acquired RPC, the stereolithography resin market has seen the entrance of new competitors (Tuxedo and Sony) and decreases in prices (*see* Exs. 7-8), evidence that barriers to entry in the market are low, and 3D Systems' acts have not been exclusionary. Thus, EOS cannot demonstrate significant anticompetitive effect or antitrust injury based on the transactions alleged in Paragraph 40(b) and (c). *See Tops Markets*, 142 F.3d at 96 (holding actual adverse effect on competition as a whole in the relevant market is necessary prerequisite to finding of antitrust violation).

More fundamentally, EOS cannot show that the acts alleged in Paragraph 40(b) and (c) caused it antitrust injury because EOS ***excluded itself*** from the stereolithography business. At no time after settling European patent litigation with 3D Systems in August 1997 has EOS ***ever*** competed in the sale of any stereolithography products anywhere in the world, including

stereolithography liquid resins.[12]  In fact, EOS made a strategic choice by early 1997 to forego

the stereolithography business and focus on laser sintering applications.[13]  Even today, EOS

continues to bill itself solely as a laser sintering company.  (*See* Ex. 9 ["EOS is today the world

leader in laser-sintering."].)[14]  In sum, EOS cannot show that it was "excluded" from the

stereolithography market by anything other than its own business decisions.[15]  Under these

circumstances, there simply cannot be antitrust injury to EOS as a matter of law.[16]

---

[12]  D'Alessandro Decl., ¶ 11; Ex. 22 [Langer Depo.] at 589:10-15 [EOS had no stereolithography resin sales after 1997 because that is when it sold its stereolithography business to 3D Systems].

> Q:  Is EOS currently involved in delivering any commercial products beyond the laser sintering field in the rapid prototyping area?
>
> . . .
>
> A:  The commercial products of EOS are mainly laser sintering products.  They are associated software products and so on.
>
> . . .
>
> Q:  But in terms of the actual commercial application of building a three-dimensional part laser – I'm sorry – laser sintering is the field of rapid prototyping that your systems use?
>
> A:  This is correct.

Ex. 22 at 585:10-25.  *See also* Ex. 23 [Langer Depo.] at 155 [EOS is "not in the liquid resin business"].

[13]  Ex. 22 at 606:6-10 ["Q:  Had EOS reached a conclusion by early '97 that it did not see a potential in the technology of stereolithography, or what you call liquid lithography? A:  Right."]; *id.* at 608:9-610:6 [reasons why it was important for EOS to focus on laser sintering].

[14]  This press release also states that "EOS has continued to increase its market share in the laser-sintering market, including in the United States. . . . In the first half of 2003 we sold nearly twice as many laser-sintering systems as any other company[.]" (*Id.*)  Hardly the words, or performance, of a company that has been excluded from the market.  *See also* III Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 657, at 113-14 (2d ed. 2002) (urging courts to be "particularly cautious" about claims by competitors who have grown during the pendency of alleged exclusionary practices because continued growth "is highly suggestive of aggressive competition rather than monopolization.").

[15]  For this reason, EOS cannot even demonstrate the Article III standing requirement of injury-in-fact from the Vantico or RPC transactions. (Ex. 23 [Langer Depo at 145:17-21 [EOS is unaware of any limitation of its sales caused by the allegations in paragraph 40(b) of the counterclaim]; *id.* at 155:2-5 ["Q:  Has EOS lost any sales as a result of the acquisition of RPC? A:  I don't know.  I can not – I can not say this."].)

[16]  *See Hayes v. Solomon*, 597 F.2d 958 (5th Cir. 1979) (plaintiff must show "by probative and substantial evidence that it had the intention, preparedness and capability to go

### 3.    Warranty Policy (Paragraph 40(d)).

In Paragraph 40(d), EOS alleges that 3D Systems excluded EOS from the market by threatening not to honor warranty or service contracts with its machine customers if those customers bought materials from third parties.  This allegation fails both because (i) the discovery in this case, including the deposition testimony of EOS's Rule 30(b)(6) witness, shows that it is based on speculation and not fact; and (ii) as alleged, Paragraph 40(d) fails to state a cognizable antitrust claim.

3D Systems noticed the Rule 30(b)(6) deposition of EOS on November 14, 2003. Among the topics on which testimony was requested were the following:

> 15.    YOUR knowledge or understanding of every instance that is described in subparagraph 40(d) of Count V of YOUR First Amended Counterclaims, namely, that 3D Systems has "threaten[ed] not to honor warranty or service claims unless [] customers agreed to purchase materials and services solely from 3D [Systems]," including the dates of such threats, the person(s) who made such threats, and the persons to whom such threats were made.

> 19.    YOUR knowledge or understanding of how the facts and circumstances that are referred to in subparagraph 40(d) of Count V of YOUR First Amended Counterclaims have impaired YOU in selling any of YOUR products in the United States, including without limitation all 3D Systems customers who have not purchased any of YOUR products or have paid a lower price for YOUR products because of a "threat[ by 3D Systems] not to honor warranty or service claims unless the customer[] agreed to purchase materials and services solely from 3D [Systems]."

(Ex. 10.) At the Rule 30(b)(6) deposition, which took place on December 17 and 18, 2003, EOS's designated Rule 30(b)(6) witness and Chief Executive Officer, Dr. Hans Langer, testified that two potential customers purportedly told EOS that they were dependent on 3D Systems'

---

(continued...)

forward with the project and that the abandonment was proximately and materially caused by defendant); *Martin v. Phillips Petroleum Co.*, 365 F.2d 629 (5th Cir. 1966) (affirming summary judgment where plaintiff failed to show intent and preparedness to enter new business).Without these showings, EOS cannot claim that its business or property was injured by any acts of 3D Systems in the stereolithography resin market.

service and did not want to get pressure from 3D Systems. (Ex. 23 [Langer Depo.] at 156-166.)
Assuming those conversations took place, Dr. Langer had no knowledge of any facts to support
an inference that these customers' concerns had been caused by anything that 3D Systems said or
did. Indeed, Dr. Langer admitted that he had *no* evidence that 3D Systems actually threatened
customers.[17] Nor did he have any evidence that the two customers' concerns had caused any
injury to EOS.[18] Thus, nine months after EOS first alleged its counterclaim, EOS still has no
facts supporting the allegations in Paragraph 40(d).[19]

Summary judgment is also appropriate because Paragraph 40(d) fails to state a "tying"
claim under the antitrust laws.[20] First, a prerequisite of a tying claim is the existence of two or

---

[17] *Id.* at 160:16-21 ["Q: Did he tell you anything that he had been told by 3D Systems about this [voiding of service contracts]? A: I do not remember that he told me exactly that there was a 3D Systems man telling him this. Q: So this was his concern? A: This was his concern."]; *id.* at 162:15-19 ["Q: Did they ever tell you that they were basing this concern on something that they had been told by 3D Systems? A: I do not remember this specific in the moment."]; *id.* at 165:15-19 ["Q: Did he provide you with any information about statements that had been reported from 3D Systems on this issue, actual threats from 3D Systems? A: He didn't mention this."].

[18] *See id.* at 168:8-17 ["Q: Were you able to sell powder to both Solid Concepts and [AARK]? A: [AARK], yes, Solid Concept, I don't know . . . . Q: Do you know if EOS lost any sales of powder material for the laser sintering system to Solid Concepts or [AARK] as a result of what you've testified about earlier? A: I am not prepared for this question."]. In fact, Dr. Langer could not identify a single instance in which 3D Systems actually cancelled a warranty or imposed some other financial burden on a customer because of the use of third-party powders. (*Id.* at 166:11-17.)

[19] This failure to present evidence is not surprising, as it never occurred. 3D Systems has not threatened to void warranties or service contracts if a customer uses non-3D Systems powder as a build material in its laser sintering machines. Rather, 3D Systems' stated policy is and has been that its customers are free to use any powder they wanted, but if a third-party powder is the cause of a malfunction or damage, 3D Systems would charge for repair service. (D'Alessandro Decl., ¶ 16; McAlea Decl., ¶¶ 2-3.) Thus, 3D Systems' policy simply insures that it will not become an insurer for products manufactured by other companies. EOS apparently recognizes the reasonableness of this approach, as it has the same warranty policy. (Ex. 23 [Langer Depo.] at 167:9-168:7.)

[20] The leading antitrust treatise defines tying as "when a seller refuses to sell a product that a buyer desires unless the buyer also agrees to purchase a second product, which the buyer would not otherwise want from this seller on the offered terms." IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 1700a (2d ed. 2003); *see also Northern Pacific Ry. v. United States*, 356 U.S. 1, 5-6 (1958) (defining tying as "an agreement by a party to sell one product but

more *separate* products. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)

("[E]ssential characteristic of an invalid tying arrangement lies in the seller's exploitation of its

control over the tying product to force the buyer into the purchase of a tied product . . . ."); *Bob*

*Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981) (basic element of

tying claim is two separate products). But EOS has explicitly defined the market to include

equipment along with materials and services. (*See, e.g.,* May 22, 2003 EOS Opposition to

Motion to Dismiss at 5 ["These markets [Laser RP systems and Industrial RP systems] are also

defined to include associated materials and services."].) Having thus failed to allege separate

"tying" and "tied" product markets involving equipment and materials, no tying claim can exist

as a matter of law.

Second, even if RP&M systems and materials are defined as separate products, the

conduct alleged by EOS does not constitute the "coercion" necessary to state a claim.[21] Here,

EOS alleges only that 3D Systems threatened to not honor warranty or service claims by 3D

Systems equipment customers who used materials and services provided by third-party sellers.

(Counterclaim, ¶ 40(d).) Missing is the essential allegation that 3D Systems refused to sell

RP&M systems unless buyers also agreed to buy RP&M materials and service from 3D Systems.

*See, e.g., Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) (customers could forgo

warranty benefits and buy toner cartridges from the vendor of their choice); *T. Harris Young &*

*Assocs., Inc.*, 931 F.2d at 823 ("THY does not even allege that Marquette withheld or threatened

---

(continued...)
only on the condition that the buyer also purchases a different (or tied) product, or at least agrees
that he will not purchase that product from any other supplier.").

[21] A tying claim requires proof that the seller agreed to sell one product (*e.g.,* photocopy
machine) but only on the condition that the buyer also purchase a different product (*e.g.,* toner
cartridge). *See Jefferson Parish*, 466 U.S. at 12; *Northern Pacific Ry.*, 356 U.S. at 5-6. "In other
words, for a tie to exist a seller must withhold product A unless the buyer also selects product

to withhold electronic medical equipment unless its customers selected Marquette electrocardiographic recording paper."); *Bayou Bottling,* 725 F.2d at 304 (rejecting tying claim based on allegations that soft drink distributor provided free maintenance service on machines bought from defendant only if customers did not stock competing soft drinks in those machines).

Nor can EOS establish that 3D Systems' alleged threats foreclosed a substantial amount of commerce with respect to the materials or service that the customers purportedly were forced to buy from 3D Systems. The law is clear that a "not insubstantial amount of interstate commerce" in the tied product market must be foreclosed. *See Jefferson Parish,* 466 U.S. at 16 ("[W]e have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby."); *Northern Pacific,* 356 U.S. at 6.

**B.    EOS'S SECTION 2 CLAIM ALSO FAILS BECAUSE THE ALLEGED "ANTICOMPETITIVE CONDUCT" IS SIMPLY COMPETITION ON THE MERITS.**

EOS's failure to put forth facts demonstrating a genuine issue of fact related to antitrust injury compels summary judgment on the whole of counterclaim Count V, and the Court need not conduct any further analysis if it so finds. But EOS's Section 2 claim fails for the additional reason that EOS has failed to put forth facts demonstrating anything other than competition on the merits that is typical in competitive industries.

To state a claim for illegal monopolization under Section 2 of the Sherman Act, a claimant must prove that the asserted violator (i) possesses monopoly power in the relevant market, and (ii) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product,

---

(continued...)

B." *T. Harris Young & Assocs., Inc. v. Marquette Elec., Inc.,* 931 F.2d 816, 822 (11th Cir. 1991).

business acumen or historic accident. *See Stearns Airport Equip. Co, v. FMC Corp.*, 170 F.3d

518, 522 (5th Cir. 1999) (citing *United States v. Grinnell Corp.*, 384 U.S. 563 (1966)).

Additionally, to establish a claim for monopolization based on allegations of exclusionary

conduct, an antitrust claimant must demonstrate that the allegedly exclusionary practice had a

substantial anticompetitive effect in a properly defined relevant market. *See Microsoft*, 253 F.3d

at 58. Of course, a private claimant must also demonstrate that it suffered proximately caused

antitrust injury. *See Austin v. McNamara*, 979 F.2d 728 (9th Cir. 1992).

Fundamentally, EOS still has not explained how the four acts alleged in Paragraph 40

have contributed to the enhancement of monopoly power — the power to exclude competition or

control prices — in any relevant market in a significant way. *See Microsoft*, 253 F.3d at 51

(citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 381 (1956)). The conduct

in Paragraph 40(a) involves a garden-variety exclusive distributorship agreement that prevented

no competing materials manufacturers from access to the market and no customer from access to

the powder it desired to buy. The conduct in Paragraphs 40(b) and 40(c) has had no effect on

the number of materials suppliers, and indeed, the number of such suppliers has increased. There

is no evidence on the dimensions of the impact of the conduct alleged in Paragraph 40(d), and no

basis for concluding that it has contributed in any appreciable way to the impairment of

competition in any market. *See Stearns*, 170 F.3d at 525 ("Competition grounded in nonprice

considerations such as reliability, *maintenance support*, and general quality is competition on the

merits.") (emphasis added); *Microsoft*, 253 F.3d at 58 ("[T]o be condemned as exclusionary, a

monopolist's acts . . . must harm the competitive process and thereby harm consumers").

Although Count V contains an allegation that proclaims in a conclusory manner that EOS

has been excluded from that market, it offers no facts explaining how that exclusion was (or even

could be) due to the Valspar distribution agreement, the termination of the Vantico distribution agreement, the acquisition of RPC, or 3D Systems' warranty and repair policies. Because EOS cannot apparently even plead the mechanism by which it was injured, it is not surprising that it cannot marshal sufficient evidence to create a genuine issue for trial. *See Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 98 (3d Cir. 1976) (affirming summary judgment where plaintiffs failed to develop a theory or set forth facts showing a causal link between the defendant's alleged anticompetitive acts and plaintiff's injury). Nor has EOS put forth any evidence that suggests that any claimed loss it suffered reflects an actual anticompetitive effect on the relevant market, rather than a loss to a single competitor. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for the protection of *competition*, not *competitors*.") (emphasis in original; citation omitted).

Moreover, a key aspect of determining whether conduct is willful acquisition of monopoly power, as opposed to competition on the merits, is the inquiry into the business justifications for that conduct. "Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2." *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984); *see also T.O. Bell v. Dow Chem.*, 847 F.2d 1179, 1185 (5th Cir. 1988) (stating that if legitimate business reasons exist for a defendant's actions, then court can decide as a matter of law that no Section 2 violation occurred).[22] Conversely, if the alleged exclusionary conduct "has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Stearns*, 170 F.3d at 522.

---

[22] As the Fifth Circuit has noted: "It ought to be apparent that 'a monopolist's right to compete is not limited to actions undertaken with an altruistic purpose. Even monopolists must be allowed to do as well as they can with their business.'" *Bayou*, 725 F.2d at 304 (quoting *Northeastern Tel. Co., v. AT&T*, 651 F.2d 76, 93 (2d Cir. 1981)).

The "no rational business purpose" standard necessary to support a Section 2 exclusion claim is illustrated in *Aspen Skiing Co. v. Aspen Highlands*, 472 U.S. 585 (1985). The Fifth Circuit succinctly summarized the import of the case:

> [T]wo companies ran ski lifts on several different mountains in the same resort area. Traditionally the companies had honored ski passes that were good on all mountains. The larger company stopped honoring the joint passes, instead setting up tickets that only cover its mountains. This decision violated long-standing industry practice and "infuriated" the *larger* mountain's customers. The Supreme Court found that the defendant "was apparently willing to forgo daily ticket sales" to these customers "because it was more interested in reducing competition . . . by harming its smaller competitor" and that the logical inference was that the defendant "was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival."

> In short, *Aspen* involved a company willingly accepting a real loss because it represented a relative gain.

*Stearns*, 170 F.3d at 523-24 (emphasis in original). Here, there is no evidence of the type of predatory conduct found in *Aspen*. As discussed above, EOS cannot establish a Section 1 violation, and so its Section 2 claim also fails. *See Sicor Ltd v. Cetus Corp.*, 51 F.3d 848, 856 (1st Cir. 1995) (holding conduct deemed not to be anticompetitive under Section 1 must also fail under Section 2). Additionally, the record in this case fails to disclose anything other than rational business actions by 3D Systems.

Since June 2002, the distribution of Valspar powders alleged in Paragraph 40(a) has provided 3D Systems with sufficient supplies to compete with EOS and others in the market for the sale of nylon powder to laser sintering machine users and to develop specialized blends. That arrangement thus has had the potential to increase competition and, at worst, has been competition neutral. In either case, the Valspar distribution arrangement certainly cannot be said to have no rational business purpose other than to injure competition.

Nor can the acts alleged in Paragraphs 40(b) and 40(c) constitute acts of monopolization. After Vantico terminated 3D Systems' right to distribute Vantico's liquid stereolithography resins, 3D Systems acquired RPC to ensure that 3D Systems could continue to sell resins to stereolithography machine users. And, since Vantico's termination of its supply agreement and 3D Systems' acquisition of RPC, the market for the sale of stereolithograpy resins has seen increased competition, with new market entrants and considerable price declines.[23] (*E.g.,* Ex. 7.) Thus, EOS cannot demonstrate that 3D Systems' actions were competitively irrational or caused significant anticompetitive effect.

Finally, with respect to Paragraph 40(d), 3D Systems' policy of not providing free warranty service for any damage to its laser sintering machines that might be caused by powders supplied by EOS or any other material supplier is likewise rational. By providing warranty service to its equipment customers (*i.e.,* a benefit to consumers), 3D Systems is assuming the risk of frequency and cost of repairs. If repairs become too frequent and costly, 3D Systems stands to lose a considerable amount of profit. That in turn could lead to the end of free warranty service (*i.e.,* a loss to consumers). Moreover, if 3D Systems were to provide free warranty service regardless of whose product caused the malfunction, it would create freerider problems — competitors could manufacture inferior and incompatible products while benefiting from the warranty 3D Systems was financing. It is therefore rational for 3D Systems to protect against this unpredictable risk. *See generally* XI Areeda, *supra,* § 1813 (discussing the competitive benefits of similar service contracts).

---

[23] For these same reasons, EOS's claim under Section 7 of the Clayton Act fails. *See Fruehauf,* 603 F.2d at 352 (noting that vertical mergers typically do not substantially lessen competition and may increase competition).

At bottom, the only apparent limitation on EOS's entry into the United States RP&M market, apart from its own business decisions,[24] is 3D Systems' intellectual property rights. But as the Court has already recognized, the assertion of those intellectual property rights cannot form the basis of antitrust liability. *See* Jul. 2, 2003 Order at 13-15.[25]

## C.    WITHOUT A CONSPIRACY, EOS HAS NO SECTION 1 CLAIM.

In addition to the absence of antitrust injury, EOS's Section 1 claim fails because EOS cannot prove concerted activity by two or more separate entities. *See* 15 U.S.C. § 1; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (Section 1 liability requires a contract, combination or conspiracy between separate entities).[26] With the dismissal of the University of Texas, the only counterclaim defendants that remain are 3D Systems and its parent

---

[24] Despite its antitrust claims here, EOS has conceded that it made a business decision, quite apart from any alleged exclusionary conduct by 3D Systems, to focus on foreign markets and not even attempt to enter the United States market until mid-2001:

> Q:  And is the reason that EOS decided not to begin the process of qualifying EOSINT systems for shipment into the United States before the Summer of 2001, because no customers had requested it?

> A:  I think it's a question of engineering priorities. . . . And from a general point of view, the – I mean, you satisfy the requirements first you can first satisfy . . . . You understand? If I can sell five unmodified systems into Japan, why should I then do the work first to modify it?  So I first make my five sales to Japan, and then I go on. . . . So it just – it has a business – it's a question of business priorities.

(Ex. 22 [Langer Depo.] at 199:12-200:9; *see also id.* at 36:21-37:6 [EOS first formed an intention to enter North American market in Spring/Summer 2001]; *id.* at 193:9-197:13 [EOS first offered to sell laser sintering powder in the U.S. in July or August 2001 and was not prepared to sell laser sintering machines until July-December 2002]; Ex. 12 [Oberhofer Depo.] at 200:20-201:17 [EOS's delay in introducing laser sintering machines after powders was due to need to comply with U.S. safety standards].)

[25] Because an attempted monopolization claim also requires proof of predatory conduct with "no rational business purpose" and antitrust injury, EOS fares no better on that claim. *See Taylor Publishing Co. v. Jostens, Inc.*, 216 F.3d 465, 474-75 (5th Cir. 2000); *Sicor*, 51 F.3d at 855 n.11. Nor has EOS put forth facts demonstrating that any of the challenged conduct contributed appreciably to the achievement of a "dangerous probability" of achieving monopoly power in a properly established relevant market. *See Spectrum Sports*, 506 U.S. at 459. At bottom, all of the claims here involve commonplace transactions without any resulting diminution of competition amidst an expanding number of materials suppliers.

[26] It is not clear if EOS even has a Section 1 claim remaining after the Court's previous orders. *See* Oct. 17, 2003 Order at 4.

corporation, 3D Systems Corporation. Since, for the purposes of Section 1, a parent corporation cannot conspire with its wholly-owned subsidiary, summary judgment on EOS's Section 1 claim is appropriate. *See Copperweld*, 467 U.S. at 771-72.

Nor can EOS state a cognizable Section 1 claim based on 3D Systems' August 2001 merger with DTM Corporation. After the merger, DTM ceased to exist, and 3D Systems was the surviving corporation. Although 3D Systems and DTM were separate corporations before the merger, EOS has not, and cannot, claim antitrust injury simply from the merger itself. *See Brunswick*, 429 U.S. 477; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986); *Photoron*, 842 F.2d at 99.[27]

## IV.
## CONCLUSION

For the foregoing reasons, pursuant to Federal Rule of Civil Procedure 56, the Court should grant counterclaim defendants' motion for summary judgment.

---

[27] Apart from the relationships between 3D Systems and its parent, or 3D Systems and DTM, none of EOS's allegations are based on concerted activity between 3D Systems and any other third party that is required for a Section 1 claim:

    1. Paragraph 40(a) lacks evidence, or even an allegation, of a "conscious commitment" by 3D Systems and Valspar to "a common scheme designed to achieve an unlawful objective." *See Virgin Atlantic*, 257 F.2d at 263 (affirming summary judgment on Section 1 claim).

    2. Paragraph 40(b) only alleges that 3D Systems terminated an agreement, a unilateral act outside the scope of Section 1.

    3. Paragraph 40(c) does not allege that RPC was involved in any common scheme designed to achieve an unlawful objective, and thus any such claim may be dismissed on the same basis that this Court dismissed the original counterclaims against UT.

    4. Paragraph 40(d) is not based on concerted action; but instead challenges 3D Systems' conduct alone.

Dated:  December 31, 2003

Respectfully submitted,

*Philip E. Cook, by permission*

/ *EQBF*

PHILIP E. COOK
Admitted *pro hac vice*
ROBERT W. DICKERSON
Admitted *pro hac vice*
JONES DAY
555 West Fifth Street, Suite 4600
Los Angeles, CA  90013-1025
Telephone: (213) 489-3939
Facsimile:  (213) 243-2539

OF COUNSEL:

JOHN A. HERFORT
Admitted *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone: (212) 351-3832
Facsimile: (212) 351-5258

ALAN D ALBRIGHT
Federal Bar No. 13048
Texas State Bar No. 00973650
ELIZABETH J. BROWN FORE
Texas State Bar No. 24001795
GRAY, CARY, WARE & FREIDENRICH LLP
1221 South MoPac Expressway, Suite 400
Austin, TX 78746-6875
Telephone:  (512) 457-7000
Facsimile:  (512) 457-7001

Attorneys for Plaintiffs
BOARD OF REGENTS, THE
UNIVERSITY OF TEXAS SYSTEM,
and 3D SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served in the following manner to the following counsel of record on this 31st day of December, 2003.

Thomas H. Watkins                         *Via Certified Mail*
Albert A. Carrion, Jr.
HILGERS & WATKINS P.C.
98 San Jacinto Boulevard
San Jacinto Center, Suite 1300
Austin, Texas 78701
(512)476-4716
(512) 476-5139 Facsimile

Michael H. Baniak                          *Via Federal Express*
Michael D. Gannon
BANIAK PIKE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois 60606
(312) 673-0360
(312) 673-0361 Facsimile

Attorneys for Defendant
EOS GMBH ELECTRO OPTICAL SYSTEMS

ELIZABETH J. BROWN FORE