ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

Board of Regents, The University of Texas     §
System, and 3D Systems, Inc.,                 §
                                              §
                                              §
          Plaintiffs,                         §
                                              §
v.                                            §          Civil Action No. A03 CA 113SS
                                              §
EOS GmbH Electro Optical Systems,             §
                                              §
          Defendant.                          §
                                              §

**REPLY OF BOARD OF REGENTS, THE UNIVERSITY OF TEXAS
SYSTEM AND 3D SYSTEMS, INC. IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON
EOS'S THIRD AFFIRMATIVE DEFENSE OF EXPRESS LICENSE**

Plaintiffs Board of Regents, University of Texas ("UT") and 3D Systems, Inc. ("3D

Systems") hereby respectfully submit this Reply in response to the opposition of defendant EOS

GmbH Electro Optical Systems ("EOS") and in support of their Motion for Summary Judgment

on EOS's Third Affirmative Defense of Express License.

194

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................1

    1.   EOS's "This Has Already Been Decided " Diversion (pp. 6-7) ..................1

    2.   EOS's "The Settlement Agreement Has Different Language"
       Diversion (p. 13) ......................................................................................2

    3.   EOS's "We've Found A Different Dictionary Meaning"
       Diversion (p. 10) ......................................................................................2

    4.   EOS's "You Can't Rewrite the Agreement" Diversion (p. 10) ..................3

    5.   EOS's "There Are 3D Systems Cross-Licenses" Diversion (pp.
       8-9, 19-20) ...............................................................................................4

    6.   EOS's "Smoking Gun" Diversion (pp. 8-9) ...............................................4

    7.   EOS's "3D Systems Drafted the License Agreement"
       Diversion....................................................................................................5

    8.   EOS's "We're Licensed But We Didn't Have To Mark"
       Diversion (p. 21) ......................................................................................6

II.  ARGUMENT .........................................................................................................6

  A.   There Is No Genuine Issue of Material Fact as to Whether EOS Is
      Licensed to the UT Patents. .........................................................................6

    1.   EOS Cannot Avoid the Legal Meaning of "Issue To" In
       Deciding What the License Agreement Means. ..........................................7

       a.   Legal Authorities Are Not Parol Evidence. .....................................7

       b.   Legal Meaning Cannot Be Supplanted with Subjective
          Understanding. .................................................................................8

    2.   EOS's Proposed Interpretation Would Require the Court to
       Necessarily Alter the Language of the Contract. .......................................9

    3.   Plaintiffs' Interpretation of Section 1.1(b) Does Not Result in
       Any Absurdities. ......................................................................................10

       a.   Plaintiffs' Interpretation Does Not Yield Absurdities. ..................10

       b.   EOS's Interpretation Yields An Absurdity. ...................................12

**TABLE OF CONTENTS**
(continued)

Page

B.   Even If the Court Were to Consider Extrinsic Evidence of *Objective Manifestations of the Parties' Intent, the Well-Established Meaning of "Issue To" Is Consistent With Those Manifestations. ...........................................12

    1.   The Circumstances at the Time of Contracting Show Why EOS Obtained a License to Future Patents that "Issue To" 3D Systems. ........................................................................................................13

    2.   The Object, Nature and Subject Matter of the License Agreement Show Why EOS Obtained a License to Future Patents that Were to "Issue To" 3D Systems.............................................13

C.   EOS's Extrinsic Evidence Is Inadmissible to Prove that the UT Patents Somehow "Issued To" 3D Systems. ........................................................15

    1.   The Court Should Disregard EOS's Inadmissible Parol Evidence.........................................................................................................15

        a.   The Letter of Intent Is Inadmissible Parol Evidence. ...................15

        b.   Langer's Declaration Is Rife With Inadmissible Parol Evidence.......................................................................................16

    2.   Uncommunicated Subjective Intent is Irrelevant......................................16

III.   CONCLUSION.............................................................................................................16

TABLE OF AUTHORITIES

Page

**Cases**

*AIU Ins. Co. v. Sup. Ct.,*
51 Cal. 3d 807 (1990) ................................................................................ 6

*Alling v. Universal Manufacturing Corp.,*
5 Cal. App. 4th 1412 (1992) ..................................................................... 15

*Careau & Co. v. Security Pacific Business Credit, Inc.,*
222 Cal. App. 3d 1371 (1990) .................................................................. 10

*Crestview Cemetery Ass'n v. Dieden,*
54 Cal. 2d 744 (1960) ................................................................................ 6

*Estate of Klauenberg,*
32 Cal. App. 3d 1067 (1973) .................................................................... 16

*Hernandez v. Badger Constr. Equip. Co.,*
28 Cal. App. 4th 1791 (1994) ............................................................. 6, 12

*Hilleary v. Garvin,*
193 Cal. App. 3d 322 (1987) .................................................................... 16

*In re Cox' Estate,*
8 Cal. App. 3d 168 (1970) .......................................................................... 7

*Indenco, Inc. v. Evans,*
201 Cal. App. 2d 369 (1962) ...................................................................... 6

*Kennecott Corp. v. Union Oil Co.,*
196 Cal. App. 3d 1179 (1987) .................................................................... 6

*ML Direct, Inc. v. TIG Specialty Ins. Co.,*
79 Cal. App. 4th 137 (2000) ...................................................................... 3

*Morey v. Vannucci,*
64 Cal. App. 4th 904 (1998) ............................................................... 12, 15

*Nat'l Advanced Sys. v. United States,*
26 F.3d 1107 (Fed. Cir. 1994) ................................................................... 8

*Price v. Wells Fargo Bank,*
213 Cal. App. 3d 465 (1989) .................................................................... 15

*Sharlin v. Superior Ct.,*
9 Cal. App. 4th 162 (1992) ......................................................................... 7

**Statutes**

35 U.S.C. § 153 ......................................................................................... 3

TABLE OF AUTHORITIES
(continued)

Page

Cal. Civ. Code § 1635-1656 ............................................................................ 12

Cal. Civ. Code § 1645 ...................................................................................... 7

Cal. Civ. Code § 1654 ...................................................................................... 5

Cal. Civ. Proc. Code § 1856(a) ................................................................ 15, 16

Cal. Civ. Proc. Code § 1859 ........................................................................... 12

Cal. Civ. Proc. Code § 1860 ........................................................................... 12

Cal. Civ. Proc. Code § 1861 ........................................................................... 12

Cal. Civ. Proc. Code § 1864 ........................................................................... 12

**Other Authorities**

1 Witkin, SUMMARY OF CAL. LAW, "Contracts,"
    §§ 688-689 (9th ed. 1987) ......................................................................... 13

H. Prince, *Contract Interpretation in California*,
    31 LOY. L.A. L. REV. 557 (1998) ............................................................... 8

## I.    INTRODUCTION

EOS claims that under the "issue to" language in Section 1.1(b) of its 1997 License Agreement with 3D Systems, it obtained a license to the patents-in-suit, even though *there is no dispute that the patents-in-suit, as with all UT Patents:  (i) issued to and are owned by UT; and (ii) were licensed exclusively to 3D Systems in August 2001.*  EOS's burden to prove it has been licensed to any UT Patent is daunting, particularly because it concedes (as it must) that the term "issued to" when used in the patent law context means the initial creation of patent rights by the U.S. Patent and Trademark Office (or the equivalent foreign agency).

EOS instead opposes the instant motion with a smoke screen of irrelevant issues, blown about by a whirlwind of inadmissible extrinsic evidence, which appear designed merely to divert attention and avoid the inescapable conclusion that there is no genuine issue of fact on the relevant questions before the Court.  Before turning to those relevant questions, several of EOS's diversions are blown aside first to clear the air:

### 1.    *EOS's "This Has Already Been Decided " Diversion (pp. 6-7)*

EOS attempts to avoid a summary judgment decision by this Court by suggesting that proceedings that have taken place in California should dictate the outcome.  This position is both (i) contrary to EOS's representations to this Court when it attempted to keep Counts IV of its counterclaims in play here after they had been dismissed twice in California;[1] and (ii) fails to disclose that EOS made the same "this has already been decided" arguments to the California court.  That court — knowing the procedural history of the case — rejected EOS's claim and

---

[1]  EOS's Opposition does not attempt to address its prior representations to this Court, in its opposition to Plaintiffs' Motion to Sever and Transfer, that its affirmative defense of express license in the California and Texas cases "are only applicable to the claims in each case." (Ex. 11 at 6.)  Explaining that difference, EOS previously distinguished what it now attempts to blur, stating that "in the California action, EOS asserts that it is licensed under the *DTM* patent being asserted by 3D.  In this case, . . . EOS asserts that it is licensed under the two *UT patents-*

decided the merits of the motion anyway (finding in an August 2003 decision that there was a triable issue of fact on the defense as EOS asserted it in California).[2]  And EOS fails to tell this Court that following a decision relating to the patent EOS claims it is licensed to by the California court, the issue will never be tried.

2.    *EOS's "The Settlement Agreement Has Different Language" Diversion (p. 13)*

Perhaps EOS's most misleading diversion is its argument that the Court should interpret the License Agreement based on different language that appears in a companion Settlement Agreement.  Relying on California Civil Code section 1642, which permits contracts "made as parts of substantially one transaction" to be taken together when determining their meaning, EOS claims that language in the Settlement Agreement shows that the parties meant "issue to" to include "held by."  (Opposition at 12-13.)  But the last sentence of Article 5 of the Settlement Agreement — a key provision that EOS conspicuously leaves out of its quote — states,

> Any inconsistency between this Art. 5 and the terms of the License Agreement *shall be resolved in favor of the License Agreement.*

(Ex. 7 [Settlement Agreement], Art. 5; emphasis added.)  What EOS thought it could accomplish through this ruse is unclear, but the Settlement Agreement plainly (i) contemplates the potential for an inconsistency between the two agreements, and (ii) resolves it in favor of the License Agreement.

3.    *EOS's "We've Found A Different Dictionary Meaning" Diversion (p. 10)*

To avoid the legal meaning of the term "issue to" in the patent law context, EOS seizes on a broad, dictionary definition of "issue."  (Opposition at 10.)  But the dictionary does not

---

(continued...)

*in-suit*."  (*Id.*; emphasis in original.)  Apparently for EOS, the facts change to suit the argument-of-the-day.

[2]  This diversion is even more specious when it is understood that EOS knows the initial summary judgment and preliminary injunction motions were all denied by the California court solely for reasons of procedure and timing.

purport to describe the meaning of "issue" in the patent context, and its meaning in that context has already been conceded by EOS:

> MR. BANIAK:  All the patents have to *issue* from a patent office.[3]

EOS's argument that a broader definition of "issue" should apply, despite the fact that the definition is wholly out of place in the patent context, should be rejected.

### 4.    *EOS's "You Can't Rewrite the Agreement" Diversion (p. 10)*

EOS argues that Plaintiffs' interpretation of Section 1.1(b) would require the Court to construe "issue to" to mean "issue <u>directly from the U.S. Patent and Trademark Office</u> to LICENSOR [3D Systems]," and thus would impermissibly add new words to the License Agreement.  (Opposition at 10.)  However, the term "issue to" in the patent context already refers to a specific function that can be performed only by the PTO (or comparable foreign agency).  *See, e.g.,* 35 U.S.C. § 153 (describing how the PTO issues patents).  Thus, "issue <u>[directly from the PTO]</u> to" 3D Systems is already implicit in the words "issue to," and adding these words would be mere surplusage.  The interpretation EOS advances would require the Court to rewrite and alter significantly the words that appear there —changing "issue to" into "issue to, <u>owned by, controlled, or held by.</u>"  This modification bears little resemblance to the words the parties used to make their agreement, and EOS's proposed change would run afoul of the principles applied in EOS's own authorities.[4]

---

[3]  Ex. 15 [Langer Depo.] at 93:24-94:1 (emphasis added).  *See also* Ex. 18 [EOS Brief] at 5:10-11 ("[T]here is no magic to the use of the 'issue to' language, beyond the obvious meaning that *all patents must issue to begin life.*").

[4]  *E.g., ML Direct, Inc. v. TIG Specialty Ins. Co.,* 79 Cal. App. 4th 137, 142 (2000) ("[Courts] do not have the power to create for the parties a contract which they did not make and cannot insert language which one party now wishes were there[.]") (quoted by EOS in its Opposition, p. 10).

**5.     EOS's "There Are 3D Systems Cross-Licenses" Diversion (pp. 8-9, 19-20)**

EOS goes far afield in attempting to compare 3D Systems' cross-licenses with Japanese

companies Sony and NTT Data / NTT Data CMET ("CMET") to create doubt about what "issue

to" means in the License Agreement. (*See* EOS Exs. 10, 15.) Those cross-licenses, by the

express definitions they contain, cover broad categories of patents, such as those "owned or

controlled" exclusively by the parties (defining "Patents").[5] That language contrasts sharply

with patents that "issue to" 3D Systems in the agreement before the Court. If anything, these

cross-licenses show only that 3D Systems knew how to draft a license grant broader than the one

that appears in the License Agreement when it wanted to.[6]

**6.     EOS's "Smoking Gun" Diversion (pp. 8-9)**

EOS claims to have found the "smoking gun," citing to a November 3, 1999 letter from

3D Systems to Asahi Tec ("Asahi"), a customer of 3D Systems who had apparently expressed

some concerns about CMET's patent rights.[7] 3D Systems' letter "confirmed" *certain* aspects of

3D Systems' cross-license with CMET, assuring Asahi that it should not be concerned about the

risk of a CMET infringement suit against it because 3D Systems was licensed to any patent that

"issued to" CMET. (EOS Ex. 11.) From this, EOS argues that because the CMET cross-license

extends to patents "owned or controlled by" CMET, 3D Systems used the terms "issued to" and

---

[5] Cross-licenses generally have broader license grants, where both sides share in the benefits. In a one-way grant (like the License Agreement), every aspect of the license grant increases the relative cost to the grantor.

[6] EOS's claim that these are "contemporaneous contracts" (Opposition at 20) to possibly bolster their import as documents that should be used to help interpret the License Agreement is completely off the mark. The cross-licenses were entered into with different parties, between 8 and 16 months after the License Agreement was executed, covered under Japanese law (with respect to the CMET cross-license), with Japanese companies (and not a German company), for cross-licenses (and not a one-way license grant), with royalties running to 3D Systems (even absent a sublicense, litigation recovery, or otherwise), in the field of stereolithography (and not laser sintering).

[7] The record is silent as to what Asahi's concerns were, or what it had asked 3D Systems to address, despite significant attempts to locate that inquiry.

"owned by, controlled, or held by" interchangeably. This EOS diversion is misguided for at least two reasons. First, there is no evidence that the assurance given to Asahi was intended to summarize the terms, or even the scope, of the CMET cross-license. To the contrary, the letter stressed the confidential nature of the CMET cross-license. (*See* EOS Ex. 10, § 1 at p.10 (confidentiality provision).) Thus, far from describing the terms or scope of the CMET cross-license, the letter simply provided Asahi with the assurance it apparently asked for, and nothing more. Second, the letter expressly states that the scope of 3D Systems' rights under the CMET cross-license are broader than the "issued to" assurances given to Asahi: "[3D Systems has a] non-exclusive license under *all* of [CMET's] patents to produce and sell stereolithography systems throughout the world." (EOS Ex. 11.) Not surprisingly, EOS ignores this language in constructing its diversion, focusing only on the words "issue to" in the letter to construct its "interchangeable vocabulary" argument. If nothing else, the letter's juxtaposition of "all patents" to describe 3D Systems' rights, and patents "issued to" to provide the assurance apparently sought by Asahi, exposes EOS's chicanery.

### 7.    EOS's "3D Systems Drafted the License Agreement" Diversion

Sprinkled throughout its opposition is EOS's suggestion that the License Agreement be viewed through EOS's eyes because 3D Systems' Mr. Alpert drafted it. Apart from failing to establish that foundational fact (apart from Alpert's testimony specifically commenting on his role in drafting language in Section 1.1), EOS's reliance on any rule of contract interpretation that requires the License Agreement be construed against 3D Systems is misplaced. First, the rule is applied *only* as a rule of last resort, when other canons of contract interpretation fail to resolve an ambiguity. Cal. Civ. Code § 1654. Here, there is no ambiguity. Second, the rule does *not* apply where two sophisticated parties, like those here who were both represented by

counsel, engage in arms-length negotiations. *AIU Ins. Co. v. Sup. Ct.*, 51 Cal. 3d 807, 823 (1990); *Indenco, Inc. v. Evans*, 201 Cal. App. 2d 369, 375 (1962).

### 8.    *EOS's "We're Licensed But We Didn't Have To Mark" Diversion (p. 21)*

EOS's conduct after the 1997 License Agreement was signed shows EOS's true understanding: specifically, that EOS's license does not include the UT Patents. Of course, "[t]he conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the *most reliable evidence* of the parties' intentions."[8] EOS dismisses this important issue by contending its non-marking conduct is only a red herring. (Opposition at 21.) EOS explains that (i) it does not mark because the patents-in-suit do not cover its machines (based on its *Markman* arguments, which the Court has rejected); but (ii) if EOS is wrong and the patents-in-suit do cover its machines, EOS is licensed. If a party were truly licensed, any question relating to a party's rights would be resolved by adding patent numbers to a marking plate, especially considering the consequences of other alternatives, such as breaching a license provision requiring marking.

## II.    ARGUMENT

### A.    There Is No Genuine Issue of Material Fact as to Whether EOS Is Licensed to the UT Patents.

EOS does not, and apparently cannot, challenge the heart of Plaintiffs' motion. EOS does not dispute that, under California law, the language of a written contract governs its interpretation if that language is clear and explicit, and does not involve an absurdity. Nor does EOS dispute that the intention of the contracting parties must be gathered from the four corners of the contract where possible, or that the term "issue to" has been used consistently in statutes,

---

[8] *Hernandez v. Badger Constr. Equip. Co.*, 28 Cal. App. 4th 1791, 1814 (1994) (citing *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 (1987)) (emphasis added); *see also Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 753-754 (1960) ("[t]he acts of the

regulations, and cases over the past 200 years to refer to the initial creation of patent rights by the

U.S. Patent and Trademark Office ("PTO") in granting a patent application. With this tableau,

EOS's attempts to avoid the legal meaning of the words the parties used in Section 1.1(b) to

make their agreement are unavailing.

1.    **EOS Cannot Avoid the Legal Meaning of "Issue To" In Deciding What the License Agreement Means.**

Although EOS does not contest the legal meaning of "issue to" (nor can it), EOS

contends instead that U.S. Patent laws — statutes, cases, and regulations using the term "issue

to" — are irrelevant here. (Opposition at 18.) It is difficult to imagine what could be *more*

relevant. Under California law, technical terms such as "issue to" when used in a patent license

must be interpreted as usually understood by persons knowledgeable in the field of patents. *See*

Cal. Civ. Code § 1645; *see also Sharlin v. Superior Ct.*, 9 Cal. App. 4th 162, 168 (1992) (legal

terms are presumed to be used in their legal sense); *In re Cox' Estate*, 8 Cal. App. 3d 168, 191

(1970) (where an instrument is drafted by a competent lawyer, it is presumed that legal terms

embodied in the instrument are used in their legal sense). Because the parties made their ***patent***

***license*** agreement with words that for more than 200 years have had a precise legal meaning in

the patent context, that meaning must govern unless it involves an absurdity.

a.    ***Legal Authorities Are Not Parol Evidence.***

EOS seeks to avoid this governing rule of construction by contending that Plaintiffs'

citation to legal authorities in its motion is "'extrinsic' to the License Agreement," and thus

Plaintiffs should have no objection to EOS's mound of extrinsic evidence. (Opposition at 18.)

EOS's objection to the statutes, regulations, patent office practice manuals, and case law

interpreting license agreement language on the grounds that they constitute extrinsic evidence is

---

(continued...)

parties under the contract afford one of the *most reliable means* of arriving at their intention")

rooted in its observation that Congress was not a party to the License Agreement, did not draft it, and 3D Systems has not submitted any evidence of legislative intent. (*Id.*) EOS misses the point entirely. The historical uniformity of the use of the word "issue" in U.S. Patent law was already well-established when the parties sat down at the bargaining table and used the words "issue to" to make their patent license agreement. These legal authorities plainly are not extrinsic evidence. *See Nat'l Advanced Sys. v. United States*, 26 F.3d 1107, 1111 (Fed. Cir. 1994) ("Neither the statute *nor* the extrinsic evidence produced at trial indicates that Congress intended to limit the scope of the statutory term[.]").

      b.    ***Legal Meaning Cannot Be Supplanted with Subjective Understanding.***

EOS also claims that the uniform use of "issue to" in U.S. Patent law cannot be relevant because it is not the same as the "*ordinary German citizen's interpretation of 'issue to'*" (which presumably EOS's witnesses who purport to interpret the License Agreement represent). (Opposition at 18, n.11.) However, this not only begs the question of which party's subjective, after-the-fact "understanding" the Court should credit, it also ignores that the License Agreement itself forecloses such an inquiry. Because the License Agreement is governed by California law, it is irrelevant what the ordinary German citizen (or any other individual) thinks the words in the agreement mean. Under the circumstances, this is far from harsh.[9] EOS was represented during

---

(continued...)
(emphasis added).

    [9] This is not to suggest, however, that fairness or equity is one of the factors that the Court properly considers in deciding what a written, integrated contract means. EOS's desperate attempt to avoid the express language of its agreement is manifest in its request that the Court take into account principles of equity in deciding this motion. (Opposition at 5.) However, the only authority EOS cites for that proposition recognizes that ***California law*** does not permit consideration of such principles. H. Prince, *Contract Interpretation in California*, 31 LOY. L.A. L. REV. 557, 569, 620 (1998) ("the California Supreme Court continues to state, relying on the California Civil Code, that contractual language that is clear and explicit must govern the interpretation of the contract.")

the License Agreement negotiations by Uwe Steininger, an attorney from the international law firm of Baker & McKenzie. (EOS Ex. 14 [Steininger Decl.], ¶ 2.)[10]

## 2. EOS's Proposed Interpretation Would Require the Court to Necessarily Alter the Language of the Contract.

EOS tries to minimize the significance of the phrase "issue to LICENSOR [3D Systems]" by arguing that it "merely serves to identify 3D as the grantor of the license." (Opposition at 18-20.) EOS argues that, because the License Agreement was a one-way license of patents by 3D Systems (unlike the cross-licenses it has submitted), the "issue to Licensor [3D Systems]" language was essential to make clear that 3D Systems was not granting a license to patents "regardless of who owned them (i.e., 3D, IBM, etc.)." (Opposition at 20.) Thus, according to EOS, the "issue to Licensor [3D Systems]" provision served a very limited purpose, and should be construed to mean "owned, controlled, or held by 3D [Systems]." (Opposition at 19-20.)

This argument is nonsensical: Why would the parties need to identify whose patents were being licensed, if "IBM, etc." were not parties to the agreement? Or, why would the parties use "issued to LICENSOR [3D Systems]" if they had actually meant for the license to extend to patents "owned, controlled, or held by 3D [Systems]"? Simply put, if the parties had intended for EOS to receive a broader license, they would have used language saying so and could have done so quite easily without creating any confusion about who was granting the license.[11] In fact, for the Existing Patents, the License Agreement states that EOS has a license to all patents

---

[10] *See also* Ex. 15 [Langer Depo.] at 109:1-110:9 (regarding revisions to Article 5 of the Settlement Agreement, "I would not be surprised if this was from Steininger's office"); *id.* at 112:19-114:14, 117:7-118:19 (Langer was involved in negotiating language of the License Agreement).

[11] EOS's mistaken reliance on one of the California court's preliminary orders denying on procedural grounds a summary judgment motion (Opposition at 19 & EOS Ex. 5), in an attempt to prove its point is disingenuous at best. As EOS's counsel conceded on the record at the hearing on that motion, the California court simply decided that there were grounds, based on the record at that time, to permit EOS to take further discovery pursuant to Federal Rule of Civil Procedure 56(f).

"owned by LICENSOR [3D Systems]." This argument is merely another attempt by EOS to

circumvent the significance of the word "issue" and its use in Section 1.1(b).

> 3.    **Plaintiffs' Interpretation of Section 1.1(b) Does Not Result in Any Absurdities.**
>
>   a.    *Plaintiffs' Interpretation Does Not Yield Absurdities.*

Stuck with the legal meaning of "issue to," EOS urges the Court to ignore that meaning

because it would lead to "absurd results." (Opposition at 11-12.) EOS articulates two theoretical

possibilities it claims "def[y] logic," and would lead to "abhorrent results" and "bizarre and

unintended" consequences. (Opposition at 11.) Neither possibility EOS imagines, however,

withstands scrutiny:

> **IMAGINED ABSURDITY NO. 1:**  3D Systems could avoid
> licensing patents stemming from its ongoing research and
> development activities simply by not recording invention
> assignment documents with the PTO, or by setting up a wholly-
> owned subsidiary in whose name patents could be issued.
> (Opposition at 12.)

If intentional, such hypothetical subterfuges would plainly have violated the covenant of

good faith and fair dealing implied in the License Agreement under California law,[12] and would

be remedied like any other breach of the agreement. The imagined threat that EOS could lose

the benefit of its bargain in this way ignores EOS's legal rights under California law.

Moreover, EOS's parade of horribles — particularly in light of the time that has passed

since the License Agreement was entered into — simply cannot be reconciled with the

undisputed facts. 3D Systems obtained nearly 50 additional Stereolithography Patents during the

five years after the License Agreement was executed and during which EOS was entitled to a

---

[12] *See Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371,
1394-95 (1990) (the implied covenant of good faith and fair dealing is breached by "a failure or
refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad
judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the

license to patents "issued to" 3D Systems, including several that EOS has asserted in the

California patent litigation. (Ex. 20 [D'Alessandro Decl.], ¶¶ 3-6.) EOS has presented no

evidence, and there is none, showing that 3D Systems ever created a wholly owned subsidiary or

failed to record invention assignment documents to avoid its contractual obligations to EOS

under the License Agreement. Apart from EOS's hypothetical musings, there is no absurdity in

limiting the scope of EOS's license to Future Patents that "issue to" 3D Systems.

> **IMAGINED ABSURDITY NO. 2:** 3D Systems could
> conceivably have sued EOS for infringing a patent that 3D
> Systems acquired from a third party immediately after the signing
> of the License Agreement. (Opposition at 11.)

EOS again imagines a scenario that could potentially violate the implied covenant of

good faith and fair dealing, if not an express term of the parties' Non-Competition Agreement

entered into at the same time as the License Agreement. (Ex. 8.) Moreover, assuming as EOS's

hypothetical does, that a third party has patent rights that could be enforced against EOS, why

would EOS's license with 3D Systems give rise to a reasonable expectation (apart from any

express contract provision like the Non-Competition Agreement giving EOS exclusive rights to

laser sintering for a limited time) that EOS would not be liable for infringing those patents? And

absent some other restriction (like the Non-Competition Agreement), why would it matter

whether infringement claims were brought by the third party or, if acquired by 3D Systems, by

3D Systems? The bargain EOS struck with 3D Systems in the License Agreement cannot

reasonably be construed as buying EOS peace with every other intellectual property owner in the

world, and there is nothing absurd about EOS's hypothetical possibility.

---

(continued...)

agreed common purposes and disappoints the reasonable expectations of the other party thereby
depriving that party of the benefits of the agreement").

b.    *EOS's Interpretation Yields An Absurdity.*

The absurdity posed by EOS's interpretation is its insistence that its license under the

"issue to" language includes the UT Patents.  (Langer Decl., ¶ 36.)  EOS's position that it is

licensed to the UT patents under the "issue to" language in the License Agreement is

extraordinary:  3D Systems *does not own* the UT patents.  As an exclusive licensee, 3D Systems

pays to UT a royalty on all laser sintering systems it sells.  If EOS has a license to the UT Patents

as it claims and its activities in the United States are covered by those patents, 3D Systems would

owe UT a royalty on *EOS's sales* of its laser sintering systems — without a corresponding right

to collect those royalties from EOS (because EOS's license is "paid up" under Section 2.1 of the

License Agreement).  That absurdity can only be avoided by finding that "issue to" has the same

meaning it uniformly has in the patent context, and that EOS is not licensed to the UT Patents.

**B.    Even If the Court Were to Consider Extrinsic Evidence of *Objective*
Manifestations of the Parties' Intent, the Well-Established Meaning of "Issue
To" Is Consistent With Those Manifestations.**

Although it is not necessary for the Court to look beyond the four corners of the License

Agreement, the Court may also consider other "*objective* manifestations of the parties' intent,

including . . . extrinsic evidence of such *objective* matters as [i] the surrounding circumstances

under which the parties negotiated or entered into the contract; [ii] the object, nature and subject

matter of the contract; and [iii] the subsequent conduct of the parties."[13]  Even were the Court to

do so, however, the result is the same.

Most of EOS's "evidence" consists solely of EOS's *subjective* hopes and desires during

its negotiations with 3D Systems, which is not admissible for any purpose in deciding what the

License Agreement means.  Focusing instead on *objective* matters, the parties' choice of words,

---

[13]  *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) (citing Cal. Civ. Code, §§ 1635-
1656; Cal. Civ. Proc. Code, §§ 1859-1861, 1864; *Hernandez v. Badger Constr. Equip. Co.*, 28

including the "issue to" language, establishes that neither party could reasonably have believed

that EOS's license to Future Patents would include anything more that those that "issued to" 3D

Systems.

### 1. The Circumstances at the Time of Contracting Show Why EOS Obtained a License to Future Patents that "Issue To" 3D Systems.

EOS admits that at the time the parties entered into the License Agreement, 3D Systems'

only business and then present interest was stereolithography (Langer Decl., ¶ 9), and that the

development of 3D Systems' patent portfolio was limited to that technology. (Ex. 6 [Alpert

Decl.], ¶ 2.) Thus, EOS's claim that it thought it was getting anything more than 3D Systems'

stereolithography patent portfolio and its continued innovation in that field, and then only for a

limited period, is belied by the circumstances at the time of contracting.

### 2. The Object, Nature and Subject Matter of the License Agreement Show Why EOS Obtained a License to Future Patents that Were to "Issue To" 3D Systems.

EOS got the benefit of its bargain from its license to the Stereolithography Patents. First,

EOS obtained continuous access to the fruits of 3D Systems' research and development in the

stereolithography field and freedom to practice those inventions in the laser sintering field.[14]

Between August 27, 1997 and August 20, 2002, the PTO issued to 3D Systems a total of 47

Stereolithography Patents, four of which EOS has sued on. (Ex. 20 [D'Alessandro Decl.], ¶ 5.)

Thus, the "issue to" language in Section 1.1(b) delivered to EOS all of the additional research

---

(continued...)

Cal. App. 4th 1791, 1814 (1994); 1 Witkin, SUMMARY OF CAL. LAW, "Contracts," §§ 688-689 at 621-623 (9th ed. 1987)) (emphasis added).

[14] Fundamentally, a patentee has the right to exclude others from making, selling or using the claimed invention. Without the grant of Future Patents to EOS in the License Agreement, 3D Systems' patents that applied to laser sintering could have issued to 3D Systems after the License Agreement was signed and "blocked" EOS from making, selling, or using claimed inventions it already had a license to. By providing a license to EOS for patents that "issued to" 3D Systems, EOS protected its reasonable expectation that it would continue to be

and development conducted by 3D Systems employees that ripened into patent rights "to the extent, and only to the extent," those patents apply to the "field of Laser Sintering." (Ex. 9 [License Agreement], § 1.1.)

Second, EOS claims one of its primary purposes for obtaining the license to 3D Systems' Stereolithography Patents was to accuse DTM of infringing certain of the licensed patents in order to pressure DTM into a business relationship. (Langer Decl., ¶ 8.) Of course, the notion that EOS sought a license to the Stereolithography Patents simply to pursue DTM ignores that EOS was on the verge of being forced out of its stereolithography business (and perhaps business altogether) due to its infringement of the Stereolithography Patents. (Ex. 7 [Settlement Agreement] (admitting validity and infringement).) EOS needed to settle with 3D Systems, and it got what it wanted — settlement of the existing litigation with 3D Systems and assurance that 3D Systems would not later assert its Stereolithography Patents against EOS's remaining laser sintering product line. Moreover, EOS was apparently unable to reach acceptable terms for a suitable business relationship with DTM during the 3-year period 3D Systems had agreed not to, and in fact did not, engage in the laser sintering business. (Ex. 8 [Non-Competition Agreement].) EOS's failure to achieve some resolution to its differences with DTM does not mean, however, that the purpose of the License Agreement was not achieved. It plainly was, and the Court does not need to change the "issue to" language of the agreement and provide to EOS for free (*i.e.*, the UT Patents) what EOS had the opportunity to obtain but was apparently unwilling or unable to pay enough for (*i.e.*, a merger or acquisition with DTM). (*Compare* Ex. 20 [D'Alessandro Decl.], ¶ 7 (3D Systems paid over $46 million to acquire DTM).)

_____

(continued...)
free to make, sell, or use in the field of laser sintering those patents it had licensed from 3D Systems. (Langer Decl., ¶ 24.)

**C.    EOS's Extrinsic Evidence Is Inadmissible to Prove that the UT Patents Somehow "Issued To" 3D Systems.**

EOS's submission of self-serving testimony and negotiation history is not admissible to transmogrify the term "issue to" to mean "owned by, controlled, or held by," which would result in a license to EOS for the UT Patents.

### 1.    The Court Should Disregard EOS's Inadmissible Parol Evidence.

Under California law, the parol evidence rule is a rule of substantive law that "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument intended by the parties thereto as the final expression of their agreement."[15] The License Agreement contains a "merger" clause and is an integrated written agreement. (Ex. 9 [License Agreement], § 8.2.) That clause provides that the License Agreement "embodies the entire understanding of the Parties and shall supersede all previous communications, representations or undertakings, either verbal or written between the Parties . . . ." (*Id.*) Thus, evidence that contradicts the express provisions of the License Agreement is not admissible. *See* Cal. Civ. Proc. Code § 1856(a).

#### a.    *The Letter of Intent Is Inadmissible Parol Evidence.*

Despite EOS's heavy reliance on the August 6, 1997 Letter of Intent, it does not qualify as a contract made as part of the same transaction under Civil Code section 1642. (Opposition at 13.) In addition to misstating the law, EOS's reliance on the Letter of Intent is undermined by the terms of the letter itself: "This letter shall not constitute an agreement and is not binding upon the signatures [sic] hereto." (Langer Decl., Ex. P, ¶ 7.) The letter is inadmissible parol evidence introduced to vary, alter or contradict the terms of the integrated License Agreement.

---

[15] *Morey v. Vannucci*, 64 Cal. App. 4th 904, 913 n. 4 (1998) (citing Cal. Civ. Proc. Code § 1856(a); *Alling v. Universal Manufacturing Corp.*, 5 Cal. App. 4th 1412, 1433-1434 (1992); *Price v. Wells Fargo Bank*, 213 Cal. App. 3d 465, 486 (1989).

b.    ***Langer's Declaration Is Rife With Inadmissible Parol Evidence.***

Hans Langer's Declaration proffers significant parol evidence that is at odds with, and directly contradicts the terms of, the integrated License Agreement. The declaration is strewn with recitations of Langer's subjective hopes and desires during the negotiations between 3D Systems and EOS leading up to the License Agreement, a one-sided description of those negotiations, unexecuted drafts of agreements, and other supposed agreements between the parties. This parol evidence is inadmissible for the purpose offered.

**2.    Uncommunicated Subjective Intent is Irrelevant.**

EOS has opposed the instant motion with a torrent of extrinsic evidence purporting to show that, despite the actual language used, EOS intended for the License Agreement to extend to patents that did not issue to 3D Systems. The Court should reject as inadmissible any evidence of a party's uncommunicated, subjective intent.

> [U]ncommunicated subjective intent is not relevant. The existence of mutual assent is determined by objective criteria. The test is whether a reasonable person would, from the conduct of the parties, conclude that there was mutual agreement.

*Hilleary v. Garvin*, 193 Cal. App. 3d 322, 327 (1987) (citations omitted); *see also Estate of Klauenberg*, 32 Cal. App. 3d 1067, 1068 (1973). For instance, Langer's Declaration seeks to introduce, *inter alia,* the factors that EOS considered during negotiations, Langer's and Shellabear's understanding of License Agreement terms, the rights that EOS hoped to receive under the License Agreement, and EOS's views on how the various agreements interrelated. (*See, e.g.,* Langer Decl., ¶¶ 11, 23, 27-30, 34-36, 44.) All of this evidence is irrelevant.

## III.    CONCLUSION

For the reasons set forth above and in the moving papers, Plaintiffs ask the Court to find that under Section 1.1(b) of the License Agreement, EOS's license to 3D Systems' Future

Patents does not include the UT Patents, and EOS's third affirmative defense fails as a matter of law.

Dated: February 4, 2004

*Philip E. Cook, by permission*

PHILIP E. COOK (admitted *pro hac vice*)
Calif. State Bar No. 149067
ROBERT W. DICKERSON (admitted *pro hac vice*)
Calif. State Bar No. 89367
JONES DAY
555 West Fifth Street, Suite 4600
Los Angeles, CA 90013-1025
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

ALAN D ALBRIGHT
Federal Bar No. 13048
Texas State Bar No. 00973650
ELIZABETH J. BROWN FORE
Texas State Bar No. 24001795
GRAY, CARY, WARE & FREIDENRICH LLP
1221 South MoPac Expressway, Suite 400
Austin, TX 78746-6875
Telephone: (512) 457-7000
Facsimile: (512) 457-7001

Attorneys for Plaintiffs
BOARD OF REGENTS, THE
UNIVERSITY OF TEXAS SYSTEM,
and 3D SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served in the following manner to the following counsel of record on this 4th day of February, 2004.

Thomas H. Watkins                    *Via Certified Mail*
Albert A. Carrion, Jr.
HILGERS & WATKINS P.C.
98 San Jacinto Boulevard
San Jacinto Center, Suite 1300
Austin, Texas 78701
(512)476-4716
(512) 476-5139 Facsimile

Michael H. Baniak                    *Via Federal Express*
Michael D. Gannon
BANIAK PIKE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois 60606
(312) 673-0360
(312) 673-0361 Facsimile

Attorneys for Defendant
EOS GMBH ELECTRO OPTICAL SYSTEMS

ELIZABETH J. BROWN FORE